# EXHIBIT A

PERLMAN-DEPETRIS CONSUMER LAW
Paul DePetris
Attorney ID No. 005821996
Email: info@newjerseylemons.com
Lee M. Perlman
Attorney ID No. 019171994
Email: lperlman@newjerseylemons.com
1926 Greentree Road, Suite 100
Cherry Hill, New Jersey 08003
(856) 751-4224
Co-counsel for Plaintiff
LAW OFFICES OF LEWIS G. ADLER
Attorney ID No. 023211985
Email: lewisadler@verizon.net
26 Newton Avenue
Woodbury, New Jersey 08096
(856) 845-1968
Co-Counsel for Plaintiff

**DULY SERVED**
DATE 5-20-21
John A. Kemler, Sheriff
BY R. Samousk,
Special Deputy

| | |
|---|---|
| *Plaintiffs* | : SUPERIOR COURT OF NEW JERSEY |
| | : MIDDLESEX COUNTY |
| Jerry Scattaglia, individually and on behalf of others similarly situated | : LAW DIVISION |
| | : |
| | : |
| *vs.* | : |
| | : Docket No. L-2759-21 |
| *Defendant* | : Civil Action |
| | : |
| | : |
| | : |
| Mercedes-Benz USA, LLC and John Does 1-10 | : |
| | : |
| | : ***SUMMONS*** |

*From The State of New Jersey To The Defendant(s) Named Above:* Mercedes-Benz USA, LLC

     The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for the lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (The address of each deputy clerk of the Superior Court is provided.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the [Clerk of the Superior Court]

<u>Treasurer, State of New Jersey</u> and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed.   You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above.   A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit.   If judgment is entered against you, the Sheriff may seize your money, wages or property all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live.   A list of these offices is provided.   If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services.   A list of these numbers is also provided.

Dated: _5/10/21_

/s/ Michelle M. Smith
CLERK, SUPERIOR COURT OF NEW JERSEY

*Name of defendant to be served:*
*Address for Service:*

*Mercedes-Benz USA, LLC*
*c/o C T Corporation System*
820 Bear Tavern Road
West Trenton, New Jersey 08628

# Civil Case Information Statement

**Case Details: MIDDLESEX | Civil Part Docket# L-002759-21**

| | |
|---|---|
| **Case Caption:** SCATTAGLIA JOHN  VS MERCEDES-BENZ USA LL C | **Case Type:** COMPLEX COMMERCIAL |
| **Case Initiation Date:** 05/07/2021 | **Document Type:** Complaint with Jury Demand |
| **Attorney Name:** LEWIS G ADLER | **Jury Demand:** YES - 6 JURORS |
| **Firm Name:** LEWIS G. ADLER | **Is this a professional malpractice case?** NO |
| **Address:** 26 NEWTON AVENUE | **Related cases pending:** NO |
| WOODBURY NJ 08096 | **If yes, list docket numbers:** |
| **Phone:** 8568451968 | **Do you anticipate adding any parties (arising out of same** |
| **Name of Party:** PLAINTIFF : Scattaglia, John | **transaction or occurrence)?** NO |
| **Name of Defendant's Primary Insurance Company** | |
| (if known): Unknown | **Are sexual abuse claims alleged by:** John Scattaglia? NO |

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
#### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

Do parties have a current, past, or recurrent relationship? NO

If yes, is that relationship:

Does the statute governing this case provide for payment of fees by the losing party? NO

Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:


Do you or your client need any disability accommodations? NO
     If yes, please identify the requested accommodation:


Will an interpreter be needed? NO
     If yes, for what language:


Please check off each applicable category: Putative Class Action? YES  Title 59? NO  Consumer Fraud? YES


I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

| | |
|---|---|
| 05/07/2021 | /s/ LEWIS G ADLER |
| Dated | Signed |

**LEWIS G. ADLER, ATTORNEY AT LAW**
Attorney ID#: 023211985
26 Newton Ave.
Woodbury, NJ 08096
Tel. #: (856) 845-1968
Fax #: (856) 848-9504
Email: lewisadler@verizon.net
Counsel for plaintiffs

**PERLMAN-DEPETRIS CONSUMER LAW**
Paul DePetris
Attorney ID #: 005821996
Email: info@newjerseylemons.com
Lee M. Perlman
Attorney ID #: 019171994
Email: lperlman@newjerseylemons.com
1926 Greentree Road, Suite 100
Cherry Hill, New Jersey 08003
Tel.#: 856-446-9797
Fax#: 888-635-5933
Counsel for plaintiffs

**THE ROBISON LEMON LAW GROUP, LLC**
Emma C. Robison
Attorney ID: 029452011
181 Andrien Rd.
Glen Mills, PA 19342
(267) 504-4744
Attorney ID #: 029452011
Email: emma@lemonlawcar.com
Counsel for plaintiffs

| | |
|---|---|
| JERRY SCATTAGLIA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>PLAINTIFFS[1],<br><br>V.<br><br>MERCEDES-BENZ USA, LLC AND JOHN DOES 1-10,<br><br>DEFENDANTS. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, CIVIL PART MIDDLESEX COUNTY CIVIL ACTION DOCKET NO. MID-L- 2759 - 21<br><br>**COMPLAINT** |

---

[1] As used in this document, use of the plural includes the singular, where applicable. The parties are referred to in the plural regardless of their actual number.

Plaintiffs plead as follows:

## ABBREVIATIONS USED IN THIS DOCUMENT

1. For brevity's sake, hereafter the following abbreviated terms are used in this document:

   A. This civil action - this case or the case.

   B. Plaintiffs Jerry Scattaglia - plaintiffs.

   C. Defendants MERCEDES-BENZ USA, LLC - the manufacturer or defendants.

   D. Defendants John Does 1-10 – fictitious defendants named to the complaint – the Does.

   E. All parties named to the complaint collectively - the parties.

   F. The MERCEDES-BENZ 2021 GLE450W4 that is the subject of this case - the vehicle.

   G. The sales or lease transaction that is the subject of this case - the sale or the transaction.

   H. Ray Catena Motor Car Corporation of Edison, New Jersey - the selling dealer.

   I. The contract for the sale or lease of the vehicle to plaintiffs - the contract.

   J. The various new vehicle limited warranties that defendants issued plaintiffs with the vehicle collectively - the warranty.

   K. The automotive repair attempts that defendants' authorized dealerships performed to the vehicle under the vehicle's warranty - the repairs or repair attempts.

L. The automotive dealerships that performed the repair attempts collectively - the servicing dealers or the dealers.

M. The problems-nonconformities that the consumers' experienced with the vehicle and/or when using the vehicle - the problems or the defect.

N. The New Jersey Truth-In-Consumer Contract, Warranty And Notice Act, N.J.S.A. 56:12-14 To -18 – TCCWNA.

O. New Jersey Uniform Commercial Code, N.J.S.A. 12A:1-101, et seq. – UCC.

P. Magnuson-Moss Warranty- Federal Trade Improvement Act, 15 U.S.C. § 2301, et seq. – MMWA.

Q. The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, Et Seq. – CFA.

R. New Jersey Used Car Lemon Law, N.J.S.A. 56:8-67, et seq. – UCLL.

S. N.J.S.A. 56:8-2 – section 2.

T. New Jersey Division Of Consumer Affairs – DCA.

U. An act concerning new motor vehicle warranties and repealing P.L. 1983, c. 215 and making an appropriation, N.J.S.A. 56:12-29, et seq. a-k-a the New Jersey New Car Lemon Law – NCLL.

V. New Jersey Automotive Sales Practices Regulations, N.J.A.C. 13:45A-26B.1, et seq. – ASP.

W. New Jersey Automotive Advertising Practices Regulations a-k-a New Jersey Motor Vehicle Advertising Practices, N.J.A.C. 13:45A-26A.1, et seq. – MVAP.

X. Motor Vehicle Cost Information Act, 49 U.S.C. § 32701, et seq. a-k-a

federal odometer law – FOL.

Y. An Act Concerning Service Contracts And Supplementing And Amending P.L.1980, C.125; the Service Contracts Act, N.J.S.A. 56:12-87, et seq. – SCA.

Z. National Highway Transportation Authority – NHTSA.

## EXHIBITS TO COMPLAINT

2. The allegations contained in the previous paragraphs are repeated as if fully set forth herein.

3. Attached hereto as complaint exhibit A is a repair history summary for the vehicle.

4. Attached hereto as complaint exhibit B is the article titled The Warranty Process Flow Within The Automotive Industry: An Investigation Of Automotive Warranty Processes And Issues (Center For Automotive Research, August 2005).

5. Attached hereto as complaint exhibit C is a MBWorld online vehicle forum article thread titled "New GLE Keeps Draining Battery - won't start".

6. Attached hereto as complaint exhibit D is a Mercedes GLE Forum online vehicle forum article thread titled "Electrical Problems with 2020 GLE450".

7. Attached hereto as complaint exhibit E is a Cars.com online vehicle forum article thread titled "2020 Mercedes-Benz GLE 450 Consumer Reviews".

8. Attached hereto as complaint exhibit F is the expert report of Richard Roth of RSJ Auto LLC and Xentry Tips articles titled "Functional impairment of 48 V on-board electrical system", "Implausible 'service due' instrument cluster", "Xentry Battery Tester results disagree with workshop assessment" and "Vehicle does

not start / Vehicle cannot be unlocked"

## PARTIES

9. The allegations contained in the previous paragraphs are repeated as if fully set forth herein.

10. Plaintiffs are individuals with an address of 135 Oak Avenue, Staten Island, New York 10306.

11. Defendants MERCEDES-BENZ USA, LLC is a business with address of 1 Mercedes-Benz Drive, Sandy Springs, Georgia, 30328.

12. Defendants John Does 1-10 are fictitious defendants who are entities and/or individuals, including but not limited to those who have yet to be identified by plaintiffs but whose identity may be revealed during the period of discovery that shall occur in future relative to this action and who may be liable for plaintiffs' damages as referenced herein or who are known but not presently considered to be indispensable parties relative to this matter. Such individuals-entities may include but are not necessarily limited to automotive manufacturers, automotive distributors, automotive parts manufacturers, automotive parts distributors, automotive transporters, automotive dealerships, contractors, subcontractors, independent contractors, companies, corporations, businesses, partnerships, agents, officers, directors, managing members, employees, salespeople, technicians, staff, workmen or representatives of the other defendants named herein.

13. Unless otherwise noted below, all allegations set forth below are directed against all defendants named herein and all references to "defendants" shall be to all defendants named herein.

**FACTUAL ALLEGATIONS**

14. The allegations contained in the previous paragraphs are repeated as if fully set forth herein.

15. This case is a putative class action against the manufacturer of a vehicle that knew that the vehicle suffered from defects long before plaintiffs purchased the vehicle.

16. The defect involves the vehicle's electrical system which manifests itself when the vehicle fails to start.

17. The vehicle is one of a line of 450 GLE make and model of vehicles manufactured by defendant.

18. Many have complained about electrical issues plaguing the 450 GLE vehicles.

19. In particular, people have complained about electrical issues plaguing the 2020 450 GLE vehicles.

• As indicated by a bulletin issued by the manufacturer on 1-29-20, as early as then, the manufacturer was aware of electrical issues plaguing the 2021 450 GLE vehicles – specifically, regarding the vehicle's 48 volt on-board electrical system.

20. Per the DCA's list of vehicles branded under the New Jersey Lemon Law as of

April 1, 2021,[2] approximately twenty (20) 2020 450 GLE vehicles have been branded as lemons, such as those with the following vehicle identification numbers: "2020 MERCEDES BENZ GLE450 4JGFB5KE5LA005134; 2020 MERCEDES BENZ GLE450 4JGFB5KB7LA065342; 2020 MERCEDES BENZ GLE450  JGFB5KB0LA004074; 2020 MERCEDES BENZ GLE450 4JGFB5KB1LA024141; 2020 MERCEDES BENZ GLE450 4JGFB5KB8LA005764; 2020 MERCEDES BENZ GLE450 4JGFB5KEXLA051025; 2020 MERCEDES BENZ GLE450 4JGFB5KB3LA074023; 2020 MERCEDES BENZ GLE450 4JGFB5KB8LA072851; 2020 MERCEDES BENZ GLE450 4JGFB5KB4LA073558; 2020 MERCEDES BENZ GLE450 4JGFB5KE7LA052035; 2020 MERCEDES BENZ GLE450 4JGFB5KE8LA024468; 2020 MERCEDES BENZ GLE450 4JGFB5KBXLA069241; 2020 MERCEDES BENZ GLE450 4JGFB5KB7LA022796; 2020 MERCEDES BENZ GLE450 4JGFB5KE8LA089904; 2020 MERCEDES BENZ GLE450 4JGFB5KB5LA103361; 2020 MERCEDES BENZ GLE450 4JGFB5KB6LA043851; 2020 MERCEDES BENZ GLE450

---

[2] https://www.njconsumeraffairs.gov/llu/Documents/Vehicles-Branded-Under-The-New-Jersey-Lemon-Law.pdf.   By way of explanation, the list states, in relevant part: "If a motor vehicle is returned to the manufacturer under the provisions of the New Jersey Lemon Law or similar statute of another state or as a result of a legal action or an informal dispute settlement procedure, it shall not be resold or re-leased in New Jersey unless the manufacturer has the vehicle's title stamped "R - RETURNED TO THE MANUFACTURER UNDER LEMON LAW OR OTHER PROCEEDING." A copy of the stamped title shall be submitted to the New Jersey Motor Vehicle Commission (MVC) to be permanently branded as a Lemon (Status "L" on your NJ title)."

4JGFB5KB5LA047924; 2020 MERCEDES BENZ GLE450

4JGFB5KB5LA161888; 2020 MERCEDES BENZ GLE450

4JGFB5KE7LA045229; and 2020 MERCEDES BENZ GLE580

4JGFB8GB0LA172176.

21. Despite that foreknowledge, the manufacturer failed to disclose the existence of that defect to plaintiffs before plaintiffs purchased the vehicle from the manufacturer's franchise dealership – the selling dealer.

22. What resulted was a chain of repair attempts and a vehicle that suffers from a diminution in value due to those repair attempts.

23. At all times relevant to this case, the selling dealer was a dealership authorized by defendants to sell the vehicle, issue manufacturer warranties associated therewith, service the vehicle and perform warranty repairs to the vehicle under the warranty.

24. At all times relevant to this case, the selling dealer was a "dealer", meaning a person who is actively engaged in the business of buying, selling or exchanging motor vehicles at retail and who has an established place of business.[3]

25. At all times relevant to this case, the vehicle was a "motor vehicle", meaning a passenger automobile, authorized emergency vehicle, or motorcycle as defined in N.J.S.A. 39:1-1 which is purchased or leased in the State of New Jersey or which is registered by the New Jersey Motor Vehicle Commission, except the living facilities of motor homes.[4]

---

[3] N.J.S.A. 56:12-30; N.J.S.A. 56:12-31
[4] N.J.S.A. 56:12-30.

26. At all times relevant to this case, the vehicle was a "consumer product", which means any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed).[5]

27. Defendants manufactured and/or assembled and/or distributed and/or advertised the vehicle, prepared the warranty and via the selling dealer, issued plaintiffs the warranty.

28. At all times relevant to this case, the manufacturer was a "manufacturer", meaning a person engaged in the business of manufacturing, assembling or distributing motor vehicles, who will, under normal business conditions during the year, manufacture, assemble or distribute to dealers at least 10 new motor vehicles.[6]

29. At all times relevant to this case, the manufacturer was a "supplier", which means any person engaged in the business of making a consumer product directly or indirectly available to consumers.[7]

30. At all times relevant to this case, the manufacturer was a "warrantor", which means any supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty.[8]

31. At all times relevant to this case, plaintiffs were "consumers", meaning a buyer or

---

[5] 15 U.S.C. § 2301(1).
[6] N.J.S.A. 56:12-30.
[7] 15 U.S.C. § 2301(4).
[8] 15 U.S.C. § 2301(5).

lessee, other than for purposes of resale or sublease, of a motor vehicle; a person to whom a motor vehicle is transferred during the duration of a warranty applicable to the motor vehicle; or any other person entitled by the terms of the warranty to enforce the obligations of the warranty.[9]

32. At all times relevant to this case, plaintiffs were "consumers", meaning a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and anynew other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract).[10]

33. Pursuant to its definition of "motor vehicle," the NCLL applies to the vehicle and the class vehicles: "Motor vehicle" means a passenger automobile or motorcycle as defined in R.S.39:1-1 which is purchased or leased in the State of New Jersey or which is registered by the Division of Motor Vehicles in the Department of Law and Public Safety, except the living facilities of motor homes."   N.J.S.A. 56:12-30.  Pursuant to said definition, the New Jersey motor vehicle code, N.J.S.A. 39:1-1, et seq., defines "motor vehicle" as follows:  "Motor vehicle" includes all vehicles propelled otherwise than by muscular power, excepting such vehicles as run only upon rails or tracks and motorized bicycles." N.J.S.A. 39:1-1.

34. Plaintiffs are "purchasers" as defined by N.J.S.A. 56:12-30 and the manufacturer

---

[9] N.J.S.A. 56:12-30.
[10] 15 U.S.C. § 2301(3).

is a "Manufacturer" as defined by N.J.S.A. 56:12-30.

35. The dealers were the manufacturer's "dealers" as defined by N.J.S.A. 56:12-30 and as referenced in N.J.S.A. 56:12-31.

36. Here is a chronology of events relevant to this case that other 450 GLE vehicle owners or lessees experienced with their vehicles.

37. On or about 11-8-19, a consumer wrote on an online vehicle forum board that: "Most unreliable car I have ever owned. by CEO from Lexington NC on Fri Nov 08 2019 I currently own 3,Mercedes (sic) - I will never own another one. This 2020?450!GLE (sic) has refused to start, left me stranded 10 times in 8 weeks- only to find out from a tow truck driver there is a problem with the software . Which Mercedes has now confessed is true. I will turn this new car back to dealer. NC lemon law."  Exhibit E.

38. On 1-28-20, the manufacturer issued a Xentry Tips technical service bulletin for issues related to failure to start issues with its vehicles.  Exhibit F.

39. That bulletin expressly referred to problems with vehicles' 48 volt on board batteries.  Exhibit F.

40. On 8-7-20, the manufacturer issued a Xentry Tips technical service bulletin for issues related to failure to start issues with its vehicles.  Exhibit F.

41. That bulletin expressly referred to problems with vehicles' batteries and the need to replace same.  Exhibit F.

42. On 8-10-20, the manufacturer issued a Xentry Tips technical service bulletin for issues related to the batteries of its vehicles.  Exhibit F.

43. On or about 6-12-20, a consumer wrote on an online vehicle forum board that:

"Hello Everyone Sorry this is my first post. Got a new 2020 GLE350 about 3 months ago About a week ago, it would not start, bunch of lights on the dash, would not turn over MB sent out a service and they jumped the car It ran for another week, and then just died again. We had it towed to MB this time Already checked the Battery and the Alternator, all are fine Any idea what is causing the battery drain Tks".  Exhibit C.

44. On or about 6-12-20, a consumer on the same forum responded as follows: "Don't rule out the battery. I had a similar situation except that with the 450 the 48 volt starts the car. I kept getting "critical battery" message and the dealer couldn't find anything wrong. Then when it was in for 3 days to replace the MBUX controller it ran down after a charge and they replaced it (the 12 volt battery). I think it had an internal short but got that 3td hand from SA & probably a guess."

45. On or about 6-18-20, the first consumer replied as follows: "Back from the shop ESP was a constant drain on battery Supposedly a known issue Fixed with a software update Will let you know if it fixes the problem permanently, tks for the responses".  Exhibit C.

46. On or about 8-3-20, another consumer posted on the same forum: "So this is what they claim was wrong with my GLE only took 3 weeks to figure it out. I'm not buying it. Just picked it up so we will see . Now I feel like I don't have a reliable vehicle especially with all the bad reviews I have read. Pinched wiring starter circuit BUT it stopped while at a stop light and then didn't start after it cut off. I'm no mechanic but it doesn't add up to me."  Exhibit C.

47. On or about 8-4-20, another consumer posted on the same forum: "I've had the

same issue with my four month old 2020GLE! Keep getting "Critical" messages via email. Dealer has had the vehicle three or four times and continues with software updates apparently dictated by Mercedes. "Starter Battery Partly Charged" shows on the Mercedesme app for almost a week now despite the car being driven daily. Really frustrating and I'm quickly losing confidence in bothe the vehicle and dealership!"  Exhibit C.

48. On or about 12-20-20, another consumer posted on the same forum "I had a similar experience my new '21 GLE450: battery went dead after 230 miles. Had to be towed - could not be jumped. I am waiting more than 30 days fir a new battery coming from Germany. None in the US. So frustrating. Mercedes has a serious problem here with this 48v battery system." Exhibit C.

49. On or about 12-20-20, another consumer posted on the same forum "Same here. First a 48 volt battery malfunction, then a red 48 volt system failure, then, Must stop the engine due to overheating. Stopped on the side of the road, called Mercedes Road side assistance which is a joke for another post. After repeating to the guy on the phone that I need a tow truck, NOT a jump...who do they send... a jump guy. Anyway, he called me and said he's seen this before, and for me to try to start the car. Did that...everything was just fine...no warnings. I drove it to the dealer in Pompano Beach, FL. the next morning. Drove perfectly fine to the shop. They informed me later in the day that the 48 volt battery needed to be replaced, there are none in the US, and 47 on back order in Germany with no idea when I would get one. The car is still with them since December 1. This is my first MB, and I'm NOT impressed at all. The biggest question I have is...this a

battery problem, or software issue...or both? Batteries don't usually come back to life after a failure, and a 10 minute shutdown?? Seems that resetting the software by restarting the car made the issue go away...for now at least." Exhibit C.

50. On or about October, 2020, a consumer wrote on an online vehicle forum board that "I have had 4 occasions in last 3 months where 450 is dead after only sitting for an hour. Its (sic) now at Dealer for second (sic) time for this problem with total of 15 days of trying to fix it. In 3 of those occasions, jumping finally started it. Dealer replaced starter battery. THen (sic) it happened again last week and thus up at the dealer. A GLE 450 they gave me as a loaner last time also ended up not starting while I had it and had to be towed- not even a jump started it. ANy (sic)one know if other GLEs are having this problem? I know hundreds of GLEs were stored at the factory when they were originally built. My GLE was built in November of 2018. I bought it new in January of 2020. ANy (sic) help would be greatly appreciated. Love the car but don't trust it at all." Exhibit D.

51. A Upon information and belief, before plaintiffs purchased the vehicle from the selling dealer, none of the employees of the selling dealership that showed plaintiffs the vehicle or were involved in the sale of the vehicle to plaintiffs ever mentioned the defect.

52. Upon information and belief, before plaintiffs purchased the vehicle from the selling dealer, none of the employees of the manufacturer ever forwarded plaintiffs any literature about the defect.

53. Upon information and belief, before plaintiffs purchased the vehicle from the selling dealer, none of the employees of the selling dealership that showed

plaintiffs the vehicle or were involved in the sale of the vehicle to plaintiffs ever gave plaintiffs any literature mentioning or referring to the defect.

54. Upon information and belief, before plaintiffs purchased the vehicle from the selling dealer, none of the employees of the manufacturer ever forwarded plaintiffs any literature mentioning or referring to the defect.

55. When plaintiffs purchased the vehicle, plaintiffs were totally unaware of the defect.

56. On or about 10-29-20, plaintiffs purchased the vehicle in new condition at the selling dealer in Edison, New Jersey for the sum of approximately $76,918.36.

57. Plaintiffs' purchase of the vehicle occurred after: (1) the manufacturer issued at least three (3) technical service bulletins related to a no start condition and/or issues related to the vehicle's battery and/or the vehicle's electrical system (exhibit F); and (2) after the posting online by consumers of summaries of their no start and/or electrical and/or battery issues with their 450 GLE vehicles and their efforts to get the manufacturer's franchise dealerships to repair their vehicles for those issues. Exhibits C-E.

58. Therefore, when the vehicle was sold to plaintiffs by the selling dealer, the manufacturer had knowledge that the vehicle suffered from electrical problems that would cause the vehicle to fail to start.

59. At time of sale, the selling dealer issued plaintiffs the warranty with various coverage periods for various components, including but not limited to the following: coverage for 4 years/50,000 miles for "basic" components.

60. At all times relevant to this case, the warranty was a "warranty", which means

any warranty, whether express or implied of the manufacturer of a new motor vehicle, or, in the case of a new motor vehicle that is an authorized emergency vehicle, of the manufacturer, co-manufacturer or post-manufacturing modifier, of the vehicle's condition and fitness for use, including any terms or conditions precedent to the enforcement of obligations under the warranty. [11]

61. At all times relevant to this case, the warranty was a "written warranty", which means — (A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or (B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product. [12]

62. At all times relevant to this case, the warranty was a warranty which pertained to a consumer product actually costing plaintiffs more than $5 (i.e., the vehicle). [13]

63. As time of sale, one or more implied warranties covering the vehicle arose as a matter of law in plaintiffs' favor, with the term "implied warranty" meaning

---

[11] N.J.S.A. 56:12-30.
[12] 15 U.S.C. § 2301(6).
[13] 15 U.S.C. § 2302(2)(e).

an implied warranty arising under State law (as modified by 15

U.S.C. 2308 and 2304(a)) in connection with the sale by a supplier of

a consumer product.[14]

64. At all times relevant to this case, plaintiffs were entitled to seek repair attempts to

the vehicle under the warranty for problems that plaintiffs experienced with the

operation of the vehicle.

65. Following purchase, plaintiffs experienced problems with the vehicle's operation

and pursuant to the manufacturer's new vehicle limited warranty, took the vehicle

to various dealerships for multiple unsuccessful repair attempts.

66. The vehicle's repair history is summarized in the repair history summary. Exhibit

A.

67. During the vehicle's warranty period and/or during the first 24,000 miles of

operation or during the period of two years following the date of original delivery

of the vehicle to plaintiffs (whichever occurred first), plaintiffs experienced the

problems, the details of which are set forth below and/or in complaint exhibit A.

68. In all, following the sale of the vehicle to plaintiffs by the selling dealer, the

vehicle has undergone at least 3 repair attempts and spent approximately 47

days at the manufacturer's franchise dealership – the selling dealer - for repair

attempts for issues with a no start condition and/or electrical malfunction. Exhibit

A.

69. Approximately 2 weeks after plaintiffs took delivery of the vehicle, the vehicle had

to be towed into the dealer because the entire passenger side of the vehicle

_____

[14] 15 U.S.C. § 2301(7).

experienced a loss of power, with the mirror on that side of the vehicle failing to extend for use.

70. On or about 11-30-20, the vehicle died while parked in plaintiffs' garage, with the vehicle's power going on but the vehicle failing to turn over.

71. Accordingly, at that time, the vehicle was towed to the selling dealer for warranty service.

72. The service department staff of the selling dealer told plaintiffs that the vehicle's 48 volt battery was the cause of the vehicle's problems but allegedly because of the demand for those batteries which were claimed to be on backorder, it took until 1-9-21 to get the vehicle repaired.

73. Following that repair attempt, on various occasions, plaintiffs noticed that the vehicle's dashboard display experienced a power failure as it rebooted and restarted.

74. On or about 4-10-21, the vehicle again died and was towed to the selling dealer.

75. On this occasion, the service department staff of the selling dealer told plaintiffs that the vehicle's 48 volt battery was the cause of the vehicle's problems.

76. the service department staff of the selling dealer told plaintiffs that, to prevent his having to wait a long time for the completion of repairs, the selling dealer was going to simply take the battery that they had set aside for another customer's vehicle and install it in the vehicle.

77. While the invoice for that repair refers to the vehicle being returned to the consumer on 4-15-21, in fact, the vehicle was not returned to plaintiffs until 4-16-21. Exhibit A.

78. Had plaintiffs known what the manufacturer knew about the vehicle presale – i.e., that the vehicle, along with all other 2021 450 GLEs, suffered from a no start problem or electrical problem – plaintiffs never would have purchased the vehicle.

79. The problems were "nonconformities", which means a defect or condition which substantially impairs the use, value or safety of a motor vehicle.[15]

80. During the vehicle's warranty period and/or during the first 24,000 miles of operation or during the period of two years following the date of original delivery of the vehicle to plaintiffs (whichever occurred first), plaintiffs presented the vehicle to the dealerships for the dealerships, reported the problems to the dealerships and those dealerships performed repair attempts to the vehicle relative to the problems.  Exhibit A.

81. As detailed below and in complaint exhibit A, during the vehicle's warranty period and/or during the first 24,000 miles of operation or during the period of two years following the date of original delivery of the vehicle to plaintiffs (whichever occurred first), defendants or their agents the dealerships were unable to repair or correct the problems within a reasonable time.  Exhibit A.

82. Due to the repeated repair attempts, plaintiffs view the problems as affecting the use and value of the vehicle.

83. Plaintiffs have no idea if or when the vehicle's problems will occur again, potentially requiring further repairs.

84. Plaintiffs fear being in a situation in which the vehicle fails to start and that

---

[15] N.J.S.A. 56:12-30.

plaintiffs will be stranded somewhere.

85. Given the need to have the vehicle towed and its lack of reliability, the problems have significantly impaired plaintiffs' use of the vehicle and plaintiffs believe the vehicle is unsafe and plaintiffs' confidence in the vehicle is shaken.

86. In addition, the vehicle's repair history cannot be erased – instead, that history is a permanent blemish on the vehicle's value.

87. Accordingly, given the vehicle's repair history, plaintiffs believe that the vehicle is less valuable than if the vehicle didn't have the problems.

88. Therefore, plaintiffs believe that the vehicle's use, value and/or safety is substantially impaired by the problems and plaintiffs' confidence in the vehicle is totally shaken.

89. The NCLL states, in relevant part: "[t]he Legislature finds that the purchase of a new motor vehicle is a major, high cost consumer transaction and the inability to correct defects in these vehicles creates a major hardship and an unacceptable economic burden on the consumer. It is the intent of this act to require the manufacturer of a new motor vehicle, or, in the case of a new motor vehicle that is an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier, to correct defects originally covered under warranty which are identified and reported within a specified period. It is the further intent of this act to provide procedures to expeditiously resolve disputes between a consumer and a manufacturer, co-manufacturer, or post-manufacturing modifier when defects in a new motor vehicle are not corrected within a reasonable time, and to provide to award specific remedies where the uncorrected defect

substantially impairs the use, value, or safety of the new motor vehicle.

90. Under NCLL, the UCC and/or the MMWA, proof of the existence of a problem in the vehicle or of negligence on any defendants' part is not a prerequisite to a finding that the problems substantially impair the vehicle's use and/or value and/or safety.

91. To date, the manufacturer never repurchased the vehicle from plaintiffs pursuant to the NCLL.

79. Upon information and belief, defendants maintain a computerized database of all of the warranty repairs and resources for defendants' franchise dealerships to use to attempt to repair vehicle issues or nonconformities complained of by vehicle purchasers to said dealerships.  Exhibit B.

80. Therefore, defendants provide technical support to franchise dealerships performing repair attempts under the warranty such as the selling dealer.  Exhibit B, p. 3.

81. Defendants require defendants' franchise dealerships to submit forms for reimbursement for warranty repairs, which include a description of the problem and the repairs being completed and those dealerships notify defendants of warranty issues.  Exhibit B, p. 4-5.

82. As explained above, every time a vehicle is brought to defendants' franchise dealerships for repairs under the warranty, said dealerships notify defendants of the issues that are the subject of the repair attempts and are frequently asked by said dealerships to authorize the performance of repair attempts (i.e., performance of labor and replacement of parts on the vehicle).

83. It is beyond question that, before plaintiffs' purchased the vehicle, other purchasers of 450 GLEs reported issues with their vehicles identical or substantially similar to the problems experienced by plaintiffs to defendants' franchise dealerships servicing those other vehicles. Exhibits C-E.

84. It is also beyond question that, before plaintiffs' purchased the vehicle, defendants issued at least four (4) technical service bulletins discussing electrical issues with the vehicle and that at least two (2) of those bulletins expressly referred to no start problems with defendants' vehicles.

85. Indeed, at least one technical service bulletin issued by the manufacturer and one or more posts placed on online vehicle forums refer in particular to issues with the 48 volt battery of 450 GLE vehicles. Exhibits C-F.

86. Accordingly, defendants: (1) had knowledge of the problems long before plaintiffs purchased the vehicle; and (2), were asked by other consumers purchasing 450 GLEs to perform repair attempts to address the same or substantially similar problems.

87. The NCLL imposes various reporting requirements on manufacturers relative to vehicles with inherent design defects and on the manufacturer and DCA relative to vehicles repurchased by manufacturers as lemons.

88. Those reporting requirements shall make it easier for plaintiffs, during the course of discovery in this case, to determine the class members' identities.

89. The NCLL requires manufacturers to "shall certify to the division, within one year of discovery, the existence of any inherent design defect common to all

motor vehicles of a particular model or make."[16]

90. Under the NCLL, a manufacturer commits a per se CFA violation if they fail to perform that certification.

91. Upon information and belief, in violation of the CFA, defendants failed to perform that certification process notwithstanding defendants having knowledge that the problems were an inherent design defect of the vehicle.

92. Pursuant to the NCLL regulations adopted by the DCA, the Division of Consumer Affairs shall maintain an index of all motor vehicle disputes by make and model and shall compile and maintain statistics indicating the record of manufacturer compliance with any settlement procedure decisions and the index and statistical record of compliance shall be made available to the public.[17]

93. Pursuant to the NCLL, "a. If a motor vehicle is returned to the manufacturer, or, in the case of an authorized emergency vehicle, to the manufacturer, co-manufacturer, or post-manufacturing modifier, under the provisions of this act or a similar statute of another state or as the result of a legal action or an informal dispute settlement procedure, it shall not be resold or re-leased in New Jersey unless: (1) The manufacturer, co-manufacturer, or post-manufacturing modifier provides to the dealer, distributor, or lessor, and the dealer, distributor or lessor provides to the consumer, the following written statement on a separate piece of paper, in 10-point bold-face type: "IMPORTANT: THIS VEHICLE WAS RETURNED TO THE MANUFACTURER OR OTHER RESPONSIBLE PARTY

---

[16]. N.J.S.A. 56:12-44.
  1. [17] N.J.A.C. 13:45A-26.15.

BECAUSE IT DID NOT CONFORM TO THE MANUFACTURER'S OR OTHER PARTY'S WARRANTY FOR THE VEHICLE AND THE NONCONFORMITY WAS NOT CORRECTED WITHIN A REASONABLE TIME AS PROVIDED BY LAW;" (2) The dealer, distributor, or lessor obtains from the consumer a signed receipt certifying, in a conspicuous and understandable manner, that the written statement required under this subsection has been provided. The director shall prescribe the form of the receipt. The dealer, distributor, or lessor may fulfill his obligation to obtain a signed receipt under this paragraph by making such a notation, in a conspicuous and understandable manner, on the vehicle buyer order form accompanying the sale or lease of that vehicle; and (3) The dealer, distributor, or lessor, in accordance with the provisions of section 1 of P.L.1993, c.21 (C.39:10-9.3), notifies the Chief Administrator of the Motor Vehicle Commission of the sale or transfer of ownership of the motor vehicle."[18]

92. Disclosure during discovery of the reasons for other 450 GLE vehicles being branded lemons could reveal that one or more of the reasons were issues similar or identical to the problems.

93. One or more statutes pled herein provide for fee shifting for parties hiring counsel and prevailing under said statutes.

94. Accordingly, the counsel bringing this case serves as a private attorney general.[19]

95. Otherwise, consumers pursuing claims under fee shifting states might incur

---

[18] N.J.S.A. 56:12-35.
[19] See *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 268 (1997).

potentially considerable expense for a potentially small recovery.[20]

94. As indicated by multiple unsuccessful repair attempts, defendants' never found a solution to the problems in a reasonable period of time and may indeed never find a solution or if found, that discovery may not occur during the period of coverage provided via the vehicle's warranty, resulting in the need for costly repairs out of pocket for problems that were covered by the warranty and should have been fixed in a reasonable time during the warranty's duration at no cost to consumer but that defendants never fixed in a reasonable time and during that duration and plaintiffs failed to receive the benefit of plaintiffs' bargain – e.g., a safe, reliable, valuable vehicle warranted against yet discovered problems or problems that could be addressed under the warranty in a reasonable period of time.

95. Instead, before plaintiffs purchased the vehicle, defendants had advanced knowledge, through the complaints of other consumers purchasing or leasing 2020 450 GLEs or older model years of 450 GLEs, that those vehicles had problems which defendants were unable to successfully repair in a reasonable time. Exhibits C-E.

96. While no consumer may be entitled to a new vehicle that is entirely trouble free mechanically, no manufacturer should place into the stream of commerce a vehicle which it knows suffers from specific problems and that

---

[20] See, e.g., *Skeer v. EMK Motors, Inc.*, 187 N.J. Super. 465, 470 (App. Div. 1982)(discussing fee shifting under the CFA); *Chattin v. Cape May Greene, Inc.*, 243 N.J. Super. 590, 610 (App. Div. 1990), aff'd o.b., 124 N.J. 520 (1992) (citing *Coleman v. Fiore Bros.*, Inc., 113 N.J. 594, 598 (1989))(same); *Furst v. Einstein Moomjy*, 182 N.J. 21 (2004)(same).

cannot be fixed after repeat repair efforts and that substantially impair the vehicle's use, value and/or safety.

97. The vehicle's warranty and the protections afforded to consumer via the NCLL are crucial to the purchasers of vehicles manufactured, assembled and distributed by defendants to which the warranty an the NCLL applies, as the warranty and the NCLL influences consumers' decisions to purchase vehicles covered by the warranty and NCLL.

98. As the Appellate Division explained: [21] "[w]arranties developed in the law ... to protect the ordinary consumer who cannot be expected to have the knowledge or capacity ... to make adequate inspection of mechanical instrumentalities, like automobiles, and to decide for himself whether they are reasonably fit for the designed purpose." *Henningsen, supra,* 32 *N.J.* at 375, 161 *A.*2d 69. An express warranty for a new automobile is not provided gratuitously by the manufacturer or seller. The cost of the warranty is included in the cost of the product. The consumer has purchased the warranty along with the car. It is "part of the benefit of the bargain." *Thiedemann v. Mercedes–Benz USA, LLC,* 183 *N.J.* 234, 251, 872 *A.*2d 783 (2005).

99. Express warranties are used by manufacturers to increase the attractiveness of their products to consumers. The inclusion of warranties is not a result of corporate benevolence. Conversely, purchasers rely on warranties; they reasonably expect them to have meaning beyond a mere promise of

---

[21] *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226 (App. Div. 2012).

replacement.[22]

100. A warranty is intended to give consumers peace of mind that any problems with the vehicle arising during the applicable coverage periods of the warranty can and shall be addressed in a reasonable period of time and if not, that consumers shall have recourse to the law to seek damages such as the remedy of revocation of acceptance and the NCLL statutory refund.

101. Therefore, while a warranty is not a guarantee against all issues that may arise in the operation of a vehicle, the warranty forms an important marketing tool, providing a consumer peace of mind that problems with a warranted vehicle's operation, brought to the manufacturer's attention during that period, can and shall be fixed by the vehicle's manufacturer in a reasonable time.

102. However, in this case, before plaintiffs purchased the vehicle, defendants (1) knew that the problems existed; (2) were unable to fix those problems in a reasonable time – as shown from warranty repair experience with 2020 and/or older model year 450 GLE owners that were equipped with parts similar or identical to those installed in 2021 450 GLEs; and (3) proceeded to manufacture, assemble and distribute the vehicle into the stream of commerce with its warranty to its ultimate end user, plaintiffs.

103. Therefore, since certain 450 GLEs suffer from known issues that defy repair and since defendants had knowledge of those issues before distributing those 450 GLEs to dealerships for sale and lease to the public,

---

[22] *Gladden v. Cadillac Motor Car Div.*, 83 N.J. 320 (1980)(Pashman, J., concurring).

the efficacy of the warranties issued with those 450 GLEs was in doubt
before those 450 GLEs were sold and leased.

104. Accordingly, acting in bad faith, defendants lured plaintiffs to consider
purchasing the vehicle, marketed and sold as it was with its warranty but
without disclosure of the problems that were unable to be fixed in a
reasonable time under the warranty.

105. Under the UCC "[a]ny affirmation of fact or promise made by the seller to the
buyer which relates to the goods and becomes part of the basis of the bargain
creates an express warranty that the goods shall conform to the affirmation or
promise."[23]

106. Further, every contract with a merchant for the sale of goods contains an
implied warranty that the goods are fit for ordinary purposes for which the goods
are used.  This warranty is known as the implied warranty of merchantability.[24]

107. In addition to other remedies available to consumers under the UCC for a
breach of warranty, a UCC remedy available to consumers when a manufacturer
fails to fix a vehicle in a reasonable period of time is revocation of acceptance.[25]

108. By failing to fix the problems in a reasonable time, defendants violated the
NCLL and breached the warranty and the implied warranty of merchantability that
arose as a matter of law relative to the vehicle.

---

[23] *N.J.S.A.* 12A:2–313(1)(a).
[24] New Jersey Model Civil Jury Charge 4:22B.
[25] N.J.S.A. 12A:2-608; *General Motors Acceptance Corp. v. Jankowitz*, 216 N.J. Super.
313 (App. Div. 1987); *Realmuto v. Straub Motors*, 65 N.J. 336 (1974); *Ford Motor Credit
Co. v. Mendola*, 427 N.J. Super. 226, 242 (App. Div. 2012); See also *Ventura v. Ford
Motor Corp.,* 180 N.J. Super. 45, 53–54, 433 *A*.2d 801 (App. Div.1981).

109. The vehicle's use, value and safety are substantially impaired by defendants' failure to fix the problems in a reasonable time.

110. The vehicle's value has suffered from diminution.

111. Diminution in value is a standard measure of damages in breach of warranty cases, such as here, where a revocation of acceptance remedy is sought.[26]

112. Further, breach of warranty damages need not be established with exact certainty: "[M]ere uncertainty as to the quantum of damages is an insufficient basis on which to deny the non-breaching party relief. Although it complicates the precise calculation of damages, our courts have long held that "[p]roof of damages need not be done with exactitude. ... It is therefore sufficient that the plaintiff prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate."[27]

113. As explained in the Restatement (Second) of Contracts: Alternative to Loss in Value of Performance § 348 (Am. Law Inst. 1981), a small windfall to the injured party based on an inability to prove exact damages should not defeat recovery.

---

[26] See, e.g., In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 816-17 (3d Cir. 1995) (emphasizing, in a class action suit, that section 2-714(1) of the UCC allows for damages "as determined in any manner which is reasonable"); *Perth Amboy Iron Works, Inc. v. Am. Home Assurance Co.*, 226 N.J. Super. 200, 219, 543 A.2d 1020 (App. Div. 1988); *McDonald v. Mianecki*, 79 N.J. 275, 282 n.1 (1979); accord *Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 13, 860 A.2d 435 (2004) (applying UCC principles to a consumer fraud case and concluding that the cost of replacing a damaged carpet was the appropriate measure of damages, as that method put the buyer in the position he would have been in if he had received a non-defective carpet).

[27] *Totaro, Duffy, Cannova and Co., LLC v. Lane, Middleton & Co., LLC*, 191 N.J. 1, 14, 921 A.2d 1100 (2007) (quoting *Lane v. Oil Delivery Inc.*, 216 N.J. Super. 413, 420, 524 A.2d 405 (App. Div. 1987) ).

114. Also, the injured party need not prove that he or she actually spent the money to repair the defect in order to recover for the breach.[28]

115. The United States Supreme Court rejected the notion that a jury may not estimate damages.[29]

116. As to the implied warranty of merchantability, that warranty was breached because the vehicle was unfit for the ordinary purpose for which such goods are used.

117. As reflected by the vehicle's repair history, before filing suit, plaintiffs gave defendants multiple efforts to cure the problems but defendants failed to fix the problems in a reasonable time.  Exhibit A.

118. Moreover, as explained above, since defendants knew about the problems at the time of purchase, defendants had ample opportunity before the sale to cure the breach of warranty.

119. The manufacturer failed to repurchase the vehicle from plaintiffs pursuant to the NCLL.

120. The NCLL states, in relevant part: "[t]he Legislature finds that the purchase of a new motor vehicle is a major, high cost consumer transaction and the inability to correct defects in these vehicles creates a major hardship and an unacceptable

---

[28] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 22, 647 A.2d 454 (1994).
[29] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)("[a]lthough the factfinder is not entitled to base a judgment on speculation or guesswork, the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly").  See also *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. ——, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016).

economic burden on the consumer. It is the intent of this act to require the manufacturer of a new motor vehicle, or, in the case of a new motor vehicle that is an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier, to correct defects originally covered under warranty which are identified and reported within a specified period. It is the further intent of this act to provide procedures to expeditiously resolve disputes between a consumer and a manufacturer, co-manufacturer, or post-manufacturing modifier when defects in a new motor vehicle are not corrected within a reasonable time, and to provide to award specific remedies where the uncorrected defect substantially impairs the use, value, or safety of the new motor vehicle.

121. Because of defendants' failure to fix the vehicle in a reasonable time and defendants' failure to provide plaintiffs with a revocation of acceptance remedy or a statutory repurchase under the NCLL, plaintiffs must now seek damages against defendants.

122. To the extent that via the vehicle's warranty booklet, defendants attempt to disclaim liability for consequential damages and thereby limit the warranty to one simply providing a repair remedy, such an effort is fruitless.

123. Such limitation language fails to negate plaintiffs' damages claims because where a limited repair remedy fails of its essential purpose (i.e., failing to fix a vehicle in a reasonable time), the repair remedy limitation is no impediment to the consumer's recovering consequential damages. This is because, to be effective, a repair remedy must be provided within a reasonable period of time. Otherwise, the buyer loses the substantial benefit of the buyer's purchase and is

thus entitled to seek damages against the offending party.[30]

124. "It is to be emphasized that we are here dealing with words of exclusion or limitation contained in a contract document that is not the product of mutual negotiation or cooperative draftsmanship. The purchaser of a mass-produced consumer article with a standard warranty form or booklet, as in this case, has no opportunity to bargain over its terms. Warranties are prepared unilaterally by the company and distributed automatically with the product on a mass basis. *Henningsen v. Bloomfield Motors, Inc.*, supra, 32 N.J. at 390. The consumer must ordinarily place considerable reliance upon the fairness and good faith of the manufacturer and its dealers. It has therefore been recognized that the reliance which a consumer necessarily reposes in a seller engenders a corresponding responsibility on the seller. See id. at 399." [31]

125. As to the NCLL and warranty claims, this isn't a case a defect but rather, the relief to which consumers are entitled when a manufacturer fails to provide a limited warranty repair remedy in a reasonable time.

126. Under NCLL, the UCC and/or the MMWA, proof of the existence of a problem in the vehicle or of negligence on any defendants' part is not a prerequisite to a finding that the problems substantially impair the vehicle's use and/or value and/or safety. [32]

---

[30] *G.M.A.C. v. Jankowitz*, 216 N.J. Super. 329, 330-331 (App. Div. 1987); *Chatlos Systems v. NCR Corp., Inc.*, 635 F.2d 1081, 1085-1086 (3rd Cir. 1980); N.J.S.A. 12A:2-719(2); *Smith v. Chrysler*, 1990 WL 65700 (E.D.Pa. 1990); *Beal v. General Motors Corporation*, 354 F. Supp. 423, 426, 427 (1973).

[31] *Gladden v. Cadillac Motor Car Div.*, 83 N.J. 320 (1980).

[32] As stated by the court in *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226 (App. Div. 2012): "the plaintiff in a warranty action need not establish the existence of a .

127.  To establish the existence of a defect or nonconformity impairing the product's vehicle's use or value, plaintiffs need only identify the effect of a defect rather than pinpointing its cause.[33]

128. As further explained by the Appellate Division, the "intent" of the Lemon Law is to "provide procedures to expeditiously resolve disputes between a consumer and a manufacturer when defects in a new motor vehicle are not corrected within a reasonable time," and to provide "specific remedies where the uncorrected defect substantially impairs the use, value, or safety of the new motor vehicle." Ibid. Toyota's construction of the statute would turn this expeditious administrative proceeding into a full blown litigation entangling the consumer in the intricacies of design defects and other complexities of product liability law. The Legislature clearly intended to spare the unfortunate buyer of a "lemon" those hazards and costs.[34]

129. Moreover, to establish a breach of warranty, plaintiffs need not show that

---

defect; the failure of the goods to perform as warranted is sufficient." Spring Motors, supra, 98 N.J. at 586, 489 A.2d 660;accord Gen. Motors Acceptance Corp. v. Jankowitz, 216 N.J. Super. 313, 336, 523 A.2d 695 (App. Div.1987). Proof of causation must still be shown in a case based on breach of an express warranty, but "mere failure of promised performance is enough without proof of any defect." Realmuto v. Straub Motors, Inc., 65 N.J. 336, 343, 322 A.2d 440 (1974) (citing Collins v. Uniroyal, Inc., 64 N.J. 260, 262, 315 A.2d 16 (1974)). In Jankowitz, supra, 216 N.J. Super. at 320–22, 336–37, 523 A.2d 695, on facts that resemble those of this case, we held that the buyer of a new car was not required to produce expert evidence to prove that the manufacturer's and the seller's failure to repair the car was a breach of the express warranty they had provided.  See also Ventura v. Ford Motor Corp., 180 N.J. Super. 45, 53–54, 433 A.2d 801 (App. Div.1981).
[33] Christelles v. Nissan Motor Corp., 305 N.J. Super. 222, 228-229 (App. Div. 1997).
[34] Berrie v. Toyota Motor Sales, USA, Inc., 630 A.2d 1180, 267 N.J. Super. 152 (App. Div. 1993).

defendants acted negligently or in bad faith.[35]

130. The MMWA includes a private cause of action for consumers damaged by a breach of warranty as follows: "(d) Civil action by consumer for damages, etc.; jurisdiction; recovery of costs and expenses; cognizable claims (1) Subject to subsections (a)(3) and (e), a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief— (A) in any court of competent jurisdiction in any State or the District of Columbia; or (B) in an appropriate district court of the United States, subject to paragraph (3) of this subsection. (2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

131. The MMWA envisions class action treatment of claims brought pursuant to the MMWA.[36]

132. In this case, since this pleading doesn't name over 100 putative class action

---

[35] *Chatlos Systems v. NCR Corp., Inc.*, 635 F.2d 1081, 1085 (3rd Cir. 1980).
[36] 15 U.S.C. § 2310.

representatives, this court and not any district court, has jurisdiction over the dispute – an issue that cannot be circumvented by the Class Action Fairness Act (CAFA).[37]

133. Pursuant to 15 U.S.C. § 2310(e), plaintiffs are entitled to bring this class action and are not required to give defendants notice and an opportunity to cure until such time as the court determines the representative capacity of plaintiffs.

134. The CFA is a statute that is to be applied broadly given the statute's remedial purpose.[38]

135. Under the CFA, "(d) The term "person" as used in this act shall include any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof;" N.J.S.A. 56:8-1(d).

136. The parties meet the definition of "person" as set forth in N.J.S.A. 56:8-1(d).

137. Under the CFA, "[t]he term "advertisement" shall include the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter

---

[37] 15 U.S.C. § 2310. As to class actions, MMWA's requirement to name one hundred plaintiffs must be met independently of CAFA's jurisdictional standard." *Floyd v. Am. Honda Motor Co.*, 2018 WL 6118582, at *3 (C.D. Cal. June 13, 2018) (Wilson, J.); *MacDougall v. Am. Honda Motor Co.*, 2017 WL 8236359, at *4 (C.D. Cal. Dec. 4, 2017) (Guilford, J.); *Cadena v. Am. Honda Motor Co.*, 2019 WL 3059931, at *11 (C.D. Cal. May 29, 2019) (Fitzgerald, J.). "CAFA—a basis for federal courts to exercise jurisdiction over state law disputes between diverse parties—doesn't fill in the gaps for missing substantive requirements of a federal law." *MacDougall*, 2017 WL 8236359, at *4.
[38] *Lemelledo v. Beneficial Management Corp. of Am.*, 150 N.J. 255, 264 (1997); *Blatterfein v. Larken Associates*, 323 N.J. Super. 167, 178 (App. Div. 1999).

into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof or to make any loan;...." N.J.S.A. 56:8-1(a).

138. Under the CFA, "[t]he term "merchandise" shall include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale;...." N.J.S.A. 56:8-1(c).

139. The vehicle is merchandise subject to the CFA.

140. Under the CFA, the term "sale" shall include any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute. N.J.S.A. 56:8-1(e).

141. The sale of the vehicle constitutes a "sale" under the CFA.

142. Further, N.J.S.A. 56:8-2 states, in pertinent part: "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice...." N.J.S.A. 56:8-2.

143. The CFA is designed to protect the public even when a merchant acts in good faith.[39]

144. As to any individual defendants facing CFA violations pled in this pleading,

---

[39] *Cox v. Sears*, 138 N.J. 2, 16 (1994).

under the CFA, there is no need to pierce any corporate or company veil; the Court instead focuses on individual defendants' misconduct supporting CFA violations.

145. Therefore, assuming for argument's sake that the individual defendants named to this case operated via one or more valid corporations or companies, the corporate veil does not insulate corporate officers or employees or company managing members or employees from CFA liability.[40]

146. Defendants' course of conduct in this dispute provides evidence of a section 2 knowing omission violation of N.J.S.A. 56:8-2 (section 2) via unlawful practices, both in the initial transaction and in subsequent performance.

147. Relative to the vehicle's problems, which were known to defendants before plaintiffs purchased the vehicle and which defendants failed to disclose to plaintiffs, defendants committed a knowing omission involving the following: (1) nondisclosure—"a fact existing at the time of the transaction was not disclosed"; (2) materiality of fact undisclosed—"the fact, if disclosed, would be important to the plaintiffs' decision to purchase or to the decision of any reasonable buyer"; (3) knowledge— defendants "knew the fact and its importance at the time of the transaction"; and (4) intentional concealment— defendants withheld the information intending for the buyer to make a decision without knowing the fact.

148. Defendants engaged in an "omission" - the act of neglecting to do what the law requires and liability is imposed for such inaction because of the existence of a

---

[40] *Allen v. V & A Bros.*, 208 N.J. 114 (2011).

duty to act under the circumstances.[41]

149. Vehicle purchasers such as plaintiffs have viable knowing omission claims where, as here, a manufacturer designs and distributes a vehicle with a problem not readily discoverable by customers but of which the manufacturer was aware yet failed to disclose to those customers.[42]

150. Unlike the usual vehicle put into the steam of commerce with a warranty, the manufacturer was not in good faith insuring against a risk but actually knew *with certainty* that the product at issue or one of its components was going to fail.[43]

151. Plaintiffs need not prove their case on the pleadings but rather, must merely allege details showing that it is *plausible* that defendants knew of the problems before the sale and yet failed to disclose same to plaintiffs.[44]

152. There is evidence of defendants' foreknowledge of failure because defendants

---

[41.] New Jersey Model Civil Jury Charge 4:43.

[42.] *Robinson v. Kia Motors Am., Inc.*, No. 13-006, 2015 U.S. Dist. LEXIS 121755 (D.N.J. Sept. 11, 2015). The court explained:  In addition to the allegations of knowledge described above, Plaintiffs further assert that Kia was aware of the defect based on (1) online customer complaints about the alleged problem, and (2) a technical service bulletin ("TSB") issued by Defendants . . . . Specifically, Plaintiffs direct the Court to specific websites that they allege contain complaints about the crankshaft pulley bolt problem. (*Id.*). They include detailed information regarding the names of the websites and the number and nature of the complaints. (*Id.*). In addition, Plaintiffs allege that a TSB issued in June 2007 that "identified the problem discussed in this complaint stating: '[t]he Crankshaft Pulley bolt may become loose, especially if improperly torqued during routine service . . . .'" At least one New Jersey Plaintiff, Robinson, purchased her vehicle after the June 2007 TSB was issued . . . . Its "publication adds further plausibility to [plaintiffs'] allegations that [d]efendants had knowledge of . . . the alleged defect."

[43.] *Coba v. Ford Motor Co.*, No. 12-1622 (KM) (MAH), 2017 U.S. Dist. LEXIS 123546 (D.N.J. Aug. 4, 2017).

[44] *Leon v. Rite Aid Corp.*, 340 N.J. Super. 462, 472 (App. Div. 2001).   See also *Printing Mart v. Sharp Elecs.Corp.*, 116 N.J. 739, 746 (1989)("…in determining whether dismissal under Rule 4:6-2(e) is warranted, the court should not concern itself with the plaintiffs' ability to prove its allegations.").

knew the problems plagued successive model years of 450 GLEs (as evidenced

by comments on the aforesaid vehicle owner forum indicating the repeated

reporting of failures for identical or near identical or related reasons) and yet

failed to correct the problems for subsequent model year lines.[45]

153. In addition to the aforesaid misconduct referenced above, during the course of

the transaction or during subsequent performance of obligations, defendants may

have committed other types of CFA violations, such as failure to make other

mandatory disclosures or the like – misconduct which may be uncovered during

the course of discovery.

154. To the extent that substantial aggravating circumstances are necessary for any

of the aforesaid CFA violations, all of the aforesaid misconduct amounted to

substantial aggravating circumstances over and above a mere breach of contract

and/or breach of warranty and therefore, said misconduct was sufficient to trigger

one or more CFA violations.

155. Substantial aggravating circumstances may include, 'existence of bad faith or

---

[45]. *T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-04209 (WHW) (CLW), 2015 U.S. Dist. LEXIS 29678 (D.N.J. Mar. 11, 2015). The court explained: Plaintiff buttresses this allegation with a research report from CK Commercial Vehicles, published before Plaintiff purchased any of its tractors, which indicates that 37% of a group of users of tractors with Cummins engines experienced "a high rate of cracked DPF filters . . . ." [T]he amended complaint also alleges that Defendants learned about these defects through "[t]he on-board diagnostics systems . . . that store trouble or fault codes and provide data to Defendants' and/or their authorized service providers' diagnostic computers." On a motion for class certification of the CFA claims, the district court held that the plaintiffs' CFA claims sufficed. As to ascertainable loss, one plaintiff incurred over $80,000 in post-warranty repair costs. *T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-4209 (WHW) (CLW), 2015 U.S. Dist. LEXIS 29678 (D.N.J. June 7, 2016).

lack of fair dealing.'"[46]

156. Substantial aggravating circumstances are present in this case because defendants, possessing knowledge of the vehicle's predelivery problems, acted in bad faith and failed to deal fairly with plaintiffs because defendants: (1) put into the stream of commerce and continued to offer the vehicle for sale to consumers such as plaintiffs while failing to disclose the vehicle's problems; (2) were aware that the problems would manifest themselves within the warranty period and that the vehicle would fail yet failed to disclose that information to plaintiffs; and (3) provided repeated repairs that defendants knew would not fix the vehicle or fix the vehicle in a reasonable period of time while failing to disclose such fact to plaintiffs and while failing to simply provide plaintiffs with a UCC revocation of acceptance remedy or NCLL statutory repurchase remedy.[47]

157. When purchasing the vehicle, plagued as it is by the problems of which the manufacturer was aware of presale, plaintiffs failed to receive the benefit of plaintiffs' bargain. The vehicle's value is substantially impaired by the predelivery

---

[46] JWQ Cabinetry Inc. v. Granada Wood & Cabinets Inc., No. 13-4110 (FLW), 2015 U.S. Dist. LEXIS 31730 (D.N.J. Mar. 16, 2015) (citing Petri Paint Co., Inc. v. OMG Ams., Inc., 595 F. Supp. 2d 416, 420 (D.N.J. 2008)) (citing, in turn, Cox v. Sears Roebuck & Co., 138 N.J. 2, 18 (1994)).

[47] See, e.g., Mickens v. Ford Motor Co., 900 F. Supp. 2d 427, 443 (D.N.J. 2012) (citing Perkins v. DaimlerChrysler Corp., 383 N.J. Super. 99, 111-12 (App. Div. 2006); Maniscalco v. Brother Int'l Corp. (USA), 627 F. Supp. 2d 494, 501 (D.N.J. 2009); Kuzian v. Electrolux Home Prods., Inc., No. 12-3341 (NLH/AMD), 2013 U.S. Dist. LEXIS 44050, at *29-30 (D.N.J. Mar. 27, 2013)(A putative class of plaintiffs alleged that defective ice makers failed to produce ice, leaked water into the refrigerators causing the electrical components to short out and malfunction, thereby caused the refrigerators to warm to unsafe temperatures and that the defective ice makers and resulting leaks caused food to spoil and caused damage to flooring, walls and other personal property beyond the refrigerator itself.).

problems of which plaintiffs only became aware after taking delivery of the
vehicle.

158. Plaintiffs had the vehicle examined by a mechanic expert and that expert
determined that the vehicle suffered a diminution in value and that the defect
affects the vehicle's use, value and safety.  Exhibit H.

159. That diminution in the vehicle's value due to its repair history establishes the
basis for an ascertainable loss of money or property proximately caused by the
CFA violations detailed above that is able to be ascertained within a reasonable
degree of certainty.[48]

160. The potential for future repair costs to attempt to fix the problems once the
warranty is over is evidence of an out of pocket ascertainable loss of money that
is able to be ascertained within a reasonable degree of certainty.[49]  Where, as
here, someone faces or expects to incur an out of pocket loss, such a loss
equates with an ascertainable loss sufficient to support liability under the CFA.[50]

---

[48]. *Bang v. BMW of N. Am., LLC*, No. 15-6945, 2016 U.S. Dist. LEXIS 166329 (D.N.J.
Dec. 1, 2016). The court explained: Here, Plaintiffs have alleged injuries that have
already occurred, as well as imminent future injury. Specifically, all Named Plaintiffs
have alleged economic injury in the form of diminished resale value of their vehicles. In
addition, Plaintiffs spent time taking their vehicles to BMW repair centers. Several
Plaintiffs have also incurred out-of-pocket costs to purchase extra oil and replacement
batteries. Accordingly, they have satisfied Article III's injury in fact requirement.
*Bang v. BMW of N. Am., LLC*, No. 15-6945, 2016 U.S. Dist. LEXIS 166329 (D.N.J. Dec.
1, 2016).
[49] *T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-4209 (WHW) (CLW), 2015 U.S.
Dist. LEXIS 29678 (D.N.J. June 7, 2016).(one plaintiff incurred over $80,000 in post-
warranty repair costs.).
[50] See *Cox v. Sears Roebuck & Co.*, 138 N.J. 2 (1994); *Thiedemann v. Mercedes-Benz
USA*, 183 N.J. 234 (2005).  Under the CFA one does not need to actually incur the loss
to sufficiently allege same in a pleading.  See *Thiedemann v. Mercedes-Benz USA*, 183
N.J. 234 (2005).

161. Making payments on a vehicle while it is being repaired for approximately 47

days is evidence of an out of pocket ascertainable loss – i.e., paying for a vehicle

that is unable to be used.

162. Being deprived of the use of a vehicle while it is undergoing repairs is an

ascertainable loss of property. See N.J.S.A. 56:8-2.

163. Plaintiffs are considering purchasing substitute transportation to replace the

vehicle and if plaintiffs do so, the cost of that substitute transportation will be

evidence of an out of pocket ascertainable loss.

164. If plaintiffs rent a vehicle or pay for public transportation or rideshares or taxi so

that plaintiffs don't have to drive an unreliable vehicle, those costs will be

evidence of an out of pocket ascertainable loss.

165. Had plaintiffs received disclosure of the problems before purchasing the

vehicle, plaintiffs would have never paid out of pocket for the vehicle and that

purchase price – paid for a vehicle with problems that can't be fixed in a

reasonable time or perhaps ever under the warranty - establishes an out of

pocket ascertainable loss of money that is able to be ascertained within a

reasonable degree of certainty.[51]

166. Because plaintiffs suffered an ascertainable loss as aforesaid, treble damages

---

[51.] *BK Trucking Co. v. PACCAR, Inc.*, No. 15-2282 (JBS/AMD), 2016 U.S. Dist. LEXIS 85149 (D.N.J June 30, 2016)(Vehicle buyers claimed vehicles equipped with emission treatment system are defective and render plaintiffs' vehicles inoperable due to the engines' constant failure despite repeated warranty repair and the precise details of those systems are in the exclusive control of defendants. Plaintiffs have further alleged that, if defendants had disclosed to them the nature of the ATS and its impact on the engine, they would not have bought vehicles equipped with the engine or would not have paid over $100,000 for them).

are available for the CFA aforesaid CFA violations.[52]

167. Equitable relief is available in the form of a full refund and a judgment or order declaring the aforesaid misconduct as illegal.[53]

168. In addition, a statutory refund is sought – that is, relief pursuant to the CFA's refund provision, which states: "Any person violating the provisions of the within act shall be liable for a refund of all moneys acquired by means of any practice declared herein to be unlawful.[54] The refund of moneys herein provided for may be recovered in a private action or by such persons authorized to initiate actions pursuant to P.L.1975, c. 376 (C. 40:23-6.47 et seq.).[55]" The New Jersey Supreme Court explained the separate cause of action available for refunds as follows: "The CFA vests the Attorney General with jurisdiction to enforce its provisions through a variety of mechanisms, N.J.S.A. 56:8-3 to -8, -11, -15 to -18, & -20, but it also provides individual consumers with a cause of action to recover refunds, N.J.S.A. 56:8-2.11 to -2.12, and treble damages for violations, whether in good faith or otherwise, N.J.S.A. 56:8-19."[56]

169. Pursuant to the CFA, an award of counsel fees and litigation costs is also sought.[57]

170. One or more statutes pled herein provide for fee shifting for parties hiring

---

[52] N.J.S.A. 56:8-19.
[53] N.J.S.A. 56:8-19.
[54] N.J.S.A. 56:8-2.11.
[55] N.J.S.A. 56:8-2.12. The last reference in this provision to "P.L.1975, c. 376 (C. 40:23-6.47 et seq.)" refers to actions by the offices of the Department of Consumer Affairs.
[56] *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255 (1997).
[57] . *Artistic Lawn & Landscape Co., Inc. v. Smith*, 381 N.J. Super. 75, 89 (Law Div. 2005) (citing *BJM Insulation & Constr., Inc. v. Evans*, 287 N.J. Super. 513 (App. Div. 1996)).

counsel and prevailing under said statutes.

171. Accordingly, the counsel bringing this case serves as a private attorney general.[58]

172. Otherwise, consumers pursuing claims under fee shifting states might incur potentially considerable expense for a potentially small recovery.[59]

173. Plaintiffs bring this putative class action for damages, repurchases, refunds, equitable and injunctive relief on behalf of themselves and applicable New Jersey citizens.

174. More specifically and subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, plaintiffs propose the following class of persons who purchased or leased a 2021 or older 450 GLE vehicle (class vehicle) manufactured or assembled or distributed by defendants, with the vehicle being purchased, leased or registered in New Jersey.

175. Excluded from the class are: (a) defendants, any entity in which defendant has a controlling interest and its legal representatives, officers, directors, employees, assigns and successors; (b) the Judges to whom this case is assigned and any member of the Judges' staff or immediate family; and (c) class counsel.

176. Plaintiffs seek only damages and injunctive relief on behalf of themselves and the class members. Plaintiffs disclaim any intent or right to seek any recovery in

---

[58] See *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 268 (1997).
[59] See, e.g., *Skeer v. EMK Motors, Inc.*, 187 N.J. Super. 465, 470 (App. Div. 1982)(discussing fee shifting under the CFA); *Chattin v. Cape May Greene, Inc.*, 243 N.J. Super. 590, 610 (App. Div. 1990), aff'd o.b., 124 N.J. 520 (1992) (citing *Coleman v. Fiore Bros.*, Inc., 113 N.J. 594, 598 (1989))(same); *Furst v. Einstein Moomjy*, 182 N.J. , 21 (2004)(same).

this action for personal injuries, wrongful death, or emotional distress suffered by plaintiffs and/or the class members.

177. Defendants are in exclusive possession, custody and control of the list of persons who were class members in the prior case and any other cases.

178. While there may be other cases pending against defendants, upon information and belief, the proposed class members' claims in this matter don't overlap with those other pending cases.

179. It isn't the intent to have overlapping classes and any overlap will be ameliorated through amendment if facts show that they do overlap.

180. Defendants' actions are not isolated.

181. Defendants' actions have affected similarly situated individuals throughout the State of New Jersey.

182. Defendants acted on grounds generally applicable to the class members, thereby justifying relief against defendants for the class members as whole.

183. Plaintiffs are members of the class that they seek to represent.

184. The class is believed to number at least hundreds, if not thousands, of persons and their joinder is impracticable, except by via a class action.

185. The disposition of the claims of the class in a class action will benefit both the parties and the Court.

186. There are questions of law and/or fact common to the class predominating over any question affecting only individual class members as to whether defendants are liable to plaintiffs for violation of applicable law. For instance, are defendants liable for the class action claims pled in the complaint?

187. Class certification is also appropriate because defendants acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to plaintiffs and the class members.

188. Specifically, plaintiffs seek injunctive relief via a court judgment or order requiring an end to the unlawful practices and/or the issuance of a corrective or explanatory notice to the class members.

189. Plaintiffs' claims are typical of the claims of the class insofar as named class representatives and the members of the class were similarly exposed to the statutory harms alleged herein and were similarly injured and/or face similar risks therefrom.

190. The proposed class representatives state a claim upon which relief can be granted that is typical of the claims of absent class members. If brought and prosecuted individually, the claims of each class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

191. Plaintiffs will fairly and adequately represent the interests of the class insofar that the plaintiffs' claims are typical of those of the class members.

192. Plaintiffs are committed to the vigorous representation of the class members.

193. Plaintiffs retained counsel experienced and skilled in consumer law and class action litigation.

194. Plaintiffs have no conflict of interest in the maintenance of this class action.

195. If the matter is maintained as a class action, it shall provide for a fair and efficient adjudication of this dispute.

196. The claims and remedial theories pursued by the named class representative are sufficiently aligned with the interests of absent class members to ensure that the individual claims of the class will be prosecuted with diligence and care by the individual plaintiffs as class representatives.

197. Contrawise, especially in view of the small dollar amounts in controversy relative to the individual plaintiffs' claims, it would be impracticable and undesirable for each member of the class who suffered harm to bring a separate action.

198. Further, the maintenance of separate actions in lieu of the instant proposed class action would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications.

199. Contrawise, a single class action such as the instant proposed class action can determine the rights of all class members while economizing judicial resources.

200. Moreover, as plaintiffs invoked consumer protection statutes and have pled a prima facie case for the violation of same, the policy goals behind those consumer protection statutes provide further reason for permitting class action certification of the instant action.

201. The benefits of adjudicating this case via a class action far outweigh any difficulties in management of the case as a class action.

202. Class action treatment of this case is a superior method for the fair and efficient adjudication of this dispute because:

- individual claims by the class members are impractical as the costs of pursuit far exceed what any one plaintiff or class member has at stake;

- as a result, there has been no other litigation over the controversies herein;

- individual members of the class have no interest in prosecuting and controlling separate actions; and

- the proposed class action is manageable.

- the proposed class is readily ascertainable.

203. Certification of the class under R. 4:32 or Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate because defendants acted on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

204. Certification of the class under R. 4:32 or Rule 23(b)(3) of the Federal Rules of Civil Procedure is appropriate in that: (a) the questions of law or fact common to the members of the class predominate over any questions affecting an individual member; and (b) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

205. Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual lawsuits would entail.

206. Absent a class action, many members of the class will likely not even obtain relief, whether because they are unaware of their right to relief from the harm caused by defendants' illegal practices, due to the prohibitive time and monetary cost inherent in individual litigation, or otherwise.

207. While the exact number of class members is unknown to plaintiffs at this time and can only be determined by appropriate discovery, membership in the class is ascertainable based upon the records maintained by defendants and governmental officials.

208. Upon information and belief, during the relevant time periods, over one hundred of the class vehicles, if not thousands of class vehicles, were sold, leased or registered in New Jersey.

209. Therefore, the class members are so numerous that individual joinder of all class members is impracticable under R. 4:32 or Fed. R. Civ. P. 23(a)(1).

210. Plaintiffs' claims are typical of the claims of the class members whom they seek to represent under R. 4:32 or Fed. R. Civ. P. 23(a)(3) because plaintiffs and each class member have a vehicle with the same problems.

211. Plaintiffs will fairly and adequately represent and protect the interests of the class members as required by R. 4:32 or Fed. R. Civ. P. 23(a)(4).

212. Plaintiffs are adequate representatives because their interests do not conflict with the interests of the class members and intend to vigorously prosecute this case.

213. Further, plaintiffs retained counsel (i.e., Lewis Adler and Paul DePetris) competent and experienced in complex class action litigation, including putative automotive warranty class action litigation and New Jersey CFA litigation and who together certified at least eight (8) class actions and intend to vigorous prosecute this case.

214. Therefore, the interests of the class members will be fairly and adequately

protected.

215. A class action is appropriate under R. 4:32 or Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to class members predominate over any questions affecting only individual members and a class action is superior to any other available means for fairly and efficiently adjudicating the controversy.

216. The class members' interests in individually controlling the prosecution of separate actions is low given the magnitude, burden, and expense of individual prosecutions against large merchants such as defendants.

217. Plaintiffs nor their counsel are aware of any pending litigation concerning this controversy already begun by any of the class members.

218. It is desirable to concentrate this litigation in this forum to avoid burdening the courts with individual lawsuits.

219. As interpreted by New Jersey courts, New Jersey consumer statutes lend themselves to class action treatment, lest viable individualized consumer claims go unprosecuted due to the dubious utility of prosecuting them on individual bases.

220. Further, individualized litigation presents a potential for inconsistent or contradictory results and increases delay and expense to all parties and the court system presented by the legal and factual issues of this case.

221. The proposed class action has no management difficulties.

222. Defendant's records and the records available publicly will easily identify the class members.

223. As the problems are common to all the class vehicles, the same documents

and testimony shall prove plaintiffs' and the class members' claims.

224. If the case proceeds as a class action, the parties and the court system shall benefit via a single adjudication, economies of scale and comprehensive supervision by a single court.

225. A class action is appropriate under R. 4:32 or Fed. R. Civ. P. 23(b)(2) because, as detailed above, defendants acted or refused to act on grounds applicable generally to the class members, so that final injunctive relief or corresponding declaratory relief is appropriate as to all class members.

## COUNT 1

### VIOLATION OF THE NEW JERSEY NEW CAR LEMON LAW

### PLED BY PLAINTIFFS AND THE CLASS AGAINST THE MANUFACTURER

226. The allegations contained in the previous paragraphs are repeated as if fully set forth.

227. This count is pled by plaintiffs and the class against the manufacturer.

228. Pursuant to N.J.S.A. 56:12-31, et seq., plaintiffs reported the problems and/or nonconformities with the vehicle to the manufacturer via the dealer and/or the repairing dealers (the dealers repairing the vehicle) directly to the manufacturer and thereby gave the manufacturer a reasonable number of opportunities to repair the vehicle.

229. After said notification and/or a reasonable number of repair attempts to the vehicle as performed by the manufacturer (either itself or via the dealer and/or repairing dealers), the manufacturer was unable to repair the problems and/or nonconformities in a reasonable period of time.

230. In violation of N.J.S.A. 56:12-29, et seq., the problems and/or nonconformities substantially impair or impaired the vehicle's use, value and/or safety.

231. The NCLL states, in relevant part:[60] "[i]f, during the period specified in section 3 of this act, the manufacturer, or, in the case of an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier, of that part of the motor vehicle containing the nonconformity, or its dealer or distributor, is unable to repair or correct the nonconformity within a reasonable time, the manufacturer, comanufacturer, or post-manufacturing modifier shall accept return of the motor vehicle from the consumer. (1) In the case of a motor vehicle, other than an authorized emergency vehicle as set forth in paragraph (2) of this subsection, the manufacturer shall provide the consumer with a full refund of the purchase price of the original motor vehicle including any stated credit or allowance for the consumer's used motor vehicle, the cost of any options or other modifications arranged, installed, or made by the manufacturer or its dealer within 30 days after the date of original delivery, and any other charges or fees including, but not limited to, sales tax, license and registration fees, finance charges, reimbursement for towing and reimbursement for actual expenses incurred by the consumer for the rental of a motor vehicle equivalent to the consumer's motor vehicle and limited to the period during which the consumer's motor vehicle was out of service due to the nonconformity, less a reasonable allowance for vehicle use. (2) In the case of an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier shall provide

---

[60] N.J.S.A. 56:12-32.

Page 52 of 69

the consumer with a full refund of the purchase price of the original emergency vehicle, depending on the source of the nonconformity, including any stated credit or allowance for the consumer's used emergency vehicle, as well as any other charges or fees, including, but not limited to, sales tax, license and registration fees, reimbursement for towing and reimbursement for actual expenses incurred by the consumer for the rental of a substitute emergency vehicle, if applicable, for the period during which the consumer's emergency vehicle was out of service due to the nonconformity. (3) Nothing in this subsection shall be construed to preclude a manufacturer, co-manufacturer, or post-manufacturing modifier from making an offer to replace the vehicle in lieu of a refund; except that the consumer may, in any case, reject an offer of replacement and demand a refund. Refunds shall be made to the consumer and lienholder, if any, as their interests appear on the records of ownership maintained by the Chief Administrator of the New Jersey Motor Vehicle Commission. In the event that the consumer accepts an offer to replace the motor vehicle in lieu of a refund, it shall be the manufacturer's, co-manufacturer's, or postmanufacturing modifier's responsibility to insure that any lien on the returned motor vehicle is transferred to the replacement vehicle. b. A consumer who leases a new motor vehicle shall have the same remedies against a manufacturer, co-manufacturer, or post-manufacturing modifier under this section as a consumer who purchases a new motor vehicle. If it is determined that the lessee is entitled to a refund pursuant to subsection a. of this section, the consumer shall return the leased vehicle to the lessor or manufacturer, co-

Case 2:21-cv-10275-BRM-RJW 2020-3-43-58 PM Page 066087 Pahs Page 6202 2057 20 gelD: 73

manufacturer, or post-manufacturing modifier, and the consumer's lease

agreement with the motor vehicle lessor shall be terminated and no penalty for

early termination shall be assessed. The manufacturer, co-manufacturer, or post-

manufacturing modifier shall provide the consumer with a full refund of the

amount actually paid by the consumer under the lease agreement, including any

additional charges as set forth in subsection a. of this section if actually paid by

the consumer, less a reasonable allowance for vehicle use. The manufacturer,

comanufacturer, or post-manufacturing modifier shall provide the motor vehicle

lessor with a full refund of the vehicle's original purchase price plus any

unrecovered interest expense, less the amount actually paid by the consumer

under the agreement. Refunds shall be made to the lessor and lienholder, if any,

as their interests appear on the records of ownership maintained by the Chief

Administrator of the Motor Vehicle Commission.

232. While plaintiffs, via plaintiffs' counsel, offered to return the vehicle to the

manufacturer, to date and in violation of N.J.S.A. 56:12-32, the manufacturer

never accepted return of the vehicle from plaintiffs and never provided plaintiffs

with a full refund of the purchase price of the vehicle as required by N.J.S.A.

56:12-32.

233. Pursuant to N.J.S.A. 56:12-32 and N.J.S.A. 56:12-42, plaintiffs seek a refund

and other actual expenses incurred (including any expert witness fees incurred)

as well as attorney's fees and court costs.

234. As set forth on the certifications annexed to this pleading, plaintiffs complied

with the provisions of N.J.S.A. 56:12-41.

## COUNT 2

## SECTION 2 CFA VIOLATIONS

## PLED BY PLAINTIFFS AND THE CLASS AGAINST THE MANUFACTURER

235. The allegations contained in the previous paragraphs are repeated as if fully set forth herein.

236. This count is pled by plaintiffs and the class against the manufacturer.

237. Given defendants' omission about the problems and the predelivery repairs, defendants engaged in knowing omission affirmative act section 2 CFA violations via unlawful practices, both in the initial transaction and in subsequent performance thereof.

238. By failing to alert or disclose presale to plaintiffs the existence of the problems of which defendants had knowledge, defendants engaged in an "omission" - the act of neglecting to do what the law requires and liability is imposed for such inaction because of the existence of a duty to act under the circumstances.[61]

239. Therefore, the following occurred in this case:  (1) nondisclosure by the manufacturer — "a fact existing at the time of the transaction was not disclosed"; (2) materiality of fact undisclosed by the manufacturer — "the fact, if disclosed, would be important to the plaintiffs' decision to purchase or to the decision of any reasonable buyer"; (3) knowledge on the part of the manufacturer — the merchant "knew the fact and its importance at the time of the transaction"; and (4) intentional concealment by the manufacturer — the merchants withheld the information intending for the buyer to make a decision without knowing the fact.

---

[61.] New Jersey Model Civil Jury Charge 4:43.

240. In addition to the aforesaid misconduct referenced above, during the course of the transaction or during subsequent performance of obligations, defendants may have committed other types of CFA violations, such as failure to make other mandatory disclosures or the like – misconduct which may be uncovered during the course of discovery.

241. To the extent that substantial aggravating circumstances are necessary for any of the aforesaid CFA violations, all of the aforesaid misconduct amounted to substantial aggravating circumstances over and above a mere breach of contract and/or breach of warranty and therefore, said misconduct was sufficient to trigger one or more CFA violations. This is because defendants' entire course of conduct indicates a lack of good faith and fair dealing towards plaintiffs and a predatory approach instead of one that was honest and forthright.

242. As a proximate result of the section 2 CFA violations detailed above, plaintiffs incurred out of pocket ascertainable losses of money detailed above.

243. For example, a merchant's sticker price for a product or service can provide evidence of loss – even if that price is greater than fair market value.[62]

244. Therefore, the dealer's sales price for the vehicle provides a measure of loss.

245. Where, as here, someone faces or expects to incur or actually incurs an out of pocket loss, such a loss equates with an ascertainable loss sufficient to support liability under the CFA.[63]

---

[62] *Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1 (2004).

[63] See *Cox v. Sears Roebuck & Co.*, 138 N.J. 2 (1994); *Thiedemann v. Mercedes-Benz USA*, 183 N.J. 234 (2005). Under the CFA one does not need to actually incur the loss if they have an estimate thereof. *Thiedemann v. Mercedes-Benz USA*, 183 N.J. 234 (2005). Further, a merchant's sticker price can provide evidence of loss. *Furst v.*

246. In addition, plaintiffs failed to receive the benefit of the bargain – the vehicle at
the promised price and free from the undisclosed problems. The vehicle's value
is diminished as stated by the expert report submitted herewith.  Exhibit H.

247. Therefore, the vehicle is worth less than its purchase price and plaintiffs didn't
get the vehicle in the condition promised and therefore, has a claim of
ascertainable loss of money or property associated therewith.

248. Treble damages are available for the aforesaid misconduct.[64]

249. Equitable relief is available in the form of a full refund and a judgment or order
declaring the aforesaid misconduct as illegal.[65]

250. In addition, a statutory refund is sought – that is, relief pursuant to the CFA's
refund provision, which states: "Any person violating the provisions of the within
act shall be liable for a refund of all moneys acquired by means of any practice
declared herein to be unlawful.[66]  The refund of moneys herein provided for may
be recovered in a private action or by such persons authorized to initiate actions
pursuant to P.L.1975, c. 376 (C. 40:23-6.47 et seq.).[67]"  The New Jersey
Supreme Court explained the separate cause of action available for refunds as
follows: "The CFA vests the Attorney General with jurisdiction to enforce its
provisions through a variety of mechanisms, N.J.S.A. 56:8-3 to -8, -11, -15 to -18,
& -20, but it also provides individual consumers with a cause of action to recover

---

*Einstein Moomjy, Inc.*, 182 N.J. 1, 12 (2004).
[64] N.J.S.A. 56:8-19.
[65] N.J.S.A. 56:8-19.
[66] N.J.S.A. 56:8-2.11.
[67] N.J.S.A. 56:8-2.12.  The last reference in this provision to "P.L.1975, c. 376 (C. 40:23-6.47 et seq.)" refers to actions by the offices of the Department of Consumer Affairs.

refunds, N.J.S.A. 56:8-2.11 to -2.12, and treble damages for violations, whether

in good faith or otherwise, N.J.S.A. 56:8-19."[68]

251. Pursuant to the CFA, an award of counsel fees and litigation costs is also

sought.[69]

## COUNT 3

## BREACH OF EXPRESS WARRANTY AND VIOLATION OF THE MAGNUSON-MOSS

## WARRANTY—FEDERAL TRADE COMMISSION IMPROVEMENT ACT

## PLED BY PLAINTIFFS AND THE CLASS AGAINST THE MANUFACTURER

252. The allegations contained in the previous paragraphs are repeated as if fully set

forth.

253. This count is pled by plaintiffs and the class against the manufacturer.

254. Since the vehicle are goods, the UCC applies to this dispute.[70]

255. At the time of sale and/or thereafter, defendants or their agents issued plaintiffs

the warranty, which was an express warranty in accordance with the UCC and/or

the MMWA.

256. Plaintiffs accepted the vehicle in the belief that the vehicle conformed to the

aforesaid warranty.

---

[68] *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255 (1997).

[69]. N.J.S.A. 56:8-19; *Artistic Lawn & Landscape Co., Inc. v. Smith*, 381 N.J. Super. 75, 89 (Law Div. 2005) (citing *BJM Insulation & Constr., Inc. v. Evans*, 287 N.J. Super. 513 (App. Div. 1996)).

[70] As explained by the Appellate Division: Article 2 of the UCC applies to transactions in goods. N.J.S.A. 12A:2-102. "'Goods' mean all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities and things in action." N.J.S.A. 12A:2-105(1). *Dilorio v. Structural Stone & Brick*, 845 A.2d 658, 368 N.J. Super. 134 (N.J. Super., 2004).

257. Defendants expressly warranted the labor that defendants performed or caused
to be performed to the vehicle and/or parts that defendants replaced or caused to
be replaced on the vehicle.

258. Plaintiffs relied on said warranty and/or representations and believed them to
be true and would not have purchased the vehicle but for said warranty.

259. Following delivery of the vehicle to plaintiffs and problems arising therewith,
plaintiffs learned that the vehicle wasn't as warranted.

260. For, the vehicle, as originally delivered and/or subsequent to repair, exhibited
problems that substantially impair the vehicle's value to plaintiffs.

261. Plaintiffs performed plaintiffs' obligations under the aforesaid warranty,
including but not limited to plaintiffs' obligation to notify defendants of problems
that plaintiffs experienced with/exhibited by the vehicle and gave defendants a
reasonable time to correct and/or repair and/or address said problems and
defendants or their agents failed to correct and/or repair and/or address said
problems in a reasonable time.

262. By failing to correct and/or repair and/or remedy the vehicle's problems within a
reasonable time, defendants breached their obligations under the aforesaid
warranty.

263. The limited repair remedies that defendants provided to plaintiffs failed of their
essential purpose, as defendants were unable and/or unwilling to correct and/or
repair and/or remedy the vehicle's problems within a reasonable time. Therefore,
any disclaimers/limitations of liability contained in the warranty are null and void
under the doctrine of failure of essential purpose.

264. Defendants' failure to correct and/or repair and/or remedy the vehicle's problems within a reasonable time or to replace it with conforming goods in a reasonable period of time or to provide the remedy of revocation of acceptance constitute a breach of express warranty.

265. Pursuant to the MMWA, via one or more repair attempts referenced in this pleading (exhibit A) and before filing suit, plaintiffs afforded defendants a reasonable opportunity to cure defendants' failure to comply with the warranty but defendants failed to render such compliance.

266. Thereafter, pursuant to the UCC (N.J.S.A. 12A:2-608), plaintiffs provided defendants with a letter notifying defendants that plaintiffs revoked acceptance of the vehicle and demanded a refund from defendants pursuant to the UCC and/or MMWA. Exhibit A. However, to date, defendants refused to comply with said demand.

267. Defendants committed a breach of express warranty under the UCC and/or under that of any other jurisdiction whose law the Court finds applies to the instant action.

268. Plaintiffs are entitled to relief pursuant to N.J.S.A. 12A:2-608 and therefore, seek the remedy of revocation of acceptance in accordance therewith.

269. Plaintiffs are consumers as defined by 15 U.S.C. § 2301, defendants are warrantors as defined by 15 U.S.C. § 2301 and the vehicle is a consumer product as defined by 15 U.S.C. § 2301.

270. The provisions of 15 U.S.C. § 2301, et seq. apply to this case, because, pursuant to 15 U.S.C. § 2301-2303, defendants are manufacturers and/or sellers

and/or warrantors of a consumer product sold to plaintiffs with written and implied warranties and plaintiffs are entitled to enforce the provisions of same.

271. Pursuant to 15 U.S.C. § 2308, defendants provided a written warranty to plaintiffs in conjunction with the vehicle.

272. Defendants' breach of warranty caused plaintiffs to suffer a diminution of value in the vehicle. Accordingly, plaintiffs suffered damages by defendants' failure to comply with defendants' obligations under the U.C.C. and/or MMWA and/or under the aforesaid warranty and thus bring this action against defendants for damages and pursuant to 15 U.S.C. § 2310, et seq., plaintiffs are entitled to recover attorney's fees and court costs.

273. More specifically, 15 U.S.C. § 2310 states in part: "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief—(A) in any court of competent jurisdiction in any State or the District of Columbia…(2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiffs for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

274. Accordingly, pursuant to the UCC and the MMWA, plaintiffs seek the remedies of revocation of acceptance, damages applicable under those statues and an award of fees and costs pursuant to the MMWA.

## COUNT 4

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND VIOLATION OF THE MAGNUSON-MOSS WARRANTY—FEDERAL TRADE COMMISSION IMPROVEMENT ACT

## PLED BY PLAINTIFFS AND THE CLASS AGAINST THE MANUFACTURER

275. The allegations contained in the previous paragraphs are repeated as if fully set forth.

276. This count is pled by plaintiffs and the class against the manufacturer.

277. At the time of sale and/or thereafter, defendants failed to properly disclaim implied warranties in accordance with the UCC and/or the MMWA and/or defendants impliedly warranted that the vehicle was of merchantable quality and/or was reasonably fit and/or suitable for the purpose for which it was purchased.

278. Plaintiffs accepted the vehicle in the belief that the vehicle conformed to the aforesaid warranty.

279. Plaintiffs relied on said warranty and/or representations and believed them to be true and would not have purchased the vehicle but for said warranty.

280. Following delivery of the vehicle to plaintiffs and problems arising therewith, plaintiffs learned that the vehicle was not as warranted.

281. For, the vehicle, as originally delivered and/or subsequent to repair, exhibited

problems that substantially impair the vehicle's value to plaintiffs.

282. Plaintiffs performed plaintiffs' obligations under the aforesaid warranty, including but not limited to plaintiffs' obligation to notify defendants of problems that plaintiffs experienced with/exhibited by the vehicle and gave defendants a reasonable time to correct and/or repair and/or address said problems and defendants or their agents failed to correct and/or repair and/or address said problems in a reasonable time.

283. By failing to correct and/or repair and/or remedy the vehicle's problems within a reasonable time, defendants breached their obligations under the aforesaid warranty.

284. Defendants' failure to correct and/or repair and/or remedy the vehicle's problems within a reasonable time or to replace it with conforming goods in a reasonable period of time constitute a breach of defendants' warranty obligations, including but not limited to a breach of the implied warranty of merchantability.

285. Pursuant to the MMWA, via one or more repair attempts referenced in this pleading (exhibit A) and before filing suit, plaintiffs afforded defendants a reasonable opportunity to cure defendants' failure to comply with the warranty but defendants failed to render such compliance.

286. Thereafter, pursuant to the UCC (N.J.S.A. 12A:2-608), plaintiffs provided defendants with a letter notifying defendants that plaintiffs revoked acceptance of the vehicle and demanded a refund from defendants pursuant to the UCC and/or MMWA. Exhibit A. However, to date, defendants refused to comply with said

demand.

287. Defendants committed a breach of the implied warranty of merchantability under the UCC and/or under that of any other jurisdiction whose law the Court finds applies to the instant action.

288. Plaintiffs are entitled to relief pursuant to N.J.S.A. 12A:2-608 and therefore, seek the remedy of revocation of acceptance in accordance therewith.

289. Plaintiffs are consumers as defined by 15 U.S.C. § 2301, defendants are warrantors as defined by 15 U.S.C. § 2301 and the vehicle is a consumer product as defined by 15 U.S.C. § 2301.

290. The provisions of 15 U.S.C. § 2301, et seq. apply to this case, because, pursuant to 15 U.S.C. § 2301-2303, defendants are manufacturers and/or sellers and/or warrantors of a consumer product sold to plaintiffs with written and implied warranties and/or service contracts and plaintiffs are entitled to enforce the provisions of same.

291. Pursuant to 15 U.S.C. § 2308, as defendants have extended written warranties and/or service contracts to plaintiffs, except for the modifications permitted in said statute, defendants are unable to disclaim or modify the implied warranties issued in conjunction with the vehicle.

292. Defendants' breach of warranty caused plaintiffs to suffer a diminution of value in the vehicle. Accordingly, plaintiffs suffered damages by defendants' failure to comply with defendants' obligations under the U.C.C. and/or MMWA and/or under the aforesaid warranty and thus bring this action against defendants for damages and pursuant to 15 U.S.C. § 2310, et seq., plaintiffs are entitled to

recover attorney's fees and court costs.

293. More specifically, 15 U.S.C. § 2310 states in part: "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief—(A) in any court of competent jurisdiction in any State or the District of Columbia…(2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiffs for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

294. Accordingly, pursuant to the UCC and the MMWA, plaintiffs seek the remedies of revocation of acceptance, damages applicable under those statues and an award of fees and costs pursuant to the MMWA.

### COUNT 5

### CLAIMS AGAINST THE DOES ONLY

295. The allegations contained in the previous paragraphs are repeated as if fully set forth.

296. This count is pled against the Does.

297. All allegations pled in the above counts are pled against the Does and all relief

sought in said counts is sought against the Does.

## PRAYER FOR RELIEF COMMON TO ALL COUNTS

**WHEREFORE**, judgment is demanded for: (1) all applicable damages – including any specific types of damages specifically pled in any of the above listed counts; (2) the remedies provided for under the common law and/or any state and/or federal statutes pled herein or applicable to this case including any mandated counsel fees and/or costs/expenses and any applicable equitable relief; and (3) such other and further relief as the court shall deem equitable and just.

## JURY DEMAND PURSUANT TO R. 4:35-1

Pursuant to R. 4:35-1, relative to all issues pled in the instant action that so triable, a trial by six (6) jurors is demanded.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, **LEWIS G. ADLER, ESQ.** is designated as trial counsel in this matter for the parties submitting this pleading for filing.

## NOTICE PURSUANT TO R. 1:5-1(a) AND R. 4:17-4(c)

Take notice that, pursuant to R. 1:5-1(a) and R. 4:17-4(c), each party named in the complaint that serves or receives pleadings of any nature (including discovery requests) to or from any other party to the action is requested to forward copies of same along with any documents provided in answer or response thereto and take notice that this is a continuing demand.

## NOTICE PURSUANT TO R. 1:7-1(b)

PLEASE TAKE NOTICE that to the extent applicable to this case, at the time of closing argument it may be suggest to the trier of fact with the respect to any element of

damages, that unliquidated damages be calculated on a time-unit basis, without reference to a specific sum.

<div align="center">

**DEMAND PURSUANT TO RULE 4:10-2(B)**

</div>

Pursuant to Rule 4:10-2(b), demand is made for the disclosure of whether or not there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or indemnify or reimburse for payments made to satisfy the judgment. Demand is made for true copies of those insurance agreements or policies, including but not limited to any and all declaration sheets. This demand includes a request for not only primary coverage insurance policies but also any and all excess, catastrophe and umbrella insurance policies.

[REST OF PAGE INTENTIONALLY BLANK]

## CERTIFICATION PURSUANT TO R. 4:5-1(2) and (3)

Pursuant to R. 4:5-1(2) and (3), I hereby certify that:

1. I am an attorney at law of the State of New Jersey.

2. I am counsel for the party-parties offering this document for filing in this case and am personally familiar with the facts recited in this certification by my involvement in those facts.

3. Upon my initial review of this matter, the matters in controversy in this action are not the subject of any other action pending in any other court or of a pending arbitration proceeding, that no other action or arbitration proceeding is currently contemplated and that I am unaware of any other parties who currently should be joined to this action.

4. Confidential personal identifiers have been redacted from documents now submitted to the court and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

"I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment."

DATED:  May 6, 2021                              /s/ LEWIS G. ADLER

                                                 LEWIS G. ADLER

[REST OF PAGE INTENTIONALLY BLANK]

## CERTIFICATION OF SERVICE PURSUANT TO

### N.J.S.A. 56:8-20 AND/OR N.J.A.C. 13:45A-26F.2 AND/OR N.J.S.A. 56:12-41

LEWIS G. ADLER hereby certifies to the Court as follows:

1. I am an attorney at law of the State of New Jersey.

2. I am counsel for the party-parties offering this document for filing in this case and am personally familiar with the facts recited in this certification by my involvement in those facts.

3. As required by N.J.S.A. 56:8-20 and/or N.J.S.A. 56:12-41 and/or N.J.A.C. 13:45A-26F.2, I hereby certify that I am causing a copy of the complaint to be served upon the following offices via first class United States Mail, postage prepaid:

| XX | Office of the Attorney General, Richard J. Hughes Justice Complex, P.O. Box 80, Trenton, NJ, 08625-0080 |
|----|--------------------------------------------------------------------------------------------------------|
|    | Division of Consumer Affairs, Used Car Lemon Law Unit, P.O. Box 45026, 124 Halsey St., Newark, NJ 07101-5026 |

"I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment."

DATED:  May 6, 2021                              /s/ LEWIS G. ADLER

                                                LEWIS G. ADLER

# COMPLAINT
# EXHIBIT A

**REPAIR HISTORY SUMMARY**
**SCATTAGLIA V. MERCEDES-BENZ USA, LLC, ET AL.**

| DATE IN & OUT & # OF DAYS VEHICLE AT DEALER | MILES IN & OUT OF DEALER | INVOICE # | CUSTOMER COMPLAINT AND/OR REPAIR ATTEMPT AND/OR DIAGNOSIS REPORTED BY DEALER |
|---|---|---|---|
| 11/10/20 To 11/11/20 | 242 | M8CS225 26 | CLIENT STATES THE R/SIDE OF THE VEHICLE IS DEAD - DOOR LOCK INOP - MIRROR DOESN'T FOLD - CHECK/REPORT VERIFY COMPLAINT, DRIVE VEHICLE INTO SHOP. HOOK UP SDS AND CHARGER. FOUND FAULT CODES IN MANY MODULES FOR COMMUNICATION TO RF DOOR CONTROL MODULE N69/2. OPENING RF DOOR APPEARS TO HAVE RECTIFIED FAULT. RNR RF DOOR SILL TRIM, CHECK FUSE 302. FIND 13.2 VOLTS. RNR RF DOOR PANEL. CHECK CONNECTORS ON DOOR CONTROL MODULE AND PINS FOR TIGHTNESS. FOUND CONNECTOR 6 TO NOT BE PLUGGED IN COMPLETELY. CONNECTOR 6 DOES NOT APPEAR TO BE ROOT OF CAUSE BEING THAT CONNECTOR 6 PRIMARILY CONTROLS LIGHTING AND SEAT POSITION. CONCERNED ABOUT CONNECTOR 3 BECAUSE OF CIRCUIT 30 VOLTAGE AND CAN COMMUNICATION. FIND 13.2 VOLTS AT CONNECTOR 3 PINS 4 AND 5. OK. CHECK CAN COMMUNICATION FIND 2.2V CAN LOW PIN 1 TO CHASSIS GROUND. FIND 2.6V FROM CAN HIGH PIN 2 TO CHASSIS GROUND. RNR RF SEAT RNR RF CARPETING. DUE TO VEHICLE AGE FINDING LOOSE GROUND IS NOT UNCOMMON. PERFORM VOLTAGE DROP TEST FROM CONNECTOR 3 PIN 4 TO W15/1 FIND 0.0V |

| | | | |
|---|---|---|---|
| | | | OK. CHECK FOR CONTINUITY BETWEEN THOSE TWO POINTS, FIND .1 OHMS OF RESISTANCE. CHECK PINS FOR TIGHTNESS AT X35/2X1 FIND ALL ASSOCIATED PINS TO HAVE GOOD DRAG AND CONTACT PATTERN. NO FAULT FOUND THERE. PERFORM HARD RESET OF N69/2 BY TENSION AT F150/1 TENSION OK. UPON REINSTALLING FUSE FOUND EVERYTHING TO FUNCTIONING. SUSPECT FAULTY MODULE DUE TO HARD RESET HAVING TO BE PERFORMED. INSTALL NEW DOOR CONTROL MODULE RF. PERFORM INITIAL START UP OF RF DOOR. ALL OK AT CURRENT TIME. CLEAR CODES. |
| 12/01/20 To 01/08/21 | | M8CS239 82 | CLIENT STATES RED BATTERY LIGHT IS ON - VEHICLE WILL NOT CRANK/START VERIFIED COMPLAINT , NO START AND WARNING IN CLUSTER 48 VOLTS BATTERY WARNING ON., PERFORMED QUICK TEST PRINT CODE# B183387 DC/DC CONVERTER BATTERY FOR THE 48V SYSTEM HAS A MALFUNCTION, THE MESSAGE IS MISSING. LIN G1/3 - 48V ON VOLT. B183349 THE BATTERY FOR THE 48VOLT ON BOARD SYSTEM HAS A MALFUNCTION. FOLLOWING LI54. 10-P-069698 FUNCTIONAL IMPAIRMENT OF 48V ON-BOARD ELECTRICAL OPEN PTSS CASE# 154425 SYSTEM,VEHICLE FALLS INTO CAUSE/REMEDY 1 AND 2 CAUSE#1 NO START WITH B183387 IN · DC/DC CONVERTER N83/1, CAUSE 2 B183349 IN 48 VOLT BATTERY. PERFORMED rEMEDY1 CAUSED NO START WITH B183387 IN DC/DC CONVERTER N83-1 A. IF FIRST VISIT PULL QUICK CHEST IF FAULT CODE IS B183387 IN N83-1 (REGARDLESS OF OTHERFAULTS) REPLACE |

ONLY 48V BATTERY. REMEDY 2 B183349 IN 48V
BATTERY. A. IF
FAULT B 183349 IN 48V I. REPLACE ONLY 48 V
BATTERY
(REGARDLELSS OF OTHER FAULTS). I
UPDADED DC /DC CONVERTER IF
LATEST S/W IS AVAILABLE 9 IS THE
RESOLUTION RPLACE 48V
BATTERY AND UPDATED DC/DC CONVERTER.
PULLED INITIAL QUICK TEST AND DC/DC·
CONTROL UNIT LOG.
PULLED ISA PERFORMANCE DATA BEFORE
CLEARING FAULTS. COULD
NOT ROAD TEST VEHICLE WOULD NOT START.
COULD NOT CONFIRM ALL
48V COMPONENTS COULD BE ACTUATED. NO
48V OUTPUT OF BATTERY.
VIA XENTRY GUIDE TEST
A1=M75 ELECTRICAL COOLANT PUMP
A2=M60 ELECTRICAL TURBO
A3=A95 ELECTRICAL AC COMPRESSOR
PRINTED OUT FROM 12V TEST WITH XENTRY
BATTERY TESTER IN
FRONT SAM. DETACHED LINES BETWEEN
DC/DC CONVERTER N83-1
AN48V ON BOARD ELECTRICAL SYSTEM
BATTERY, NO DAMAGE ,
SOILING , CORROSION AND RESISTANCE OF
ALL CABLE PINS .1
OHMS. REMOVED IND INSPECT ALL CABLE
INTO/ OUT OF DC/DC
CONVERTER ALL CLEAN AND TIGHT. AS A
RESULT ME (SIC) MUST REPLACE
48V ON BOARD ELECTRICAL SYSTEM
BATTERY, R&R PASS FRONT SEAT
ASSEMBLY, R&R REAR SEAT BOTTOM , R&R
FRONT AND REAR CARPET
R&R FLOOR PANELS , ACCESS 48V BATTERY ,
R&R BATTERY COOLANT
LINES , R&R ELECTRICAL LINES , REMOVE
FOAM AND REPLACED 48V
BATTERY , SWAP CONTROL MODULE TO NEW
BATTERY , INSTALLED NEW
BATTERY ,ASSEMBLE VEHICLE IN REVERSE
ORDER, PROGRAM NEW

|  |  |  | COMMENTS<br>TOW IN<br>THIS CAR IS GONE DO NOT CALL CLIENT |
|---|---|---|---|
| 04/10/21<br>To<br>04/15/21 |  |  | J#1 VEHICLE TOWED IN |
|  |  |  | J#2 LOANER CAR #27<br>SUPPLIED LOANER CAR |
|  |  |  | J#3 CLIENT STATES VEHICLE WILL NOT START<br>- NO CRANK NO START<br>CK. VEHICLE DOES NOT START, SDS AND<br>CHARGER HOOK UP SDS TEST<br>CK. DTC'S B183349 BATTERY FOR 48 VOLT ON<br>BOARD ELECTRICAL<br>SYSTEM HAS A MALFUNCTION...THERE'S AN<br>INTERNAL ELECTRICAL<br>FAULT. B183371 THE BATTERY FOR 48 VOLT<br>ON BOARD ELECTRICAL<br>SYSTEM HAS A MALFUNCTION..THE<br>ACTUATOR IS BLOCKED. PROCESS<br>DTC'S AS PER LI54.10-P-069698 AND PERFORM<br>CK. LIST..FOR<br>CAUSE 2 FOR THESE 2 FAULT CODES<br>MENTIONED ABOVE...<br>AS PER LI54.10-P-069698 REMOVE R/F SEAT<br>AND R/F RUG AND R/R<br>PORTION OF REAR RUG REMOVE FLOOR<br>BOARD PANELING AND REPLACE<br>48 VOLT BATTERY..WITH DC/DC CONVERTER<br>AND INITIAL STARTUP OF<br>DC/DC CONVERTER AND UPDATE 48V SYSTEM<br>BATTERY...RECK.<br>FUNCTIONS OK. ERASED CODES AND<br>REASSEMBLE VEHICLE ..: |
|  |  |  | J#4 CLIENT STATES DASH WENT OUT FOR 1-2<br>MINUTES AND THEN CAME<br>BACK ON (WHILE DRIVING) CK. VEHICLE<br>CLUSTER WENT BLANK, SDS AND CHARGER<br>HOOK UP SDS TEST CK. DTCS NONE CK. FOR<br>RELATED LI'S NONE CK. FOR RELATED<br>PROBLEMS WITH OTHER VEHICLES NONE<br>SPECIFIC TO THIS COMPLIANT CK. FOR<br>CLUSTER S/W UPDATES AND UP CLUSTER S/W |

➢ TOTAL MINIMUM DAYS VEHICLE AT FRANCHISE DEALERSHIPS SINCE DELIVERY FOR REPAIR ATTEMPTS FOR ISSUES WITH ELECTRICAL SYSTEM = 47

➢ TOTAL MINIMUM NUMBER OF REPAIR ATTEMPTS PERFORMED UPON VEHICLE SINCE DELIVERY BY FRANCHISE DEALERSHIPS FOR ISSUES WITH ELECTRICAL SYSTEM = 3.

# COMPLAINT
# EXHIBIT B

# The Warranty Process Flow Within the Automotive Industry:
# An Investigation of
# Automotive Warranty Processes and Issues

Prepared for the

Program on Automotive Practices

Sponsored by

Microsoft Corporation



CAR
CENTER FOR AUTOMOTIVE RESEARCH

August 2005

The statements, findings, and conclusions herein are those of the authors and do not
necessarily reflect the views of the project sponsor.

## Acknowledgements

The CAR-Microsoft Program on Automotive Industry Practices is a four-year research effort consisting of in-depth, focused interviews with industry participants on subjects of importance to all industry stakeholders. The Automotive Industry Program, funded by Microsoft, will investigate two topics per year, with results publicly disseminated. The first topic of investigation for 2005, presented in this report, is the flow of warranty data within the automotive industry.

The Center for Automotive Research would like to thank Microsoft Corporation for its support and proactive interest in topics of critical importance to all automotive industry stakeholders. We believe the CAR-Microsoft Program on Automotive Industry Practices is representative of Microsoft's desire to further public discussion on important automotive issues.

We would like to thank those in the automotive industry who took time to guide our work. CAR greatly appreciates the willingness of those interviewed to share their insights and ideas. Without their support such a project would not be possible. These individuals showed a strong passion for creating better warranty processes both within their companies, and throughout the industry. We hope this report reflects, in some way, the commitment these industry participants have toward their work.

Finally, this report is the result of several people contributing in many ways. The authors of this report would like to thank Karen Esper, who contributed by formatting and managing the document. Jillian Lindsay Gauthier assisted in the interview process and document review.

Brett C. Smith
Assistant Director, Manufacturing, Engineering and Technology

Raymond T. Miller
Research Assistant

The Center for Automotive Research
1000 Victors Way, Suite 200
Ann Arbor, MI 48108
Telephone: (734) 662-1287
Fax: (734) 662-5736
www.cargroup.org

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ..................................................................................................I

Introduction ...................................................................................................................1

The Path from Repair Bay to the Supplier ..................................................................2

From the Dealer to the Vehicle manufacturer ............................................................3

The Pathway Within the Vehicle manufacturers .........................................................5

Data Overload..............................................................................................................10

Strategic Warranty Considerations ...........................................................................13

Conclusions .................................................................................................................16

# Executive Summary

The Center for Automotive Research (CAR) has undertaken the CAR-Microsoft Program on Automotive Industry Practices. The program is a four-year research effort consisting of in-depth, focused interviews with industry participants on subjects of importance to all industry stakeholders. The Automotive Industry Program will investigate two topics per year, with results publicly disseminated. [The first topic of investigation is warranty process flow in the automotive industry.] Importantly, this topic is not intended to gather confidential data such as warranty cost estimates. Instead, this report will describe the flow of warranty data gathering, including processing and application activities, and where possible, highlight selected practices and critical future operating issues.

As with many CAR projects, the identity of companies interviewed will not be made available—nor will information be presented in a way that may directly identify any participating companies. CAR researchers interviewed representatives from three automakers, four suppliers, and one dealership as part of this project. Given the relative small number of interviews, this report is not intended to be a complete description of the topic. Instead it is hoped that by selecting companies that have been identified as thought leaders in a specific topic, these reports will be then be viewed as contributing to the greater understanding of the issues and challenges.

Given the high volume of manufacture, the complexity of the product, and the often harsh operating environment in which the automobile is used, it is inevitable that there will be component failures. While there are certainly lessons to be learned from these failures, such incidents can in some ways be viewed as normal operating noise from non-assignable causes. However, the manufacturers and suppliers must be able to differentiate the expected component failure rate—the 'noise'—from those incidents that may be an indication of a systemic failure of the component. This report will focus on how the industry is addressing those warranty issues that appear to be serial in nature, and would thus present significant potential cost exposure.

Guided by the responses of those interviewed, CAR has identified two areas of the warranty process of focus for this report, and four issues that are likely to be critical challenges for the industry in the coming years. The first area of focus is the flow of data from the dealership to the manufacturer, and then from the manufacturer to the supplier. The second area of focus is the challenges brought about by the large volume of warranty data that is available.

Lastly, CAR will address four issues that were described by interviewees as pending warranty challenges within the industry: (1) the challenge of increased warranty issues surrounding greater application of on-vehicle electronics; (2) the lack of skilled mechanics; (3) the action of vehicle manufacturers moving toward warranty cost-sharing as a method to increase revenue; and finally (4) the difficulty presented when applying current warranty strategies in developing markets.

The flow of warranty data, in its most simple form, is a reporting and transfer of information regarding an in-service product failure. A failure is reported by the service representative (the dealer) to the vehicle manufacturer, and then, if deemed necessary by the vehicle manufacturer, to the component supplier. In reality, this seemingly simple path is exceptionally complex, and at times even serendipitous. The warranty data

process is highly quantitative and qualitative, sometimes scientific, and often creative. The process as identified by the participants includes:

1. Part identification/defect analysis and codification.
2. Reporting of warranty claim to the vehicle manufacturer—claim processing.
3. Investigation of claim by vehicle manufacturer warranty analysis center— claim review.
4. Notification of incident—or more accurately, increase in reported incidents— to component supplier.
5. Incident remediation (i.e. manufacturing, engineering, materials etc.) as required.
6. And, possible further action taken to assure the correction is implemented throughout the product line, including future components.

This report describes the communication formats, and touch-points for the six data flow processes.

As noted, on the surface the warranty process would appear to be rather straight forward. However, the variance with which the data is collected, communicated and analyzed creates opportunity for complexity nearly unimaginable by an outsider. Warranty data coding of failures varies from dealer to dealer—even from technician to technician—within a vehicle manufacturer dealer network, as well as between the vehicle manufacturer dealer networks. Nearly all interviewed suggested that if they were to take the same part to five different dealers, the failure would likely be identified and coded differently by each dealer. In their view, this was not an indictment of the repair shops ability to analyze the problem. Instead it was a reflection of the extent of the challenge. Often times the reason for a part failure is obvious, but just as often, the root cause of a failure is not readily apparent. The dealer repair shop must make a rapid decision regarding the failed part. Included in the decision process is allowable repair time, workload of staff, the experience of the technician, and even the history of reimbursement by the vehicle manufacturer.

From this rather inauspicious start, the data is then sent to the vehicle manufacturer where, although it is usually centrally housed, it often follows several separate paths. While each manufacturer has developed its own internal process for warranty data, the flow generally starts with a review of the dealership claim. In most aspects, this step serves as a method to monitor dealer repair work and focus on the process of repairing the vehicle. Although the claim process has become electronic in recent years, there is still a considerable amount of staff effort required to analyze and follow-up via telephone for clarification. While this review process is intended to monitor the dealership repair work, it is also considered a line of first defense in identifying potential warranty problems.

Once the warranty data is in an acceptable form, the vehicle manufacturer enters it into a database. From this point, each manufacturer has developed very established and confidential internal systems, often using both internally developed and third party software. The warranty data is controlled by either a quality or warranty function, but can be accessed by product engineering, manufacturing, materials, legal, finance, and other functions within the company.

Selected data is then made available to the suppliers. The type of data transferred from vehicle manufacturer to supplier differs greatly among the vehicle manufacturers. One respondent described three general types of data they receive: incident-based data (limited to claims and count); rate-based data (based on production/sales); and warranty data with month of production/months in service (MOP/MIS) data included. Obviously the ability to tie a defect to a date of manufacture, months in service, or some similar measure is of great value when assessing the problem and developing a response. It was widely agreed that to have an effective warranty process, the 'born on date' for a component is critical. The traceability of subsystems may become a competitive advantage for manufacturers and suppliers.

While the warranty data is vital to identifying systemic failures, an analysis of the component is often required to establish root cause of the failure. Due largely to logistics and transportation, it is also a costly proposition. Thus it is important to better understand the fate of the failed component. Often the component is disposed of at the dealership, thus ending any opportunity to establish root cause of the failure. Manufacturers also may randomly select dealers to send a limited number of components for inspection, allowing a sample for study. These are then sent to the supplier for review. Finally, if the supplier has an indication there may be issues related to a component, the supplier may request the vehicle manufacturer obtain a small number of components for analysis from the dealers. Importantly, the vehicle manufacturers differ greatly in how they deliver the parts. Some send them through a vehicle manufacturer parts center, while others have a more formal warranty processing location, and still others send the parts directly to the supplier. The inherent conflict of the warranty system is that it was originally developed to monitor and pay claims, not necessarily to capture the data.

The vehicle manufacturers (and some of the suppliers) interviewed indicated that one of the most pressing challenges of warranty investigation is the vast amounts of data processed, and the wide range of groups within the company that have use for the data. During the creation and implementation of the TREAD (Transportation Recall Enhancement, Accountability and Documentation) act, much was made of the enormous amount of data already collected by the industry. Based on numerous published reports, CAR estimates the automotive industry handles well over 100 million warranty claims per year. Each claim includes numerous fields, and often several lines of text. Realistically, the industry handles billions of warranty data fields annually.

Not only are companies challenged to develop methods of effectively capturing and storing warranty data, but they also must have the ability to access the information in a timely—and perhaps most importantly—cost effective way. As noted, each manufacturer has developed such information technology systems, but there continues to be concern that these systems are not yet fully capable of delivering consistent data to the suppliers. One supplier suggested they don't need more data, instead they need increased responsiveness (of the manufacturers to data requests); while another suggested that there was not consistent data available. A strong theme from all discussions was that a successful warranty program relied on a strong relationship between the interested parties.

Several companies were either currently investigating or had recently investigated text data mining as a method of increasing their ability to better analyze warranty data. From a vehicle manufacturer's viewpoint, text data mining presents opportunity to further

investigate and understand the vast text reports received from dealer repair shops. The ability to accurately analyze text entered by technicians may offer insight into, and potential early warning of, likely in-service product failures. One supplier indicated that it had spent several months investigating text data mining, but concluded that the cost of off-the-shelf systems could not be justified by the expected savings.

During the interviews, respondents identified several issues that will likely challenge the automotive industry in the near future. While CAR does not attempt to offer solutions to these issues, each of them is worthy of discussion and provides fertile ground for further research. Those areas are:

1. Warranty cost sharing
2. The lack of skilled mechanics
3. Electronics as a warranty burden
4. Adapting warranty systems to developing markets

This report presents a description of the flow of warranty data within the automotive industry, and highlights pending challenges faced by dealers, vehicle manufacturers and suppliers. CAR's investigation has highlighted several areas that offer opportunity for improvement. It is apparent that the industry continues to struggle with the warranty data flow, particularly in the areas of data management and process interfaces. In conclusion, CAR believes the warranty process will continue to be an area of great challenge, interest and opportunity for the industry.

iv

## Introduction

The Center for Automotive Research (CAR) has undertaken the CAR-Microsoft Program on Automotive Industry Practices. This program is a four-year research effort consisting of in-depth, focused interviews with industry participants on subjects of importance to all industry stakeholders. The Automotive Industry Program will investigate two topics per year; the results will be publicly disseminated. Warranty in the automotive industry is the first topic for consideration. It is important to note that it is not the study's purpose to gather confidential data, such as warranty cost estimates. Instead, this report will describe the flow of warranty data gathering and, where possible, highlight selected practices and critical future operating challenges. The identity of companies interviewed will not be made available—nor will information be presented in a way that could directly identify any participating company.

As a part of this project, CAR researchers interviewed representatives from three vehicle manufacturers (VM), four automotive suppliers, and one automobile dealer. By design, this program's studies are not intended to be a complete description of the topic. Instead it is hoped that by focusing on companies identified as leaders in a specific topic, these reports will then be viewed as contributing to the greater understanding of the issues and challenges.

Given the high volume of manufacture, the complexity of the product, and the often harsh environment in which the automobile operates, it is inevitable that there will be component failures. While there are certainly lessons to be learned from these failures, such incidents can in some ways be viewed as normal operating noise. However, the vehicle manufacturers and suppliers must be able to differentiate the expected component failure rate—the 'noise'—from those incidents that may indicate a systemic failure of the component. This report will focus on how the industry is addressing those warranty issues that appear to be systemic in nature, and would thus present significant potential cost exposure.

Theoretically, vehicle manufacturers can address warranty costs via two approaches. First, they can proactively attempt, through engineering, to reduce expected warranty costs toward zero. While this approach will likely lead to robustly engineered products, and concomitantly higher usage of engineering resources, it also often requires a willingness to accept a higher initial price for a component. Alternatively, the manufacturers can attempt to monitor the warranty data and react to in–service incidents. This approach is closely associated with those companies that have a strong cost-focused purchasing bias in their sourcing decision process. Realistically, each vehicle manufacturer uses a combination of the strategies, with some companies biased more toward the proactive engineering approach, while others tend to place more emphasis on reacting to reported data.

The automotive industry tends to focus on warranty in terms of direct costs— manufacturing, logistics and labor for replacement. Granted, these are significant costs; however, it is also important to understand other 'soft' costs associated with warranty. While any in-service product failure is likely to dissatisfy a customer to some extent, the quick, accurate repair of a warranty issue is likely to lessen the customer's overall dissatisfaction. Any discussion of warranty processes should not overlook the

1

importance of developing warranty strategies that deliver the greatest customer satisfaction—or more appropriately—least dissatisfaction in the most cost effective manner.

## The Path from Repair Bay to the Supplier

The flow of warranty data, in its most simple form, is a reporting and transferring of information regarding an in-service product failure. A failure is reported by the service representative (the dealer) to the vehicle manufacturer, and then, if deemed necessary by the vehicle manufacturer, to the component supplier[1]. In reality, this seemingly simple path is exceptionally complex, and at times even serendipitous. The warranty data process is highly quantitative and qualitative, sometimes scientific, and often creative.

The process, as identified by the participants, includes:

1. Part identification/defect analysis and codification. This may be the most critical element of the process, and yet it is certainly the most variable. The process of capturing the customer's description of an in-service product failure, diagnosing the problem and correcting it remains a difficult and unscientific process.

2. Reporting of warranty claims to the vehicle manufacturer. The movement of data from the dealer repair shop to the vehicle manufacturer has become electronic in recent years, which has allowed for a much faster reporting system.

3. Investigation of claim by vehicle manufacturer warranty analysis center. Even though warranty claim filing has become increasingly electronic, it still requires effort to verify and clarify the data. Each manufacturer has a group review the data and enter it into some form of warranty database. This database is then accessed by product engineering, product development, manufacturing engineering, and the manufacturing plant, among others.

4. Notification of incident—or more frequently, increase in reported incidents—to component supplier. The type and amount of data transferred to supplier differs among the vehicle manufacturers.

5. Incident remediation (i.e. manufacturing, engineering, materials etc.) as required. If the in-service product failure is found to be caused by a supplier component, the supplier will then use the available data and parts to identify the problem, and determine actions to elicit a remedy.

---

[1] CAR acknowledges the failure of a product may enter through other sources (e.g. police reports, fleet reports, insurance claims and customer service calls). For this study, the focus is on the warranty process though the most common entry-point, from the dealer's repair shop.

2

6. Proactive suppliers and the vehicle manufacturers will take action to assure the correction is implemented throughout the product line, including incorporating the knowledge into future component development.

## From the Dealer to the Vehicle Manufacturer

On the surface the warranty process appears to be rather straightforward. However, the variance with which the data is collected, communicated, and analyzed results in complexity nearly unimaginable by someone unfamiliar with the process. Warranty data reporting varies from dealer to dealer within vehicle manufacturer dealer networks, and even mechanic to mechanic within dealerships. Vehicle manufacturers also differ in the reporting methods they require of their dealers. Such a varied starting point for warranty data creates potential for great difficulty downstream.

Nearly all study participants suggested that if they were to take the same part to five different dealers, the failure would likely be identified and coded differently by each dealer. In their views, this was not an indictment of the repair shops' ability to analyze the problem. Instead, it was a reflection of the extent of the challenge. Often times, the reason for a part failure is obvious, but just as often, the root cause of a failure is not readily apparent. The dealer repair shop must make a rapid decision regarding the failed part. Included in the decision process is allowable repair time, workload of staff, the experience of the technician or mechanic, and even the history of reimbursement by the vehicle manufacturer.

Because the point of entry for an in-service product failure is so critical, it is valuable to investigate this stage of the process more closely (Diagram 1). The first step in the process is to record the customer's complaint. Again, while this is a seemingly simple task, there is great opportunity for miscommunication as the customer tries to explain the problem to the service manager. Importantly, this input—often a short written documentation of the issue—can be a vital part of the warranty tracking process. Key words or phrases entered at this point can potentially offer insights as vehicle manufacturers and suppliers undertake root cause analysis weeks, months or even years later. An investigation of the warranty process in the automotive industry quickly highlights the fact that the dealer repair shop service manager is, in many ways, the cornerstone of a successful process.   Once the shop manager identifies a likely cause of the problem, the vehicle is assigned to the appropriate mechanic.[2]

Each vehicle manufacturer continues to develop strategies that remove the responsibility from the repair shop floor. One vehicle manufacturer respondent suggested the biggest improvement of the information received from the repair shop to the vehicle manufacturer would be the implementation of a new, more structured warranty reporting software; however, the respondent also suggested that the replacement cost was currently prohibitive. While it is important to develop systems that make the identification of an in-service failure more efficient and effective, it is also important to realize that the ability of the mechanic or technician will be a key part of any diagnosis strategy for the

---

[2] Repair shops may use a technician to identify the problem, then, in turn assign a mechanic who will do the actual repair work.

3

foreseeable future. As such, it behooves the industry to work to develop a skilled technical base at the dealership level.

**Diagram 1: In-Service Problem Identification**



The mechanic, using visual inspection, technical manuals, service bulletins, and technical support from the vehicle manufacturer, must then begin the process of identifying the part that has failed. Upon determining the failure, the mechanic must then match it to a warranty repair code. The coding process illustrates two important variables. First, there are often ulterior motives for the mechanic to select a code for the in-service failure. For example, some codes may tend to offer more repair time, or may be less likely to be questioned by the manufacturer[3]. Second, the true cause of the failure may not be completely understood, thus the mechanic may make an educated guess as to why the failure occurred, and code it accordingly. Given the time constraints, working environment and differing experience level among mechanics, it is understandable that the mechanics often aren't able to fully identify the product failure. However, once the repair is performed, a warranty claim is then sent to the manufacturers.

Most respondents expressed concern that there is potential for dealers to consider the repair shop as a profit center by affecting *unnecessary* repair work. Although there was no data presented to support this concern, those that mentioned the problem indicated that if new vehicle sales were down, some dealers were more likely to push warranty

---

[3] CAR does not wish to suggest that these are necessarily fraudulent acts, instead they may be honest attempts by the mechanic to better capture the time needed to complete an adequate repair, and better satisfy the customer, while remaining within the standards set forth.

claims to fill the profit 'valleys.' While such actions have wide ranging implications, of interest to this report is the potential for a decrease in the accuracy of the reported warranty data. A warranty claim that is not accurate—whether intentionally or unintentionally entered as such—will have consequences throughout the entire warranty process.

Finally, it is at the dealer repair shop where warranty data and the part are separated. Most parts are scrapped, while others are shipped to the manufacturer—or directly to the supplier for review. In order to understand and analyze the warranty process more completely, it is important to note the data and the component take markedly different paths.

## The Pathway Within the Vehicle Manufacturer

From this rather inauspicious start, the data is then sent to the vehicle manufacturer where it often follows several separate paths, although it is usually centrally housed. While each manufacturer has developed its own internal process for warranty data, the flow generally starts with a review of the dealership claim. Such a review is intended to monitor the work done at the dealership. In most aspects, this step serves as a method to monitor dealer repair work and focus on the process of repairing the vehicle. Special attention is given at this step to assuring the warranty claim meets the standards set by the manufacturer. Commonly, the review includes an evaluation of the claim to assure completeness and correctness, an analysis of the type of repair, the time taken to make the repair (especially if different from the standard), the frequency of repair at that dealership vis-à-vis other dealerships and other such concerns. Although the entry of the claim process has become electronic in recent years (most are now on-line, and completed overnight), there is still a considerable amount of staff effort required to analyze and follow-up via telephone for clarification. While this review process is intended to monitor the dealership repair work, it is also considered a line of first defense in identifying potential warranty problems as trends become evident.

The reduction in time for the claim filing process has important implications for root cause analysis. Critical to understanding any in-service part failure is the interaction with the mechanic. The ability for the vehicle manufacturer—or even the supplier—to contact the mechanic within a few days of when the repair is affected increases the chance the mechanic will be able to more clearly remember the repair in question, and thus more accurately describe the problem identified, and the process of repair.

Once the warranty data is in an acceptable form, the vehicle manufacture enters it into a database. From this point, each manufacturer has developed comprehensive and confidential internal systems, often using both internally developed and third party software. The warranty data is controlled by either a quality or warranty function, but is available to be accessed by product engineering (product and manufacturing), manufacturing (assembly plant), legal and other functions within the company. Diagram 2 illustrates the complex flow of warranty data within the vehicle manufacturer. It is important to note warranty data is only one form of information used to identify in-service product issues. Other forms (technical call centers, insurance claims, police reports, etc.) are often captured by other internal functions, and are likely to be stored in entirely different data warehouses.

5

Warranty data is accessed by many different functions within a vehicle manufacturer. The manufacturers interviewed indicated that because the warranty data was accessed by so many functions internally, some uncertainty exists among the different functions as to who else in the organization might be accessing the same data and what their needs might be. There was also uncertainty expressed as to how the data might be of value to others in the company. · It is a valuable area of further study to more closely examine the pathways within the vehicle manufacturers. However, two caveats are offered. First, the flow of data, or more appropriately the description of users, within these large companies is complex. Second, each manufacturer views the warranty process as a competitive advantage, and is not necessarily interested in discussing detailed descriptions of the process.

**Diagram 2: Flow of Data within the Vehicle Manufacturer (VM)**



The type and amount of data that flows to suppliers from a vehicle manufacturer differs greatly among vehicle manufacturers. Generally, the supplier must query the vehicle manufacturer database (increasingly via web-based applications) to access warranty information. One respondent described three general types of data his company receives (Diagram 3): incident-based data (limited to claims and count); rate-based data (based on production/sales); and data that included months in service, and month of production. While the suppliers interviewed had developed strong internal warranty tracking processes, the respondents made it clear the quality of data passed along by

6

the vehicle manufacturers affected the speed and accuracy of any early warning system. The ability to tie a defect to a date of manufacture, months in service, or other similar measures is of great value when assessing the problem and developing a response. Certainly there has been much discussion surrounding the traceability of parts in the manufacturing process. However, the traceability of some key components in service presents an opportunity for those wishing to gain a competitive advantage in the automotive warranty business. Vehicle manufacturers that develop effective reporting systems—a means of getting concise, accurate warranty data to their suppliers in a timely fashion—will take a large step toward developing a proactive early warning system.

**Diagram 3: The Reporting of Data from Vehicle Manufacturer to Supplier**



Because of the variance in the warranty reporting processes among vehicle manufacturers, each supplier interviewed had set up its warranty efforts by customer. Such redundancy was difficult for the suppliers to justify financially. Although several people interviewed indicated it would be valuable for the vehicle manufacturers to work to make their systems more common, there was little hope that it would occur. It is worth noting the Automotive Industry Acton Group (AIAG) has begun to investigate warranty process flow, with the intention of developing a set of industry best practices for use as a guideline. As such, this guideline could potentially serve to offer a first step toward industry standardization within some elements of the automotive warranty reporting system.

While the warranty data is important for identifying systemic failures, an analysis of the component is often required to establish the root cause of the failure. It is a costly proposition, due largely to logistics and transportation. Thus, it is important to better understand the fate of the failed component. Diagram 4 shows the possible outcomes for an in-service failure under warranty. The vast majority of components are disposed of at the dealership, thus eliminating any opportunity to establish the root cause of the

failure.[4]  Manufacturers may randomly select dealers and require that the dealers send a limited number of components for inspection, creating a sample for study.  Depending on the vehicle manufacturer, these components are then sent either to their component assessment center, or directly to the supplier for review.

**Diagram 4: The Returning of Parts from Vehicle Manufacturer Repair Shop to Supplier**



If the supplier has an indication there may be issues related to a component, the supplier may request the vehicle manufacturer obtain a small number of components for analysis from the dealers.  As was illustrated during the course of the interviews for this project, the automotive warranty process is often driven by relationships.  Each of the suppliers interviewed had established relationships that enabled them to side-step the bureaucratic red tape, and resolve issues rapidly.  This was especially evident in the area of component procurement.  Such relationships are difficult to represent in a flow chart, but are vital to successfully solving warranty issues.  One final method of parts dispersal, according to one supplier: one vehicle manufacturer sends the supplier a 'box of parts' with no information nor explanation of failure.

Each supplier interviewed had developed similar, albeit slightly different processes, for analyzing the warranty data.  Diagram 5 shows the general flow of warranty data and parts as described by a smaller supplier.  The data (and component) is directed from the vehicle manufacturer to the supplier's manufacturing plant, where it is received by the plant's quality department.  After review of the data, a cross-functional team is assembled to begin the process of identifying the problem.  It is important to note that the smaller supplier felt warranty issues were in essence a 'plant issue,' thus they used

---

[4] Vehicle manufacturers have often struggled with quality on newly launched vehicles, and therefore have become much more aggressive in addressing launch quality.  Several companies have leveraged the existing warranty system to assure that launch products have a 100 percent part return program.  By capturing all parts that fail during the launch phase and using the warranty infrastructure to analyze the data, companies hope to quickly respond to potential product issues.

the manufacturing plant as the central processing point for the in-service product failures.

**Diagram 5: Stylized Flow of Warranty Data and Parts—Tier 2 (Small Supplier)**



CAR researchers also had discussions with a larger supplier who admitted that ownership of the problem—and thus solution—was often found at the manufacturing plant. However, this supplier had a more comprehensive program than the others (Diagram 6). This maybe due, in part, to a progressive warranty strategy as well as availability of greater resources. According to this supplier, the warranty data was received from the vehicle manufacturer by a central quality contact for this supplier. This supplier requested a structured monthly data report from its customer. The data was then reviewed by the customer-focused quality team. Any issues were discussed at a cross-functional meeting. The warranty data was tracked using structured problem solving strategies. If it was determined that more information was needed, they would make a special request to the vehicle manufacturer for more specific data or components. The supplier also worked with the vehicle manufacturers' assembly facility, engineers and others as needed.

The supplier requested that generic parts (i.e. those components that were used for several different vehicle lines and customers) be sent to a central location. This was done because these products tended to be manufactured using similar processes in multiple plants. Components that were product specific (i.e. those components that were unique to a vehicle) were passed on to their specific manufacturing plant.

**Diagram 6: Stylized Flow of Warranty Data and Parts—Tier 1 (Large Supplier)**



The availability of resources was an important determinant of the supplier's warranty process. The larger companies are more likely to have dedicated quality departments, focusing on ongoing warranty tracking. Conversely, smaller companies are more likely to have a small quality staff, with much of the product failure analysis done by an ad hoc cross-functional team at the manufacturing facility. In such cases, the tracking of warranty information is then done by a small staff at the product engineering center.

Several respondents interviewed used basic spreadsheet software found on most computers to handle all data. A few respondents indicated they needed more complex information technologies to be used for specific and more technical actions—or as one respondent suggested the "backroom work." However, most of the respondents interviewed strongly indicated their current spreadsheet software was more than adequate for many of their manipulation and data management needs. The challenge was making the "back room" operations available in a format conducive to corporate wide use through common user-friendly interfaces.

## Data Overload

The manufacturers (and some of the suppliers) interviewed indicated one of the most pressing challenges of warranty investigation is the vast amount of data processed. Further, they indicated the wide range of groups within the company that have use for

the data adds even greater complexity. During the creation and implementation of the TREAD (Transportation Recall Enhancement, Accountability and Documentation) Act (2000), much was made of the enormous amount of data already collected by the industry. Based on numerous published estimates, and discussions with industry sources, CAR researchers estimate the automotive industry handles well over 100 million warranty claims per year. Each claim includes numerous fields, and often several lines of text. Realistically, the industry handles billions of warranty data fields annually. The challenge for vehicle manufacturers is not to get enough data, but instead to better understand which of the data is important.

While the TREAD act is not of central concern to this report, it is important to briefly address some key points of the regulation. Probably the most visible element of TREAD is the development of an early warning database to help identify critical safety defects. Like many aspects of the warranty/defect discussion, this database (containing information on 24 vehicle systems) presents a challenge far greater than merely reporting those key systems. Although the act requires vehicle manufacturers to report quarterly on 24 different systems, in reality each of those systems is made up of numerous components, which are manufactured by a wide range of suppliers. Interestingly, the interviewees had varying levels of familiarity with TREAD. The vehicle manufacturers have proactively approached the act by developing internal systems. Each manufacturer has developed a TREAD response system that it believes offers a significant advantage over its competitors. However, the vehicle manufacturer representatives were not willing to discuss the specifics of those programs. This highlights an interesting challenge with regard to investigating warranty processes. Each manufacturer believes warranty to present opportunity for strong competitive advantage. Thus, there is little willingness to share strategies, and even less understanding of the opportunities presented by collaborative efforts. The suppliers interviewed seemed to better grasp the opportunity—and even need—to develop collaborative solutions. This is likely due to the fact the suppliers have to deal with numerous warranty systems. The suppliers may be better able to identify which vehicle manufacturer systems truly provide a competitive advantage.

Although the usefulness of the TREAD act was initially questioned by many within the automotive industry, several respondents did credit the act for leading manufacturers to be more proactive in establishing early warning reporting systems. It has encouraged—even required—the companies to re-examine their existing systems, to better understand the data, and to assess how the warranty process might be improved.

Diagram 7 shows the various inputs that comprise a vehicle manufacturer warranty data warehouse. It is important to note although the diagram suggests a single data storage warehouse, there are often numerous data warehouses within each manufacturer. While this report has focused on the dealer warranty repair shop as the entry point, it is valuable to briefly consider the other input sources. National Highway Transportation Safety Administration (NHTSA) reports, police reports and insurance claims are usually presented in some form of coded response and unstructured text. Customer feedback (via call centers and other forums) is often the first line of notification for a developing problem. Critical data can also be gathered from mechanic councils and tracking repair part sales. There is also valuable information available from monitoring both internal and supplier engineering documents. Many of these inputs present rich information. However, they are often in the form of unstructured text.

**Diagram 7: In-Service Product Failure Reporting Channels**



Not only are companies challenged to develop methods of effectively capturing and storing warranty data, but they also have the ability to access the information in a timely—and perhaps most importantly—cost-effective way.  As noted, each manufacturer has developed numerous internal information technology storage and retrieval systems.  These legacy systems are occasionally redundant, and often narrowly focused.  One individual stated that data overload was an important challenge.  According to this respondent, it was critical for each function within a vehicle manufacturer to learn what data were the best indicators for their needs.  They should then use that type of data as the guidepost.  The other types of data should then be used to confirm trends identified by the lead data.

A supplier indicated that it doesn't need more data. Instead, it needed increased responsiveness from the manufacturers to data requests. Another supplier also

12

suggested that consistent data was not available. All discussions asserted a successful warranty program relied on a strong relationship between the interested parties, in part to make up for the lack of robust data (and component retrieval) processes.

Both manufacturers and suppliers highlighted the richness and importance of warranty claim text. Each of the respondents described the complexity and repetitiveness of reviewing the unstructured text. Each of the suppliers was either currently investigating, or had recently considered unstructured text data mining as a method of increasing their ability to better analyze warranty data. From a vehicle manufacturer perspective, text data mining presents an opportunity to further investigate and understand the vast text reports received from dealer repair shops. The text entries may offer insight into, and potentially an early warning of, in-service product failures. Such analysis also adds depth to the often vague or inconclusive repair codes entered at the repair shop.

One supplier indicated that his company had spent several months investigating text mining, but concluded that the cost of off-the-shelf systems could not be justified by the expected savings. The respondent believed the vast coding differences and terminology between vehicle manufacturers presented complexity issues that made text mining strategies difficult (and cost prohibitive) at the supplier level. This respondent believed the standard reports were sufficient in tracking potential problems. However, another supplier had worked with a software provider to develop a text mining application that effectively searched data text from several manufacturers. This supplier believed that its ability to mine text was a significant advantage. Further, they indicated several other suppliers had contacted him to inquire about their application of the software.

## Strategic Warranty Considerations

During the interviews, respondents identified several issues that will likely challenge the automotive industry in the near future. This section will address those concerns. While solutions to these issues are not presented here, each of the issues is worth discussing and provides fertile ground for further research.

A. Warranty Cost Recovery

The issue of most concern to supplier respondents was that of vehicle manufacturers moving toward a cost recovery warranty strategy as a revenue stream. As an increasing amount of the vehicle is built by suppliers, it is logical to believe components produced by suppliers are a major portion of the total warranty cost. One vehicle manufacturer estimated that 80 to 85 percent of all recalls were traceable to supplier components. Therefore, according to the vehicle manufacturers, it is logical that the suppliers take a larger portion of the financial responsibility for the failures. The vehicle manufacturer representatives indicated it was a logical step to pursue some form of cost sharing. They also expected it would happen.

Currently, it is common practice for the component supplier to be responsible for the manufacturing cost of the failed part covered under warranty plus some portion of the logistics and labor cost. However, the vehicle manufacturer must cover the remaining costs, including transportation, part replacement labor, and

13

information processing. Warranty cost recovery has shifted an increased portion of those non-manufacturing costs to the supplier.

Suppliers felt that if the vehicle manufacturers continue to pursue cost recovery, it will have a negative impact on product quality. It was suggested that suppliers will be forced to put increased resources into defending against accusations, and less time resolving issues, resulting in more cost for all. Another aspect is the lack of ability to build some cost for warranty into the piece price of the component. Suppliers suggested that the car companies 'bake-in' warranty cost into the price of a vehicle. (Assuming they are able to get the 'price.') Suppliers have no leverage/leeway to include a 'warranty cost' into the price of the component. A part is sold at production cost, with no allowance for future warranty costs. Thus, if the suppliers are increasingly charged for total warranty costs, the respondents believe it could have serious implications.

Importantly, the suppliers interviewed indicated they had made recommendations—even warnings—to vehicle manufacturers regarding product decisions. According to these suppliers, the warnings usually went unheeded and occasionally predicted warranty actions accurately during production. There was great concern among the suppliers that with warranty cost recovery, the suppliers would likely be paying for future product failures that could have been prevented with better upfront engineering.

Suppliers (and the dealership manager) also expressed concern regarding vehicle manufacturers including a strong purchasing bias in their component sourcing decision process. One supplier recounted an example where it had clearly demonstrated that its component, although a few pennies more expensive than that of its competitor's, had a significantly lower expected warranty cost— and a thus a lower overall cost. According to the supplier, the vehicle manufacturer, driven by its purchasing bias, chose the component with the lower upfront cost. According to this supplier, within several months of launch the cheaper component was already causing significant warranty expense and likely customer dissatisfaction. Suppliers indicated such a strategy creates a very difficult operating environment.

Suppliers also expressed concern regarding initial analysis of the component at the dealership, and the integration of that component into the vehicle. Because of the vagaries of component identification, defect analysis and codification processes (at the dealership repair shop) suppliers suggested there is opportunity, even likelihood, that their part may be improperly identified as at fault. Further, if the in-service failure is the fault of their part, they may be held liable for the costs of disassembling the vehicle to conduct a repair. Such cost (as measured in mechanic labor hours) could be substantial, and is driven, not by the component, but instead by vehicle design decisions made by the vehicle manufacturer.

## B. Lack of Skilled Mechanics

As described in this report, the first step in the warranty process is the identification of the in-service product failure by the mechanic at the dealer repair shop. If a problem is not properly identified, or it takes several attempts to

correctly pinpoint the problem, the process is less efficient. The service manager interviewed indicated his concern regarding the availability of highly competent mechanics. According to the service manager, a strong understanding of how a vehicle works is essential to quickly and accurately assessing in-service product failures. Based on his experience, he believes there are too few mechanics who truly understand the automobile. He left little doubt that a good mechanic can be one of the most effective early warning points in the process.

While mechanics are critical to the warranty process, they can also be viewed as the touch point for the customer. An accurate, fair and fast assessment of a warranty issue by the mechanic can greatly enhance customer satisfaction. Thus, a first step for vehicle manufacturers looking to more effectively address warranty costs while increasing customer satisfaction is to address the shortage of highly trained mechanics with a strong diagnostic skill.

C. Electronics as a Warranty Burden

Numerous articles in the popular press have illustrated the growing dissatisfaction (as measured in quality ratings) among consumers—and concern among vehicle manufacturers—regarding the reliability of in-vehicle electronics. Warranty repair for electrical systems has always presented unique challenges. Traditionally a wire that was 'pinched' during installation in the vehicle could cause a short in the electrical system. This type of electrical open circuit has been a part of the failure identification challenge since the alternator became a standard option on the vehicle. However, it is no longer as simple as finding a bare wire or a poorly performing electrical motor. Now many of the product failures are caused by software or other electronic glitches. The non-technical term for such challenges offered by one respondent was 'chasing electronic gremlins.'

These electronic gremlins present significant challenges for the repair shop attempting to properly identify and correct the problem. A dealer repair shop manager interviewed for this project estimated that 90 percent of the electronic problems reported by consumers were intermittent, and were not able to be validated by the dealership on the first attempt. Since the warranty process cannot start without a validated problem, they will return the vehicle to the consumer and expect it back within a short period. After two failed attempts to verify using vehicle manufacturer guidelines, the manager then advises the mechanic to attempt to identify the problem by using a process of elimination. Often times such a strategy proves to be very time-consuming and difficult to code into warranty claim forms. However, the manager felt it was his responsibility to his customers to go beyond what the system allowed, and do anything in his power to resolve their problems. Once the electronic gremlin was identified, the dealership was able to correct about 90 percent of the problems. The area of in-service electronic product failure resolution—and prevention of such incidences—presents a strong opportunity for further investigation.

D. The International Challenge

The final area of concern addressed in this report is the international challenge—or more accurately the *two* international challenges. The first challenge is that of

15

vehicle manufacturers operating different warranty strategies and processes in the United States, Japan and Europe. Suppliers indicated some manufacturers have different warranty processes and targets for each of these regions. The elimination of such differences could bring significant efficiency gains. The second challenge is that of bringing the current warranty methodology to developing markets.

The warranty process is, in many ways, driven by the dealer repair service shops. As noted earlier, the dealer repair service is the point of entry for any in-service product failure. The United States, Japanese and European dealer systems are characterized by strong technical expertise, significant experience, and ample resources. As such, they have demonstrated an ability to analyze and identify in-service product failures. They also benefit from strong logistical networks within the borders of their country of operation. Although the dealerships in these different regions are similar in some ways, they have developed within the constraints of the local customs, laws and consumer requirements. Suppliers indicated their customers had different systems in place in the each of the developed markets. From their point of view, there is significant opportunity to standardize international warranty operations.

As manufacturers move into developing markets, they often ask their suppliers to apply their warranty data control systems to operations in these new markets. This request presents challenges on many levels. It was strongly suggested that operations in markets with relatively undeveloped dealer networks—and no local suppliers—cannot meet the same warranty standards as those in more experienced markets. It is important for vehicle manufacturers to work with suppliers and dealers in these developing markets to leverage the systems already in place elsewhere, but also to be prepared for lapses in the system.

# Conclusions

This study, the first in the CAR-Microsoft Program on Automotive Industry Practices, is intended to identify the flow of warranty data through the automotive value chain. As such, CAR researchers have captured the drivers and pertinent issues regarding this important automotive data process flow. However, to view the path warranty data travels as merely a data flow process would be a mistake. As this project progressed, it became apparent that although the flow of warranty data was increasingly becoming more formalized, successful actions were still often behavioral and relationship driven. From the dealership through to the supplier, each of the interviewees had examples of how they went beyond the process 'structure' to obtain a better result.

It is valuable to present a few examples of this creative behavior for illustrative purposes. One supplier, with a critical new engine component, developed an early warning system by enlisting the help of local dealerships. This supplier contacted several local dealers and asked them to inform the supplier if the dealer were to perform repairs on engines that used this particular technology. The supplier had an engineer assigned to the dealerships to observe the repair, and analyze specifics of the failure. While such an action is not statistically reliable, it gives the supplier immediate feedback on early problem detection.

16

Another supplier spoke of how his personal relationship with his vehicle manufacturer warranty contact allowed him to 'go around' the process to get a more immediate response to questions and concerns. If this supplier needed better access to a part, or wanted further data, he would contact the vehicle manufacturer representative. And certainly, the service manager interviewed had developed numerous action plans that better enabled him to reach a satisfactory—and equitable—resolution for the vehicle owner. CAR researchers believe any analysis of the warranty process must consider these behavioral characteristics as an important and effective part of the system.

Similarly, there were individuals within the vehicle manufacturers that had clearly driven a process or project to resolve challenges. These individuals had to use creativity to overcome the challenge of the legacy systems, scope, and cost to develop solutions that achieved the desired results while still staying within the bounds of their corporate culture.

These relationships, while successful, are indicative of the complexity of an effective warranty process. As vehicle manufacturers and IT providers attempt to formalize the warranty process, it is likely that behavioral aspects will continue to be a vital part of rapid warranty resolution.

17

# COMPLAINT
# EXHIBIT C

//////MBWorld (https://mbworld.org)

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)
> New GLE Keeps Draining Battery - won't start

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)    Log In |

Register (https://mbworld.org/forums/register.php)

🔗 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#) MBWorld.org Forums (https://mbworld.org/forums/) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/mercedes-benz-suvs-trucks-vans-diesels-other-9/) > GLE Class (V167) (https://mbworld.org/forums/gle-class-v167-250/)
↳ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html) > New GLE Keeps Draining Battery - won't start

| Username | Username |
| Password | |  Log In |

By logging into your account, you agree to our Terms of Use (https://www.internetbrands.com/ibterms/) and Privacy Policy (https://www.internetbrands.com/privacy/privacy-main.html), and to the use of cookies as described therein.
Register (https://mbworld.org/forums/register.php)    Forgot Password? (https://mbworld.org/forums/login.php?do=lostpw)

| Register (https://mbworld.org/forums/register.php) | FAQ (https://mbworld.org/forums/faq.php) | Community ▽ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#community) | Calendar (https://mbworld.org/forums/calendar.php) | (h |

GLE Class (V167) Produced 2020 to present

# New GLE Keeps Draining Battery - won't start

↰ Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&p=8079971)

Subscribe 🔔 (https://mbworld.org/forums/subscription.php?do=addsubscription&t=785752)

Thread Tools (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools) ▽

Search this Thread (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch) ▽

Rate Thread (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadrating) ▽

☐ 06-12-2020, 08:46 AM    #1 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8079971)

**Willfulone (https://mbworld.org/forums/members/461941-willfulone.html)**
Newbie

Join Date: Jun 2020
Location: Virginia
Posts: 4
Likes: 0
Received 3 Likes on 2 Posts (https://mbworld.org/forums/post_thanks.php?do=find&u=461941)
2020 GLE350

**New GLE Keeps Draining Battery - won't start**

Hello Everyone

Sorry this is my first post.

Got a new 2020 GLE350 about 3 months ago

About a week ago, it would not start, bunch of lights on the dash, would not turn over

MB sent out a service and they jumped the car

It ran for another week, and then just died again. We had it towed to MB this time

Already checked the Battery and the Alternator, all are fine

Any idea what is causing the battery drain

Tks

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8079971)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8079971&securitytoken=guest)

Contact Us (https://mbworld.org/forums/sendmessage.php) · About Us (https://mbworld.org/forums/about-us/) · Archive (https://mbworld.org/forums/mercedes-benz-forums/) · Advertising (https://www.internetbrandsauto.com/contact) · Cookie Policy (https://www.internetbrands.com/privacy/cookie-policy.html) · Privacy Statement (https://www.internetbrands.com/privacy/privacy-main.html) · Terms of Service (https://www.internetbrands.com/ibterms/) · Do Not Sell My Personal Information (https://www.internetbrands.com/privacy/privacy-contact-form.php) ·

© 2021 MH Sub I, LLC dba Internet Brands

ib Internet Brands® Automotive

↰ Reply (ht

Share » (ht

< First  ‹ Prev    1 / 1    Next ›  Last ››    Go to Page...    Go



1 / 1    « ‹    › »    Go to Page…

☰ | ///////MBWorld | 🔍

MBWorld.org Forums (https://mbworld.org)

MBWorld.org Forums (https://mbworld.org/forums/) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746...)

> New GLE keeps draining-battery-won-t-start.html?nojs=1#goto_threadtools)

NOW PLAYING

HG_ChevroletTrail...    HG_LincolnNaviga...

---

☐ 06-12-2020, 10:17 AM | #2 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8080042)

**Ron.s (https://mbworld.org/forums/members/410733-ron-s.html)**
MBWorld Fanatic!

(https://mbworld.org/forums/members/410733-ron-s.html)

Join Date: May 2018
Location: Boise
Posts: 2,023
Likes: 240 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=410733)
Received 352 Likes on 270 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=410733)
2021 GLE AMG 53 SUV....
2018 Audi SQ5

Don't rule out the battery. I had a similar situation except that with the 450 the 48 volt starts the car. I kept getting "critical battery" message and the dealer couldn't find anything wrong. Then when it was in for 3 days to replace the MBUX controller it ran down after a charge and they replaced it (the 12 volt battery). I think it had an internal short but got that 3td hand from SA & probably a guess.

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8080042)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8080042&securitytoken=guest)

---

☐ 06-17-2020, 07:03 AM | #3 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8084079)

**me2mb (https://mbworld.org/forums/members/461563-me2mb.html)**
Newbie

Join Date: Jun 2020
Posts: 4
Likes: 3 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=461563)
Received 0 Likes on 0 Posts
2020 GLE 350 4matic

Quote:

Originally Posted by **Willfulone 🔧** (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8079971)
Hello Everyone

Sorry this is my first post.

Got a new 2020 GLE350 about 3 months ago

About a week ago, it would not start, bunch of lights on the dash, would not turn over

MB sent out a service and they jumped the car

It ran for another week, and then just died again. We had it towed to MB this time

Already checked the Battery and the Alternator, all are fine

Any idea what is causing the battery drain

Tks

I was detailing/ceramic coating mine last week and received a notification that my starter battery is in critical condition. I realized that by having my key in my pocket and opening every door, opening and closing the doors and unlocking the car multiple times, the process took me a total of 10 hours and the alert occurred around hour 8. When I

💬 Reply (https://mbworld.org/forums/newreply...)    Share ▾ (https://mbworld.org/...)

SPONSORED BY ADVERTISING PARTNER
(HTTPS://EB2.3LIFT.COM/PASS?
TL_CLICKTHROUGH=TRUE&REDIR=HTTPS%3A%2F
QW67TPTYILKRQTLZGXFL63IXNBRHKQVCB44KNVC
OAVBZ-
QLSKH7KWPIA6PAE45PCEJ9EY2ET3CKJHBBT3XOQ
YECHXMV6C-_2MFXDGCI8F-
XG8TU3OE4WTSR2ECF0SXJRM2_FO3Q8GJXRVZ6Y
E46VIMEYDORZH6P_PTYOPZPVH9F6-CW-
29WPTBZMYCCVFF1JN3TYRUU6DOKKF7KSEUFFW
KFFJX_C-
EH58DXDKZG2UCOSV0GR9H9SGJB5Y9DWD686GJF
TQWZCBZQBH178KKD2L7BDPERGEDXMI5X-
V6UEJKONDB9O4UTQSQ4HWVZNCRELMTGG8TRO1
SAXUZ0SALRS3DNRM5FYJ5HINBKZVL8NL1HZXSA8!
DWWP9ATT9YRXFXABY4U-AL54S-
CTX2ETCDTJTX0IDZVTLTZ6HT32Y2H3UKFAMRZ9LR
UYC8TOOXOMMMV7FPWQ7FBK61OREH96OL4ZQX1
JWZVDG4K0K_ATW-YSURGQAZMNO7-
SCOMZQDJVNZKBTBIEMI7BUATHQNH2LVDZ_U9HD2
CISS3LGMNOIH-
YQ0HIXNUATXAFS9%26SAI%3DAMFL-
YRZL6YDCLR8C3F7U_WTPN9SMXNFDJGJLMLI9HC8I
_BT3CY%26SIG%3DCG0ARKJSZAX1DWPVLHCDEAE

Sponsored Video
(Https://Eb2.3lift.Com/Pass?...
Watch to learn more

SEE MORE (HTTP
QLSKH7KWPIA6PAE45PCE

UYC8TOOXOMMMV7FPWQ7FBK

_BT3CY%26SIG%3DCG0ARKJSZAX1D\

////MBWorld (https://mbworld.org)

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=91) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

> New GLE Keeps Draining Battery - won't start (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)

Log In | Register (https://mbworld.org/forums/register.php)

---

☐ 06-18-2020, 06:17 PM

**#4 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085537)**

**Willfulone (https://mbworld.org/forums/members/461941-willfulone.html)**

Newbie

Join Date: Jun 2020
Location: Virginia
Posts: 4
Likes: 0
Received 3 Likes on 2 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=461941)
2020 GLE350

Back from the shop

ESP was a constant drain on battery

Supposedly a known issue

Fixed with a software update

Will let you know if it fixes the problem permanently, tks for the responses

Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8085537)

☐ Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8085537&securitytoken=guest)

---

☐ 06-18-2020, 10:55 PM

**#5 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085738)**

**Ron.s (https://mbworld.org/forums/members/410733-ron-s.html)**

MBWorld Fanatic!

(https://mbworld.org/forums/members/410733-ron-s.html)

Join Date: May 2018
Location: Boise
Posts: 2,023
Likes: 240 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=410733)
Received 352 Likes on 270 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=410733)
2021 GLE AMG 53 SUV.....
2018 Audi SQ5

Quote:

Originally Posted by **Willfulone** ☑ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085537)
*Back from the shop*

*ESP was a constant drain on battery*

*Supposedly a known issue*

*Fixed with a software update*

*Will let you know if it fixes the problem permanently, tks for the responses*

Even with the ignition off? Do you have the TSB or Software detail so some of us can check to see if ours needs it? Or post a copy of work order?

Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8085738)

☐ Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8085738&securitytoken=guest)

---

☐ 06-19-2020, 06:39 AM

**#6 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085868)**

**Willfulone (https://mbworld.org/forums/members/461941-willfulone.html)**

Newbie

Join Date: Jun 2020
Location: Virginia
Posts: 4
Likes: 0
Received 3 Likes on 2 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=461941)
2020 GLE350

Quote:

Originally Posted by **Ron.s** ☑ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085738)
*Even with the ignition off? Do you have the TSB or Software detail so some of us can check to see if ours needs it? Or post a copy of work order?*

I do, I will dig it out and post it up

Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

(https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)

# /////MBWorld

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

New GLE keeps Draining Battery, won't start

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)     Log In |

Register (https://mbworld.org/forums/register.php)

---

□ 06-20-2020, 08:23 PM                    #7 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8087087)

**robert c (https://mbworld.org/forums/members/398518-robert-c.html)**
Member

Join Date: Nov 2017
Location: Eastern Maryland
Posts: 125
Likes: 11 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=398518)
Received 14 Likes on 12 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=398518)
ES350 E300 GLE350 GMC3500 Duramax

It seems battery issues are a thing to deal with as our lives and driving patterns have changed due to the virus shutdowns. I am only driving to the post office and grocery store and barely keeping the battery up on the GLE. My Denali Duramax lost both batteries during the cold weather as they weren't being fully charged and the extra drain on the batteries by the glow plugs. Those new AGM batteries just gave up. I am using a Granite battery tender on the new ones for sure. I am also using a Granite tender on the E300 as it hasn't been started since March. The GLE is keeping it's battery ok for some reason but if it acts funny I'll put a tender on it also.
Robert

🗩 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8087087)

🗘 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8087087&securitytoken=guest)

---

□ 06-22-2020, 01:53 AM                    #8 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8087859)

**maalox (https://mbworld.org/forums/members/427860-maalox.html)**
Member

Join Date: Feb 2019
Location: Boston
Posts: 137
Likes: 3 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=427860)
Received 30 Likes on 24 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=427860)

Quote:

Originally Posted by **Willfulone** ▷ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085868)
*I do, I will dig it out and post it up*

Just wondering if you were able to find the TSB #? I might have to get my car serviced this week and would like to get outstanding software updates done at the same time. Dealer always claims there are no updates to any of the components, though I did see in another thread GregW mentioned he got updates a while back to the EIS (Electronic Ignition Switch), ESP (Electronic Stability Program), ME & fuel pump software at some point.

Thanks!

🗩 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8087859)

🗘 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8087859&securitytoken=guest)

---

□ 08-03-2020, 11:34 AM                    #9 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8123608)

**vermedia (https://mbworld.org/forums/me...**

**2020 Just at dealer 3 weeks** (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)
I just wanted to follow up with you to see if you were still having problems. I was driving my 2020 GLE on the expressway and as soon as I got off stopped at a light my car

//////MBWorld

mbers/465290-
vernedia.html)
Newbie

turned off. All light on dash were lite and the car did not restart. It was towed to dealer and has been there since. Dealer is telling me ($entity@mbworld.org) battery is critical. I am beginning to believe reading all of the posts below, this is a known issue

MBWorld.org Forums (https://mbworld.org/forums/index.php) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

New GLE Keeps draining battery - won't start
(https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)     Log In |

Register (https://mbworld.org/forums/register.php)

2020 GLE

Originally Posted by **Wullf Nlone** 🔳 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085537)
*Back from the shop*

*ESP was a constant drain on battery*

*Supposedly a known issue*

*Fixed with a software update*

*Will let you know if it fixes the problem permanently, tks for the responses*

Last edited by Vernedia; 08-03-2020 at 11:36 AM. Reason: Misspelling

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8123608)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8123608&securitytoken=guest)

---

🗓 08-03-2020, 01:08 PM     #10 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8123701)

**robert c**
(https://mbworld.org/forums/members/398518-robert-c.html)
Member

Join Date: Nov 2017
Location: Eastern Maryland
Posts: 125
Likes: 11
(https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=398518)
Received 14 Likes on 12 Posts
(https://mbworld.org/forums/post_thanks.php?do=findthanks&u=398518)
ES350 E300 GLE350
GMC3500 Duramax

Is this car equipped with the electronics assistance package if so...... did the car start by disconnecting the battery and hooking back up as it appears most do
Robert

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8123701)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8123701&securitytoken=guest)

---

🗓 08-03-2020, 08:08 PM     #11 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124137)

**Vernedia**
(https://mbworld.org/forums/members/465290-vernedia.html)
Newbie

Join Date: Aug 2020
Posts: 3
Likes: 0
Received 1 Like on 1 Post
(https://mbworld.org/forums/post_thanks.php?do=findthanks&u=465290)
2020 GLE

**Pinched wire for starter solenoid**

Quote:

Originally Posted by **robert c** 🔳 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8123701)
*Is this car equipped with the electronics assistance package if so......*
*did the car start by disconnecting the battery and hooking back up as it appears most do*
*Robert*

So this is what they claim was wrong with my GLE only took 3 weeks to figure it out. I'm not buying it. Just picked it up so we will see . Now I feel like I don't have a reliable vehicle especially with all the bad reviews I have read. Pinched wiring starter circuit BUT it stopped while at a stop light and then didn't start after it cut off. I'm no mechanic but it doesn't add up to me.

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8124137)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8124137&securitytoken=guest)

---

🗓 08-04-2020, 10:32 AM     #12 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124441)

**cosmobenz**
(https://mbworld.org/forums/members/...cosmobenz.html)

I've had the same issue with my four month old 2020GLE! Keep getting "Critical" messages via email. Dealer has had the vehicle three or four times and continues with software updates apparently dictated by Mercedes. "Starter Battery Partly Charged" shows on menu display even after being driven and despite the car being driven daily. Really frustrating and has quickly eroded my confidence in both the vehicle and dealership!

# /////MBWorld (https://mbworld.org)

Junior Member
Join Date: Dec 2016
Location: Central Virginia

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

New GLE Keeps Draining Battery - won't start

2017 MB GLC300 & 2020 GLE350

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)

🔔 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8124441)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8124441&securitytoken=guest)

Log In |

Register (https://mbworld.org/forums/register.php)

---

☐ 08-04-2020, 11:21 AM

#13 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124483)

**Ron.s (https://mbworld.org/forums/members/410733-ron-s.html)**
MBWorld Fanatic!

(https://mbworld.org/forums/members/410733-ron-s.html)

Join Date: May 2018
Location: Boise
Posts: 2,023
Likes: 240 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=410733)
Received 352 Likes on 270 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=410733)
2021 GLE AMG 53 SUV.... 2018 Audi SQ5

Quote:

> Originally Posted by **cosmobenz** 🔗 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124441)
> I've had the same issue with my four month old 2020GLE! Keep getting "Critical" messages via email. Dealer has had the vehicle three or four times and continues with software updates apparently dictated by Mercedes. "Starter Battery Partly Charged" shows on the Mercedesme app for almost a week now despite the car being driven daily. Really frustrating and I'm quickly losing confidence in bothe the vehicle and dealership!

As I posted earlier....mine turned out to be a bad battery and it has been good since it was replaced. Common sense is it's either 1. Battery issue 2. Short draining battery 3. Not charging properly. This isn't Rocket Science so I'd go with the theory of the Dealer Tech being the problem. Since it's a fairly uncommon problem you have to wonder why they would be looking at software anyway? If it was software wouldn't it be widespread?

🔔 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8124483)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8124483&securitytoken=guest)

---

☐ 08-04-2020, 12:19 PM

#14 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124533)

**Vernedia (h tt ps :/ / w**

**Pinched wire for starter solenoid**

Quote:

> Originally Posted by **Ron.s** 🔗 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124483)
> As I posted earlier....mine turned out to be a bad battery and it has been good since it was replaced. Common sense is it's either 1. Battery issue 2. Short draining battery 3. Not charging properly. This isn't Rocket Science so I'd go with the theory of the Dealer Tech being the problem. Since it's a fairly uncommon problem you have to wonder why they would be looking at software anyway? If it was software wouldn't it be widespread?

I totally agree. I picked up the car yesterday and looked at app a few hours later" battery partially charged " drove it, for15 minutes changed to charged. Checked it all night and drove 40 minutes to work. Still says charged, had to pray all the way to work that this expensive car didn't stop on me again. I will attach work order. Sorry could not straighten it upward. And yes I do have EAP.

🔔 Reply (...)

Share

« First ‹ Prev 1 / 1 Next › Last » Go to Page... Go

MID-L-002759-21   05/07/2021 3:48:53 PM   Pg 108 of 160 Trans ID: LCV20211157920

DESCRIPTION OF SERVICE AND PARTS

email: no@no.com

#2 - 51MBZ: BODY ELECTRICAL
TOW IN - CUSTOMER STATED THE VEHICLE STOPPED
RUNNING WHILE SITTING AT A STOP LIGHT. INTERIOR
ITEMS HAVE POWER, VEHICLE WOULD NOT START. NO
NOISE FROM THE ENGINE WHEN PRESSING THE STARTING
BUTTON

Caused by
PINCHED WIRING STARTER CIRCUIT
Tech: DANIEL ZGOBICA       (001)
Tech: DANIEL ZGOBICA       (001)
CONNECT SDS. CONNECT BATTERY CHARGER. PERFORMED
DIAGNOSTICS. FOUND PINCHED WIRING FOR STARTER
SOLENOID. REPAIRED HARNESS. VEHICLE NOW WORKING
TO MB SPECS AT THIS TIME. RELEASE TO CLIENT.

Originally Posted by **maalox** ⚙ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html)

*Just wondering if you were able to find the TSB # ? I might have to get my car serviced this week and just want to make sure I have all the info available.*

*Thanks!*

> **New GLE Keeps Draining Battery won't start**

*Sorry for the delay - had a little stay in the Hospital*

*Here you go*

MBWorld.org Forums (https://mbworld.org/forums/index.php) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?f=...) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?f=...)

////MBWorld 🔍

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)     Log In

Register (https://mbworld.org/forums/register.php)

---

| J5882 | | 338906 | **Mercedes-Benz of Alexand** |
|---|---|---|---|
| | | *INVOICE* | 200 South Pickett Street  Alexandria, VA 2 |
| aselton | | | Contact Us: 703.341.2140    Mercedes-Alexandri |
| | | PAGE 1 | Service and Parts Hours: |
| CONT: 703-398-9108 | | | Monday - Friday 7:00 AM to 7:00 PM Saturday 8:00 AM to... |
| CELL: 703-398-9108 | | SERVICE ADVISOR:  800865 CARLOS ESCOBAR | |

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN / OUT | T |
|---|---|---|---|---|---|---|
| WHITE | 20 | Mercedes-Benz Truck | ▓▓▓▓▓▓ | | 6447/6448 | T83 |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|
| 01JUN20 DD | | | 19.00 12JUN20 | | 0.00  CASH | 15JUN20 |

| R.O. OPENED | READY | OPTIONS: DLR: 80101 |
|---|---|---|
| 18:50 11JUN20 | 12:56 15JUN20 | |

| LINE | OPCODE | TECH | TYPE | HOURS | | LIST | NET | CO |
|---|---|---|---|---|---|---|---|---|

A CUSTOMER STATES VEHICLE WILL NOT START AND THIS IS THE 2ND TIME IT
   HAS HAPPENED PLEASE CHECK AND REPORT
CAUSE:
   540650: ON-BOARD POWER SUPPLY VOLTAGE MAINTAIN
     (WHEN CHECKING/ TESTING AND TROUBLESHOOTING)
    800556    W
   541011 PERFORM QUICK TEST
    800556    W
   420641 INDIVIDUAL PARTS OF TRACTION AND BRAKE
     SYSTEMS: ............. CHECK
     ACCORDING TO FAULT CODE
    800556    W
   540991 PROGRAM AND PARAMETERIZE CONTROL UNIT
     .............. (AFTER QUICK TEST)
    800556    W
PARTS:   0.00 LABOR:   0.30 OTHER:   0.00  TOTAL LINE A:
PERFORMED DTB LI42.47-P-069817. CONNECTED A BATTERY CHARGER AND
UPDATED THE ESP CONTROL UNIT TO THE LATEST SOFTWARE LEVEL. STARTED THE
CAR MANY TIMES OVER 2 DAYS AND FOUND IT STARTED NORMALLY EACH TIME.
*****************************************

B Main Shop - Multi-Point Inspection
  02MBZ25R Main Shop - Multi-Point Inspection
    800556    C                    0.00
PARTS:   0.00 LABOR:   0.00 OTHER:   0.00  TOTAL LINE B:
*****************************************

EST: 0.64      12JUN20 07:55  SA: 800865
CONTACT:
*****************************************

**CUSTOMER COPY**

---

Join Date: Jun 2020
Location:
Posts: 4

Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

Share ▾ (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

« First    ‹ Prev | 1/1 | Next › | Last »    Go to Page...  →Go

# //////MBWorld (https://mbworld.org)

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)
New GLE Keeps Draining Battery - won't start

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)    Log In |

Register (https://mbworld.org/forums/register.php)

🗩 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8124779)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8124779&securitytoken=guest)

| The following users liked this post: | maalox (https://mbworld.org/forums/members/427860-maalox.html) (08-04-2020) |
|---|---|

#16 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8125359)

"Working to MB Specs". — back in the day, that meant something. Now it just means a reset to the counter to w
it's back in the shop.

Quote:

> Originally Posted by **Vernedia** 🔒 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124533)
> *I totally agree. I picked up the car yesterday and looked at app 3 hours later" battery partially charged ." I drove it for15 minutes changed to charged . Checked it all night and drove 40 minutes to work. Still says charged, had to pray all the way to work that this expensive car didn't stop on me again. I will attach work order. Sorry could not straighten it upward. And yes I do have EAP.*

🗩 Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

Share (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)



DESCRIPTION OF SERVICE AND PARTS

Email: no@no.com

42 - 51 MBZ: BODY ELECTRICAL
TOW IN - CUSTOMER STATED THE VEHICLE STOPPED
RUNNING WHILE SITTING AT A STOP LIGHT. INTERIOR
ITEMS HAVE POWER, VEHICLE WOULD NOT START. NO
NOISE FROM THE ENGINE WHEN PRESSING THE STARTING
BUTTON
    Caused by
    PINCHED WIRING STARTER CIRCUIT
Tech: DANIEL ZGOBICA        (001)
Tech: DANIEL ZGOBICA        (001)
CONNECT SDS. CONNECT BATTERY CHARGER. PERFORMED
DIAGNOSTICS. FOUND PINCHED WIRING FOR STARTER
SOLENOID. REPAIRED HARNESS. VEHICLE NOW WORKING
TO MB SPECS AT THIS TIME. RELEASE TO CLIENT.

MID-L-002759-21   05/07/2021 3:48:53 PM   Pg 111 of 160 Trans ID: LCV20211157920

# //////MBWorld (https://mbworld.org)

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

> New GLE Keeps Draining Battery - won't start

Thread Tools ▼ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▼ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)   **Log In** |

**Register** (https://mbworld.org/forums/register.php)

Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

Share ▼ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)

« First ‹ Prev | 1 / 1 | Next › Last » | Go to Page... | Go

# //////MBWorld (https://mbworld.org)

🔍

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

## New GLE Keeps Draining Battery - won't start

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)   Log In |

**Register** (https://mbworld.org/forums/register.php)

---

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8125394)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8125394&securitytoken=guest)

---

📅 12-20-2020, 12:32 PM | #17 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8229025)

**nwehler** (https://mbworld.org/forums/members/474063-nwehler.html)

Newbie

Join Date: Dec 2020
Location: Delray Beach FLORIDA
Posts: 3
Likes: 4 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=474063)
Received 0 Likes on 0 Posts
GLE 450

⚙

**GLE battery drain**

I had a similar experience my new '21 GLE450: battery went dead after 230 miles. Had to be towed - could not be jumped. I am waiting more than 30 days fir a new battery coming from Germany. None in the US. So frustrating. Mercedes has a serious problem here with this 48v battery system.

> Quote:

> Originally Posted by **Ron.s** 🔗 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8080042)
> *Don't rule out the battery. I had a similar situation except that with the 450 the 48 volt starts the car. I kept getting "critical battery" message and the dealer couldn't find anything wrong. Then when it was in for 3 days to replace the MBUX controller it ran down after a charge and they replaced it (the 12 volt battery). I think it had an internal short but got that 3td hand from SA & probably a guess.*

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8229025)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8229025&securitytoken=guest)

---

📅 12-20-2020, 07:03 PM | #18 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8229274)

**MikeFLA** (https://mbworld.org/forums/members/...)

> Quote:

> Originally Posted by **nwehler** (https://mbworld.org/forums/gle-class-v167/785752-...html#post8229025)
> *I had a similar experience my new '21 GLE450: battery went dead after 230 miles. Had to be towed - could not be jumped. I am waiting more than 30 days*

‹ Prev  1/1  Next ›  Last ››   Go to Page...   Go

mbers/474087-
mikefla.html)
Junior Member
MBWorld.org Forums (https://mbworld.org/forums/index.php)
Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/mercedes-benz-suvs-trucks-vans-diesels-other-52/)
GLE-Class (V167) (https://mbworld.org/forums/forumdisplay.php?...)
GLE-Class (V167) (https://mbworld.org/forums/gle-class-v167-785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this thread (https://mbworld.org/forums/gle-class-v167-785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)

Log In |

Register (https://mbworld.org/forums/register.php)

fir a new battery coming from Germany. None in the US. So frustrating. Mercedes has

///MBWorld (https://mbworld.org)

Likes:12
(https://mbworld.org/forum
s/post_thanks.php?
do=findthanks_user_gave&u
=474087)
Received 6 Likes on 5 Posts
(https://mbworld.org/forum
s/post_thanks.php?
do=findthanks&u=474087)
2020 GLE450

...assistance which is a joke for another post. After repeating to the service department that I need a tow truck, NOT a jump...who do they send... a jump guy. Anyway, he called me and said he's seen this before, and for me to try to start the car. Did it start! Yep...drove my Mercedes-Benz GLE450 4matic SUV to the dealer in Pompano Beach, FL. the next morning. Drove perfectly fine to the shop. They informed me, the car has to stay in for 48 volt battery needs to be replaced...there are NONE in the US, and 47 on back order in Germany with no idea when I would get one. The car is still with them since December 1. This is my first MB, and I'm NOT impressed at all. The biggest question I have is...this a battery problem, or software issue...or both? Batteries don't actually come back to life after a failure, and a 10 minute shutdown??? Seems that resetting the software by restarting the car made the issue go away...for now at least.

> Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8229274)

> Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8229274&securitytoken=guest)

---

☐ 04-06-2021, 10:44 AM    #19 (https://mbworld.org/forums/gle-class-v167-785752-new-gle-keeps-draining-battery-won-t-start.html#post8309265)

Bill Baird
(https://mbworld
.org/forums/me
mbers/269175-
bill-baird.html)
Member
Join Date: Mar 2013
Location: Chicago suburbs
Posts: 109
Likes:151
(https://mbworld.org/forum
s/post_thanks.php?
do=findthanks_user_gave&u
=269175)
Received 26 Likes on 19
Posts
(https://mbworld.org/forum
s/post_thanks.php?
do=findthanks&u=269175)
2018 C43 Coupe, 2018
GL350, 2007 CL600

My '18 GLE sat from May to August with no problem. My '07 CL600 sat from November to February with no problem. Neither had a battery tender. It makes me think there is some kind of draw. There was a really good explanation on how to find the problem on the "Car Wizards" youtube channel.



What's draining the battery on this '01 Mercedes SLK320? CAR ...

> Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8309265)

> Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8309265&securitytoken=guest)

---

#20 (https://mbworld.org/forums/gle-class-v167-785752-new-gle-keeps-draining-battery-won-t-start.html#post830

Quote:

Originally Posted by Willfulone ♪ (https://mbworld.org/forums/gle-class-v167-785752-new-gle-keeps-draining-battery-won-t-start.html#post8124779)
Here you go

Sorry for the delay - had a little stay in the Hospital

> Reply (http://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

Share (https://mbworld.org/forums/gle-class-v167-785752-new-gle-keeps-draining-battery-won-t-start.html#)

# ////MBWorld (https://mbworld.org)

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c) > GLE-Class (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

> **New GLE Keeps Draining Battery - won't start**

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)   Log In |   Register (https://mbworld.org/forums/register.php)

*INVOICE*   200 South Pickett Street Alexandria, VA

Contact Us: 703.341.2140   MercedesAlexan

CONT: 703-398-9108

CELL: 703-398-9108 /gle   SERVICE ADVISOR:   838865   CARLOS ESCOBA

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN / OUT |
|---|---|---|---|---|---|
| WHITE | 20 | Mercedes-Benz Truck | | 6447/6448 | |

| DEL. DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DAT |
|---|---|---|---|---|---|---|---|
| 01JAN20 DD | | | 19:00 12JUN20 | | 0.00 | CASH | 15JUN20 |

R.O. OPENED   READY   OPTIONS:   DLR:80101

18:50 11JUN20   12:56 15JUN20
LINE OPCODE TECH TYPE HOURS                    LIST            NET

A CUSTOMER STATES VEHICLE WILL NOT START AND THIS IS THE 2ND TIME IT
     HAS HAPPENED PLEASE CHECK AND REPORT

CAUSE: .
     540650 ON-BOARD POWER SUPPLY VOLTAGE MAINTAIN
            (WHEN CHECKING/ TESTING AND TROUBLESHOOTING)
            800556      W
     541011 PERFORM QUICK TEST
            800556      W
     420641 INDIVIDUAL PARTS OF TRACTION AND BRAKE
            SYSTEMS: ..................... CHECK
            ACCORDING TO FAULT CODE
            800556      W
     540991 PROGRAM AND PARAMETERIZE CONTROL UNIT
            .................... (AFTER QUICK TEST)
            800556      W

PARTS:        0.00 LABOR:        0.00 OTHER:        0.00  TOTAL LINE A:
PERFORMED DTB L142.47-P-069817. CONNECTED A BATTERY CHARGER AND
UPDATED THE ESP CONTROL UNIT TO THE LATEST SOFTWARE LEVEL. STARTED THE
CAR MANY TIMES OVER 2 DAYS AND FOUND IT STARTED NORMALLY EACH TIME.
**********************************************

B Main Shop - Multi-Point Inspection
     02MB225R Main Shop - Multi-Point Inspection
     800556      C                                         0.00
PARTS:        0.00 LABOR:        0.00 OTHER:        0.00  TOTAL LINE B:
     **********************************************

EST: 0.64!          12JUN20 07:55  SA: 800865
     CONTACT:
**********************************************

| WARRANTY DISCLAIMER: ALL PARTS AND ACCESSORIES ARE SOLD AND ALL REPAIRS ARE PROVIDED BY THE DEALERSHIP AS IS THE DEALERSHIP HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND NEITHER ASSUMES NOR AUTHORIZES ANY OTHER PERSON TO ASSUME FOR IT ANY LIABILITY IN CONNECTION WITH THE SALE OF PARTS OR PRODUCTS OR THE REPAIR. THIS WARRANTIES ON PARTS AND ACCESSORIES OR REPAIRS ARE THOSE WHICH MAY BE OFFERED BY THE VEHICLE MANUFACTURER OR THE PARTS MANUFACTURER OR DISTRIBUTOR AND ONLY SUCH MANUFACTURER OR DISTRIBUTOR SHALL BE LIABLE FOR PERFORMANCE UNDER SUCH WARRANTIES. CUSTOMER SHALL NOT BE ENTITLED TO RECOVER FROM THE DEALERSHIP ANY CONSEQUENTIAL DAMAGES, DAMAGES TO PROPERTY, DAMAGES FOR LOSS OF USE, LOSS OF TIME, LOSS OF PROFIT OR INCOME, OR ANY OTHER INCIDENTAL DAMAGES. By signing below, you acknowledge that you were notified of and authorized the charges to perform the services/repairs itemized on this invoice and that your vehicle is being returned to you in exchange for your payment of the Amount Due | SHOP SUPPLY COSTS: | DESCRIPTION | TOTALS |
| | We have added a charge | LABOR AMOUNT | |
| | of 6% of labor and parts | PARTS AMOUNT | |
| | to the "SHOP SUPPLY | GAS OIL ETC | |
| | COST" for shop supplies. | S.E.E* AMOUNT | |
| | Not to exceed $250.00. | MISC CHARGES | |
| | | TOTAL CHARGES | |
| ALL PARTS ARE NEW UNLESS OTHERWISE INDICATED | LESS INSURANCE | |
| | SALES TAX | |
| PLEASE PAY THIS AMOUNT | | |

| DATE | CUSTOMER SIGNATURE | AUTHORIZED DEALERSHIP REPRESENTATIVE SIGNATURE | |

SERVICAR                          CUSTOMER COPY

H'mm how is MB Alexandria doing these days. Had one car there, now moved them all to Arlington, far better se
in my experience

↰ Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

Share ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)

« First  ‹ Prev  | 1/1 |  Next ›  Last ››   Go to Page...   Go

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

**New GLE Keeps Draining Battery - won't start**

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)    Log In |

Register (https://mbworld.org/forums/register.php)

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=830

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8309419&securitytoken=

↩ Reply
(https://mbworld.org/forums/newreply.php?
do=newreply&noquote=1&p=8079971)

Subscribe 🔔 (https://mbworld.org/forums/subscription.php?do=addsubscription&t=785752)

↩ Reply
Back to Subforum
(https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

(https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)

≡ //////MBWorld (https://mbworld.org) →

2021 GLE 450 Battery Charging

🔍

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)
> **New GLE Keeps Draining Battery – won't start**

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)    **Log In**

**Register** (https://mbworld.org/forums/register.php)

↩ Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

Share ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)

« First  ‹ Prev  1 / 1  Next ›  Last »    Go to Page...    Go

# COMPLAINT
# EXHIBIT D

Case 2:21-cv-12750-BRM-JRA   Document 1-1   Filed 06/18/21   Page 123 of 201 PageID: 138
MID-L-002759-21   03/07/2021 3:48:53 PM  Pg 119 of 160 Trans ID: LCV20211157920

4/16/2021                                    Electrical Problems with 2020 GLE450 | Mercedes GLE Forum





| Search Community | 🔍 |

Home  >  Forums  >  Mercedes-Benz GLE (W166 & ...  >  **Mercedes GLE General Discu...**  >

# Electrical Problems with 2020 GLE450

➜ Jump to Latest                                                          Follow

1 - 4 of 4 Posts

**J**   **johnh55@att.net** · Registered
Joined 6 mo ago · 1 Posts

✓ Discussion Starter • #1 • 6 mo ago

I have had 4 occasions in last 3 months where 450 is dead after only sitting for an hour. Its now at Dealer for second time for this problem with total of 15 days of trying to fix it. In 3 of those occasions, jumping finally started it. Dealer replaced starter battery. THen it happened again last week and thus up at the dealer.

A GLE 450 they gave me as a loaner last time also ended up not starting while I had it and had to be towed - not even a jump started it.

ANy one know if other GLEs are having this problem? I know hundreds of GLEs were stored at the factory when they were originally built.

My GLE was built in November of 2018. I bought it new in January of 2020.

ANy help would be greatly appreciated. Love the car but don't trust it at all.

Reply

 **Jeorge** · Registered
Joined 6 mo ago · 4 Posts

#2 • 6 mo ago

Do you still have warranty ?

Reply

**W** **WG36** · Registered
Joined 5 mo ago · 1 Posts

#3 · 5 mo ago

Hi,

I had the same problem with 2016 GLE 450 AMG, (bought new from the dealer) The first week I received it the car would completely shutdown I would have to open the door in order to restart it, for 4 years I had nothing but problem after problem, mostly electrical. They never found the issue with the engine and entire ignition and computer system shutting down and having to be restarted. This had nothing to do with the eco engine start and stop.
The transmission from day one was beyond jolty. Eventually the car completely shutting down stopped after the dealer had done updates to the cars computer system etc.., but they could never diagnose many recurring and new issues. I sold the car as I deemed it a complete lemon from day one.

All that being said I fell in love with the all new GLE 53 AMG when I first heard of its announcement and even considered many full M competition BMW vehicles and Range Rovers etc....,

The New GLE53 AMG, is beyond impressive and works wonderfully, the car is mind blowing and drives 1000 times better then the older GLE's (2019 and older).

Everything is new on the car from what I understand and it is an amazing vehicle.

Reply

 **NicholasAnderson** · Registered
Joined 1 mo ago · 1 Posts

#4 · 1 mo ago

Yes, I'm very familiar with your problem, it usually happens with this type of model. Usually it has to be solved in the production service centers, but it is also possible to have the repair done by a handyman who works for himself. I am now convinced that it is worth it to check your car several times before buying it and make sure there are no factory problems with it. I was trained to do this when I took a course <u>How to</u>

4/16/2021                                    Electrical Problems with 2020 GLE450 | Mercedes GLE Forum

Become an Electrician: Career Guide [2021 Update] and I don't think you should neglect the training because it explains many things and solves problems.

Reply

1 - 4 of 4 Posts

# Join the discussion

Continue with Facebook

G  Continue with Google
or sign up with email

# Recommended Reading

Did you find the recommended reading relevant to this discussion?    ☺ Yes    ☹ No

## 9G-Tronic Transmission - Almost Everything You Need To Know
Transmission and Drivetrain Discussion

💬 7    👁 8K

H    HDGFND · updated 8 mo ago

## 2016 gle 350d
Engines and Technical Discussion

💬 9    👁 4K

S    serta · updated Jan 17, 2017

## 2020 gle 450 air conditioner problems
Introductions

💬 3    👁 1K

R    Ross Novelli Jr · updated 29 d ago


## Check Engine Light on Brand New GLE 350d
Mercedes GLE General Discussion

💬 20    👁 15K

B    bwdownie · updated Jun 16, 2017


## 2016 GLE350 broke after 50 miles
Mercedes GLE General Discussion

💬 1    👁 2K

H    helodrive · updated Jun 25, 2016


Home    About Us    Terms of Use    Privacy Policy    Help    Contact us

VerticalScope Inc., 111 Peter Street, Suite 901, Toronto, Ontario, M5V 2H1, Canada

Forum software by XenForo 🔊

# COMPLAINT
# EXHIBIT E

**2020 Mercedes-Benz GLE 450**

★★★★☆ **4.0** 26 Reviews

Learn About This Car

Write Your Review

Research / Mercedes-Benz / GLE 450 / 2020 GLE 450

# Consumer Reviews
## 2020 Mercedes-Benz GLE 450
## $55,791 - $104,948 MSRP Range

Share

Feedback



## Review Score

★★★★☆ **4.0** 26 Reviews

👍 **54%** of drivers recommend this car

### Score Breakdown

▬▬▬▬▭ Comfort

▬▬▬▭ Value for the Money

▬▬▬▭ Interior Design

▬▬▬▬▭ Reliability

▬▬▬▭ Performance

▬▬▬▬▭ Exterior Styling

Learn about the 2020 Mercedes-Benz GLE 450

4/16/2021                              2020 Mercedes-Benz GLE 450 Consumer Reviews | Cars.com

**2020 Mercedes-Benz GLE 450**

**4.0**  26 Reviews

Learn About This Car

Write Your Review

# Have You Driven the 2020 Mercedes-Benz GLE 450?

Write Your Review

**What Drivers Are Saying**

**Read reviews that mention:**

| All Reviews | Engine | Easy Entry | New Car | Mechanical Problem | Beautiful Car |

| Comfortable Ride | Comfortable Seat | Great Job | Great Creature | Safe Car | Brake |

Feedback

1 - 26 of 26 reviews     Most Helpful

★★★★★

Most innovative vehicle I've owned.
*by Penny J from WICHITA, KS on Sun Feb 02 2020*

I'm completely blown away with all the features in this GLE 450. I wanted a 6 cylinder and it's an SUV

Show Full Review ⌄

★★★★★

My Favorite Mercedes SUV yet!
*by Lone Star Lady from Dallas, TX on Fri Feb 07 2020*

This is my third Mercedes SUV that I have owned over the past 15 years. This GLE 450 is amazing. They

Show Full Review ⌄

★★★★★

Super solid and comfortable cruiser

**2020 Mercedes-Benz GLE 450**

**4.0**  26 Reviews

Learn About This Car

Write Your Review

☆ ★ ★ ★

This the 5th MBZ I have owned and it is the best .
*by MBZ fan from Ocean City, NJ on Thu Apr 09 2020*

Show Full Review ⌄

Feedback

★ ★ ★ ★ ★

Soft handling
*by Watchman from Alaska on Mon Jun 22 2020*

Show Full Review ⌄

★ ☆ ☆ ☆ ☆

Most unreliable car I have ever owned.
*by CEO from Lexington NC on Fri Nov 08 2019*

I currently own 3, Mercedes - I will never own another one. This 2020?450!GLE has refused to start, left me stranded 10 times in 8 weeks- only to find out from a tow truck driver there is a problem with the software . Which Mercedes has now confessed is true. I will turn this new car back to dealer. NC lemon law.

Comfort          Value for the Money
Interior Design  Reliability
Performance      Exterior Styling

Purchased a **New** car
Uses car for **Commuting**
**Does not** recommend this car!!

**39** out of **41** people found this review helpful. Did you?

4/16/2021                                    2020 Mercedes-Benz GLE 450 Consumer Reviews | Cars.com

**2020 Mercedes-Benz GLE 450**
**4.0** 26 Reviews

**Learn About This Car**

Write Your Review

★★★★★
I spoke too soon
*by Christopher Holloway from Suffolk, Virginia on Wed Jul 24 2019*

Show Full Review ﹀

**Feedback**

★★★★★
Been in the shop more days than I've owned it☹
*by Dschu from Mcallen Texas on Mon Nov 18 2019*

Show Full Review ﹀

★★★★★
Not worth the frustration
*by Rosa Disappointed Customer from Atlanta, GA on Wed Feb 05 2020*

Show Full Review ﹀



★★★★★
I spoke too soon
*by LA Guy from LA, CA on Wed Nov 20 2019*

Show Full Review ﹀

**2020 Mercedes-Benz GLE 450**

**4.0**   26 Reviews

<div style="border:1px solid black; display:inline-block; padding:6px 14px;">Learn About This Car</div>

Write Your Review

...hod it for months. It has been out of service and in the shop over forty days. Mercedes will...

Show Full Review ⌄

---

★★★☆☆

Not a reliable and a safe car to drive

by Tom from Bay Area , Fremont on Sun Dec 29 2019

The GLE 450 car is good with exterior and interior. But when it comes to long ride it's not the safest car...

Show Full Review ⌄

---

★★★☆☆

Disappointment

by Disappointment from New York, NY on Sat Sep 21 2019

Do you know that dream of having a merc? Believe it become a nightmare. In my mind, it's...

Show Full Review ⌄

---

★★★★☆

Good outweighs Bad (Maybe)

by Cliff M, retiree cruising Canada and U.S.A. from Lashburn, SK., Canada on Wed Mar 25 2020

...ught it because of all its features. I am still discovering some of them. We have put on 26k...

Show Full Review ⌄

---

★★★★★

Impressed and Satisifed

Feedback

## 2020 Mercedes-Benz GLE 450

**4.0** 26 Reviews

Learn About This Car

Write Your Review

★★★★★

Good car, no issues, a small reliability problem.

*by Jenny Liverhead from San Antonio, TX on Thu Jan 30 2020*

This car is a great car, spacious, intelligent, and overall good interior and exterior. But the

Show Full Review ∨

★★★★☆

So happy with my new GLE 450

*by Amanda from Cincinnati, OH on Mon Nov 04 2019*

Hands down the best in the segment. The one and only complaint is that I can't channel surf the radio

Show Full Review ∨

★★★★★

Absolutely Beauty

*by Happy from Saskatoon Sk. on Wed Oct 09 2019*

Excellent, an absolute pleasure to drive, and mileage for a vehicle of this size is outstanding. I have

Show Full Review ∨

★★★★★

Luxurious and Roomie

*by Lionsfan from Los Ángeles,CA on Tue Jan 21 2020*

I am 6'2 and was looking for a roomie, luxury ride with all the bells and whistles. This ride does not

Show Full Review ∨

**2020 Mercedes-Benz GLE 450**

**4.0** 26 Reviews

Learn About This Car

Write Your Review

Show Full Review ∨

★★★★★

New 2020 GLE is worth the wait
*by Pkmakai from Newport Beach CA on Mon Aug 05 2019*

Show Full Review ∨

★★★★★

Awesome Vehicle
*by Ienko from Orleans Ma on Mon May 13 2019*

Show Full Review ∨

TEST DRIVE REVIEW

★★★★☆

Thinking of buying
*Jeff Long Island from New york on Sun Feb 16 2020*

Show Full Review ∨

★★★☆☆

Never had a car so bad

Feedback

**2020 Mercedes-Benz GLE 450**

### **4.0** 26 Reviews

Learn About This Car

Write Your Review

★★★★★
Very comfortable and reliable.
*by Sara Brown from Liberty, Tx on Sun Feb 14 2021*

Show Full Review ⌄

★★★☆☆
Great vehicle but......
*by KLYPH EM from Lashburn, SK Canada on Fri Feb 12 2021*

Show Full Review ⌄

Prev          Next

1

250 Per Page

**Our Company**

About Cars.com

Investor Relations

Contact Cars.com

Mobile Apps

**Buying & Selling**

Find a Car

Certified Pre-Owned

Sell Your Car

Car Book Values

**Our Partners**

Auto.com

NewCars.com

Feedback

**2020 Mercedes-Benz GLE 450**

**4.0** 26 Reviews

Learn About This Car

Write Your Review

Accessibility Statement

Feedback

# COMPLAINT
# EXHIBIT F

Richard Roth
RSJ AUTO LLC

May 5, 2021

Perlman-DePetris Consumer Law
1926 Greentree Rd. Suite 100
Cherry Hill, NJ 08003

RE:
Jerry Scattaglia
135 Oak Ave.
Staten Island, NY 10306

Mr. DePetris,

I have reviewed this vehicle's repair invoices, Mr. Scattaglia's documentation of his repeated attempted repair experiences, technical service bulletins and other relevant information regarding this case. Subsequent to reviewing the supplied documentation, I examined Mr. Scattaglia's 2021 Mercedes Benz GLE 450 VIN# 5FNRL6H75JB096844 on 4/28/21. I performed a multipoint inspection which includes road testing the vehicle, a visual inspection, and a diagnostic scan of the vehicle's electronic systems. The vehicle had 2,384 miles at the time of my inspection. During this review, I have formed opinions about the vehicle's repair history, defects, and value. My evaluation takes into account the disclosure of its repair history.



Page 1

## SUMMARY

- Three (3) repair visits and forty-nine (49) days out of service for abnormal no crank, no start conditions and electrical system anomalies in 6 months of ownership.
- This vehicle is clearly defective from the factory. There were latent defects that existed at the time of sale that have caused the repeated no crank, no start abnormal condition and electrical system anomalies that are extant to this day.
- These anomalies are known issues as there are numerous Mercedes Benz TSBs regarding the 48V on-board electrical system.
- The right front door module was replaced, and the 48V battery was replaced twice in 6 months of ownership. This repeated repair is significant as a majority of the interior of the vehicle has to be removed during this repair attempt. The passenger front seat, seat bottom, front and rear carpet and the floor panels all were removed twice. All this to attempt to repair the repeated and continued no crank, no start anomalies that Mr. Scattaglia complained about no less than 3 times since delivery of the Mercedes Benz GLE 450.
- I found the use, value and safety of this vehicle have been impaired by the recurring defects and malfunctions of the engine and electrical system.
- I found the diminished value of this vehicle to be $10,483.97.


## I. RECORDS REVIEWED

1. Retainer agreement signed by counsel.
2. RO 4-10-21
3. RO 12-1-20
4. RO 11-11-20
5. Cars.com forum posts
6. MBworld.com forum posts
7. Mercedes GLE forum posts.
8. Client contact info for use in scheduling inspection
9. Client factual summary
10. Window sticker
11. Pages from warranty book (summaries of coverage)
12. Service contract page
13. Certificate of title for vehicle
14. Redacted retail order
15. Mercedes Benz TSBs
16. Current NADA Value Report

## II. BACKGROUND

Mr. Scattaglia purchased the vehicle new on 10/29/20. The purchase price is $76,918.36. The vehicle was delivered defective as manifested during his ownership. **This Mercedes Benz GLE 450 has had repeated abnormal conditions including: right side of the vehicle is dead, no crank, no start (2 times), battery light illuminated, and dash goes blank while driving.** It has required no less than three (3) additional repairs and forty-nine (49) days out of service to attempt to correct these abnormal conditions. Mr. Scattaglia reports that the electrical system problems still occur to this day.

## III. REPAIR HISTORY

Mr. Scattaglia reports that the vehicle was serviced by an authorized Mercedes Benz repair facility at least three (3) times between the purchase date of 10/29/20 and 4/10/21.

The specific repair visits based on the records supplied by Mr. Scattaglia are as follows:

- 11/10/20 @ 242 miles. 13 days after purchase. 2 days out of service.

  - CLIENT STATES THE R/SIDE OF THE VEHICLE IS DEAD - DOOR LOCK INOP - MIRROR DOESN'T FOLD.
    - Verify complaint, drive vehicle into shop. Hook up sds and charger.
    - Found fault codes in many modules for communication to RF door control module N69/2. Opening RF door appears to have rectified fault.
    - RNR RF door sill trim, check fuse 302. Find 13.2 volts.
    - RNR RF door panel. Check connectors on door control module and pins for tightness.
    - Found connector 6 to not be plugged in completely. Connector 6 does not appear to be root of cause being that connector 6 primarily controls lighting and seat position. Concerned about connector 3 because of circuit 30 voltage and can communication. Find 13.2 volts at connector 3 pins 4 and 5. OK. Check CAN communication find 2.2V CAN low pin 1 to chassis ground. Find 2.6V from CAN high pin 2 to chassis ground.
    - RNR RF seat RNR RF carpeting. Due to vehicle age finding loose ground is not uncommon. Perform Voltage drop test from Connector 3 pin 4 to W15/1 find 0.0V ok. Check for continuity between those two points, find .1ohms of resistance. Check pins for tightness at X35/2x1 find all associated pins to have good drag and contact pattern. No fault found there.
    - Perform hard reset of N69/2 by tension at F150/1 tension ok. Upon reinstalling fuse found everything to functioning. Suspect faulty module due to hard reset having to be performed.
    - Install new door control module RF. Perform initial start up of RF door. All ok at current time. Clear codes.

- 12/1/20 @ 554 miles. 41 days out of service.

   *NOTE: Mr. Scattaglia reports the vehicle failed on 11/30/20*
   *and was towed to the dealer that day.*

   o CLIENT STATES RED BATTERY LIGHT IS ON - VEHICLE WILL NOT CRANK/START

      ▪ VERIFIED COMPLAINT , NO START AND WARNING IN CLUSTER 48 VOLTS BATTERY WARNING ON.
      ▪ PERFORMED QUICK TEST PRINT CODE#B183387 DC/DC CONVERTER BATTERY FOR THE 48V SYSTEM HAS A MALFUNCTION, THE MESSAGE IS MISSING: LIN G1/3 - 48V ON VOLT.B183349 THE BATTERY FOR THE 48 VOLT ON BOARD SYSTEM HAS A MALFUNCTION.
      ▪ FOLLOWING LI54. 10-P-069698 FUNCTIONAL IMPAIRMENT OF 48V ON-BOARD ELECTRICAL OPEN PTSS CASE# 154425 SYSTEM, VEHICLE FALLS INTO CAUSE/REMEDY 1 AND 2 CAUSE#1 NO START WITH B183387 IN DC/DC CONVERTER N83/1, CAUSE 2 B183349 IN 48 VOLT BATTERY.
      ▪ PERFORMED rEMEDY1 CAUSED NO START WITH B183387 IN DC/DC CONVERTER N83-1 A. IF FIRST VISIT PULL QUICK CHEST IF FAULT CODE IS B183387 IN N83-1 (REGARDLESS OF OTHERFAULTS) REPLACE ONLY 48V BATTERY.
      ▪ REMEDY 2 B183349 IN 48V BATTERY. A. IF FAULT B 183349 IN 48V I. REPLACE ONLY 48 V BATTERY (REGARDLELSS OF OTHER FAULTS). I UPDADED DC /DC CONVERTER IF LATEST S/W IS AVAILABLE 9 IS THE RESOLUTION RPLACE 48V BATTERY AND UPDATED DC/DC CONVERTER.
      ▪ PULLED INITIAL QUICK TEST AND DC/DC CONTROL UNIT LOG.
      ▪ PULLED ISA PERFORMANCE DATA BEFORE CLEARING FAULTS. COULD NOT ROAD TEST VEHICLE WOULD NOT START. COULD NOT CONFIRM ALL 48V COMPONENTS COULD BE ACTUATED. NO 48V OUTPUT OF BATTERY.
      ▪ VIA XENTRY GUIDE TEST
         • A1=M75 ELECTRICAL COOLANT PUMP
         • A2=M60 ELECTRICAL TURBO
         • A3=A95 ELECTRICAL AC COMPRESSOR
      ▪ PRINTED OUT FROM 12V TEST WITH XENTRY BATTERY TESTER IN FRONT SAM. DETACHED LINES BETWEEN DC/DC CONVERTER N83-1 AN48V ON BOARD ELECTRICAL SYSTEM BATTERY, NO DAMAGE , SOILING , CORROSION AND RESISTANCE OF ALL CABLE PINS .1 OHMS.
      ▪ REMOVED IND INSPECT ALL CABLE INTO/ OUT OF DC/DC CONVERTER ALL CLEAN AND TIGHT. AS A RESULT WE MUST REPLACE 48V ON BOARD ELECTRICAL SYSTEM BATTERY
      ▪ R&R PASS FRONT SEAT ASSEMBLY, R&R REAR SEAT BOTTOM , R&R FRONT AND REAR CARPET, R&R FLOOR PANELS , ACCESS 48V BATTERY , R&R BATTERY COOLANT LINES , R&R ELECTRICAL LINES , REMOVE FOAM AND REPLACED 48V BATTERY , SWAP CONTROL MODULE TO NEW BATTERY , INSTALLED NEW BATTERY , ASSEMBLE VEHICLE IN REVERSE ORDER, PROGRAM NEW BATTERY.

--------

**Page 4**

- 4/10/21 @ 2,194 miles.  6 days out of service.

  o CLIENT STATES VEHICLE WILL NOT START - NO CRANK NO START

    ▪ VEHICLE DOES NOT START, SDS AND CHARGER HOOK UP SDS TEST CK.
    ▪ DTC'S B183349 BATTERY FOR 48 VOLT ON BOARD ELECTRICAL SYSTEM HAS A MALFUNCTION...THERE'S AN INTERNAL ELECTRICAL FAULT. B183371 THE BATTERY FOR 48 VOLT ON BOARD ELECTRICAL SYSTEM HAS A MALFUNCTION..THE ACTUATOR IS BLOCKED.
    ▪ PROCESS DTC'S AS PER LI54.10-P-069698 AND PERFORM CK. LIST..FOR CAUSE 2 FOR THESE 2 FAULT CODES MENTIONED ABOVE...
    ▪ AS PER LI54.10-P-069698 REMOVE R/F SEAT AND R/F RUG AND R/R` PORTION OF REAR RUG REMOVE FLOORBOARD PANELING AND REPLACE 48 VOLT BATTERY..WITH DC/DC CONVERTER AND INITIAL STARTUP OF DC/DC CONVERTER AND UPDATE 48V SYSTEM BATTERY...CHECK.
    ▪ FUNCTIONS OK. ERASED CODES AND REASSEMBLE VEHICLE.

  o CLIENT STATES DASH WENT OUT FOR 1-2 MINUTES AND THEN CAME BACK ON (WHILE DRIVING)
    ▪ CK. VEHICLE CLUSTER WENT BLANK, SDS AND CHARGER HOOK UP SDS TEST CK.
    ▪ DTCS NONE CK. FOR RELATED LI'S NONE CK. FOR RELATED PROBLEMS WITH OTHER VEHICLES NONE SPECIFIC TO THIS COMPLIANT
    ▪ CK. FOR CLUSTER S/W UPDATES AND UP CLUSTER S/W


Mr. Scattaglia reports that the electrical system anomalies still occur to this day.

## IV. INSPECTION

I inspected Mr. Scattaglia's vehicle on 4/28/21 @ 2,384 miles.

- I checked the vehicle's fluids; they were of normal level and condition.

- I scanned the vehicle's computer systems. Numerous abnormal trouble codes were found.

  - 48 computer systems were analyzed on this vehicle.

  - I found 28 abnormal trouble codes, 18 of which were in the instrument cluster module which directly corresponds to Mr. Scattaglia's most recent complaint, the instrument cluster display blacking out while driving.

  - ***NOTE: It is logical to conclude that during the last repair attempt at the authorized Mercedes Benz repair facility that these codes were not retrieved nor diagnosed, OR, the abnormal were retrieved, not diagnosed then cleared, (but not documented on the repair order) and they have all set/reset in the last 13 days between when the defective unrepaired vehicle was delivered back to Mr. Scattaglia and my inspection. Either way, the vehicle is not repaired and has extant abnormal conditions as illustrated by the numerous trouble codes. From these codes it is reasonable to conclude that Mr. Scattaglia will continue to experience the instrument cluster anomalies while driving which is a serious safety concern.*** See the following abnormal trouble codes.

  - Engine
    - U0416-08 | Implausible Data Were Received From Control Unit 'Traction System'. There is a signal fault or the message is faulty. - Pending.

  - Antilock Brakes
    - U1155-FF | Communication With The Lower Control Panel Has A Malfunction. - Stored.
    - U1427-94 | Implausible Data Were Received From Control Unit 'Audio Or Comand'. There Is An Unexpected Instruction. - Stored.

  - Instrument Panel
    - U0100-87 | Communication With The Control Unit 'Combustion Engine' Has A Malfunction. The message is missing.- Stored.
    - U0101-87 | Communication With Control Unit Transmission Has A Malfunction. The message is missing. - Stored.
    - U0109-87 | Communication With Control Unit Fuel Pump Has A Malfunction. The message is missing. - Stored.
    - U0115-87 | Communication With Control Unit 'drivetrain' Has A Malfunction. The message is missing. - Stored.
    - U0122-87 | Communication With Control Unit 'Traction System' Has A Malfunction. The message is missing. -Stored.

- U0127-87 | Communication with the tire pressure monitor has a malfunction. The message is missing. - Stored.
- U0141-87 | Communication with the front signal acquisition and actuation module has a malfunction. The message is missing. - Stored.
- U0142-87 | Communication with the rear signal acquisition and actuation module has a malfunction. The message is missing. - Stored.
- U0147-87 | Communication With Control Unit 'audio Or Comand' Has A Malfunction. The message is missing. -Stored.
- U0151-87 | Communication with the supplemental restraint system (SRS) has a malfunction. The message is missing. - Stored.
- U0159-87 | Communication with PARKTRONIC has a malfunction. The message is missing. - Stored.
- U0212-87 | Communication with the steering column module has a malfunction. The message is missing. - Stored.
- U111B-87 | Communication With The Control Unit 'Mercedes Benz Intelligent Drive' Has A Malfunction. The message is missing. - Stored.
- U1167-87 | Communication with the left front reversible emergency tensioning retractor has a malfunction. The message is missing. - Stored.
- U1168-87 | Communication with the right front reversible emergency tensioning retractor has a malfunction. The message is missing. - Stored.
- U118F-87 | Communication With The Control Unit For Telematics Services Has A Malfunction. The message is missing. - Stored.
- U11AD-87 | Communication With Control Unit Display Cluster Has A Malfunction. The message is missing. - Stored.
- U120E-87 | Communication With The Blind Spot Assist Has A Malfunction. The message is missing. - Stored.

o Parktronic
  - U0147-86 | Communication With Control Unit 'audio Or Comand' Has A Malfunction. There Is An Incorrect Signal. -Stored.

o Electronic Ignition Switch
  - U1160-00 | A Bus Keep Awake Unit Was Detected. There Is A General Failure. - Stored.

o Ambiance Light
  - U1127-87 | Communication With One Or More Color Generation And Coupling Modules On LIN Bus 6 Has A Malfunction. The message is missing. - Stored.

o Audio/COMAND Display
  - U014787 | Communication With Control Unit 'Audio Or Comand' Has A Malfunction. The Message Is Missing.

o Audio or COMAND
  - B227B-00 | The Specified And Actual Configurations Of The MOST Components Are Different. There Is A General Failure. - Stored.

- o Panoramic Sliding Roof
  - ▪ U0147-87 | Communication With Control Unit 'audio Or Comand' Has A Malfunction. The message is missing. -Stored.
  - ▪ U0169-87 | Communication With The Overhead Control Panel Has A Malfunction. The message is missing. -Stored.

- o Touchpad
  - ▪ U0147-87 | Communication With Control Unit 'audio Or Comand' Has A Malfunction. The message is missing. -Stored.

- o Rear Switching Module
  - ▪ U1160-00 | A Bus Keep Awake Unit Was Detected. There Is A General Failure. -Stored.

- I road tested the vehicle.  No anomalies were experienced.

## V. OPINION

Mr. Scattaglia has a vehicle that has had numerous abnormal conditions including: the right side of the vehicle is dead, no crank, no start (2 times), battery light illuminated, and dash goes blank while driving, during 6 months of ownership. These type of warranty issues are not acceptable under any industry standard I am aware of and I find them unreasonable from my standpoint as a 29-year veteran of the industry.

I have many years' experience as an automotive shop owner/operator, responsible for generating, authorizing and auditing records exactly like these. Relying on this experience, my inspection of the vehicle, the accounts of Mr. Scattaglia, and the documentation from the authorized factory agencies, I am able to make this evaluation.

The above repair history is significant since:

- There are repeated abnormal complaints about the engine not starting and electrical system anomalies. It is impossible to ignore the abnormal and poor performance of the vehicle given Mr. Scattaglia's repeated complaints. This vehicle has not been repaired after three (3) visits and forty-nine (49) days out of service for the same and various abnormal conditions.

- Mercedes Benz knew as early as 1/28/20 the problems with this vehicle existed. They still knowingly delivered the vehicle to Mr. Scattaglia on 10/29/20 with the known problems as is illustrated in official Mercedes Benz service bulletins regarding the 48V on-board electrical system. These bulletins are:

    o LI54.10-P069698 "Functional impairment of 48 V on-board electrical system"
        - 1/28/2020
        - Complaints:
            - Instrument cluster message 48 V on-board electrical system battery (G1/3) in yellow or red.
            - Vehicle does not start.
            - Limp home mode due to high engine operating temperatures.

    o LI54.10-P-071596 "Vehicle does not start / Vehicle cannot be unlocked - starter battery may be discharged"
        - 8/7/2020
        - Complaints:
            - Vehicle does not start / Vehicle cannot be unlocked
            - Display message in instrument cluster "Battery - Start Engine - see Operator's Manual"

    o LI54.10-P-071499 "Xentry Battery Tester results disagree with workshop assessment"
        - 8/10/2020
        - Complaint:
            - The result from the XENTRY battery test does not match the current state of the battery.

---

**Page 9**

- The repair invoices prove the malfunctions have occurred repeatedly and the authorized Mercedes Benz repair facility has not performed any meaningful diagnosis or repairs to correct these problems.

- The right front door module was replaced, and the 48V battery was replaced twice in 6 months of ownership. This repeated repair is significant as a majority of the interior of the vehicle has to be removed during this repair attempt. The passenger front seat, seat bottom, front and rear carpet and the floor panels all were removed twice. All this to attempt to repair the repeated and continued no crank, no start anomalies.

- Mr. Scattaglia reports the electrical system issues continue to this day.

The above repair history and vehicle inspection results are significant as the repeated complaints include no start, no crank and electrical system anomalies.

Overall, the condition and performance of this vehicle is fair at best and dangerous at worst in certain situations. I have been in the automotive repair industry for 29+ years and have owned a transmission and total car care repair facility for 10+ years. I consider the poor performance of this vehicle to be a serious safety concern and understand Mr. Scattaglia's reluctance to drive this vehicle as he is concerned that the vehicle will not start, or the instrument cluster will black out while driving like he has experienced numerous times. Mr. Scattaglia does not feel safe operating this vehicle and is concerned for his and his family's safety. I would not feel safe or confident driving Mr. Scattaglia's vehicle due to the above concerns experienced.

**Repair History Effect on Use, Value, and Safety**

The use of this vehicle has been substantially compromised since it repeatedly failed to operate as intended, the unreasonable number of times it has had to go back to the dealer for repair attempts to have essentially the same abnormal condition fixed, the number of days it has been out of service, and through the difficulty of procuring proper repairs from the authorized Mercedes Benz repair facility.

The value of this vehicle has been substantially compromised. The significant repair history with right side of the vehicle is dead, no crank, no start (2 times), battery light illuminated, and dash goes blank while driving, the numerous abnormal trouble codes found during my inspection, along with three (3) repair visits and forty-nine (49) days out of service in 6 months of ownership, compromises the vehicle's value.

This is because one of the greatest areas of diminished value is private party sale. Since Mr. Scattaglia would achieve the greatest value for his Mercedes Benz GLE 450 when listing it himself for sale rather than trading it in to a dealer and that disclosure of the vehicle's repair history would be a prerequisite to the private sale and thus cause the sale price to be lowered significantly. Dealers do not consider warranty repairs when accepting vehicle trades or purchasing vehicles from consumers. Automotive dealers instead focus mainly on physical exterior and interior visible condition and miles registered on the vehicle's odometer.

Mr. Scattaglia's repair history coupled together is unreasonable; the problems Mr. Scattaglia experienced are unexpected and abnormal. I would consider this GLE 450 unreliable given Mr. Scattaglia's repair history.

The safety of this vehicle has been compromised by the engine and electrical system malfunctions chronicled in its repair history. The engine should start as expected without failing to crank or start, and the instrument cluster should not black out while driving. If the engine fails to start or the instrument cluster blacks out while driving, serious safety concerns occur.

Finally, there is no indication that this Mercedes Benz GLE 450's engine and electrical system nonconformities, defects and abnormal conditions are the result of abuse, neglect, or unauthorized modifications or alterations of this Mercedes Benz GLE 450 by anyone other than the manufacturer. This is based on my vehicle inspection and the review of the records provided which include the authorized Mercedes Benz repair facility repair orders and records, Mercedes Benz recalls and service bulletins, along with the accounts of Mr. Scattaglia. It is also my understanding Mr. Scattaglia will testify under oath that the vehicle has not been in any accidents, damaged, modified or undergone any body or collision repairs or refinishing since he purchased it.

<u>VI. Damages</u>

Diminished Value is the difference in value at the time and place of acceptance between the value of the goods as accepted and the value they would have had if they had been delivered as warranted. This 2021 Mercedes Benz GLE 450 was unfit, unmerchantable and unsafe at the time of sale. There is a significant difference or diminished value from as the vehicle was represented and as it truly existed. The diminished value of this vehicle as delivered and warranted equals 13.63% of the purchase price.

Valuation is a part of what I have done on a daily basis at my shop. We performed major repairs like transmissions, engine, AC and everything in between. It is important to value the vehicle to determine if the repairs are the right thing to do. Valuing and appraising is a process that any mechanic or used car dealer would do. Starting with a thorough examination of the vehicle, sometimes disassembling components to determine the extent of the repair or damage. Next, I calculate the cost of the repairs. Using the same court accepted methodology mechanics and used car dealers employ, I determine the value of the vehicle with the industry accepted reference guides like Kelly Blue Book and NADA guides. I gather the elements and facts including what was paid for the vehicle, what was its price when new, mileage and condition. I then apply an objective, court and industry accepted standard to determine the value of the vehicle. I have applied the same method to the facts of this case.

I based this diminution on the vehicle's value today per NADA Guides.com. In "Clean Retail" condition the vehicle is worth $74,625 based on its age and mileage. "Rough" condition is defined by NADA as "A vehicle with significant mechanical defects requiring repairs in order to restore reasonable running condition." I define the condition of this vehicle as "Rough" since its purchase given the significant repair history with right side of the vehicle is dead, no crank, no start (2 times), battery light illuminated, and dash goes blank while driving, the numerous abnormal trouble codes found during my inspection, along with three (3) repair visits and forty-nine (49) days out of service in 6 months of ownership. As the vehicle was delivered in "Rough" condition, its value today is $64,450. The difference between these figures is 13.63%. Therefore, the diminution in the value of this vehicle, as warranted and delivered at the time and place of delivery is equal to 13.63% of the purchase price. Taking the 13.63% and multiplying it by the purchase price of $76,918.36 equals $10,483.97 as the diminished value at the time of purchase.

These opinions have been made to a reasonable degree of automotive mechanical certainty based on my years of experience in the automotive repair industry. I reserve the right to supplement and amend this report with additional inspection reports, pictures, videos or other information in the future.

Respectfully submitted,

Richard Roth

- For Reference, the following is the CV for Richard Roth.

# EXPERIENCE

**Owner, RSJ AUTO LLC**                                                    **December 2012-Present**

- Provide Expert Witness services including vehicle inspections, report generation with photos and videos, attendance and testimony at trials/arbitrations, attendance at service advisor, and mechanic depositions.
- Court Admissions as a Mechanical and Valuation Expert:
  - Philadelphia County, PA
  - Allegheny County, PA
  - Lehigh County, PA
  - Camden County, NJ
  - Cumberland County, NJ
  - Sussex County, NJ
  - Burlington County, NJ
- Provide service to automotive repair shops including diagnostic, mechanical, and management assistance on an as needed basis.
- Provide mechanical and physical damage appraisals. (PAMVPDA License #788577)
- Provide mechanical breakdown and physical inspections for insurance, warranty, and fleet companies. (Allstate, Safe-Guard VSC, Auto Retention Services, Aegis/APCO, Preferred Warranties Inc., ARI, General Motors-Chrysler-Mopar Vehicle Protection, Subaru Factory Warranty and others).
- Provide pre-purchase vehicle inspections for warranty companies.


**Owner, AAMCO Transmissions and Total Car Care, Turnersville, NJ  July 2007-September 2017**

- Involved daily in the diagnosis and repair of customer vehicles.
- Manage all operations, sales, marketing and technical proficiencies.  This includes customer interfacing, management of customer service manager and technicians.
- Practical hands-on knowledge and performance of all repair services, supplies and equipment including: automatic transmission, manual transmission, clutch, brakes, exhaust, air conditioning, cooling system, air bag, automotive parts, automotive lubricants, friction materials, part suppliers, differential, emissions, alignment, steering, suspension, tires, EGR, EVAP, check engine light diagnosis, engine, tools, scan tools, scanner, smoke machine, alignment, and tires.
- Regularly worked with insurance, warranty and fleet company adjusters providing service on current model year vehicles.
- Over 15,000 vehicles serviced.


**Director of Transmission Operations, Henley Transmissions,**
**Newton, MA/Moveras, Salem, NH**                                    **May 2006-June 2007**

- General management of 6 AAMCO centers' operations, sales, marketing and technical proficiencies. This includes human resources management of customer service managers and technicians, 67 employees.
- Worked daily in the diagnosis and service recommendations of vehicles in all 6 centers.
- Shared in the management of a centralized transmission remanufacturing facility (Moveras) that supplied transmissions to the company owned stores and other local repair shops. Assisted in the design and management of transmission teardown, parts supply, rebuilding and dyno testing procedures

**Director of Technical Services, AAMCO Transmissions Inc.**                    **July 1991-April 2006**

- Management of AAMCO's Technical Support Department, providing technical support for transmission repair and total car care repair to over 800 AAMCO centers.
    o Support services provided to the chain include management of:
        ▪ Technical Hotline (phone technical support for all AAMCO Centers).
        ▪ Regional Technical Support Managers (8 in-field trainers/center analysts).
        ▪ Technical Information, Certification and Testing.
- Technical Training Materials Production – Manage the planning, developing and leadership of Technical projects to meet corporate goals. Personally involved at every level of production of books, technical bulletins, certification tests, and videos including writing, layout, editing, photography, print production, slide production, video production (taping, editing, on-screen talent, duplication, collateral materials, etc.).
    o Some of the training titles produced include but are not limited to: transmission specific programs (E4OD, VW 01M, CD4E, JF506E, SATURN, 4L80-E, 4T65E, 45RFE, etc.), Valve Body Repair, ACCESS (Automotive Computer Controls & Electrical System Servicing), 1-5 Series, Differential Repair, R&R (transmission removal and reinstallation), Fundamental Rebuilding, Standard Transmission, *Do These or CBs, Rebuilder's Kwik Reference Guide, Kwik Pressure Specifications Guide*, Brake System Servicing, Air Conditioning System Servicing, Air Bag System servicing, and the Benchnote Series.
- Equipment and Tools
    o Performed evaluation, in-field testing, and recommendation of tools and equipment from numerous vendors.
    o Maintained AAMCO's required tool and equipment list for AAMCO Dealers.
    o Negotiated national pricing programs with RTI (now MAHLE), Snap-on, Hot Flush, and Rotary.
    o Worked closely with AAMCO's Parts warehouse on procurement and distribution.

- Part, Lubricant and Service vendors
    - o Negotiated national programs with Autozone, Transtar and Lubeguard.
    - o Met with vendors executives regularly to design special programs and promotions for AAMCO Dealers.
- Technical Seminars
    - o Developed, created, and presented technical training seminars.
    - o Presented seminars to groups of dealers and technicians with audiences ranging from 10 to over 300 attendees.
- Center Visits
    - o Personally performed over 500 AAMCO center visits nationwide, in Canada, and Puerto Rico.

## AFFILIATIONS AND CERTIFICATIONS

**Pennsylvania Insurance Department**

- **Licensed Motor Vehicle Physical Damage Appraiser, License #788577**

**ASE Certification**

- **A1 through A7 certified through 2021**

**GLG (Gerson Lehrman Group) Research Consulting Management Council Member**

- Council Member since 2010
- Paid consultant on various automotive projects including part suppliers, tools, lubricants, repair and industry trends

**MOBILE AIR CONDITIONING SOCIETY (MACS)**
- Certified MACS Air Conditioning Repair, Training and Testing Proctor

**SMART AIR**
- Certified Vehicle Mold Screening Technician

## EDUCATION

- **B.A. Cabrini College in Communications and Business**      **May 1988**

# XENTRY TIPS

## Functional impairment of 48 V on-board electrical system

| | |
|---|---|
| Topic number | LI54.10-P-069698 |
| Version | 3 |
| Function group | 54.10 Battery, power supply, voltage converter |
| Date | 01-28-2020 |
| Validity | Model series 257, 213, 238, 167, 290 with code B01 |
| Reason for change | Refining Remedies |
| Reason for block | |

**Complaint:**

1. Instrument cluster message 48 V on-board electrical system battery (G1/3) in yellow or red

2. Vehicle does not start

3. Limp home mode due to high engine operating temperatures

**Cause:**

Cause 1/5: Communication error between 48 V on-board battery G1/3 and DC/DC converter: B183387 in DC/DC converter N83/1

Cause 2/5: Limp home mode with additional symptoms: overheating, A/C blowing hot, and loss of acceleration with fault code: B1873371 The battery for 48V on-board electrical system has a malfunction. The actuator is blocked.

Note: this fault code may include additional 48V system consequential faults although B1873371 is the primary root cause.

Cause 3/5: Red battery light or check engine light without fault B1873371

Cause 4/5: Battery Not found in Quick Test.

Cause 5/5: Fault B183301 in DC/DC or B183349 in 48V battery.

**Remedy:**

Preliminary measures NOTE: It is imperative to document each one of these steps in detail. Some of the remedies will require opening a PTSS case. This information is vital in helping to expedite the diagnostic process.

• Make sure Add-ons are are up to date in Xentry Machine

• Disconnect and inspect all chassis grounds such as W15/5, W15/7, W16/3, W16/4, and W16/5. If painted over, remove all paint such that ring terminal can press flush against bare surface.

• Complete guided test(s) and subsequent physical layer inspection.

• Confirm all 48v components can be actuated via Xentry guided tests: A1 = M75 electrical coolant pump, A2 = M60 Electrical turbo, A3 = A9/5 electric refrigerant (A/C)

# XENTRY TIPS

• Test 12v battery with Midtronics. Document results in case.

• Detach line between DC/DC converter N83/1 and 48 V on-board electrical system battery. Check for: damage, soiling, corrosion,and check resistance of all cable pins (should nearly 0.2 ohms).

• Road test to attempt to duplicate fault. Test drive under as many various driving styles as possible: manual, automatic, slow, aggressive, Comfort, Sport+, etc. SAFETY is more important than testing. Please proceed with caution.

• Make sure to indicate in file names or descriptions the order the uploaded documents occurred.

• If complaint cannot be replicated and this is vehicles first visit clear all fault codes, save new quick test, field test for 20 miles with varying driving styles, and then open PTSS case.

• Upload all relevant documentation from above including:

1. Screenshots showing completed guided test(s) for Every fault code

2. Initial quick test

3. Upload any control unit logs only from relevant control units that have faults

Remedy 1/5 -- if (No start)

a. If first visit pull Quick Test

  i. If fault code is B183387 in DC/DC converter N83/1

    1. Update Xentry with newest Add-Ons

    2. Inspect Physical layers (grounds, DC/DC to 48v battery connector, etc)

    3. Confirm all 48v components can be actuated via Xentry guided tests

    4. Complete guided test(s) for every fault code--not just 48v

    5. Clear all faults and test drive for 30 miles

      a. If fault B183387 returns = replace battery only

      b. If fault B183387 does not return = release vehicle

      c. If additional faults = open PTSS case.

b. If second visit open PTSS case

Remedy 2/5 -- if limp home: CEL, overheating, loss of power/acceleration, etc.

i. If First visit pull Quick Test AND if fault code B183371 The actuator is blocked is present in battery (regardless of other faults)

  1. Update Xentry with newest Add-Ons

  2. Inspect Physical layers (grounds, DC/DC to 48v battery connector, etc)

  3. Confirm all 48v components can be actuated via Xentry guided tests

  4. Confirm completed guided test(s) for every fault code--not just 48v

  5. Disconnect 12V battery more than 10 minutes for hard reset 48V system

---

6. Clear all faults and test drive for 30 miles

   a. If fault B183371 returns = replace battery and DC/DC

   b. If fault B183371 does not return = release vehicle

   c. If additional faults = open PTSS case

ii. If second or greater visit open TIPS case.

Remedy for 3/5 Battery light or CEL (without limp home mode)

a. If faults any of these faults exist (WITHOUT B183371): B183214, B183216, or B183217

b. Check ground point W106/x or W30/11 exactly (correct torque, damage, soiling)

c. Test drive.

i. If reproducible:

1. unplug all 48 V components individually (on F153/2 disconnect the individual components of circuits 40) and perform a test drive each time.

2. After each test drive, run a quick test to check if any of the 48 V components - except the unplugged ones - are detected as faulty.

a. Try to actuate all components that are still connected.

3. If unable to actuate or detected faulty = replace component.

4. Retest.

ii. If cannot reproduce = release

Remedy for 4/5 and 5/5

a. if 48v battery not found in quick test even though wiring harness G1/3 to N83/1 has no faults

b. OR if fault B183301 in DC/DC

c. OR if fault B183349 in 48v

i. Replace battery only

ii. Update DC/DC converter N83/1 if later software is available.

| Symptoms |
|---|
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery function / Battery discharges |
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery/on-board electrical system display message / Battery/Alternator - Serviced Required |

**Control unit/fault code**

| Control unit | Fault code | Fault text |
|---|---|---|

© Copyright Mercedes-Benz AG

# XENTRY TIPS

| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183301 | The battery for the 48V on-board electrical system has a malfunction. There is a general electrical fault. (LIB48_222) |
|---|---|---|
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183217 | The 48V on-board electrical system has a malfunction. The limit value for electrical voltage has been exceeded. |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183216 | The 48V on-board electrical system has a malfunction. The limit value for electrical voltage has not been attained. |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183214 | The 48V on-board electrical system has a malfunction. There is a short circuit to ground or an open circuit. |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183214 | The 48V on-board electrical system has a malfunction. There is a short circuit to ground or an open circuit. (LIB48_222) |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183216 | The 48V on-board electrical system has a malfunction. The limit value for electrical voltage has not been attained. (LIB48_222) |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183217 | The 48V on-board electrical system has a malfunction. The limit value for electrical voltage has been exceeded. (LIB48_222) |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183319 | The battery for the 48V on-board electrical system has a malfunction. The limit value for current has been exceeded. (LIB48_222) |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183371 | The battery for the 48V on-board electrical system has a malfunction. The actuator is blocked. (LIB48_222) |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183371 | The battery for the 48V on-board electrical system has a malfunction. The actuator is blocked. |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183319 | The battery for the 48V on-board electrical system has a malfunction. The limit value for current has been exceeded. |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183301 | The battery for the 48V on-board electrical system has a malfunction. There is a general electrical fault. |

| Parts | | | | | | |
|---|---|---|---|---|---|---|
| Part number | ES1 | ES2 | Designation | Quantity | Note | EPC |
| A 000 901 45 09 | | | 48 V on-board electrical system battery (48 V LIB) G1/3 | 1 | | X |
| A 000 902 49 48 | | | DC/DC converter (DDW) N83/1 | 1 | | X |

| Operation numbers/damage codes | | | | | |
|---|---|---|---|---|---|
| Op. no. | Operation text | Time | Damage code | Note | |
| | | | 540HY 73 | Battery 48 V on-board electrical system - electrical fault | |
| | | | 09803 ** | Electric additional compressor - not determinable | |
| | | | 1500X 92 | Integrated starter alternator short circuit | |
| | | | 5416D 73 | DC/DC converter 48 V on-board electrical system | |

© Copyright Mercedes-Benz AG

# XENTRY TIPS

## Implausible "service due" instrument cluster message, head unit pop-up, or MMC message

| | |
|---|---|
| Topic number | LI00.20-P-070791 |
| Version | 4 |
| Function group | 00.20 Maintenance, service system (FSS, ASSYST) |
| Date | 05-28-2020 |
| Validity | Model series 118, 167, 177, and 247 |
| Reason for change | Remedy updated |
| Reason for block | |

### Complaint:
The following customer complaints may be noted:
- "Service A/B Due" message is displayed in the instrument cluster before the appropriate mileage or date is reached
- "Service A/B Due: Do you want to make an appointment?" pop-up message in the head unit display (see attachment) before the appropriate mileage or date is reached
- "Your Mercedes-Benz _ is due for service." MMC service lead email or App message (see attachment) is sent to the customer before the appropriate mileage or date is reached

| Attachments | |
|---|---|
| File | Description |
| MMC service lead email example.jpg | MMC service lead email |
| service lead popup example.jpg | Service Lead head unit popup message |

### Cause:
Improper mileage synchronization between the electronic ignition lock (N73), instrument cluster (N133/1), and the central powertrain controller (N127)
Note: The vehicle's odometer as displayed in the instrument cluster is not affected and continues to operate as designed.

### Remedy:
At present time updated Central Powertrain Controller (N127) software is available for the following vehicles:
- Model series 118, 177 and 247 equipped with the M260 engine variant
- Model series 167 equipped with the M264 engine variant
Software is still under development for other affected engine variants and models.

| Symptoms |
|---|
| Overall vehicle / Maintenance / Active Service System Plus ASSYST PLUS / Premature indication |

| Attachments |
|---|
| |

# XENTRY TIPS

MMC service lead email example.jpg:

## Your Mercedes-Benz A 220 4MATIC Sedan is due for service.

Dear ▮▮▮

Your Mercedes-Benz A 220 4MATIC Sedan, ▮▮▮▮▮▮▮, is due for service. Commit to excellence with genuine Mercedes-Benz parts and expert technicians to keep your vehicle running at its very best.

Service includes:
• Synthetic motor oil replacement
• Oil filter replacement
• Fluid level checks and corrections based on factory recommended service intervals for your vehicle
• Tire inflation check and correction
• Brake component inspection
• Reset maintenance counter
• Other vehicle and mileage dependent services

To schedule an appointment, please contact Mercedes-Benz of ▮▮▮▮▮▮▮ or book an appointment online today.

Sincerely,

Mercedes-Benz of ▮▮▮▮

*This message was triggered by sensors within your vehicle.*

Book an Appointment

# XENTRY TIPS

service lead popup example.jpg

# XENTRY TIPS

## Xentry Battery Tester results disagree with workshop assessment

| | |
|---|---|
| Topic number | LI54.10-P-071499 |
| Version | 1 |
| Function group | 54.10 Battery, power supply, voltage converter |
| Date | 08-10-2020 |
| Validity | 118, 177, 247, 167, 205, 213, 217, 222, 238, 253, 257, except code U98 (LITHIUM-IONEN-STARTERBATTERIE (LISB)) |
| Reason for change | |
| Reason for block | |

**Complaint:**
The result from the XENTRY battery test does not match the current state of the battery.

**Cause:**
The XENTRY battery tester uses the stored on-board electrical system data in the SAM module to access the health of the 12 volt battery. The XENTRY battery test may not take into account a single discharge event because the SAM cannot record the data if the battery is discharged.

Note: A discharged battery is not necessarily defective. A discharged battery may be recovered with no permanent damage.

**Remedy:**
1) If the battery is discharged, charge battery. Review WS54.00-P-0037B for minimum charger specifications.

Note the amperage difference between trickle (maintainer) chargers of at least 16A and quick chargers of at least 30A.

Review AP54.10-P-5449U. Note when battery is sufficiently charged the charger current is less 5A.

2) While charging the battery analyze the vehicle data to determine root cause of discharge using the following data points:

A) Review FSAM on-board electrical data conspicuous records

NOTE: For guidance on use of the on-board electrical data please review the AKUBIS video titled "New on-board electrical system diagnosis shown on BR 166". The video can be accessed through WIS by following the path WSM--> content by model series --> passenger cars --> ML-Class --> Model 166 --> group 54 --> New on-board electrical system diagnosis.

B) Customer description

C) Midtronics test

Determine if root cause is due:

• vehicle technical issue?

# XENTRY TIPS

• customer behavior?

• defective battery?


3) If battery still does not accept charge, or if battery is determined to be defective, create a PTSS case.

Must include with case:

A) Amperage setting of charger and time battery was on charger

B) Xentry Battery Tester results

C) Voltage of battery taken with multimeter: Do not connect charger while taking measurements

D) SAM control unit log

E) Midtronics tester results

F) Workshop analysis of conspicuous SAM data

G) Root cause analysis for battery discharge based on the above documents (technical, customer, or defective battery)

NOTE: For expedited results when creating a case write customer complaint as "Xentry Battery Tester implausible".

| Symptoms |
| --- |
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery function / Battery discharges |

# XENTRY TIPS

## Vehicle does not start / Vehicle cannot be unlocked - starter battery may be discharged

| | |
|---|---|
| Topic number | LI54.10-P-071596 |
| Version | 1 |
| Function group | 54.10 Battery, power supply, voltage converter |
| Date | 08-07-2020 |
| Validity | BR167 |
| Reason for change | |
| Reason for block | |

## Complaint:

- Vehicle does not start / Vehicle cannot be unlocked

- Display message in instrument cluster "Battery - Start Engine - see Operator's Manual"

| Attachments | |
|---|---|
| File | Description |
| Beispiel_Buswachhalter.pdf | Example for reading bus keepawake event from electrical system data |
| Beispiel Kl. 15 EIN_de.pdf | Example for terminal 15 ON |
| example terminal 15 active.pdf | Example for terminal 15 ON |
| example_BUS_keep_awake.pdf | Example for bus keepawake event |

## Cause:

Bus keepawake control units are flagged up by event code U116000 "A bus keepawake control unit has been detected" in the electronic ignition switch (EZS) control unit.

If prolonged CAN activity (40 mins or longer) is evident in the on-board electrical system data, but this is Not flagged by the EZS, go directly to cause 3.

Cause 1. The ESP control unit is keeping the CAN bus awake.

Affected software: A1679020202, A1679025704, A1679026603, A1679021403, A1679028301

Cause 2. Concerns All vehicles with code 631/632/640/641/642

LED Head Light Module control unit is keeping the bus awake.

Affected software: A2479026401

# XENTRY TIPS

Cause 3. Only concerns vehicles with CAN activity lasting 40 minutes or longer, and without DTC U116000 in the EZS

The EZS control unit itself is keeping the bus awake

**Remedy:**
Remedy 1. Flash the ESP with the latest software release

Invoice under damage code 43181-72

Remedy 2. Concerns only vehicles with code 631/632/640/641/642

Flash LED Head Light Module control unit with the latest software release.

Invoice under damage code 82B01- 73

Remedy 3. Replace the EZS.

Invoice under damage code 8000N-54

Remedy 4.  Continue with the analysis (create a PTSS case)

The following information is required for the analysis:

- Control unit event log of electronic ignition lock, EZS (N73)

- Control unit event log of SAM-F (N10/6)

- Up-to-date no-load current measurement

For all causes, discuss the following questions with the customer:

- Were there any messages in the instrument cluster?

- Did this behavior occur once only, or has it occurred before?

If so, when (approximately)?

- Was the vehicle parked in a particular location or with high traffic levels?

- Has the vehicle been modified or are there any installations in the vehicle?

| Symptoms |
| --- |
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery function / Battery discharges |
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery function / Battery cannot be charged |
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery/on-board electrical system display message / Low voltage Charge battery |
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery/on-board electrical system display message / Charging |

| Parts | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Part number | ES1 | ES2 | Designation | Quantity | Note | | EPC |

# XENTRY TIPS

| A 001 982 81 08 | | | 80 Ah starter battery | 1 | | | X |
|---|---|---|---|---|---|---|---|
| A 001 982 82 08 | | | 92 Ah starter battery | 1 | | | X |

**Operation numbers/damage codes**

| Op. no. | Operation text | Time | Damage code | Note |
|---|---|---|---|---|
| 54-1011 | PERFORM QUICK TEST | | | Use the damage code for the component causing the damage! |
| 54-0640 | CHECK BATTERY SYSTEM (AFTER QUICK TEST) | | | Use the damage code for the component causing the damage! |
| 54-1109 | CHECK CONDITION OF BATTERY | | | Use the damage code for the component causing the damage! |
| 54-1126 | REPLACE BATTERY (AFTER CHECK) | | | Use the damage code for the component causing the damage! |
| 54-0650 | MAINTAIN ON-BOARD ELECTRICAL SYSTEM VOLTAGE (FOR TESTING AND DIAGNOSIS WORK) | | | Use the damage code for the component causing the damage! |
| 54-0991 | PROGRAM CONTROL UNIT ............... (AFTER QUICK TEST) | | | Use the damage code for the component causing the damage! |
| 54-0992 | CODE CONTROL UNIT............. (AFTER QUICK TEST) | | | Use the damage code for the component causing the damage! |
| 54-0645 | CHECK NO-LOAD CURRENT CONSUMPTION | | | Use the damage code for the component causing the damage! |
| 54-2536 | REPLACE ELECTRONIC IGNITION LOCK CONTROL UNIT (AFTER QUICK TEST) | | | Use the damage code for the component causing the damage! |

**WIS-References**

| Document number | Title | Note | Allocation |
|---|---|---|---|
| AR54.10-P-1129LW | Battery - Check condition | | Cause |
| AR54.10-P-1130LW | Charge battery | | Remedy |
| AR54.21-P-0038ME | Remove/install electronic ignition lock control unit | | Remedy |

**LEWIS G. ADLER, ATTORNEY AT LAW**
Attorney ID#: 023211985
26 Newton Ave.
Woodbury, NJ 08096
Tel. #: (856) 845-1968
Fax #: (856) 848-9504
Email: lewisadler@verizon.net
Counsel for plaintiffs

**PERLMAN-DEPETRIS CONSUMER LAW**
Paul DePetris
Attorney ID #: 005821996
Email: info@newjerseylemons.com
Lee M. Perlman
Attorney ID #: 019171994
Email: lperlman@newjerseylemons.com
1926 Greentree Road, Suite 100
Cherry Hill, New Jersey 08003
Tel.#: 856-446-9797
Fax#: 888-635-5933
Counsel for plaintiffs

**THE ROBISON LEMON LAW GROUP, LLC**
Emma C. Robison
Attorney ID: 029452011
181 Andrien Rd.
Glen Mills, PA 19342
(267) 504-4744
Attorney ID: 029452011
Email: emma@lemonlawcar.com
Counsel for plaintiffs

| | |
|---|---|
| JERRY SCATTAGLIA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>PLAINTIFFS[1],<br><br>V.<br><br>MERCEDES-BENZ USA, LLC AND JOHN DOES 1-10,<br><br>DEFENDANTS. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, CIVIL PART MIDDLESEX COUNTY CIVIL ACTION DOCKET NO. MID-L- 2759 - 21<br><br>**FIRST SET OF INTERROGATORIES** |

**PLEASE TAKE NOTICE** that pursuant to Rule 4:17-1(b) and 4:18 and/or Rule 6:4-3, certified answers to the following interrogatories are demanded within the time frame set

---

[1] As used in this document, use of the plural includes the singular, where applicable. The parties are referred to in the plural regardless of their actual number.

forth under the New Jersey Court Rules.  **TAKE FURTHER NOTICE** that these requests are deemed continuing so as to require supplemental responses should the party to whom they are addressed or such party's counsel obtain further or supplemental items between the time the answers are served and the final date prior to trial for submitting answers as provided by the New Jersey Court Rules.  **TAKE FURTHER NOTICE** that, if this request is addressed to more than one entity and/or individual, subject to the New Jersey Court Rules, unless certifications signed by each party to whom this demand is addressed are timely served, a motion to dismiss and/or suppress and/or strike and/or compel as appropriate shall be filed.

## INSTRUCTIONS

I-1 Whenever the term "and/or" is used herein, the information called for should be set forth both in the conjunctive and disjunctive and wherever the information is set out in the disjunctive, it should be given separately for each and every element sought.

I-2 Leave no answer blank. If the answer to a question and/or paragraph is "none" or "unknown", such statement must be written in the answer. If the question is inapplicable, "N/A" must be written in the answer, along with the reasons why such is the case.

I-3 If an answer is omitted because of the claim of privilege, pursuant to R. 4:10-2 and R. 4:18-1 and so as to enable the party or parties serving this request on you to assess the applicability of the privilege or protection, provide a privilege log listing the date of the item withheld if applicable, a brief detailed description of the item withheld (i.e., letter, contract, email, etc.), the author, the recipient or to whom it is addressed if applicable and basis of the privilege which you claim precludes production.

I-4 Answer each paragraph separately and fully in writing, unless it is objected to, in which event the reasons for objection must be provided in lieu of a response.

I-5 The answers to this request shall reflect the cumulative knowledge of all agents, independent contractors, contractors, subcontractors, principals, servants, salesmen, workmen, employees, technicians, advisors, attorneys or other representatives and all other persons acting on behalf of the answering party.

I-6 If a question asks for a name, where applicable, provide the first and last names for any individuals that you identify in response to the question.

I-7 If a question asks for an address, where applicable, provide the street address (including zip code, road, provide or province and if outside the United States of America, name of the country where the address is located).

I-8 Time period – unless otherwise indicated, the information being requested in this request shall relate to the period set forth in the complaint and its exhibits (if any) to the present.

I-9 Be advised that, under the New Jersey Court Rules, an evasive or incomplete answer is deemed to be a failure to answer and the party or parties serving this request on you shall file a motion to suppress your pleading and/or to compel answers and/or production and shall seek fees relative to same.

I-10 Be advised that, under the New Jersey Court Rules, you have a duty to disclose all information known to you and further, to make reasonable inquiry and

thereafter to disclose all information to which you have gained access after such reasonable inquiry.

I-11 In producing the items designated below, you are directed to furnish all items known or available to you regardless of whether an item is currently in your possession, custody or control, or that of your attorneys, employees, agents, investigators or other representatives, or is otherwise available to you.

I-12 If for any reason you are unable to produce in full any item requested, then: Produce each such item to the fullest extent possible; Specify in writing the reasons for your inability to produce the remainder; and State in detail whatever information, knowledge, or belief you have concerning the whereabouts and substance of each such item not produced in full.

I-13 If any item requested was at one time in existence, but is no longer in existence, then state for each such item: The type of item; The types of information contained therein; The date upon which it ceased to exist; The circumstances under which it ceased to exist; The identity of all persons having knowledge of the circumstances under which it ceased to exist; and The identity of all persons having knowledge, or having had knowledge, of the contents thereof.

I-14 For each item requested which you are unable to produce and which was at any time within your possession, custody or control, or to which you had access at any time, specify in detail: The nature of the item (i.e., letter, memorandum, etc.); The author of the item; All recipients of the item and/or any copy thereof; A summary of the information contained in the item; The date on which you lost, relinquished, or otherwise ceased to have possession, custody, control of, or access to the item; The identity of all persons having knowledge of the circumstances whereby you lost, relinquished, or otherwise ceased to have possession, custody or control of, or access to the item; and The identity of all persons who have or who have had knowledge of the contents of the item, in whole or in part.

I-15 In the event you seek to, or in fact do, withhold any item, in whole or in part, on the alleged basis that it is not subject to discovery, then and in that event you are to produce a list of each and every such item and to state as to each: The name of each and every author, writer, sender or initiator of the item; The name of each and every recipient, addressee or party to whom the item was sent or was intended to be sent; The name of each and every person who received a copy of the item; The date of the item or, if no date appears on the item, then the date the item was prepared; The title of the item, or if it has no title, then such other detailed description of the item and its subject matter as shall be sufficient to identify the item; and The grounds claimed for withholding the item from discovery (e.g., attorney-client privilege, work product, or any other grounds), and the factual basis for such claim.

I-16 As to each item produced, you are directed to designate in writing the paragraph and subparagraph of this demand to which each such item is responsive.

## DEFINITIONS

D-1 The terms "**and**" and "**or**" and any other conjunctions or disjunctions used herein shall be read both conjunctively and disjunctively so as to require the production

of all items (as hereinafter defined) responsive to all or any part of each particular demand for production in which any conjunction or disjunction appears.

D-2 The term "**person**" means an individual, firm, corporation, association, organization or any other entity.

D-3 The term **"items"** when used herein shall mean all documents, sound recordings, video recordings, images (digital or otherwise), photographs, blueprints, drawings, spreadsheets, photocopies, audio files, paper files, digital files, papers, books, journals, folders, records, writings, correspondence, notes, electronic mails a/k/a emails, facsimile transmissions a/k/a faxes, telegrams, memoranda, letters (sent or received), finance agreements, listing agreements, purchase orders, photographs, videos,  discs, tape recordings and any log and/or transcript thereof, reports, studies, summaries, minutes, notes, agenda, bulletins, notices, announcements, instructions, charts, manuals, brochures, schedules, price lists, teletypes, microfilms, telegrams, newspaper articles, magazines, advertisements, periodicals, bulletins, circulars, pamphlets, statements, rules, regulations, directives, minutes of meetings, interoffice communications, ledgers, books of account, proposals, prospectuses, offers, orders, receipts, working papers, desk calendars, appointment books, diaries, time sheets, logs, movies, tapes for visual or audio reproduction, illustrations, drawings, graphs, charts, photographs, data processing results, printouts and computations, contracts (including original items), service contracts, warranties, guarantees, we owe slips, promissory notes, receipts, invoices, repair invoices, repair orders, purchase orders, estimates, bills, billing statements, canceled checks, direct deposit statements, electronic funds transfer statements, credit card statements, bank transfer statements and statements as that term is defined by R. 4:10-2(c). In all cases where original and/or non-identical copies are not available, "items" also means identical copies of original items and copies of non-identical copies. The term "items" should also be broadly construed to include but not limited to all electronic media or other tangible forms in which information is stored and includes all written or graphic matter of every kind and description, however produced or reproduced, WHETHER DRAFT or FINAL, original or reproduction, (both in existence and stored in memory components) and other compilations from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form and all copies of an item which contain any additional writing, underlining, notes, deletions, or any other markings or notations, or are otherwise not identical copies of the original.

D-4 The term "**file**" or "**files**" includes all electronic  mails, electronic files and electronic folders and data stored therein or organized via same (excluding items covered by the attorney client privilege or work product doctrine – for such items please provide the privilege log as referenced in the instructions above).

D-5 The terms **"regarding"** and **"relative to"** shall mean "about".

D-6 The term **"relate to"** or "**relating to**" shall mean consist of, refer to, reflect or be in any way logically or factually connected with the matter discussed.

D-7 The term **"related"** means related or about or connected with.

D-8 The term **"fact"** refers to all evidentiary facts presently known to you and all evidentiary facts, the existence of which is presently inferred by you from the existence of any combination of evidentiary and/or ultimate fact.

D-9 The term **"you"** or **"yours"** refers to the individuals and/or companies and/or institutions to which this request is addressed and it shall be construed to mean not only the party answering in his, her, their or its own right, but shall also mean his, her, their or its agents, independent contractors, contractors, subcontractors, principals, servants, workmen, salesmen, employees, technicians, advisors, attorneys or other representatives and all other persons acting on behalf of the answering party.

D-10 The term **"incident"** refers to the incident or facts referenced or alleged in the complaint.

D-11 The term **"plaintiff"** or "**plaintiffs**" refers to the plaintiff or plaintiffs identified and/or named in the complaint.

D-12 The term **"defendants"** refers collectively to all of the defendants identified in the complaint.

D-13 The terms **"party"** and **"parties"** refers to any and all parties who are named to any pleading filed in this case.

D-14 The terms "**any other party**" and "**any other parties**" refers to any party/parties to this case other than yourself.

D-15 The term "**statement**" is to be construed to have a meaning consistent with R. 4:10-2:  (1) a written statement signed or otherwise adopted or approved by the person making it, or (2) a stenographic, mechanical, electronic, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement by the person making it and contemporaneously recorded.

D-16 The term "**R.**" is to be construed as an abbreviation for the word "rule" and to refer to the New Jersey Court Rules.

D-17 The terms "**the case**" or "**this case**" refers to this lawsuit as referenced in the caption set forth above.

D-18 The term "**pleading**" refers to any pleading filed in this case as defined by R. 4:5-1(a) (e.g., "Pleadings Allowed. There shall be a complaint and an answer; an answer to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint pursuant to R. 4:8; a third-party answer, if a third party complaint is served; and a reply, if an affirmative defense is set forth in an answer and the pleader wishes to allege any matter constituting an avoidance of the defense. No other pleading is allowed.").

D-19 The term "**complaint**" refers to the complaint filed in this case (or if amendments were filed thereto, the term instead refers to such amended pleadings).

D-20 The term "**answer**" refers to the answer to the counterclaim filed in this case (or if amendments were filed thereto, the term instead refers to such amended pleadings).

D-21 The term "**responsive pleading**" refers to any responsive pleading filed in this case and in response to the counterclaim filed in this case, inclusive of any counterclaim or third party complaint contained/pled therein (or if amendments were filed thereto, the term instead refers to such amended pleadings).

D-22  The term "**counterclaim**" refers to any counterclaim filed in this case (or if amendments were filed thereto, the term instead refers to such amended pleadings).

D-23  The term "**crossclaim**" refers to any crossclaim filed in this case (or if amendments were filed thereto, the term instead refers to such amended pleadings).

D-24  The term "**third party complaint**" refers to any third party complaint filed in this case (or if amendments were filed thereto, the term instead refers to such amended pleadings).

D-25  The term **"the contract"** refers to the contract or agreement referred to in the complaint or contracts or agreements so referred to (if there are more than one).

D-26  The term **"the services"** refers to the services referred to in the complaint, if applicable.

D-27  The term **"the vehicle"** refers to the vehicle referred to in the complaint.

D-28  The term **"the warranty"** refers to the written warranty (or written warranties) referred to in the complaint.

D-29  The term **"the problems"** refers to the problems referred to in the complaint.

D-30  The term **"the defect"** refers to the defect referred to in the complaint, if applicable.

D-31  The term "**repair invoice**" refers to the itemized, legible statement of repair (including but not limited to documents titled "repair order") which indicates any diagnosis made and all work performed on the vehicle by the manufacturer's franchise automotive dealerships or by automotive dealerships that the manufacturer authorized to perform warranty repairs to the vehicle.

D-32  The term "**the dealer**" refers to the dealer identified in the complaint.

D-33  The term "**the warranty period**" refers to the time and mileage period specified in the warranty for the performance of repairs to the vehicle under the warranty.

D-34  The term **"automotive dealership"** refers to any dealership with which you ever had any franchise relationship via which that dealership sold new automobiles at the retail level, based on a dealership contract with you or one of your subsidiaries and that also serviced said automobiles pursuant to the warranties that you issued with the sale of such vehicles.

D-35  The term "**repair invoice**" refers to the itemized, legible statement of repair which indicates any diagnosis made and all work performed on a vehicle that the manufacturer, or, in the case of an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier, through its dealer or distributor, shall provide to the consumer each time a consumer's motor vehicle is returned from being examined or repaired during the period specified in N.J.S.A. 56:12-31.

D-36  The term "**dealer**" refers to a person who is actively engaged in the business of buying, selling or exchanging motor vehicles at retail and who has an established place of business as defined by N.J.S.A. 56:12-30.

D-37  The term "**distributor**" refers to a vehicle distributor as referred to by N.J.S.A. 56:12-31(a).

D-38 The term "**the lemon period**" refers to the period specified in N.J.S.A. 56:12-31, i.e., "during the first 24,000 miles of operation or during the period of two years following the date of original delivery to the consumer, whichever is earlier".

D-39 The term "**the warranty period**" refers to the time and mileage period specified on page 9 of the warranty, i.e., "This warranty begins on the date the vehicle is put into use in one of the following ways:  The vehicle is delivered to the first purchaser by an authorized Honda automobile dealer.  The vehicle is leased. The vehicle is used as a demonstrator or company vehicle. Your vehicle is covered for 3 years or 36,000 miles, whichever comes first."

D-40 The term "**complaints**" refers to plaintiffs' report of concerns or expressions of discontent.

D-41 The term "**class member**" or "**class members**" refers to each person or persons who purchased or leased or registered a 2021 MERCEDES BENZ 450 GLE vehicle in New Jersey.

D-42 The term "**class vehicle**" or "**class vehicles**" refers to any 2021 MERCEDES BENZ 450 GLE purchased or leased or registered in New Jersey.

## INTERROGATORIES

1. MISSING ITEMS. Are there any items that you know or believe to be in existence, although not in your possession or control, that in any way relate to the subject matter of this litigation? If so, identify each such item, set forth the source of your information or belief regarding the existence of such item, and identify the first and last name, business and home address, employer and job title of the person or name and address of the entity in whose possession or control such item is known or believed to be.   If you lost and/or misplaced and/or destroyed and/or erased any items and/or file(s) and/or data in your possession and/or care and/or control referring or relating to the case or to the facts or allegations stated or pled in any pleading filed in this case, provide the date you became aware that you had lost and/or misplaced and/or destroyed said items and/or file(s), a detailed description of the items that you lost and/or misplaced and/or destroyed and the complete street address where the items were last located before they were lost and/or misplaced.

2. STATEMENTS. Has anyone made a statement regarding this lawsuit?  If so, was the statement was oral or in writing, when was it made, what are the first and last names, business or home addresses, employer, job titles and technician or employee numbers of the persons making the statement, to whom it was made and who was present when made?  Unless subject to a claim of privilege, which must be specified, provide a copy of the statement, if it is in writing and if recorded, the recording of the statement or if the statement was oral and no recording was made, provide a detailed summary of its contents. For purposes of defining the term "statement", please refer to Rule 4:10-2.  If

you claim a privilege precludes production of such materials, as required by the instructions to this demand, please provide the party or parties serving this request on you with a privilege log.

3. ADMISSIONS AND DECLARATIONS. If you know of any admissions or declarations against interest made by any party to this action or of any of such party's agents, independent contractors, contractors, subcontractors, principals, servants, salesmen, workmen, employees, technicians, advisors, attorneys or other representatives and all other persons acting on behalf of such party, for each, provide: the date each was made, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of the person or persons making it and to whom it was made and who were present at the time it was made.   Provide each and every fact upon which you base your opinion that the substance provided in your answer to the preceding interrogatory constitutes an admission or declaration against interest.

4. DEFENSES TO THE COMPLAINT. With respect to every AFFIRMATIVE OR SEPARATE DEFENSE alleged by you in your answer to the complaint, provide each and every fact that supports the defense, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of the person or persons who provided the information to you and/or who have any knowledge regarding the factual basis for the defense and provide every item supporting the defense or that may be or is relevant thereto.

5. PARTIES OR FACTUAL ALLEGATIONS OF THE COMPLAINT. If you deny any of the paragraphs contained in the sections of the complaint titled "PARTIES" or "FACTUAL ALLEGATIONS", provide each and every fact that supports such denials, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of the person or persons who provided the information to you and/or who have or may have any knowledge regarding the factual basis for the denials or that may be or is relevant thereto and provide every item supporting the denials or that may be or is relevant thereto.

6. COMPLAINT COUNT 1. If you deny any of the allegations of COMPLAINT COUNT 1, provide each and every fact that supports such denials, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of the person or persons who provided the information to you and/or who have or may have any knowledge regarding the factual basis for the denials or that may be or is relevant thereto and provide every item supporting the denials or that may be or is relevant thereto.

7. COMPLAINT COUNT 2. If you deny any of the allegations of COMPLAINT COUNT 2, provide each and every fact that supports such denials, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of the person or persons who provided the information to you and/or who have or may have any knowledge regarding the factual basis for the denials or that may be or is relevant thereto and provide every item supporting the denials or that may be or is relevant thereto.

8. COMPLAINT COUNT 3. If you deny any of the allegations of COMPLAINT COUNT 3, provide each and every fact that supports such denials, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of the person or persons who provided the information to you and/or who have or may have any knowledge regarding the factual basis for the denials or that may be or is relevant thereto and provide every item supporting the denials or that may be or is relevant thereto.

9. COMPLAINT COUNT 4. If you deny any of the allegations of COMPLAINT COUNT 4, provide each and every fact that supports such denials, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of the person or persons who provided the information to you and/or who have or may have any knowledge regarding the factual basis for

the denials or that may be or is relevant thereto and provide every item
supporting the denials or that may be or is relevant thereto.

10. EXPERT WITNESSES. Pursuant to R. 4:17-4(e), provide the names and
addresses of any and all of your proposed expert witnesses, including those you
consulted relative to the facts of this case or relative to any pleading filed in this
case, a description in detail the qualifications of the expert, including a list of all
publications authored by the witness within the preceding ten years and attach a
copy of each expert's current resume or curriculum vitae and an explanation of
whether compensation has been or is to be paid for preparing any expert reports
and/or providing any opinions and/or testimony and, if so, the terms of the
compensation, including the amount of compensation in United States Dollars.
Produce true copies of all written reports provided to you by any such proposed
expert witnesses.  For your experts who may or are expected to testify at trial
and/or arbitration, provide a detailed description of the subject matter on which
your experts are expected to testify, a detailed description of the substance of
the facts and opinions to which your experts are expected to testify and a
summary of the factual grounds for each opinion and the facts and data
considered in forming the opinions and any items (including but not limited to
videos, photographs, charts, graphs or illustrations) that they made of anything
relevant to the allegations of any pleadings filed in this case or any denials of
any pleadings filed in this case or defenses pled thereto or that they shall or may
use or testify about at any arbitration or trial of this matter.  Be sure to include in
response to this question each item that the expert relied on by in the
formulation of their opinion.  If the expert intends to rely upon or offer into
evidence any textbook, paper or authority to substantiate any opinions and
conclusions or to rely upon the same in your examination or cross-examination
of any experts, provide the exact title of each such textbook, paper or authority,
the first and last names of its authors, the name and address of its publisher and
the date when published.

11. PERSONS WITH KNOWLEDGE & FACT WITNESSES. For each person or
entity who has any knowledge whatsoever which is material and relevant or
which pertains in any way to the subject matter of this action and/or to the
events or allegations pled or alleged or stated in the pleadings filed in this case
or any defenses thereto, provide their business or home addresses, job titles
and technician or employee numbers, your relationship, if any, to said persons, a
description of such information known and how it relates to this matter.  If you

intend to call them as a fact witness at any mediation, arbitration and/or trial of this matter, provide the substance of the facts and/or opinions to which said person is expected to testify, a summary of the grounds for any layperson opinion testimony you intend to offer via said individual and all items that they shall use or rely on when testifying or testify about.

12. COMMUNICATIONS. If you or your agents, servants or employees had any conversations with anyone else regarding any of the allegations pled, stated or alleged in any pleading filed in this case or the events alleged therein, for each, provide the dates of the conversation(s), the street address of the conversation(s), the first and last names, business or home addresses, employer, job titles and technician or employee numbers of the participants in the conversations as well as those present during the conversations, a brief detailed description of the substance of each conversation and if recorded or reduced to writing, produce copies of the recording or writing.

13. OTHERS RESPONSIBLE FOR MISCONDUCT. If you claim that misconduct or cause of action alleged in any pleading that you filed in this case is the result of the actions of a person or business other than you, provide the names, telephone numbers, street addresses and job titles of each and every such person or business whose actions are to blame for the aforesaid alleged misconduct, each and every fact supporting that claim and  all items that support your response to this interrogatory or that you may or shall rely upon or use to prove that claim.

14. ADVERSARY'S VERSION OF DISPUTE. Provide your version of the facts of this dispute, including in said description the day, month and year of all events described in your narrative, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of all persons that you refer to in your narrative and provide all items that support your response to this interrogatory.

15. RELIEF SOUGHT BY PARTY OR PARTIES SERVING THIS REQUEST ON YOU. If you contend that the party or parties serving this request on you is/are not entitled to any of the forms of relief that they requested or demanded in any pleading that they filed in this case (including a repurchase of the vehicle pursuant to N.J.S.A. 56:12-29, et seq. and an award of attorney's fees and litigation expenses), provide each and every fact that supports such contention, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of each person having knowledge or claiming to have knowledge of any facts regarding or supporting such contention and any and all items supporting such contention.

16. DENIAL OF ISSUANCE OF VEHICLE WARRANTY.  If you deny issuing or providing a warranty to the party or parties serving this request on you, provide each and every fact that supports such contention, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of each person having knowledge or claiming to have knowledge of any facts regarding or supporting such contention and any and all items supporting such contention.

17. ADMISSION OF ISSUANCE OF VEHICLE WARRANTY.  If you admit to issuing or providing a warranty to the party or parties serving this request on you, provide an explanation of the terms of the warranty, including the number of miles or time period during which the vehicle is covered under the warranty, any limits to or restrictions on coverage under the warranty and any exclusions stated in the warranty.

18. VEHICLE WARRANTY – REPAIR ATTEMPTS. If, during the warranty period, you or any automotive dealership or any automotive dealership service department ever performed or attempted to perform any diagnosis of or repair attempt or service to the vehicle under the warranty or pursuant to the warranty or in response to a request by anyone made pursuant to the warranty, provide the date and the odometer reading when the vehicle was submitted for

examination or repair, the date and the odometer reading when the vehicle was made available to the party or parties serving this request on you following the examination or repair, the repair invoice number itemizing the repair, and a general description of the problem reported by the consumer or an identification of the problem reported by the consumer or an identification of the defect or condition and the source or cause of the problem, defect or condition or condition, if any.

19. VEHICLE INSPECTIONS. For each inspection of the vehicle (or any portions or components thereof) that you or any of your expert witnesses, field service engineers, zone or regional representatives, employees, independent contractors, contractors, subcontractors, principals, servants, salesmen, workmen, employees, technicians, advisors or other representatives and all other persons acting on behalf of you ever performed or attempted to perform, provide the first and last names, business or home addresses, employer, job titles and technician or employee numbers of every individual who was present when it took place, the street address where it took place and an explanation of the specific areas/components/parts of the vehicle to which the inspection pertained or which it involved and an explanation of the findings or conclusions, if any, made as a result of the inspection. If any kind of document or other writing or report or summary was prepared discussing or mentioning the inspection, provide a copy of that document or writing or report or summary.

20. VEHICLE WARRANTY - NUMBER OF DAYS UNDERGOING REPAIRS. If, during the warranty period, you or any automotive dealership or any automotive dealership service department ever performed or attempted to perform any diagnosis of or repair attempt or service to the vehicle under the warranty, how many days in total was the vehicle in the possession of your or any automotive dealership or any automotive dealership service department awaiting to be diagnosed or repaired or undergoing diagnosis or repair?

21. REFUSAL TO PERFORM REPAIRS UNDER WARRANTY. If you or any automotive dealership or any automotive dealership service department ever refused to perform any diagnosis of or repair attempt or service to the vehicle

under the warranty or you refused to reimburse any such automotive dealership or automotive dealership service department for the performance of such diagnosis of or repair attempts, service or repair attempt to the vehicle, provide the date of the refusal, the odometer reading of the vehicle when the refusal occurred, the place where the refusal occurred, the number of any corresponding repair invoice referring to the refusal, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of every individual who have or may have any knowledge regarding the factual basis for the refusal or that may be or is relevant thereto and provide every item supporting the refusal or that may be or is relevant thereto.

22. REPAIRS PERFORMED. If you or any automotive dealership or any automotive dealership service department ever performed or attempted to perform any diagnosis of or repair attempt or service to the vehicle under the warranty or you reimbursed any such automotive dealership or automotive dealership service department for the performance of such diagnosis of or repair attempts, service or repair attempt to the vehicle, provide the date begun, the date concluded, the odometer reading of the vehicle when begun, the odometer reading of the vehicle when concluded, the number of any corresponding repair invoice referring to the work, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of every individual who have or may have any knowledge regarding the work or that may be or is relevant thereto, an explanation of why the repairs were performed and provide every item supporting your response to this interrogatory.

23. BULLETINS OR SERVICE CAMPAIGNS ISSUED. If you ever issued or prepared any technical service bulletins, recalls or service campaigns for the same year, make and model of vehicle as the vehicle, provide the date the action was taken, a description of the technical service bulletins, recalls or service campaigns and the reason for their issuance or preparation and provide complete copies of each.

24. BULLETINS OR SERVICE CAMPAIGNS PERFORMED. If you or any automotive dealership or any automotive dealership service department ever

Page 14 of 21

performed or attempted to perform any technical service bulletins, recalls or service campaigns to the vehicle, provide the date and the odometer reading when the vehicle was submitted for its performance, the date and the odometer reading when the vehicle was made available to the party or parties serving this request on you following its performance, the repair invoice number itemizing its performance, and a description of the technical service bulletins, recalls or service campaigns so performed and provide complete copies of each.

25. ALLEGATIONS OF ACCIDENT, ABUSE, MISUSE, NEGLECT, MODIFICATION OR LACK OF MAINTENANCE. If you claim that the problems or any of the issues complained of by the plaintiffs or discussed in the complaint were caused in whole or part by accident, abuse, misuse, neglect, modification, alteration or lack of maintenance involving the vehicle, provide each and every fact that supports such contention, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of each person having knowledge or claiming to have knowledge of any facts regarding or supporting such contention and any and all items supporting such contention.

26. DENIAL OF RECEIPT OF COMPLAINTS AND EFFORTS TO ADDRESS COMPLAINTS. If you deny receiving any complaints from the party or parties serving this request on you (or from their attorney) about the problems or the operation of the vehicle or services that the dealer or any automotive dealership performed to the vehicle or refused to perform to the vehicle, provide each and every fact that supports such denials, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of the person or persons who provided the information to you and/or who have or may have any knowledge regarding the factual basis for the denials or that may be or is relevant thereto and provide every item supporting the denials or that may be or is relevant thereto.

27. ADMISISON OF RECEIPT OF COMPLAINTS AND EFFORTS TO ADDRESS COMPLAINTS. If you received any complaints from the party or parties serving this request on you (or from their attorney) about the problems or the operation of the vehicle or services that the dealer or any automotive dealership performed

to the vehicle or refused to perform to the vehicle, provide the date received, the manner received (e.g., through complaints made to any automotive dealership or any automotive dealership service department or, a phone call made to you or correspondence forwarded or emailed to you), a description of the complaints so received, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of the person or persons who have or may have any knowledge regarding the complaints so received and what, if anything, you or anyone else did to address or respond to such complaints, including the particulars of any inspections or repair attempts made.

28. PAYMENT FOR REPAIRS.  If you ever paid any automotive dealership or any automotive dealership service department or anyone else for the performance of any diagnosis of or repair attempt or service to the vehicle, provide the date begun, the date concluded, the odometer reading of the vehicle when begun, the odometer reading of the vehicle when concluded, the number of any corresponding repair invoice referring to the work, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of every individual who have or may have any knowledge regarding the work or that may be or is relevant thereto, explain why you paid for the work and provide every item supporting your response to this interrogatory.

29. REFUSAL TO PAY FOR REPAIRS.  If you ever refused to pay for the performance of any diagnosis of or repair attempt or service to the vehicle or to reimburse any automotive dealership or any automotive dealership service department or anyone else for the performance of any diagnosis of or repair attempt or service to the vehicle, provide the date of the refusal, the odometer reading of the vehicle when the refusal occurred, the number of any corresponding repair invoice referring to the refusal, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of every individual who have or may have any knowledge regarding the refusal or that may be or is relevant thereto, explain for such refusal and provide every item supporting your response to this interrogatory.

30. INVESTIGATIONS.  If you or any of your expert witnesses, field service engineers, zone or regional representatives, employees, independent contractors, contractors, subcontractors, principals, servants, salesmen, workmen, employees, technicians, advisors or other representatives and all other persons acting on behalf of you ever conduct or cause to be conducted an investigation into the factual allegations pled or stated or alleged in the complaint or any pleading filed in response thereto in this case, without disclosing information subject to the attorney client privilege or work product doctrine, provide  the date of the investigation, the first and last names, business or home addresses, employer, job titles and technician or employee numbers of all persons who participated in or conducted the investigation and who requested the investigation or who directed or instructed that the investigation to take place, a brief description of the results of the investigation, the street address where the investigation occurred, if applicable, the date that the investigation was completed or concluded and an explain if the findings of the investigation were reduced to writing and if so, attach a copy of those findings to your response to this interrogatory.

31. CLASS MEMBER INFORMATION.  For each class member, provide their first and last names and last known street addresses and the vehicle identification number and trim level of their class vehicle. Also provide the day, month and year that they purchased or leased or registered in New Jersey any 2021 MERCEDES BENZ 450 GLE vehicle during the duration of a warranty applicable to that vehicle or entitled by the terms of that warranty to enforce the obligations of that warranty.  Include in your answer each class member's first and last name and last known address and the class vehicle's vehicle identification number.

32. CLASS VEHICLE NCLL REPAIRS. For each class vehicle that was ever returned from being examined or repaired by any automotive dealership during the lemon period, provide the date and the odometer reading when the class vehicle was submitted for examination or repair and returned from being examined and repaired, the name and address of the dealership where the examination or repair occurred, the general description of the problem reported by the consumer or an identification of the problem reported by the consumer or an identification of the defect or condition and the source or cause of the problem, defect or condition, if any and as required to be itemized by N.J.S.A. 56:12-34(b).  Include the vehicle identification number of that class vehicle and

the first and last name and last known address of the class member owning or leasing that class vehicle and the repair invoice number.

33. CLASS VEHICLE WARRANTY REPAIRS. For each class vehicle that was ever returned from being examined or repaired by any automotive dealership during the warranty period, provide the date and the odometer reading when the class vehicle was submitted for examination or repair and returned from being examined and repaired, the name and address of the dealership where the examination or repair occurred, the general description of the problem reported by the consumer or an identification of the problem reported by the consumer or an identification of the defect or condition and the source or cause of the problem, defect or condition, if any and as required to be itemized by N.J.S.A. 56:12-34(b). Include the vehicle identification number of that class vehicle and the first and last name and last known address of the class member owning or leasing that class vehicle and the repair invoice number.

34. CLASS VEHICLE INSPECTIONS. For each inspection of any class vehicle (or any portions or components thereof) that you or any persons retained by you to serve as expert witnesses or your field service engineers, zone or regional representatives, employees, independent contractors, contractors, subcontractors, principals, servants, salesmen, workmen, employees, technicians, advisors or other representatives and all other persons acting on behalf of you ever performed or attempted to perform, provide the first and last names, business or home addresses, employer, job titles and technician or employee numbers of every individual who was present when it took place, the street address where it took place and an explanation of the specific areas/components/parts of the vehicle to which the inspection pertained or which it involved and an explanation of the findings or conclusions, if any, made as a result of the inspection. If any kind of document or other writing or report or summary was prepared discussing or mentioning the inspection, provide a copy of that document or writing or report or summary.

35. ITEMS REFERRED TO IN RESPONSE TO INTERROGATORIES. For each item you referred to or listed in response to any of the interrogatory questions

stated/contained/posed in this set of interrogatories, provide a legible copy of the item.  If you object to doing so on the grounds of privilege, pursuant to R. 4:10-2 and R. 4:18-1 and so as to enable the party or parties serving this request on you to assess the applicability of the privilege or protection, provide a privilege log listing the date of the item withheld if applicable, a brief detailed description of the item withheld (i.e., letter, contract, email, etc.), the author, the recipient or to whom it is addressed if applicable and basis of the privilege which you claim precludes production.

36. RECORDS CUSTODIAN. For each item you referred to, listed or produced in response to any of the interrogatory questions stated/contained/posed in this set of interrogatories or in response to any notice to produce that the party or parties serving this request on you served on you in this case, provide the name, business address, phone number and job title of your custodian of records or records keeper who has control, custody or care of the items and/or who is able to produce same and testify as to the item's authenticity or accuracy or chain of custody, if subpoenaed.

## CORPORATE/COMPANY CERTIFICATION

I, _____, am an employee of _____ and I declare that, for purposes of answering these interrogatories, I am the authorized agent of said entity.   I hereby certify the foregoing statements made by me in these interrogatory responses are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.   I hereby certify that the copies of reports annexed hereto rendered by proposed expert witnesses are exact copies of the entire report or reports rendered by them; that the existence of other reports of said experts, either written or oral, are unknown to me and if such become latter known or available, I shall serve them promptly upon the party or parties serving this request.

_____   _____        _____
Date                        Job Title                        Signature

### INDIVIDUAL CERTIFICATION

I, _____ hereby certify the foregoing statements made by me
in these interrogatory responses are true. I am aware that if any of the foregoing
statements made by me are willfully false, I am subject to punishment.   I hereby certify
that the copies of reports annexed hereto rendered by proposed expert witnesses are
exact copies of the entire report or reports rendered by them; that the existence of other
reports of said experts, either written or oral, are unknown to me and if such become
latter known or available, I shall serve them promptly upon the party or parties serving
this request.

Dated:_____          _____
                                                            Signature

**LEWIS G. ADLER, ATTORNEY AT LAW**
Attorney ID#: 023211985
26 Newton Ave.
Woodbury, NJ 08096
Tel. #: (856) 845-1968
Fax #: (856) 848-9504
Email: lewisadler@verizon.net
Counsel for plaintiffs

**PERLMAN-DEPETRIS CONSUMER LAW**
Paul DePetris
Attorney ID #: 005821996
Email: info@newjerseylemons.com
Lee M. Perlman
Attorney ID #: 019171994
Email: lperlman@newjerseylemons.com
1926 Greentree Road, Suite 100
Cherry Hill, New Jersey 08003
Tel.#: 856-446-9797
Fax#: 888-635-5933
Counsel for plaintiffs

**THE ROBISON LEMON LAW GROUP, LLC**
Emma C. Robison
Attorney ID: 029452011
181 Andrien Rd.
Glen Mills, PA 19342
(267) 504-4744
Attorney ID #: 029452011
Email: emma@lemonlawcar.com
Counsel for plaintiffs

| | |
|---|---|
| JERRY SCATTAGLIA, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>PLAINTIFFS[1],<br><br>V.<br><br>MERCEDES-BENZ USA, LLC AND JOHN DOES 1-10,<br><br>DEFENDANTS. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, CIVIL PART MIDDLESEX COUNTY CIVIL ACTION DOCKET NO. MID-L- 2259 - 21<br><br>**FIRST NOTICE TO PRODUCE** |

**PLEASE TAKE NOTICE** that pursuant to Rule 4:18, et seq., and/or Rule 6:4-3 you are demanded to produce true and complete copies of the following items and other

---

[1] As used in this document, use of the plural includes the singular, where applicable. The parties are referred to in the plural regardless of their actual number.

tangible evidence for inspection and copying at the office address listed in the caption of this request between the hours of 10:00 a.m. and 4:00 p.m. Eastern Standard Time and within the time frame set forth under the New Jersey Court Rules. **TAKE FURTHER NOTICE** that these requests are deemed continuing so as to require supplemental responses should the party to whom they are addressed or such party's counsel obtain further or supplemental items between the time the answers are served and the final date prior to trial for submitting answers as provided by the New Jersey Court Rules. **TAKE FURTHER NOTICE** that, if this discovery demand is addressed to more than one entity and/or individual, subject to the New Jersey Court Rules, unless certifications signed by each party to whom this demand is addressed are timely received, an appropriate motion shall be filed.

## INSTRUCTIONS

I-1 Whenever the term "and/or" is used herein, the information called for should be set forth both in the conjunctive and disjunctive and wherever the information is set out in the disjunctive, it should be given separately for each and every element sought.

I-2 Leave no answer blank. If the answer to a question and/or paragraph is "none" or "unknown", such statement must be written in the answer. If the question is inapplicable, "N/A" must be written in the answer, along with the reasons why such is the case.

I-3 If an answer is omitted because of the claim of privilege, pursuant to R. 4:10-2 and R. 4:18-1 and so as to enable the party or parties serving this request on you to assess the applicability of the privilege or protection, provide a privilege log listing the date of the item withheld if applicable, a brief detailed description of the item withheld (i.e., letter, contract, email, etc.), the author, the recipient or to whom it is addressed if applicable and basis of the privilege which you claim precludes production.

I-4 Answer each paragraph separately and fully in writing, unless it is objected to, in which event the reasons for objection must be provided in lieu of a response.

I-5 The answers to this request shall reflect the cumulative knowledge of all agents, independent contractors, contractors, subcontractors, principals, servants, salesmen, workmen, employees, technicians, advisors, attorneys or other representatives and all other persons acting on behalf of the answering party.

I-6 If a question asks for a name, where applicable, provide the first and last names for any individuals that you identify in response to the question.

I-7 If a question asks for an address, where applicable, provide the street address (including zip code, road, provide or province and if outside the United States of America, name of the country where the address is located).

I-8 Time period – unless otherwise indicated, the information being requested in this request shall relate to the period set forth in the complaint filed in this case. and its exhibits (if any) to the present.

I-9 Be advised that, under the New Jersey Court Rules, an evasive or incomplete answer is deemed to be a failure to answer and the party or parties serving this request on you shall file a motion to suppress your pleading and/or to compel answers and/or production and shall seek fees relative to same.

I-10 Be advised that, under the New Jersey Court Rules, you have a duty to disclose all information known to you and further, to make reasonable inquiry and thereafter to disclose all information to which you have gained access after such reasonable inquiry.

I-11 In producing the items designated below, you are directed to furnish all items known or available to you regardless of whether an item is currently in your possession, custody or control, or that of your attorneys, employees, agents, investigators or other representatives, or is otherwise available to you.

I-12 If for any reason you are unable to produce in full any document requested, then: Produce each such document to the fullest extent possible; Specify in writing the reasons for your inability to produce the remainder; and State in detail whatever information, knowledge, or belief you have concerning the whereabouts and substance of each such item not produced in full.

I-13 If any item requested was at one time in existence, but is no longer in existence, then state for each such item: The type of item; The types of information contained therein; The date upon which it ceased to exist; The circumstances under which it ceased to exist; The identity of all persons having knowledge of the circumstances under which it ceased to exist; and The identity of all persons having knowledge, or having had knowledge, of the contents thereof.

I-14 For each item requested which you are unable to produce and which was at any time within your possession, custody or control, or to which you had access at any time, specify in detail: The nature of the item (i.e., letter, memorandum, etc.); The author of the item; All recipients of the item and/or any copy thereof; A summary of the information contained in the item; The date on which you lost, relinquished, or otherwise ceased to have possession, custody, control of, or access to the item; The identity of all persons having knowledge of the circumstances whereby you lost, relinquished, or otherwise ceased to have possession, custody or control of, or access to the item; and The identity of all persons who have or who have had knowledge of the contents of the item, in whole or in part.

I-15 In the event you seek to, or in fact do, withhold any item, in whole or in part, on the alleged basis that it is not subject to discovery, then and in that event you are to produce a list of each and every such item and to state as to each: The name of each and every author, writer, sender or initiator of the item; The name of each and every recipient, addressee or party to whom the item was sent or was intended to be sent; The name of each and every person who received a copy of the item; The date of the item or, if no date appears on the item, then the date the item was prepared; The title of the item, or if it has no title, then such other detailed description of the item and its subject matter as shall be sufficient to identify the item; and The grounds claimed for withholding the item from discovery (e.g., attorney-client privilege, work product, or any other grounds), and the factual basis for such claim.

I-16 As to each item produced, you are directed to designate in writing the paragraph and subparagraph of this demand to which each such item is responsive.

**DEFINITIONS**

D-1 The terms "**and**" and "**or**" and any other conjunctions or disjunctions used herein shall be read both conjunctively and disjunctively so as to require the production of all items (as hereinafter defined) responsive to all or any part of each particular demand for production in which any conjunction or disjunction appears.

D-2 The term "**person**" means an individual, firm, corporation, association, organization or any other entity.

D-3 The term "**items**" when used herein shall mean all documents, sound recordings, video recordings, images (digital or otherwise), photographs, blueprints, drawings, spreadsheets, photocopies, audio files, paper files, digital files, papers, books, journals, folders, records, writings, correspondence, notes, electronic mails a/k/a emails, facsimile transmissions a/k/a faxes, telegrams, memoranda, letters (sent or received), finance agreements, listing agreements, purchase orders, photographs, videos, discs, tape recordings and any log and/or transcript thereof, reports, studies, summaries, minutes, notes, agenda, bulletins, notices, announcements, instructions, charts, manuals, brochures, schedules, price lists, teletypes, microfilms, telegrams, newspaper articles, magazines, advertisements, periodicals, bulletins, circulars, pamphlets, statements, rules, regulations, directives, minutes of meetings, interoffice communications, ledgers, books of account, proposals, prospectuses, offers, orders, receipts, working papers, desk calendars, appointment books, diaries, time sheets, logs, movies, tapes for visual or audio reproduction, illustrations, drawings, graphs, charts, photographs, data processing results, printouts and computations, contracts (including original items), service contracts, warranties, guarantees, we owe slips, promissory notes, receipts, invoices, purchase orders, estimates, bills, billing statements, canceled checks, direct deposit statements, electronic funds transfer statements, credit card statements, bank transfer statements and statements as that term is defined by R. 4:10-2(c). In all cases where original and/or non-identical copies are not available, "items" also means identical copies of original items and copies of non-identical copies. The term "items" should also be broadly construed to include but not limited to all electronic media or other tangible forms in which information is stored and includes all written or graphic matter of every kind and description, however produced or reproduced, WHETHER DRAFT or FINAL, original or reproduction, (both in existence and stored in memory components) and other compilations from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form and all copies of an item which contain any additional writing, underlining, notes, deletions, or any other markings or notations, or are otherwise not identical copies of the original.

D-4 The term "**file**" or "**files**" includes all electronic mails, electronic files and electronic folders and data stored therein or organized via same (excluding items covered by the attorney client privilege or work product doctrine – for such items please provide the privilege log as referenced in the instructions above).

D-5 The terms "**regarding**" and "**relative to**" shall mean "about".

D-6 The term "**relate to**" or "**relating to**" shall mean consist of, refer to, reflect or be in any way logically or factually connected with the matter discussed.

D-7 The term "**related**" means related or about or connected with.

D-8 The term **"fact"** refers to all evidentiary facts presently known to you and all evidentiary facts, the existence of which is presently inferred by you from the existence of any combination of evidentiary and/or ultimate fact.

D-9 The term **"you"** or **"yours"** refers to the individuals and/or companies and/or institutions to which this request is addressed and it shall be construed to mean not only the party answering in his, her, their or its own right, but shall also mean his, her, their or its agents, independent contractors, contractors, subcontractors, principals, servants, workmen, salesmen, employees, technicians, advisors, attorneys or other representatives and all other persons acting on behalf of the answering party.

D-10 The term **"incident"** refers to the incident or facts referenced or alleged in the complaint.

D-11 The term **"plaintiff"** or "**plaintiffs**" refers to the plaintiff or plaintiffs identified and/or named in the complaint.

D-12 The term **"defendants"** refers collectively to all of the defendants identified in the complaint.

D-13 The terms **"party"** and **"parties"** refers to any and all parties who are named to any pleading filed in this case.

D-14 The terms "**any other party**" and "**any other parties**" or "**any party**" refers to any party/parties to this case other than yourself and includes any plaintiffs named to this case.

D-15 The term "**statement**" is to be construed to have a meaning consistent with R. 4:10-2:  (1) a written statement signed or otherwise adopted or approved by the person making it, or (2) a stenographic, mechanical, electronic, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement by the person making it and contemporaneously recorded.

D-16 The term "**R.**" is to be construed as an abbreviation for the word "rule" and to refer to the New Jersey Court Rules.

D-17 The terms "**the case**" or "**this case**" refers to this lawsuit as referenced in the caption set forth above.

D-18 The term "**pleading**" refers to any pleading filed in this case. as defined by R. 4:5-1(a) (e.g., "Pleadings Allowed. There shall be a complaint and an answer; an answer to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint pursuant to R. 4:8; a third-party answer, if a third party complaint is served; and a reply, if an affirmative defense is set forth in an answer and the pleader wishes to allege any matter constituting an avoidance of the defense. No other pleading is allowed.").

D-19 The term "**complaint**" refers to the complaint filed in this case. (or if amendments were filed thereto, the term instead refers to such amended pleadings).

D-20 The term "**answer**" refers to the answer to the counterclaim filed in this case. (or if amendments were filed thereto, the term instead refers to such amended pleadings).

D-21 The term "**responsive pleading**" refers to any responsive pleading filed in this case. and in response to the counterclaim filed in this case., inclusive of any

counterclaim or third party complaint contained/pled therein (or if amendments were filed thereto, the term instead refers to such amended pleadings).

D-22 The term "**counterclaim**" refers to any counterclaim filed in this case. (or if amendments were filed thereto, the term instead refers to such amended pleadings).

D-23 The term "**crossclaim**" refers to any crossclaim filed in this case. (or if amendments were filed thereto, the term instead refers to such amended pleadings).

D-24 The term "**third party complaint**" refers to any third party complaint filed in this case. (or if amendments were filed thereto, the term instead refers to such amended pleadings).

D-25 The term **"the contract"** refers to the contract or agreement referred to in the complaint or contracts or agreements so referred to (if there are more than one).

D-26 The term **"the vehicle"** refers to the vehicle referred to in the complaint.

D-27 The term **"the services"** refers to the services referred to in the complaint, if applicable.

D-28 The term **"the warranty"** refers to the written warranty (or written warranties) referred to in the complaint.

D-29 The term **"the vehicle"** refers to the vehicle referred to in the complaint.

D-30 The term **"the warranty"** refers to the written warranty (or written warranties) referred to in the complaint.

D-31 The term **"the problems"** refers to the problems referred to in the complaint.

D-32 The term **"the defect"** refers to the defect referred to in the complaint, if applicable.

D-33 The term "**repair invoice**" refers to the itemized, legible statement of repair (including but not limited to documents titled "repair order") which indicates any diagnosis made and all work performed on the vehicle by the manufacturer's franchise automotive dealerships or by automotive dealerships that the manufacturer authorized to perform warranty repairs to the vehicle.

D-34 The term "**the dealer**" refers to the dealer identified in the complaint.

D-35 The term "**the warranty period**" refers to the time and mileage period specified in the warranty for the performance of repairs to the vehicle under the warranty.

D-36 The term **"automotive dealership"** refers to any dealership with which you ever had any franchise relationship via which that dealership sold new automobiles at the retail level, based on a dealership contract with you or one of your subsidiaries and that also serviced said automobiles pursuant to the warranties that you issued with the sale of such vehicles.

D-37 The term "**repair invoice**" refers to the itemized, legible statement of repair which indicates any diagnosis made and all work performed on a vehicle that the manufacturer, or, in the case of an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier, through its dealer or distributor, shall provide to the consumer each time a consumer's motor vehicle is returned from being examined or repaired during the period specified in N.J.S.A. 56:12-31.

D-38  The term "**dealer**" refers to a person who is actively engaged in the business of buying, selling or exchanging motor vehicles at retail and who has an established place of business as defined by N.J.S.A. 56:12-30.

D-39  The term "**distributor**" refers to a vehicle distributor as referred to by N.J.S.A. 56:12-31(a).

D-40  The term "**the lemon period**" refers to the period specified in N.J.S.A. 56:12-31, i.e., "during the first 24,000 miles of operation or during the period of two years following the date of original delivery to the consumer, whichever is earlier".

D-41  The term "**the warranty period**" refers to the time and mileage period specified on page 9 of the warranty, i.e., "This warranty begins on the date the vehicle is put into use in one of the following ways:  The vehicle is delivered to the first purchaser by an authorized Honda automobile dealer.  The vehicle is leased. The vehicle is used as a demonstrator or company vehicle. Your vehicle is covered for 3 years or 36,000 miles, whichever comes first."

D-42  The term "**complaints**" refers to plaintiffs' report of concerns or expressions of discontent.

D-43  The term "**class member**" or "**class members**" refers to each person or persons who purchased or leased or registered a 2021 MERCEDES BENZ 450 GLE vehicle in New Jersey.

D-44  The term "**class vehicle**" or "**class vehicles**" refers to any 2021 MERCEDES BENZ 450 GLE purchased or leased or registered in New Jersey.

### ITEMS TO BE PRODUCED

1.  PLEADING RECORDS. Items either referred to in any of the pages or paragraphs of any pleading filed in this case or supporting any/all allegations that you made in any paragraphs pled, stated or alleged in any pleading filed in this case. Please also include all items that support or refer to any denial you made of any allegations pled in the factual allegations section of the complaint or that support or refer to any denial you made of any allegations pled in any of the complaint counts.  Please also include items either referred to in any of the pages or paragraphs of any pleading filed in this case or supporting any/all allegations or denials that you made in any paragraphs pled, stated or alleged in any pleading filed in this case. Consider this a request pursuant to R. 4:18-2, which states "Copies of Documents Referred to in Pleading When any document or paper is referred to in a pleading but is neither annexed thereto nor recited verbatim therein, a copy thereof shall be served on the adverse party within 5 days after service of his written demand therefor."  Please also include items that support or refer to any affirmative or separate defenses you pled in this case.

2.  FILES & SIGNED ITEMS.  All items regarding or referring to the case, the vehicle (including but not limited to any diagnosis, repair attempts, repairs or service to same), the warranty (including any repair attempts, diagnostic services or other services performed to the vehicle thereunder) or the allegations pled, stated or alleged in any pleading filed in this case.  Please include all items in your possession, custody or control that bear or appear to bear the signature of the party or parties serving this request on you or that bear the names of any of your staff, employees or personnel and that in any manner pertain to the case, the

vehicle (including but not limited to any diagnosis, repair attempts, repairs or service to same), the warranty (including any repair attempts, diagnostic services or other services performed to the vehicle thereunder) or the allegations pled, stated or alleged in any pleading filed in this case.  If you claim a privilege precludes production of such materials, as required by the instructions to this demand, provide a privilege log.

3. NOTICES/ITEMS RECEIVED & SENT.  Any/all written notices/items your attorneys, you or your predecessors in interest ever sent to or received from any party to the case about the case, the vehicle (including but not limited to any diagnosis, repair attempts, repairs or service to same), the warranty (including any repair attempts, diagnostic services or other services performed to the vehicle thereunder) or the allegations pled, stated or alleged in any pleading filed in this case.

4. STATEMENTS.  All signed and/or unsigned statements or statements recorded by mechanical and/or electronic means made by ANY witnesses to any events relevant to this case or any events alleged to have occurred in any pleadings filed in this case.  For purposes of defining the term "statement", refer to Rule 4:10-2.

5. CONTRACTS.  Clear and legible copies of all contracts (including any addendums/amendments/change orders thereto) between you and any other individual or entity related to the case, the vehicle, the warranty (including any repair attempts, diagnostic services or other services performed to the vehicle thereunder) or the allegations pled, stated or alleged in any pleading filed in this case, including but not limited to any signature cards/pages, account agreements, addendums to any agreements between the parties, items bearing any other party to this case's signatures or notices of changes to the terms.

6. ARBITRATION & TRIAL MATERIALS.  Clear and legible copies of all items you or your attorneys, representatives, employees or agents intend to introduce into evidence, use or rely upon at any arbitration or trial of this matter.  This request excludes those items protected by the attorney client privilege or work product doctrine – for which a privilege log is demanded as specified above.

7. DISCOVERY PROPOUNDED AND PRODUCED.  All interrogatories, requests for production of documents or items, notices to produce, request for admissions and responses and/or answers thereto furnished to you, propounded by you or propounded upon you or received from any party to this case, together with the items forwarded with same and all items produced to you in response to any subpoena you or your attorneys served or issued in this matter.  Omit from your response to this request any discovery demands that the propounding party served upon you or any responses thereto.  Be sure to include all items you used or shall use at any deposition scheduled or conducted in this matter or that you were asked to provide at any such deposition or that you requested any witness to review, inspect or produce at any such deposition and all items that you questioned any party about during any such deposition and any transcripts of deposition testimony of any witnesses to any events relevant to this case or any events alleged to have occurred in any pleadings filed in this case. Include items which you utilized in preparing either answers to ANY interrogatories served

upon you by ANY party to this case or responses to notices to produce or requests for production or requests for production served upon you by ANY party to this case. Please include items identified BY you in YOUR answers to ANY interrogatories served on you by ANY party to this case or in YOUR responses to notices to produce or requests for production or requests for production served upon you by ANY party to this case.

8. TANGIBLE ITEMS. Any depictions, illustrations, photographs, drawings, videos, surveillance footage diagrams, drawings, plans, maps, charts, plans, blueprints, audio tapes or audio recordings, videos or video recordings, models, items or other visual reproduction or spreadsheets or photographs related to the case, the vehicle (including but not limited to any diagnosis, repair attempts, repairs or service to same), the warranty (including any repair attempts, diagnostic services or other services performed to the vehicle thereunder) or the allegations pled, stated or alleged in any pleading filed in this case.

9. MEETING & PHONE CONVERSATION RECORDS. All meeting notes or records related to ANY meetings or phone conversations you or your predecessors in interest ever had with ANYONE about the case, the vehicle (including but not limited to any diagnosis, repair attempts, repairs or service to same), the warranty (including any repair attempts, diagnostic services or other services performed to the vehicle thereunder) or the allegations pled, stated or alleged in any pleading filed in this case. This request excludes those items protected by the attorney client privilege or work product doctrine – for which a privilege log is demanded as specified above. Please include all meeting notes or records related to ANY meetings or phone conversations you or your predecessors in interest ever had with ANYONE about the vehicle. This includes any meeting notes or records related to ANY meetings or phone conversations that any of your employees ever had with the dealer or with any automotive dealership about the vehicle or its warranty or repairs, diagnostic services or other services performed to the vehicle.

10. EXPERT WITNESS ITEMS. ANY ITEMS you received from ANY expert witnesses you or your predecessors in interest ever employed or used relative to this case or that consulted with about this case or that you may or shall call as any witness at any arbitration or trial of this case or any other hearing held in this case or provided or gave to ANY expert witnesses you or your predecessors in interest ever employed or used relative to this case or that consulted with about this case or that you may or shall call as any witness at any arbitration or trial of this case or any other hearing held in this case or reviewed with ANY expert witnesses you or your predecessors in interest ever employed or used relative to this case or that consulted with about this case or that you may or shall call as any witness at any arbitration or trial of this case or any other hearing held in this case. This request excludes those items protected by the attorney client privilege or work product doctrine – for which a privilege log is demanded as specified above.

11. NONEXPERT WITNESS ITEMS. ANY ITEMS you received from ANY fact or lay witnesses to any events relevant to this case or any events alleged to have occurred in any pleadings filed in this case or that you intend to call or may call at

ANY arbitration or trial or any other hearing held in this case or that you provided or gave to ANY such fact or lay witnesses or that you intend to call or may call at ANY arbitration or trial or any other hearing held in this case or that you reviewed with ANY fact or lay witnesses and that concern the case, the vehicle (including but not limited to any diagnosis, repair attempts, repairs or service to same), the warranty (including any repair attempts, diagnostic services or other services performed to the vehicle thereunder) or the allegations pled, stated or alleged in any pleading filed in this case.  This request excludes those items protected by the attorney client privilege or work product doctrine – for which a privilege log is demanded as specified above.

12. TEXTS AND TREATISES. All texts, treatises, and articles which YOU intend to rely upon at trial, including those referred to by YOUR experts and those used or to be used in YOUR examination or cross-examination of any experts who may be called by YOU or by any party to this action.

13. ITEMS TO SUPPORT PRECLUSION OF EXPERTS. All items you shall rely upon to establish or prove that any person identified as an expert by any party to this action should be precluded from testifying at arbitration or trial.  Please include all items you shall rely upon to establish or prove that the reports of any person identified as an expert by any party to this action constitute a net opinion or should be stricken or precluded from use at arbitration or trial.

14. INDEMNIFICATION. All items containing any indemnification or hold harmless clauses entered into between you and any party to this case.

15. ADR PROGRAM. All items that you received from or forwarded to the Office of Administrative Law or to any dispute resolution program, arbitrator, arbitration organization/program, mediation organization/program, alternative dispute resolution organization/program or complimentary dispute resolution organization/program and that refer to or pertain to the case, the vehicle (including but not limited to any diagnosis, repair attempts, repairs or service to same), the warranty (including any repair attempts, diagnostic services or other services performed to the vehicle thereunder) or the allegations pled, stated or alleged in any pleading filed in this case.

16. INVESTIGATIONS, INSPECTIONS, AUDITS & REPORTS.  Items about any/all law enforcement reports, police reports, sheriff's reports, inspections, investigations, studies, reports or audits you or anyone else ordered, performed, conducted or prepared (whether done presuit or once suit was filed) and related in ANY arguable way to the case, the vehicle (including but not limited to any diagnosis, repair attempts, repairs or service to same), the warranty (including any repair attempts, diagnostic services or other services performed to the vehicle thereunder) or the allegations pled, stated or alleged in any pleading filed in this case.

17. DEALINGS WITH OTHERS.  Items about any/all dealings you had with any individual or entity that are related in any way to the case, the vehicle (including but not limited to any diagnosis, repair attempts, repairs or service to same), the warranty (including any repair attempts, diagnostic services or other services performed to the vehicle thereunder) or the allegations pled, stated or alleged in any pleading filed in this case.

18. WEB POSTINGS.  Any website, blog, social media or World Wide Web postings or content that you wrote and/or posted and that refers to the parties named to any pleadings filed in this case or that refer to or pertain to any diagnosis, repair attempts, repairs or service to the class vehicles, the case, the vehicle (including but not limited to any diagnosis, repair attempts, repairs or service to same), the warranty (including any repair attempts, diagnostic services or other services performed to the vehicle thereunder) or the allegations pled, stated or alleged in any pleading filed in this case.

19. DISPUTES BETWEEN PARTIES.  Any items or illustrations or recordings (whether video or audio in nature) that refer to, discuss, reference or pertain to any disputes, litigation, arbitration, mediation, differences of opinion, disagreements or arguments you had with or involving any party to this case, regardless of whether any litigation resulted therefrom.  Please include any pleadings and responsive pleadings thereto served on/received by you or your attorneys in any case other than this case that name as parties or involve any of the parties named to the complaint or that refer to or pertain to any dealings you had with any party to this case that are related in any way to the incident or to any allegations pled in the complaint.

20. CLASS ACTION LAWSUITS.  All lawsuits filed against you that involve the same year, make and model of vehicle as the vehicle which allege putative class action claims.

21. PROOF OF PAYMENTS. Any items referring to any payments made by either the party or parties serving this request on you to you or made by you to the party or parties serving this demand on you or made by you to anyone for any services, parts or inspections performed pursuant to or under the warranty.  Please also include any items exchanged between you and any automotive dealership or any automotive dealership service department or the dealer about or referring to You paying for any labor, parts, diagnosis, repair attempts, repairs or service performed to or installed on the vehicle or that You refused to pay for or that refers to any automotive dealership or any automotive dealership service department or the dealer submitting a request for reimbursement or payment for anything related to the vehicle (including any diagnosis of or service or repair attempt or repair to the vehicle thereunder).

22. PROPERTY DAMAGE.  Any items that refer to or discuss any property damage that you claim the vehicle sustained or any abuse, misuse, modification, alteration, lack of maintenance or body/accident damage that you claim occurred to the vehicle.  This includes any items that refer to or discuss or that may be used to prove that the problems don't substantially impair the use, value, or safety of the vehicle or that the problems are the result of abuse, neglect, or unauthorized modifications or alterations of the vehicle by anyone other than you.

23. INHERENT DEFECT.  All certifications that you issued or made pursuant to N.J.S.A. 56:12-44 to the New Jersey Division of Consumer Affairs, within one year of discovery, of the existence of any inherent design defect common to or involving the year, make and model of the vehicle.

24. N.J.S.A. 56:12-34(b) COMPLIANCE RECORDS.  All items that refer to or discuss your compliance with N.J.S.A. 56:12-34(b) relative to the vehicle – i.e.,

"each time a consumer's motor vehicle is returned from being examined or repaired during the period specified in section 3 of P.L.1988, c.123 (C.56:12-31), the manufacturer, or, in the case of an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier, through its dealer or distributor, shall provide to the consumer an itemized, legible statement of repair which indicates any diagnosis made and all work performed on the vehicle and provides information including, but not limited to, the following: a general description of the problem reported by the consumer or an identification of the problem reported by the consumer or an identification of the defect or condition and the source of the defect; the amount charged for parts and the amount charged for labor, if paid for by the consumer; the date and the odometer reading when the vehicle was submitted for repair; and the date and odometer reading when the vehicle was made available to the consumer." N.J.S.A. 56:12-34(b).

25. BULLETINS. All tech line call records, "servicenews articles", service campaigns, service bulletins, technical service bulletins, recalls, service notices, service notifications, tech line inquiries or requests, tech line summary articles or requests or warranty notifications you received from or forwarded to anyone, including but not limited to any state or federal government agency (e.g., DCA, the National Highway Transportation Safety Association, etc.) referring to or discussing the same year, make and model of vehicle as the vehicle.

26. REPAIR HISTORY. All items that refer to or discuss any diagnosis of or repairs, repair attempts or service to the vehicle or refusal to perform diagnosis of or repairs, repair attempts or service to the vehicle, including but not limited to any repair invoices, repair orders or repair estimates. This includes a request for the front and back sides of repair orders or invoices or work orders pertaining to the vehicle or repairs or maintenance performed to the vehicle, including the shop copy, technician copy, warranty copy, customer copy, technician notes and part order lists, slips or forms, whether prepared before or after performance of the services. Please be advised that failure to provide both sides of the orders and/or invoices requested herein and the technician notes thereto shall result in a motion to compel production of same. Should it be necessary to file said motion, the party or parties serving this request on you shall seek counsel fees and costs relative to said application. This also incudes a request for all digital warranty records, digital database records or information stored online or via any cloud based system referring to or discussing your reimbursement or payment to any automotive dealership or automotive distributor of money or any other form of compensation for work, service, repairs, evaluation, inspection, diagnosis or repair attempts performed to the vehicle.

27. WARRANTY. A copy of the warranty, regardless of whether you claim that the party or parties serving this request has a copy thereof.

28. LEMON BUYBACK VEHICLES. All items that refer to or discuss any diagnosis of or repairs, repair attempts or service to or warranty claims made or received or processed by you or requests for reimbursement of such claims involving the following vehicles identified by vehicle identification numbers in the New Jersey Division of Consumer Affairs' list of vehicles branded under the New Jersey

Lemon Law as of April 1, 2021[2]: 2020 MERCEDES BENZ GLE450 4JGFB5KE5LA005134; 2020 MERCEDES BENZ GLE450 4JGFB5KB7LA065342; 2020 MERCEDES BENZ GLE450 JGFB5KB0LA004074; 2020 MERCEDES BENZ GLE450 4JGFB5KB1LA024141; 2020 MERCEDES BENZ GLE450 4JGFB5KB8LA005764; 2020 MERCEDES BENZ GLE450 4JGFB5KEXLA051025; 2020 MERCEDES BENZ GLE450 4JGFB5KB3LA074023; 2020 MERCEDES BENZ GLE450 4JGFB5KB8LA072851; 2020 MERCEDES BENZ GLE450 4JGFB5KB4LA073558; 2020 MERCEDES BENZ GLE450 4JGFB5KE7LA052035; 2020 MERCEDES BENZ GLE450 4JGFB5KE8LA024468; 2020 MERCEDES BENZ GLE450 4JGFB5KBXLA069241; 2020 MERCEDES BENZ GLE450 4JGFB5KB7LA022796; 2020 MERCEDES BENZ GLE450 4JGFB5KE8LA089904; 2020 MERCEDES BENZ GLE450 4JGFB5KB5LA103361; 2020 MERCEDES BENZ GLE450 4JGFB5KB6LA043851; 2020 MERCEDES BENZ GLE450 4JGFB5KB5LA047924; 2020 MERCEDES BENZ GLE450 4JGFB5KB5LA161888; 2020 MERCEDES BENZ GLE450 4JGFB5KE7LA045229;  and 2020 MERCEDES BENZ GLE580 4JGFB8GB0LA172176. This request included but not limited to any repair invoices, repair orders or repair estimates.  This request includes a request for the front and back sides of repair orders or invoices or work orders pertaining to said vehicles or repairs or maintenance performed to said vehicles, including the shop copy, technician copy, warranty copy, customer copy, technician notes and part order lists, slips or forms, whether prepared before or after performance of the services.   Please be advised that failure to provide both sides of the orders and/or invoices requested herein and the technician notes thereto shall result in a motion to compel production of same. Should it be necessary to file said motion, the party or parties serving this request on you shall seek counsel fees and costs relative to said application. This also includes a request for all digital warranty records, digital database records or information stored online or via any cloud based system referring to or discussing your reimbursement or payment to any automotive dealership or automotive distributor of money or any other form of compensation for work, service, repairs, evaluation, inspection, diagnosis or repair attempts performed to said vehicles.  This also includes a request for any items that refer to any refusal to perform diagnosis of or repairs, repair attempts

---

[2] https://www.njconsumeraffairs.gov/llu/Documents/Vehicles-Branded-Under-The-New-Jersey-Lemon-Law.pdf.   By way of explanation, the list states, in relevant part: "If a motor vehicle is returned to the manufacturer under the provisions of the New Jersey Lemon Law or similar statute of another state or as a result of a legal action or an informal dispute settlement procedure, it shall not be resold or re-leased in New Jersey unless the manufacturer has the vehicle's title stamped "R - RETURNED TO THE MANUFACTURER UNDER LEMON LAW OR OTHER PROCEEDING." A copy of the stamped title shall be submitted to the New Jersey Motor Vehicle Commission (MVC) to be permanently branded as a Lemon (Status "L" on your NJ title)."

or service to said vehicles.

29. DIGITAL WARRANTY RECORDS FOR CLASS VEHICLES.  All digital warranty claim records, digital database records or information stored online or via any cloud based system referring to or discussing your reimbursement or payment to any automotive dealership or distributor of money or any other form of compensation for work, service, repairs, evaluation, inspection, diagnosis or repair attempts performed that involve or refer to the battery or no start issues of any class vehicle. This includes any request for information or technical assistance made by any automotive dealership or distributor to you about the diagnosis of or repairs to (or replacement of) the battery or to electrical issues or to no start issues of any class vehicles and any claims for warranty repairs that you did not pay or refused to pay or refused to accept or for which you refused to authorize automotive repairs or any other automotive services.

30. CLASS MEMBER DISPUTES.  Any items or illustrations or recordings (whether video or audio in nature) that refer to, discuss, refer to or pertain to any disputes, litigation, arbitration, mediation, differences of opinion, disagreements or arguments you had with or involving any owner or lessee of any class vehicle, regardless of whether any arbitration or litigation resulted from said matters.

31. PAYMENTS MADE BY CLASS MEMBERS FOR REPAIRS.  Any items referring to or discussing the billing or invoicing by any automotive dealership or distributor of any class member for the diagnosis of issues or complaints about or repairs to (or replacement of) the battery or to electrical issues or to no start issues of any class vehicles or the payment of bills or invoices by any class member to any automotive dealership or distributor for the diagnosis of issues or complaints about or repairs to (or replacement of) the battery or to electrical issues or to no start issues of any class vehicles.

[REST OF PAGE INTENTIONALLY BLANK]

## CORPORTE/COMPANY CERTIFICATION

I, _____, am an employee of _____ and I declare that, for purposes of answering this notice to produce, I am the authorized agent of said entity.

I the undersigned hereby certify that I have reviewed the document production request and that I have made or caused to be made a good faith search for documents responsive to the request. I further certify that, as of this date, to the best of my knowledge and information, the production is complete and accurate based on (check appropriate boxes below):

( ) my personal knowledge and/or ( ) information provided by others.

I acknowledge my continuing obligation to make a good faith effort to identify additional documents that are responsive to the request and to promptly serve a supplemental written response and production of such documents, as appropriate, as I become aware of them.   The following is a list of the identity and source of knowledge of those who provided information to me (complete list below):

| Identity of persons providing information to me: | Sources of knowledge of that person: |
|---|---|
| | |
| | |
| | |

I certify that the aforesaid statements are true.  If ANY of the aforesaid statements are willfully false, I understand that I am subject to punishment.

Dated:_____           _____
                                       Signature

## INDIVIDUAL CERTIFICATION

I _____ hereby certify that I have reviewed the document production request and that I have made or caused to be made a good faith search for documents responsive to the request. I further certify that, as of this date, to the best of my knowledge and information, the production is complete and accurate based on (check appropriate boxes below):

( ) my personal knowledge and/or ( ) information provided by others.

I acknowledge my continuing obligation to make a good faith effort to identify additional documents that are responsive to the request and to promptly serve a supplemental written response and production of such documents, as appropriate, as I become aware of them.   The following is a list of the identity and source of knowledge of those who provided information to me (complete list below):

| Identity of persons providing information to me: | Sources of knowledge of that person: |
|---|---|
| | |

I certify that the aforesaid statements are true.  If ANY of the aforesaid statements are willfully false, I understand that I am subject to punishment.

_____    _____    _____
Date                          Job Title                     Signature