# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GERALD SCATTAGLIA, JR., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>PLAINTIFFS,[1]<br><br>V.<br><br>MERCEDES-BENZ USA, LLC AND JOHN DOES 1-10,<br><br>DEFENDANTS. | CIVIL ACTION NO. 2:21-CV-12750-BRM-LDW |

## SECOND AMENDED COMPLAINT

**LEWIS G. ADLER, ATTORNEY AT LAW**
Attorney ID#:  023211985
26 Newton Ave., Woodbury, NJ 08096
Tel. #: (856) 845-1968
Fax #: (856) 848-9504
Email:  lewisadler@verizon.net
Counsel for plaintiffs

**PERLMAN-DEPETRIS CONSUMER LAW**
Paul DePetris
Attorney ID #: 005821996
Email: info@newjerseylemons.com
Lee M. Perlman
Attorney ID #: 019171994
Email: lperlman@newjerseylemons.com
1926 Greentree Road, Suite 100
Cherry Hill, New Jersey 08003
Tel.#: 856-446-9797
Fax#: 888-635-5933
Counsel for plaintiffs

**THE ROBISON LEMON LAW GROUP, LLC**
Emma C. Robison
Attorney ID: 029452011
181 Andrien Rd.
Glen Mills, PA 19342
(267) 504-4744
Attorney ID #: 029452011
Email: emma@lemonlawcar.com
Counsel for plaintiffs

---

[1] For simplicity's sake all references to the parties named to this case shall use plural rather than singular designation, regardless of their actual number.

Plaintiffs plead as follows:

**ABBREVIATIONS USED IN THIS DOCUMENT**

1. For brevity's sake, hereafter the following abbreviated terms are used in this document:

    A. This civil action - this case or the case.

    B. Plaintiffs GERALD SCATTAGLIA, JR. - plaintiffs.

    C. Defendants MERCEDES-BENZ USA, LLC - the manufacturer or defendants.

    D. Defendants John Does 1-10 – fictitious defendants named to the complaint – the Does.

    E. All parties named to the complaint collectively - the parties.

    F. The MERCEDES-BENZ 2021 GLE450W4 that is the subject of this case - the vehicle.

    G. The sales or lease transaction that is the subject of this case - the sale or the transaction.

    H. Ray Catena Motor Car Corporation of Edison, New Jersey - the dealer.

    I. Michael Migliore, the dealer's service advisor who dealt with plaintiffs relative to warranty repairs performed to the vehicle – the advisor

    J. The contract for the sale or lease of the vehicle to plaintiffs - the contract.

    K. The various new vehicle limited warranties that

defendants issued plaintiffs with the vehicle collectively - the warranty.

L. The automotive repair attempts that defendants' authorized dealerships performed to the vehicle under the vehicle's warranty - the repairs or repair attempts.

M. The automotive dealerships that performed the repair attempts collectively - the servicing dealers or the dealers.

N. The problems-nonconformities that the consumers' experienced with the vehicle and/or when using the vehicle - the problems or the defect.

O. The New Jersey Truth-In-Consumer Contract, Warranty And Notice Act, N.J.S.A. 56:12-14 To -18 – TCCWNA.

P. New Jersey Uniform Commercial Code, N.J.S.A. 12A:1-101, et seq. – UCC.

Q. Magnuson-Moss Warranty- Federal Trade Improvement Act, 15 U.S.C. § 2301, et seq. – MMWA.

R. The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, Et Seq. – CFA.

S. New Jersey Used Car Lemon Law, N.J.S.A. 56:8-67, et seq. – UCLL.

T. N.J.S.A. 56:8-2 – section 2.

U. New Jersey Division Of Consumer Affairs – DCA.

V. An act concerning new motor vehicle warranties and repealing P.L. 1983, c. 215 and making an appropriation, N.J.S.A. 56:12-29, et seq. a-k-a the New Jersey New Car Lemon Law – NCLL.

W. New Jersey Automotive Sales Practices Regulations, N.J.A.C. 13:45A-26B.1, et seq. – ASP.

X. New Jersey Automotive Advertising Practices Regulations a-k-a New Jersey Motor Vehicle Advertising Practices, N.J.A.C. 13:45A-26A.1, et seq. – MVAP.

Y. Motor Vehicle Cost Information Act, 49 U.S.C. § 32701, et seq. a-k-a federal odometer law – FOL.

Z. An Act Concerning Service Contracts And Supplementing And Amending P.L.1980, C.125; the Service Contracts Act, N.J.S.A. 56:12-87, et seq. – SCA.

AA.   National Highway Transportation Authority – NHTSA.

**EXHIBITS TO COMPLAINT**

2. The allegations contained in the previous paragraphs are repeated as if fully set forth herein.

3. Attached hereto as complaint exhibit A are repair invoices for the vehicle – Invoice # M8CS22526; Invoice # M8CS23982; Invoice # M8CS33101; Invoice # M8CS35778; Invoice # M8CS39921; Invoice # M8CS44095.

4. Attached hereto as complaint exhibit B is the article titled The Warranty Process Flow Within The Automotive Industry:  An Investigation Of Automotive Warranty Processes And Issues (Center For Automotive Research, August 2005).

5. Attached hereto as complaint exhibit C is a MBWorld online vehicle forum article thread titled "New GLE Keeps Draining Battery - won't start".

6. Attached hereto as complaint exhibit D is a Mercedes GLE Forum online vehicle forum article thread titled "Electrical Problems with 2020 GLE450".

7. Attached hereto as complaint exhibit E is a Cars.com online vehicle forum article thread titled "2020 Mercedes-Benz GLE 450 Consumer Reviews".

8. Attached hereto as complaint exhibit F is the expert report of Richard Roth of RSJ Auto LLC and Xentry Tips articles titled "Functional impairment of 48 V on-board electrical

system", "Implausible 'service due' instrument cluster",
"Xentry Battery Tester results disagree with workshop
assessment" and "Vehicle does not start / Vehicle cannot be
unlocked".

9. Attached hereto as complaint exhibit G are a series of
texts between plaintiffs and the advisor.

10. Attached hereto as complaint exhibit H are an exchange of
emails between plaintiffs and a representative of
defendants.

**PARTIES**

11. The allegations contained in the previous paragraphs are repeated as if fully set forth herein.

12. Plaintiffs are individuals with an address of 135 Oak Avenue, Staten Island, New York 10306.

13. Defendants MERCEDES-BENZ USA, LLC is a business with address of 1 Mercedes-Benz Drive, Sandy Springs, Georgia, 30328.

14. Defendants John Does 1-10 are fictitious defendants who are entities and/or individuals, including but not limited to those who have yet to be identified by plaintiffs but whose identity may be revealed during the period of discovery that shall occur in future relative to this action and who may be liable for plaintiffs' damages as referenced herein or who are known but not presently considered to be indispensable parties relative to this matter. Such individuals-entities may include but are not necessarily limited to automotive manufacturers, automotive distributors, automotive parts manufacturers, automotive parts distributors, automotive transporters, automotive dealerships, contractors, subcontractors, independent contractors, companies, corporations, businesses, partnerships, agents, officers, directors, managing members, employees, salespeople, technicians, staff,

workmen or representatives of the other defendants named

herein.

15. Unless otherwise noted below, all allegations set forth

below are directed against all defendants named herein and

all references to "defendants" shall be to all defendants

named herein.

## FACTUAL ALLEGATIONS

16. The allegations contained in the previous paragraphs are repeated as if fully set forth herein.

17. This case is a putative class action against the manufacturer of a vehicle that knew that the vehicle suffered from defects long before plaintiffs purchased the vehicle.

18. All of the class vehicles suffer from the same defect as they all share the same 48 volt battery.

19. The defect involves the vehicle's electrical system which manifests itself when the vehicle fails to start and exhibits other electrical issues related to that battery.

20. The vehicle is one of a line of 450 GLE make and model of vehicles manufactured by defendant.

21. Before plaintiffs ever purchased the vehicle, many other consumers complained about electrical issues plaguing the 450 GLE vehicles and their no start conditions.

22. As indicated by a bulletin issued by the manufacturer on 1-29-20, as early as then, the manufacturer was aware of electrical issues plaguing the 2021 450 GLE vehicles – specifically, regarding the vehicle's 48 volt on-board electrical system.

23. Per the DCA's list of vehicles branded under the New Jersey

Lemon Law as of April 1, 2021,[2] approximately twenty (20) 2020 450 GLE vehicles have been branded as lemons, such as those with the following vehicle identification numbers: "2020 MERCEDES BENZ GLE450 4JGFB5KE5LA005134; 2020 MERCEDES BENZ GLE450 4JGFB5KB7LA065342; 2020 MERCEDES BENZ GLE450 JGFB5KB0LA004074; 2020 MERCEDES BENZ GLE450 4JGFB5KB1LA024141; 2020 MERCEDES BENZ GLE450 4JGFB5KB8LA005764; 2020 MERCEDES BENZ GLE450 4JGFB5KEXLA051025; 2020 MERCEDES BENZ GLE450 4JGFB5KB3LA074023; 2020 MERCEDES BENZ GLE450 4JGFB5KB8LA072851; 2020 MERCEDES BENZ GLE450 4JGFB5KB4LA073558; 2020 MERCEDES BENZ GLE450 4JGFB5KE7LA052035; 2020 MERCEDES BENZ GLE450 4JGFB5KE8LA024468; 2020 MERCEDES BENZ GLE450 4JGFB5KBXLA069241; 2020 MERCEDES BENZ GLE450 4JGFB5KB7LA022796; 2020 MERCEDES BENZ GLE450 4JGFB5KE8LA089904; 2020 MERCEDES BENZ GLE450

---

[2] https://www.njconsumeraffairs.gov/llu/Documents/Vehicles-Branded-Under-The-New-Jersey-Lemon-Law.pdf.   By way of explanation, the list states, in relevant part: "If a motor vehicle is returned to the manufacturer under the provisions of the New Jersey Lemon Law or similar statute of another state or as a result of a legal action or an informal dispute settlement procedure, it shall not be resold or re-leased in New Jersey unless the manufacturer has the vehicle's title stamped "R - RETURNED TO THE MANUFACTURER UNDER LEMON LAW OR OTHER PROCEEDING." A copy of the stamped title shall be submitted to the New Jersey Motor Vehicle Commission (MVC) to be permanently branded as a Lemon (Status "L" on your NJ title)."

4JGFB5KB5LA103361; 2020 MERCEDES BENZ GLE450

4JGFB5KB6LA043851; 2020 MERCEDES BENZ GLE450

4JGFB5KB5LA047924; 2020 MERCEDES BENZ GLE450

4JGFB5KB5LA161888; 2020 MERCEDES BENZ GLE450

4JGFB5KE7LA045229;  and 2020 MERCEDES BENZ GLE580

4JGFB8GB0LA172176.

24. Despite that foreknowledge on the part of the employees of defendants' technical and management departments, the employees of defendants' management department made an intentional decision to fail to disclose the existence of that defect to plaintiffs before plaintiffs purchased the vehicle from the manufacturer's franchise dealership – the dealer.

25. The defect made the vehicle dangerous and therefore, defendants owed plaintiffs the duty to disclose the defect before the sale and to issue a recall of the vehicle.

26. What resulted was a chain of repair attempts and a vehicle that suffers from a diminution in value due to those repair attempts.

27. At all times relevant to this case, the dealer was a dealership authorized by defendants to sell the vehicle, issue manufacturer warranties associated therewith, service the vehicle and perform warranty repairs to the vehicle under the warranty.

28. At all times relevant to this case, the dealer was a "dealer", meaning a person who is actively engaged in the business of buying, selling or exchanging motor vehicles at retail and who has an established place of business.[3]

29. At all times relevant to this case, the vehicle was a "motor vehicle", meaning a passenger automobile, authorized emergency vehicle, or motorcycle as defined in N.J.S.A. 39:1-1 which is purchased or leased in the State of New Jersey or which is registered by the New Jersey Motor Vehicle Commission, except the living facilities of motor homes.[4]

30. At all times relevant to this case, the vehicle was a "consumer product", which means any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed).[5]

31. Defendants manufactured and/or assembled and/or distributed and/or advertised the vehicle, prepared the warranty and via the dealer, issued plaintiffs the warranty.

---

[3] N.J.S.A. 56:12-30; N.J.S.A. 56:12-31
[4] N.J.S.A. 56:12-30.
[5] 15 U.S.C. §2301(1).

32. At all times relevant to this case, the manufacturer was a "manufacturer", meaning a person engaged in the business of manufacturing, assembling or distributing motor vehicles, who will, under normal business conditions during the year, manufacture, assemble or distribute to dealers at least 10 new motor vehicles. [6]

33. At all times relevant to this case, the manufacturer was a "supplier", which means any person engaged in the business of making a consumer product directly or indirectly available to consumers.[7]

34. At all times relevant to this case, the manufacturer was a "warrantor", which means any supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty. [8]

35. At all times relevant to this case, plaintiffs were "consumers", meaning a buyer or lessee, other than for purposes of resale or sublease, of a motor vehicle; a person to whom a motor vehicle is transferred during the duration of a warranty applicable to the motor vehicle; or any other person entitled by the terms of the warranty to enforce the obligations of the warranty.[9]

---

[6] N.J.S.A. 56:12-30.
[7] 15 U.S.C. § 2301(4).
[8] 15 U.S.C. § 2301(5).
[9] N.J.S.A. 56:12-30.

36. At all times relevant to this case, plaintiffs were "consumers", meaning a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and anynew other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract).[10]

37. Pursuant to its definition of "motor vehicle," the NCLL applies to the vehicle and the class vehicles: "Motor vehicle" means a passenger automobile or motorcycle as defined in R.S.39:1-1 which is purchased or leased in the State of New Jersey or which is registered by the Division of Motor Vehicles in the Department of Law and Public Safety, except the living facilities of motor homes." N.J.S.A. 56:12-30.  Pursuant to said definition, the New Jersey motor vehicle code, N.J.S.A. 39:1-1, et seq., defines "motor vehicle" as follows:  "Motor vehicle" includes all vehicles propelled otherwise than by muscular power, excepting such vehicles as run only upon rails or

---

[10] 15 U.S.C. § 2301(3).

tracks and motorized bicycles."  N.J.S.A. 39:1-1.

38. Plaintiffs are "purchasers" as defined by N.J.S.A. 56:12-30 and the manufacturer is a "Manufacturer" as defined by N.J.S.A. 56:12-30.

39. The dealers were the manufacturer's "dealers" as defined by N.J.S.A. 56:12-30 and as referenced in N.J.S.A. 56:12-31.

40. Here is a chronology of events relevant to this case that other 450 GLE vehicle owners or lessees experienced with their vehicles.

41. On or about 11-8-19, a consumer wrote on an online vehicle forum board that: "Most unreliable car I have ever owned. by CEO from Lexington NC on Fri Nov 08 2019 I currently own 3,Mercedes (sic) - I will never own another one. This 2020?450!GLE (sic) has refused to start, left me stranded 10 times in 8 weeks- only to find out from a tow truck driver there is a problem with the software . Which Mercedes has now confessed is true. I will turn this new car back to dealer. NC lemon law."  Exhibit E.

42. On 1-28-20, the manufacturer issued a Xentry Tips technical service bulletin for issues related to failure to start issues with its vehicles.  Exhibit F.

43. That bulletin expressly referred to problems with vehicles' 48 volt on board batteries.  Exhibit F.

44. On 8-7-20, the manufacturer issued a Xentry Tips technical

service bulletin for issues related to failure to start issues with its vehicles.  Exhibit F.

45. That bulletin expressly referred to problems with vehicles' batteries and the need to replace same.  Exhibit F.

46. On 8-10-20, the manufacturer issued a Xentry Tips technical service bulletin for issues related to the batteries of its vehicles.  Exhibit F.

47. On or about 6-12-20, a consumer wrote on an online vehicle forum board that: "Hello Everyone Sorry this is my first post. Got a new 2020 GLE350 about 3 months ago About a week ago, it would not start, bunch of lights on the dash, would not turn over MB sent out a service and they jumped the car It ran for another week, and then just died again. We had it towed to MB this time Already checked the Battery and the Alternator, all are fine Any idea what is causing the battery drain Tks".  Exhibit C.

48. On or about 6-12-20, a consumer on the same forum responded as follows: "Don't rule out the battery. I had a similar situation except that with the 450 the 48 volt starts the car. I kept getting "critical battery" message and the dealer couldn't find anything wrong. Then when it was in for 3 days to replace the MBUX controller it ran down after a charge and they replaced it (the 12 volt battery). I think it had an internal short but got that 3td hand from

SA & probably a guess."

49. On or about 6-18-20, the first consumer replied as follows: "Back from the shop ESP was a constant drain on battery Supposedly a known issue Fixed with a software update Will let you know if it fixes the problem permanently, tks for the responses".  Exhibit C.

50. On or about 8-3-20, another consumer posted on the same forum: "So this is what they claim was wrong with my GLE only took 3 weeks to figure it out. I'm not buying it. Just picked it up so we will see . Now I feel like I don't have a reliable vehicle especially with all the bad reviews I have read. Pinched wiring starter circuit BUT it stopped while at a stop light and then didn't start after it cut off. I'm no mechanic but it doesn't add up to me."  Exhibit C.

51. On or about 8-4-20, another consumer posted on the same forum: "I've had the same issue with my four month old 2020GLE! Keep getting "Critical" messages via email. Dealer has had the vehicle three or four times and continues with software updates apparently dictated by Mercedes. "Starter Battery Partly Charged" shows on the Mercedesme app for almost a week now despite the car being driven daily. Really frustrating and I'm quickly losing confidence in both the vehicle and dealership!"  Exhibit C.

52. Upon information and belief, that consumer reported the aforesaid issues to an automotive technician named Daniel Zgobica.  Exhibit C.

53. Upon information and belief, since the post refers to the dealer having the vehicle "three or four times and continues with software updates apparently dictated by Mercedes", this post indicates that, before the sale that is the subject of this case, the consumer positing the 8-4-20 post reported his concerns to the manufacturer via its franchise dealership and that the manufacturer was issuing software updates in failed attempts to fix that consumer's vehicle.

54. Likewise, per this forum and before the sale of the vehicle to plaintiffs, on or about 6-12-20, a consumer reported the defect to the manufacturer's franchise dealership Mercedes-Benz of Alexandria, Virginia by advising service advisor Carlos Escobar employed with that dealership, who typed up an invoice reflecting the defect.

55. Upon information and belief, that automotive dealership thereafter submitted the warranty claim to the manufacturer's warranty claims reimbursement department, thereby putting its employees on notice of the defect.

56. Upon information and belief, the employees of the manufacturer's management department had access to that

information and therefore, were clearly aware of the defect as early as the Summer of 2020.

57. On or about 12-20-20, another consumer posted on the same forum "I had a similar experience my new '21 GLE450: battery went dead after 230 miles. Had to be towed - could not be jumped. I am waiting more than 30 days fir a new battery coming from Germany. None in the US. So frustrating. Mercedes has a serious problem here with this 48v battery system." Exhibit C.

58. On or about 12-20-20, another consumer posted on the same forum "Same here. First a 48 volt battery malfunction, then a red 48 volt system failure, then, Must stop the engine due to overheating. Stopped on the side of the road, called Mercedes Road side assistance which is a joke for another post. After repeating to the guy on the phone that I need a tow truck, NOT a jump...who do they send... a jump guy. Anyway, he called me and said he's seen this before, and for me to try to start the car. Did that...everything was just fine...no warnings. I drove it to the dealer in Pompano Beach, FL. the next morning. Drove perfectly fine to the shop. They informed me later in the day that the 48 volt battery needed to be replaced, there are none in the US, and 47 on back order in Germany with no idea when I would get one. The car is still with them since December 1.

This is my first MB, and I'm NOT impressed at all. The biggest question I have is...this a battery problem, or software issue...or both? Batteries don't usually come back to life after a failure, and a 10 minute shutdown?? Seems that resetting the software by restarting the car made the issue go away...for now at least." Exhibit C.

59. On or about October, 2020, a consumer wrote on an online vehicle forum board that "I have had 4 occasions in last 3 months where 450 is dead after only sitting for an hour. Its (sic) now at Dealer for second (sic) time for this problem with total of 15 days of trying to fix it. In 3 of those occasions, jumping finally started it. Dealer replaced starter battery. THen (sic) it happened again last week and thus up at the dealer. A GLE 450 they gave me as a loaner last time also ended up not starting while I had it and had to be towed- not even a jump started it. ANy (sic)one know if other GLEs are having this problem? I know hundreds of GLEs were stored at the factory when they were originally built. My GLE was built in November of 2018. I bought it new in January of 2020. ANy (sic) help would be greatly appreciated. Love the car but don't trust it at all." Exhibit D.

60. Upon information and belief, on multiple occasions when the consumers referenced in the online World Wide Web threads

of customer complaints predating the sale took their
vehicles to defendants' authorized repair facilities for
service under the warranty for the problems, the service
advisor or service writer employed by the defendants'
authorized repair facilities typed up repair invoices.
Exhibit A.

61. Upon information and belief, the names and/or technician
numbers of said employees of defendants' authorized repair
facilities performing said warranty repairs are stated on
those invoices.

62. Upon information and belief, many of those repair invoices
go into great detail about the diagnoses performed to the
vehicle, the parts replaced on the vehicle and the labor
performed on the vehicle and they discuss many instances
during which repair attempts were performed involving the
vehicle's battery and the conditions that led to such
repair attempts.

63. Upon information and belief, many of those repair invoices
refer to services being performed to the vehicle under the
warranty, as job line items appearing on the invoices use
the word "warranty" in the column stating whether the
repairs were being performed on a cash basis, were being
internally adjusted by to defendants' authorized repair
facilities or were being submitted as warranty claims to

defendants.

64. Upon information and belief, after each visit that the complaining consumers made to defendants' authorized repair facilities to get the vehicle repaired under the warranty, to defendants' authorized repair facilities submitted those invoices to the warranty claims reimbursement department of defendants so that to defendants' authorized repair facilities could get paid under the warranty.

65. Upon information and belief, those invoices described parts and labor and also provided parts numbers relative to parts being ordered for or replaced on the vehicle under the warranty.  Exhibit A.

66. Upon information and belief, after each visit that the complaining consumers made to defendants' authorized repair facilities to get the vehicle repaired under the warranty and via to defendants' authorized repair facilities' submission of requests for reimbursement for those claims, the personnel of defendants' warranty claims department were thereby informed of the problems and the complaining consumers' repeat demands that the vehicle be fixed and of defendants' authorized repair facilities' failure to fix the vehicle in a reasonable time under the warranty.

67. Upon information and belief, the employees of the legal department and employees of the management department of

defendants had access to the records of defendants'
warranty claims department and accessed those records and
therefore, were thereby informed of the problems and the
complaining consumers' repeat demands that the vehicle be
fixed and of defendants' authorized repair facilities'
failure to fix the vehicle in a reasonable time under the
warranty.

68. Therefore, upon information and belief, via the warranty
claims history for the vehicle, defendants' management
department employees had actual knowledge of the
complaining consumers' repeat demands that the vehicle be
fixed and of defendants' authorized repair facilities'
failure to fix the vehicle in a reasonable time under the
warranty.

69. Further, upon information and belief, many of those
complaining consumers called the manufacturer's customer
service line and spoke with representatives of the
manufacturer and during said calls, the complaining
consumers advised those representatives about the
complaining consumers' repeat demands that their vehicle be
fixed and about defendants' authorized repair facilities'
failure to fix the vehicle in a reasonable time under the
warranty.

70. Upon information and belief, the employees of the legal

department and employees of the management department of defendants had access to the records of defendants' customer claims department and accessed those records and therefore, were thereby informed of the problems and the complaining consumers' repeat demands that the vehicle be fixed and of defendants' authorized repair facilities' failure to fix the vehicle in a reasonable time under the warranty.

71. Therefore, upon information and belief, via the customer service department's records of discussions with those complaining consumers that called said department, defendants had actual knowledge of the complaining consumers' repeat demands that the vehicle be fixed and of defendants' authorized repair facilities' failure to fix the vehicle in a reasonable time under the warranty.

72. Upon information and belief, all of the 450 GLEs are similarly equipped with the defective battery and therefore, all suffer from the same defect in materials or workmanship as reflected by the aforesaid TSBs and forum boards.  Exhibits C & F.

73. Upon information and belief, this fact of a year, make and model wide defect was clear to the employees of defendants' management department and was also clear to the employees of defendants' technical department drafting the TSBs

issued by defendants.

74. However, upon information and belief, neither defendants'
legal department nor defendants' management acted on those
customer complaints by: (1) instructing its franchise
automotive dealerships not to sell the 450 GLE line of
vehicles; (2) ceasing production of said vehicles until
defendants came up with a reliable solution to the defect;
or (3) decided to institute a recall of the 450 GLEs.

75. Instead, upon information and belief, the employees of
defendants' management department intended to omit
information about the existence of the defects by hiding
the data about the defect from purchasers and lessees such
as plaintiffs and the class so as to induce them to
continue purchasing and leasing 450 GLEs.

76. Upon information and belief, the employees of defendants'
management department intentionally suppressed the
existence of the defect to achieve more sales and leases
and the continued distribution and sale of more 450 GLEs to
defendants' franchise dealerships.

77. Given the knowledge at the fingertips of the employees of
defendants' management department, defendants had a duty
to disclose that information and to take corrective action,
especially since the defect made the vehicle dangerous.
Exhibit F.

78. Upon information and belief, all the sources of information available to the employees of defendants' management department provided certain knowledge to them of the existence of the defect.

79. Nevertheless, upon information and belief, defendants' management made a conscious decision to put profits ahead of stopping the sale of 450 GLEs with their then unfixable defect – a defect that, as of the filing of this pleading, remains unfixed and that, regardless of any fix, substantially impairs the use, value and safety of all 450 GLEs similarly equipped with the 48 volt battery.

80. Upon information and belief, this decision was taken well before 10-28-20 the sale as shown by the many customer complaints and repeat unsuccessful repairs performed in response thereto.

81. Indeed, as mentioned in forum boards, upon information and belief, the problems were known to those employees long before the sale – i.e., as early as January 2020 per the TSBs issued relative to the defect and the Summer of 2020, as reflected by an invoice posed on a forum board. Exhibits C & F.

82. Upon information and belief, before plaintiffs purchased the vehicle from the dealer, none of the employees of the dealership that showed plaintiffs the vehicle or were

involved in the sale of the vehicle to plaintiffs ever mentioned the defect.

83. Upon information and belief, before plaintiffs purchased the vehicle from the dealer, none of the employees of the manufacturer ever forwarded plaintiffs any literature about the defect.

84. Upon information and belief, before plaintiffs purchased the vehicle from the dealer, none of the employees of the dealership that showed plaintiffs the vehicle or were involved in the sale of the vehicle to plaintiffs ever gave plaintiffs any literature mentioning or referring to the defect.

85. Upon information and belief, before plaintiffs purchased the vehicle from the dealer, none of the employees of the manufacturer ever forwarded plaintiffs any literature mentioning or referring to the defect.

86. When plaintiffs purchased the vehicle, plaintiffs were totally unaware of the defect.

87. On or about 10-29-20, plaintiffs purchased the vehicle in new condition at the dealer in Edison, New Jersey for the sum of approximately $76,918.36.

88. Plaintiffs' purchase of the vehicle occurred after:  (1) the manufacturer issued at least three (3) technical service bulletins related to a no start condition and/or

issues related to the vehicle's battery and/or the
vehicle's electrical system (exhibit F); and (2) after the
posting online by consumers of summaries of their no start
and/or electrical and/or battery issues with their 450 GLE
vehicles and their efforts to get the manufacturer's
franchise dealerships to repair their vehicles for those
issues.  Exhibits C-E.

89. Therefore, when the vehicle was sold to plaintiffs by the
dealer, the manufacturer had knowledge that the vehicle
suffered from electrical problems that would cause the
vehicle to fail to start.

90. At time of sale, the dealer issued plaintiffs the warranty
with various coverage periods for various components,
including but not limited to the following: coverage for 4
years/50,000 miles for "basic" components.

91. At all times relevant to this case, the warranty was a
"warranty", which means any warranty, whether express or
implied of the manufacturer of a new motor vehicle, or, in
the case of a new motor vehicle that is an authorized
emergency vehicle, of the manufacturer, co-manufacturer or
post-manufacturing modifier, of the vehicle's condition and
fitness for use, including any terms or conditions
precedent to the enforcement of obligations under the

warranty. [11]

92. At all times relevant to this case, the warranty was a "written warranty", which means — (A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or (B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.[12]

93. At all times relevant to this case, the warranty was a warranty which pertained to a consumer product actually costing plaintiffs more than $5 (i.e., the vehicle).[13]

94. As time of sale, one or more implied warranties covering

---

[11] N.J.S.A. 56:12-30.
[12] 15 U.S.C. § 2301(6).
[13] 15 U.S.C. § 2302(2)(e).

the vehicle arose as a matter of law in plaintiffs' favor, with the term "implied warranty" meaning an implied warranty arising under State law (as modified by 15 U.S.C. 2308 and 2304(a)) in connection with the sale by a supplier of a consumer product.[14]

95. At all times relevant to this case, plaintiffs were entitled to seek repair attempts to the vehicle under the warranty for problems that plaintiffs experienced with the operation of the vehicle.

96. During the vehicle's warranty period and/or during the first 24,000 miles of operation or during the period of two years following the date of original delivery of the vehicle to plaintiffs (whichever occurred first), plaintiffs experienced the problems, the details of which are set forth below and/or in complaint exhibit A.

97. Following purchase, plaintiffs experienced problems with the vehicle's operation and pursuant to the manufacturer's new vehicle limited warranty, took the vehicle to various dealerships for multiple unsuccessful repair attempts. Exhibit A.

98. The vehicle's repair history is detailed in part in the many repair invoices that the dealer issued plaintiffs each

---

[14] 15 U.S.C. § 2301(7).

time that plaintiffs took the vehicle to the dealer for
repairs under the vehicle's warranty.  Exhibit A.

99. In all, following the sale of the vehicle to plaintiffs by
the dealer, the vehicle has undergone at least 3 repair
attempts and spent approximately 47 days at the
manufacturer's franchise dealership – the dealer - for
repair attempts for issues with a no start condition and/or
electrical malfunction.  Exhibit A.

100. Approximately 2 weeks after plaintiffs took delivery of
the vehicle, the vehicle had to be towed into the dealer
because the entire passenger side of the vehicle
experienced a loss of power, with the mirror on that side
of the vehicle failing to extend for use.

101. On or about 11-30-20, the vehicle died while parked in
plaintiffs' garage, with the vehicle's power going on but
the vehicle failing to turn over.

102. Accordingly, at that time, the vehicle was towed to the
dealer for warranty service.

103. Following that repair attempt, on various occasions,
plaintiffs noticed that the vehicle's dashboard display
experienced a power failure as it rebooted and restarted.

104. On or about 4-10-21, the vehicle again died and was towed
to the dealer.

105. On this occasion, the service department staff of the

dealer told plaintiffs that the vehicle's 48 volt battery was the cause of the vehicle's problems.

106. The service department staff of the dealer told plaintiffs that, to prevent his having to wait a long time for the completion of repairs, the dealer was going to simply take the battery that they had set aside for another customer's vehicle and install it in the vehicle.

107. While the invoice for that repair refers to the vehicle being returned to the consumer on 4-15-21, in fact, the vehicle was not returned to plaintiffs until 4-16-21. Exhibit A.

108. One of the problems with the vehicle is that the vehicle rolls backward when plaintiffs take their foot off of the brake pedal. Exhibit A.

109. After one unsuccessful repair attempt for that problem, approximately one and a half weeks later, that problem happening again.   Exhibit A.

110. While defendants' motion to dismiss the first amended complaint for failure to state a claim was pending before this court, plaintiffs had a call in to the dealer for the following problems:  (1) if the vehicle is stopped at a red light and not on an incline and plaintiffs take their foot off the break, the vehicle rolls backward and on one occasion, almost collided with that vehicle positioned

behind the vehicle on the roadway and the vehicle's sensor advising that the vehicle was too close to the other vehicle went off; (2) the vehicle feels like it has no pickup and plaintiffs have to put their foot all the way down on the gas pedal to accelerate and the vehicle makes a weird notice when that occurs.

111. Had plaintiffs known what the manufacturer knew about the vehicle presale – i.e., that the vehicle, along with all other 2021 450 GLEs, suffered from a no start problem or electrical problem – plaintiffs never would have purchased the vehicle.

112. Every time that plaintiffs took the vehicle to the dealer for service under the warranty for the problems, plaintiffs complained about the problems to the dealer's service advisor, Michael Migliore and asked that the dealer fix the vehicle.   Exhibit A.

113. These complaints to the advisor commenced long before plaintiffs filed suit in this case.

114. Plaintiffs made these complaints to the advisor on or about 4-15-21, 5-17-21, 11-10-20, 12-1-20, 4-10-21, 7-19-21 and 10-20-21.  Exhibit A.

115. In all, after the vehicle's delivery to plaintiffs on 10-28-20, commencing on 11-11-20 when the vehicle's odometer registered approximately 242 miles up to the filing of this

document, the vehicle underwent service by the dealer at least 6 times over a period of over 70 days.  Exhibit A.

116. Less than a month following that delivery, the problems began manifesting themselves to plaintiffs.  Exhibit A.

117. On multiple occasions when plaintiffs took the vehicle to the dealer for service under the warranty for the problems, the advisor typed up repair invoices.  Exhibit A.

118. Many of those repair invoices go into great detail about the diagnoses performed to the vehicle, the parts replaced on the vehicle and the labor performed on the vehicle and they discuss many instances during which repair attempts were performed involving the vehicle's battery and the conditions that led to such repair attempts.  Exhibit A.

119. Many of those repair invoices refer to services being performed to the vehicle under the warranty, as job line items appearing on the invoices use the word "warranty" in the column stating whether the repairs were being performed on a cash basis, were being internally adjusted by the dealer or were being submitted as warranty claims to defendants.  Exhibit A.

120. Upon information and belief, after each visit that plaintiffs made to the dealer to get the vehicle repaired under the warranty, the dealer submitted those invoices to the warranty claims reimbursement department of defendants

so that the dealer could get paid.  Exhibit A.

121. Those invoices described parts and labor and also provided parts numbers relative to parts being ordered for or replaced on the vehicle.  Exhibit A.

122. Upon information and belief, after each visit that plaintiffs made to the dealer to get the vehicle repaired under the warranty and via the dealer's submission of requests for reimbursement for those claims, the personnel of defendants' warranty claims department were thereby informed of the problems and plaintiffs' repeat demands that the vehicle be fixed and the dealer's failure to fix the vehicle in a reasonable time.

123. Upon information and belief, the employees of the legal department and employees of the management department of defendants had access to the records of defendants' warranty claims department and accessed those records and therefore, were thereby informed of the problems and plaintiffs' repeat demands that the vehicle be fixed and the dealer's failure to fix the vehicle in a reasonable time.

124. Therefore, via the warranty claims history for the vehicle, defendants had actual knowledge of plaintiffs' repeat demands that the vehicle be fixed and the dealer's failure to fix the vehicle in a reasonable time.

125. Further, on or about May of 2021, plaintiffs exchanged multiple texts with the advisor regarding the vehicle's problems wherein plaintiffs described to the advisor problems with the vehicle and the dealer confirmed the existence of those problems and that the dealer couldn't find the cause of the problems.  Exhibit G.

126. Also, upon information and belief, on or about December 2020, plaintiffs communicated with defendants directly, speaking on at least one occasion via the phone with one or more representatives of defendants.  Exhibit H.

127. At that time, plaintiffs were very frustrated by the fact that plaintiffs had only very recently taken delivery of the vehicle and had not driven it very many miles before it required two repairs at the dealer.

128. For, the vehicle was only delivered to plaintiffs on or about 10-28-20 and its odometer only registered approximately 232 miles at the time of its first repair. Exhibit A.

129. During the discussion/those discussions, plaintiffs described the problems to those representatives and demanded relief from defendants for the failure to fix the vehicle in a reasonable time.  Exhibit H.

130. Upon information and belief, during the discussion/those discussions, plaintiffs asked Naportia if the manufacturer

would repurchase the vehicle and Naportia said the manufacturer would not do so.

131. On or about December 2020 and following those phone conferences, plaintiffs exchanged emails with Naportia, Executive Referral Manager of Mercedes-Benz USA, LLC. Exhibit H.

132. On or about 12-14-20, plaintiffs wrote to Naportia as follows: "Portia.  Yet again another issue with MB That's not my phone number.  My phone number is (917) 881-5557.  Please call me ASAP".

133. By that time, the vehicle had undergone 16 days of repairs and the vehicle was still at the dealership while the dealer attempted without success to fix the vehicle. Exhibit A.

134. On or about 12-30-20, plaintiffs wrote to Naportia as follows:  "Naportia.  My battery still Is not in and was delayed again until January.   Action needs to be taken in behalf of MB".

135. By that time, the vehicle had undergone over 30 days of repairs and the vehicle was still at the dealership while the dealer attempted without success to fix the vehicle. Exhibit A.

136. Upon information and belief, the employees of the legal department and employees of the management department of

defendants had access to the records of plaintiffs'
communications with defendants' customer service
department.

137. Therefore, defendants had actual knowledge of plaintiffs'
repeat demands that the vehicle be fixed and the dealer's
failure to fix the vehicle in a reasonable time.

138. The problems were "nonconformities", which means a defect
or condition which substantially impairs the use, value or
safety of a motor vehicle.[15]

139. During the vehicle's warranty period and/or during the
first 24,000 miles of operation or during the period of two
years following the date of original delivery of the
vehicle to plaintiffs (whichever occurred first),
plaintiffs presented the vehicle to the dealerships for the
dealerships, reported the problems to the dealerships and
those dealerships performed repair attempts to the vehicle
relative to the problems.  Exhibit A.

140. As detailed below and in complaint exhibit A, during the
vehicle's warranty period and/or during the first 24,000
miles of operation or during the period of two years
following the date of original delivery of the vehicle to
plaintiffs (whichever occurred first), defendants or their

---

[15] N.J.S.A. 56:12-30.

agents the dealerships were unable to repair or correct the problems within a reasonable time.  Exhibit A.

141. Due to the repeated repair attempts, plaintiffs view the problems as affecting the use and value of the vehicle.

142. Plaintiffs have no idea if or when the vehicle's problems will occur again, potentially requiring further repairs.

143. Plaintiffs fear being in a situation in which the vehicle fails to start and that plaintiffs will be stranded somewhere.

144. Given the need to have the vehicle towed and its lack of reliability, the problems have significantly impaired plaintiffs' use of the vehicle and plaintiffs believe the vehicle is unsafe and plaintiffs' confidence in the vehicle is shaken.

145. In addition, the vehicle's repair history cannot be erased – instead, that history is a permanent blemish on the vehicle's value.

146. Accordingly, given the vehicle's repair history, plaintiffs believe that the vehicle is less valuable than if the vehicle didn't have the problems.

147. Therefore, plaintiffs believe that the vehicle's use, value and/or safety is substantially impaired by the problems and plaintiffs' confidence in the vehicle is totally shaken.

148. The NCLL states, in relevant part: "[t]he Legislature finds that the purchase of a new motor vehicle is a major, high cost consumer transaction and the inability to correct defects in these vehicles creates a major hardship and an unacceptable economic burden on the consumer. It is the intent of this act to require the manufacturer of a new motor vehicle, or, in the case of a new motor vehicle that is an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier, to correct defects originally covered under warranty which are identified and reported within a specified period. It is the further intent of this act to provide procedures to expeditiously resolve disputes between a consumer and a manufacturer, co-manufacturer, or post-manufacturing modifier when defects in a new motor vehicle are not corrected within a reasonable time, and to provide to award specific remedies where the uncorrected defect substantially impairs the use, value, or safety of the new motor vehicle.

149. Under NCLL, the UCC and/or the MMWA, proof of the existence of a problem in the vehicle or of negligence on any defendants' part is not a prerequisite to a finding that the problems substantially impair the vehicle's use and/or value and/or safety.

150. To date, the manufacturer never repurchased the vehicle from plaintiffs pursuant to the NCLL.

151. Upon information and belief, defendants maintain a computerized database of all of the warranty repairs and resources for defendants' franchise dealerships to use to attempt to repair vehicle issues or nonconformities complained of by vehicle purchasers to said dealerships. Exhibit B.

152. Therefore, defendants provide technical support to franchise dealerships performing repair attempts under the warranty such as the dealer.  Exhibit B, p. 3.

153. Defendants require defendants' franchise dealerships to submit forms for reimbursement for warranty repairs, which include a description of the problem and the repairs being completed and those dealerships notify defendants of warranty issues.  Exhibit B, p. 4-5.

154. As explained above, every time a vehicle is brought to defendants' franchise dealerships for repairs under the warranty, said dealerships notify defendants of the issues that are the subject of the repair attempts and are frequently asked by said dealerships to authorize the performance of repair attempts (i.e., performance of labor and replacement of parts on the vehicle).

155. It is beyond question that, before the sale, other

purchasers of 450 GLEs reported issues with their vehicles

identical or substantially similar to the problems

experienced by plaintiffs to defendants' franchise

dealerships servicing those other vehicles.  Exhibits C-E.

156. It is also beyond question that, before the sale,

defendants issued at least four (4) technical service

bulletins discussing electrical issues with the vehicle and

that at least two (2) of those bulletins expressly referred

to no start problems with defendants' vehicles.

157. Upon information and belief, long before offering the

vehicle for sale, defendants – like other automotive

manufacturers – developed numerous internal information

technology storage systems to capture data about vehicle

defects.  Exhibit B, p. 12.

158. Upon information and belief, the employees of defendants'

management department had this knowledge readily available

to themselves and consulted same but refused to act thereon

by stopping the distribution and sale of 450 GLEs such as

the vehicle.

159. Instead, lured by profits over the well being and safety

of consumers and disinterested in offering full disclosure

to the public about the vehicle's problems, those employees

of defendants' management department intentionally

suppressed the data that they had at their disposal

regarding the defect.

160.    Indeed, at least one technical service bulletin
issued by the manufacturer and one or more posts placed
on online vehicle forums refer in particular to issues
with the 48 volt battery of 450 GLE vehicles.  Exhibits
C-F.

161. Upon information and belief, the cause of the defect is
suspected to be one in materials and workmanship.

162. For example, one automotive manufacturer estimated that
between 80 and 85 percent of all recalls were traceable to
supplier components.  Exhibit B, p. 13.

163. As indicated by the advisor via repair invoice #
M8CS35779, the programming of the vehicle (e.g., software
update) was also described as a cause of the problems.
Exhibit A.

164. As indicated by the advisor via repair invoice #
M8CS22526, the vehicle's battery was defective and required
replacement.  Exhibit A.

165. Upon information and belief, per repair invoice #
M8CS22526, the dealer faulted materials and workmanship
because during the warranty period, the poor construction
of the vehicle caused lose parts and/or a faulty door
control module was to blame for the problems.  Exhibit A.

166. The service department staff of the dealer told plaintiffs

that the vehicle's 48 volt battery was the cause of the
vehicle's problems but allegedly because of the demand for
those batteries which were claimed to be on backorder, it
took until 1-9-21 to get the vehicle repaired.  Exhibit A.

167. One of the bulletins issued by defendants appear to
discuss updating the vehicle's computer: "Update Xentry
with newest Add-Ons".  Exhibit F, Xentry Tips - functional
impairment of 48 V on-board electrical system.

168. Discovery about the nature of the alleged defect could
clarify the cause of the defect.[16]

169. As one District Court explained:[17] "At the motion to
dismiss stage, the preference in this District has been to
let Plaintiffs develop facts in discovery to flesh out the
precise source of the problem and their theory of the case.
*In re Subaru Battery Drain Prods. Liab. Litig.*, Civ. No.
20-3095, 2021 WL 1207791, at *12 (D.N.J. Mar. 31, 2021)…
*Alin v. Am. Honda Motor Co.*, Civ. No. 08-4825, 2010 WL
1372308, at *6 (D.N.J. Mar. 21, 2010). That is, the Amended
Complaint identifies ways in which the timing chain system

---

[16] *Alin v. Am. Honda Motor Co.*, No. 08-4825, 2010 WL 1372308,
at *9 (D.N.J. Mar. 31, 2010). Unlike this case, *Coba v. Ford
Motor Co.*, 932 F.3d 114 (3d Cir. 2019), *as amended* (July 26,
2019) is distinguishable, as it was decided on summary judgment
rather than at the pleading stage.
[17] *Opheim v. Volkswagen Aktiengesellschaft*, No. 20-02483 (D. N.J.
Jun. 25, 2021).

does not work. But the Amended Complaint does not pinpoint
whether that malfunction is only a consequence of design
choices or, as perhaps

discovery would reveal, a consequence of some problem in
the manufacturing process…. But principles of Rule 12(b)(6)
counsel that the better course is to deny the motion to
dismiss. On a Rule 12(b)(6) motion, a court must keep in
mind the nature of the plaintiff's claim and asymmetries in
access to relevant information. *See Garrett v. Wexford
Health*, 938 F.3d 69, 92-93 (3d Cir. 2019). We cannot expect
car owners to know the precise source of problems with
their cars, *i.e.*, whether a manufacturer purposefully
designed a car to function in a certain way or whether
something in the manufacturing process affected
functionality. Those facts are in the hands of Defendants,
so the lack of specific allegations along those lines
should not be fatal.  Moreover, whether the timing chain
system's defect is one of design or manufacturing is not
just a factual, but a legal conclusion. A plaintiff is not
bound by the legal theories in a complaint, and they can
change with discovery. *See Johnson v. City of Shelby*, 574
U.S. 10, 11 (2014) (per curiam) ("Federal pleading rules…
do not countenance dismissal of a complaint for imperfect
statement of the legal theory supporting the claim

asserted."); *Alin*, 2010 WL 1372308, at *4-5 (complaint did not require dismissal because the court need not adopt, at the pleading stage, any particular characterization of the claim). Accordingly, it is plausible (though by no means certain) that discovery will reveal the manufacturing process to be the source of the timing chain system, Plaintiffs do not exclusively press a design defect theory which would not be covered by the NVLW. *Timing Chain*, 2017 WL 1902160, at *12."

170. Per the complaint, to date, the manufacturer never refused any repairs to the vehicle because of a disclaimed design defect.  Exhibit A.

171. Instead, the vehicle's engine required repair and that the repairs were covered under the vehicle's express written warranty at no charge to plaintiffs but that it took over three months before plaintiffs learned that the vehicle would not be repaired under that warranty.  Exhibit A.

172. Moreover, bulletins covered the problem complained of by plaintiffs – so that the repair to the vehicle should have been covered under the warranty.  Exhibit F.

173. Defendants alternately take the position that they extended an express written warranty and don't deny issuing the bulletins but that they are able, when it suits them, to deny liability following repairs made at no cost.

Defendants previously covered 6 repair attempts under the warranty without any protest of those repairs being excluded by the warranty, defendants are estopped from denying that the problems aren't covered by the warranty.

174. Accordingly, defendants: (1) had knowledge of the problems long before plaintiffs purchased the vehicle; and (2), were asked by other consumers purchasing 450 GLEs to perform repair attempts to address the same or substantially similar problems.

175. The NCLL imposes various reporting requirements on manufacturers relative to vehicles with defects and on the manufacturer and DCA relative to vehicles repurchased by manufacturers as lemons.[18]

176. Those reporting requirements shall make it easier for plaintiffs, during the course of discovery in this case, to determine the class members' identities.

177. Pursuant to the NCLL regulations adopted by the DCA, the Division of Consumer Affairs shall maintain an index of all motor vehicle disputes by make and model and shall compile and maintain statistics indicating the record of manufacturer compliance with any settlement procedure decisions and the index and statistical record of

---

[18]. N.J.S.A. 56:12-44.

compliance shall be made available to the public.[19]

178. Pursuant to the NCLL, "a. If a motor vehicle is returned to the manufacturer, or, in the case of an authorized emergency vehicle, to the manufacturer, co-manufacturer, or post-manufacturing modifier, under the provisions of this act or a similar statute of another state or as the result of a legal action or an informal dispute settlement procedure, it shall not be resold or re-leased in New Jersey unless: (1) The manufacturer, co-manufacturer, or post-manufacturing modifier provides to the dealer, distributor, or lessor, and the dealer, distributor or lessor provides to the consumer, the following written statement on a separate piece of paper, in 10-point bold-face type: "IMPORTANT: THIS VEHICLE WAS RETURNED TO THE MANUFACTURER OR OTHER RESPONSIBLE PARTY BECAUSE IT DID NOT CONFORM TO THE MANUFACTURER'S OR OTHER PARTY'S WARRANTY FOR THE VEHICLE AND THE NONCONFORMITY WAS NOT CORRECTED WITHIN A REASONABLE TIME AS PROVIDED BY LAW;" (2) The dealer, distributor, or lessor obtains from the consumer a signed receipt certifying, in a conspicuous and understandable manner, that the written statement required under this subsection has been provided. The director shall prescribe

---

[19] N.J.A.C. 13:45A-26.15.

the form of the receipt. The dealer, distributor, or lessor may fulfill his obligation to obtain a signed receipt under this paragraph by making such a notation, in a conspicuous and understandable manner, on the vehicle buyer order form accompanying the sale or lease of that vehicle; and (3) The dealer, distributor, or lessor, in accordance with the provisions of section 1 of P.L.1993, c.21 (C.39:10-9.3), notifies the Chief Administrator of the Motor Vehicle Commission of the sale or transfer of ownership of the motor vehicle."[20]

179. As with the first amended complaint, this pleading does not allege any per se CFA violations – statutory or regulatory in nature.

180. Indeed, neither the first amended complaint nor this pleading ever included any counts pleading any causes of action alleging per se CFA statutory or regulatory violations.

181. However, disclosure during discovery of the reasons for other 450 GLE vehicles being branded lemons could reveal that one or more of the reasons were issues similar or identical to the problems and thereby confirm the knowledge and intent of the employees of defendants' legal and

---

[20] N.J.S.A. 56:12-35.

management departments.

182. One or more statutes pled herein provide for fee shifting for parties hiring counsel and prevailing under said statutes.

183. Accordingly, the counsel bringing this case serves as a private attorney general.[21]

184. Otherwise, consumers pursuing claims under fee shifting states might incur potentially considerable expense for a potentially small recovery.[22]

185. As indicated by multiple unsuccessful repair attempts, defendants' never found a solution to the problems in a reasonable period of time and may indeed never find a solution or if found, that discovery may not occur during the period of coverage provided via the vehicle's warranty, resulting in the need for costly repairs out of pocket for problems that were covered by the warranty and should have been fixed in a reasonable time during the warranty's duration at no cost to consumer but that defendants never fixed in a reasonable time and during

---

[21] See *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 268 (1997).

[22] See, e.g., *Skeer v. EMK Motors, Inc.*, 187 N.J. Super. 465, 470 (App. Div. 1982)(discussing fee shifting under the CFA); *Chattin v. Cape May Greene, Inc.*, 243 N.J. Super. 590, 610 (App. Div. 1990), aff'd o.b., 124 N.J. 520 (1992) (citing *Coleman v. Fiore Bros.*, Inc., 113 N.J. 594, 598 (1989))(same); *Furst v. Einstein Moomjy*, 182 N.J. , 21 (2004)(same).

that duration and plaintiffs failed to receive the
benefit of plaintiffs' bargain – e.g., a safe, reliable,
valuable vehicle warranted against yet discovered
problems or problems that could be addressed under the
warranty in a reasonable period of time.

186. Instead, before plaintiffs purchased the vehicle,
defendants had advanced knowledge, through the
complaints of other consumers purchasing or leasing 2020
450 GLEs or older model years of 450 GLEs, that those
vehicles had problems which defendants were unable to
successfully repair in a reasonable time.  Exhibits C-E.

187. A vehicle that won't start is clearly not safe – any
juror could easily reach that conclusion.  Exhibit F.

188. While no consumer may be entitled to a new vehicle that
is entirely trouble free mechanically, no manufacturer
should place into the stream of commerce a vehicle which
it knows suffers from specific problems and that cannot
be fixed after repeat repair efforts and that
substantially impair the vehicle's use, value and/or
safety.

189. The vehicle's warranty and the protections afforded to
consumer via the NCLL are crucial to the purchasers of
vehicles manufactured, assembled and distributed by
defendants to which the warranty an the NCLL applies, as

the warranty and the NCLL influences consumers' decisions to purchase vehicles covered by the warranty and NCLL.

190. As the Appellate Division explained:[23]  "[w]arranties developed in the law ... to protect the ordinary consumer who cannot be expected to have the knowledge or capacity ... to make adequate inspection of mechanical instrumentalities, like automobiles, and to decide for himself whether they are reasonably fit for the designed purpose." *Henningsen, supra,* 32 *N.J.* at 375, 161 *A.*2d 69. An express warranty for a new automobile is not provided gratuitously by the manufacturer or seller. The cost of the warranty is included in the cost of the product. The consumer has purchased the warranty along with the car. It is "part of the benefit of the bargain." *Thiedemann v. Mercedes–Benz USA, LLC,* 183 *N.J.* 234, 251, 872 *A.*2d 783 (2005).

191. Express warranties are used by manufacturers to increase the attractiveness of their products to consumers. The inclusion of warranties is not a result of corporate benevolence. Conversely, purchasers rely on warranties; they reasonably expect them to have meaning beyond a mere

---

[23] *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226 (App. Div. 2012).

promise of replacement.[24]

192. A warranty is intended to give consumers peace of mind that any problems with the vehicle arising during the applicable coverage periods of the warranty can and shall be addressed in a reasonable period of time and if not, that consumers shall have recourse to the law to seek damages such as the remedy of revocation of acceptance and the NCLL statutory refund.

193. Therefore, while a warranty is not a guarantee against all issues that may arise in the operation of a vehicle, the warranty forms an important marketing tool, providing a consumer peace of mind that problems with a warranted vehicle's operation, brought to the manufacturer's attention during that period, can and shall be fixed by the vehicle's manufacturer in a reasonable time.

194. However, in this case, before plaintiffs purchased the vehicle, defendants: (1) knew that the problems existed; (2) were unable to fix those problems in a reasonable time – as shown from warranty repair experience with 2020 and/or older model year 450 GLE owners that were equipped with parts similar or identical to those

---

[24] *Gladden v. Cadillac Motor Car Div.*, 83 N.J. 320 (1980)(Pashman, J., concurring).

installed in 2021 450 GLEs; and (3) proceeded to manufacture, assemble and distribute the vehicle into the stream of commerce with its warranty to its ultimate end user, plaintiffs.

195. Therefore, since certain 450 GLEs suffer from known issues that defy repair and since defendants had knowledge of those issues before distributing those 450 GLEs to dealerships for sale and lease to the public, the efficacy of the warranties issued with those 450 GLEs was in doubt before those 450 GLEs were sold and leased.

196. Accordingly, acting in bad faith, defendants lured plaintiffs to consider purchasing the vehicle, marketed and sold as it was with its warranty but without disclosure of the problems that were unable to be fixed in a reasonable time under the warranty.

197. Under the UCC "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."[25]

198. Further, every contract with a merchant for the sale of

---

[25] *N.J.S.A.* 12A:2-313(1)(a).

goods contains an implied warranty that the goods are fit for ordinary purposes for which the goods are used. This warranty is known as the implied warranty of merchantability.[26]

199. In addition to other remedies available to consumers under the UCC for a breach of warranty, a UCC remedy available to consumers when a manufacturer fails to fix a vehicle in a reasonable period of time is revocation of acceptance.[27]

200. By failing to fix the problems in a reasonable time, defendants violated the NCLL and breached the warranty and the implied warranty of merchantability that arose as a matter of law relative to the vehicle.

201. The vehicle's use, value and safety are substantially impaired by defendants' failure to fix the problems in a reasonable time.

202. The vehicle's value has suffered from diminution.

203. Diminution in value is a standard measure of damages in breach of warranty cases, such as here, where a revocation

---

[26] New Jersey Model Civil Jury Charge 4:22B.

[27] N.J.S.A. 12A:2-608; *General Motors Acceptance Corp. v. Jankowitz*, 216 N.J. Super. 313 (App. Div. 1987); *Realmuto v. Straub Motors*, 65 N.J. 336 (1974); *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226, 242 (App. Div. 2012); See also *Ventura v. Ford Motor Corp.,* 180 N.J. Super. 45, 53-54, 433 *A.*2d 801 (App. Div.1981).

of acceptance remedy is sought.[28]

204. Further, breach of warranty damages need not be established with exact certainty: "[M]ere uncertainty as to the quantum of damages is an insufficient basis on which to deny the non-breaching party relief. Although it complicates the precise calculation of damages, our courts have long held that "[p]roof of damages need not be done with exactitude. ... It is therefore sufficient that the plaintiff prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate."[29]

205. As explained in the Restatement (Second) of Contracts: Alternative to Loss in Value of Performance § 348 (Am. Law Inst. 1981), a small windfall to the injured party based on

---

[28] See, e.g., In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 816-17 (3d Cir. 1995) (emphasizing, in a class action suit, that section 2-714(1) of the UCC allows for damages "as determined in any manner which is reasonable"); *Perth Amboy Iron Works, Inc. v. Am. Home Assurance Co.*, 226 N.J. Super. 200, 219, 543 A.2d 1020 (App. Div. 1988); *McDonald v. Mianecki*, 79 N.J. 275, 282 n.1 (1979); accord *Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 13, 860 A.2d 435 (2004) (applying UCC principles to a consumer fraud case and concluding that the cost of replacing a damaged carpet was the appropriate measure of damages, as that method put the buyer in the position he would have been in if he had received a non-defective carpet).
[29] *Totaro, Duffy, Cannova and Co., LLC v. Lane, Middleton & Co., LLC*, 191 N.J. 1, 14, 921 A.2d 1100 (2007) (quoting *Lane v. Oil Delivery Inc.*, 216 N.J. Super. 413, 420, 524 A.2d 405 (App. Div. 1987) ).

an inability to prove exact damages should not defeat
recovery.

206. Also, the injured party need not prove that he or she
actually spent the money to repair the defect in order to
recover for the breach.[30]

207. The United States Supreme Court rejected the notion that a
jury may not estimate damages.[31]

208. As to the implied warranty of merchantability, that
warranty was breached because the vehicle was unfit for the
ordinary purpose for which such goods are used.

209. As reflected by the vehicle's repair history, before
filing suit, plaintiffs gave defendants multiple efforts to
cure the problems but defendants failed to fix the problems
in a reasonable time.  Exhibit A.

210. Moreover, as explained above, since defendants knew about
the problems at the time of purchase, defendants had ample
opportunity before the sale to cure the breach of warranty.

---

[30] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 22, 647 A.2d 454 (1994).

[31] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)("[a]lthough the factfinder is not entitled to base a judgment on speculation or guesswork, the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly").  See also *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. ----, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016).

211. The manufacturer failed to repurchase the vehicle from plaintiffs pursuant to the NCLL.

212. The NCLL states, in relevant part: "[t]he Legislature finds that the purchase of a new motor vehicle is a major, high cost consumer transaction and the inability to correct defects in these vehicles creates a major hardship and an unacceptable economic burden on the consumer. It is the intent of this act to require the manufacturer of a new motor vehicle, or, in the case of a new motor vehicle that is an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier, to correct defects originally covered under warranty which are identified and reported within a specified period. It is the further intent of this act to provide procedures to expeditiously resolve disputes between a consumer and a manufacturer, co-manufacturer, or post-manufacturing modifier when defects in a new motor vehicle are not corrected within a reasonable time, and to provide to award specific remedies where the uncorrected defect substantially impairs the use, value, or safety of the new motor vehicle.

213. Because of defendants' failure to fix the vehicle in a reasonable time and defendants' failure to provide plaintiffs with a revocation of acceptance remedy or a

statutory repurchase under the NCLL, plaintiffs must now

seek damages against defendants.

214. To the extent that via the vehicle's warranty booklet,

defendants attempt to disclaim liability for consequential

damages and thereby limit the warranty to one simply

providing a repair remedy, such an effort is fruitless.

215. Such limitation language fails to negate plaintiffs'

damages claims because where a limited repair remedy fails

of its essential purpose (i.e., failing to fix a vehicle in

a reasonable time), the repair remedy limitation is no

impediment to the consumer's recovering consequential

damages.   This is because, to be effective, a repair

remedy must be provided within a reasonable period of time.

Otherwise, the buyer loses the substantial benefit of the

buyer's purchase and is thus entitled to seek damages

against the offending party.[32]

216. "It is to be emphasized that we are here dealing with

words of exclusion or limitation contained in a contract

document that is not the product of mutual negotiation or

cooperative draftsmanship. The purchaser of a mass-produced

---

[32] *G.M.A.C. v. Jankowitz*, 216 N.J. Super. 329, 330-331 (App. Div. 1987); *Chatlos Systems v. NCR Corp., Inc.*, 635 F.2d 1081, 1085-1086 (3rd Cir. 1980); N.J.S.A. 12A:2-719(2); *Smith v. Chrysler*, 1990 WL 65700 (E.D.Pa. 1990); *Beal v. General Motors Corporation*, 354 F. Supp. 423, 426, 427 (1973).

consumer article with a standard warranty form or booklet, as in this case, has no opportunity to bargain over its terms. Warranties are prepared unilaterally by the company and distributed automatically with the product on a mass basis. *Henningsen v. Bloomfield Motors, Inc.*, supra, 32 N.J. at 390.  The consumer must ordinarily place considerable reliance upon the fairness and good faith of the manufacturer and its dealers. It has therefore been recognized that the reliance which a consumer necessarily reposes in a seller engenders a corresponding responsibility on the seller. See id. at 399." [33]

217. As to the NCLL and warranty claims, this isn't a case a defect but rather, the relief to which consumers are entitled when a manufacturer fails to provide a limited warranty repair remedy in a reasonable time.

218. Under NCLL, the UCC and/or the MMWA, proof of the existence of a problem in the vehicle or of negligence on any defendants' part is not a prerequisite to a finding that the problems substantially impair the vehicle's use and/or value and/or safety. [34]

---

[33] *Gladden v. Cadillac Motor Car Div.*, 83 N.J. 320 (1980).
[34] As stated by the court in *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226 (App. Div. 2012): "the plaintiff in a warranty action need not establish the existence of a defect; the failure of the goods to perform as warranted is sufficient." *Spring Motors, supra,* 98 *N.J.* at 586, 489 *A.*2d 660; *accord Gen. Motors*

219.  To establish the existence of a defect or nonconformity impairing the product's vehicle's use or value, plaintiffs need only identify the effect of a defect rather than pinpointing its cause.[35]

220. As further explained by the Appellate Division, the "intent" of the Lemon Law is to "provide procedures to expeditiously resolve disputes between a consumer and a manufacturer when defects in a new motor vehicle are not corrected within a reasonable time," and to provide "specific remedies where the uncorrected defect substantially impairs the use, value, or safety of the new motor vehicle." Ibid. Toyota's construction of the statute would turn this expeditious administrative proceeding into a full blown litigation entangling the consumer in the intricacies of design defects and other complexities of

---

*Acceptance Corp. v. Jankowitz,* 216 *N.J. Super.* 313, 336, 523 *A.*2d 695 (App. Div.1987). Proof of causation must still be shown in a case based on breach of an express warranty, but "mere failure of promised performance is enough without proof of any defect." *Realmuto v. Straub Motors, Inc.,* 65 *N.J.* 336, 343, 322 *A.*2d 440 (1974) (citing *Collins v. Uniroyal, Inc.,* 64 *N.J.* 260, 262, 315 *A.*2d 16 (1974)). In *Jankowitz, supra,* 216 *N.J. Super.* at 320–22, 336–37, 523 *A.*2d 695, on facts that resemble those of this case, we held that the buyer of a new car was not required to produce expert evidence to prove that the manufacturer's and the seller's failure to repair the car was a breach of the express warranty they had provided.  See also *Ventura v. Ford Motor Corp.,* 180 *N.J. Super.* 45, 53–54, 433 *A.*2d 801 (App. Div.1981).

[35] *Christelles v. Nissan Motor Corp.,* 305 N.J. Super. 222, 228-229 (App. Div. 1997).

product liability law. The Legislature clearly intended to spare the unfortunate buyer of a "lemon" those hazards and costs.[36]

221. Moreover, to establish a breach of warranty, plaintiffs need not show that defendants acted negligently or in bad faith.[37]

222. The MMWA includes a private cause of action for consumers damaged by a breach of warranty as follows: "(d) Civil action by consumer for damages, etc.; jurisdiction; recovery of costs and expenses; cognizable claims (1) Subject to subsections (a)(3) and (e), a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief— (A) in any court of competent jurisdiction in any State or the District of Columbia; or (B) in an appropriate district court of the United States, subject to paragraph (3) of this subsection. (2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the

---

[36] *Berrie v. Toyota Motor Sales, USA, Inc.*, 630 A.2d 1180, 267 N.J. Super. 152 (App. Div. 1993).
[37] *Chatlos Systems v. NCR Corp., Inc.*, 635 F.2d 1081, 1085 (3rd Cir. 1980).

court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

223. The MMWA envisions class action treatment of claims brought pursuant to the MMWA.[38]

224. In this case, since this pleading doesn't name over 100 putative class action representatives, this court and not any district court, has jurisdiction over the dispute – an issue that cannot be circumvented by the Class Action Fairness Act (CAFA).[39]

225. Pursuant to 15 U.S.C. § 2310(e), plaintiffs are entitled to bring this class action and are not required to give

---

[38] 15 U.S.C. § 2310.
[39] 15 U.S.C. § 2310. As to class actions, MMWA's requirement to name one hundred plaintiffs must be met independently of CAFA's jurisdictional standard." *Floyd v. Am. Honda Motor Co.*, 2018 WL 6118582, at *3 (C.D. Cal. June 13, 2018) (Wilson, J.); *MacDougall v. Am. Honda Motor Co.*, 2017 WL 8236359, at *4 (C.D. Cal. Dec. 4, 2017) (Guilford, J.); *Cadena v. Am. Honda Motor Co.*, 2019 WL 3059931, at *11 (C.D. Cal. May 29, 2019) (Fitzgerald, J.). "CAFA—a basis for federal courts to exercise jurisdiction over state law disputes between diverse parties— doesn't fill in the gaps for missing substantive requirements of a federal law." *MacDougall*, 2017 WL 8236359, at *4.

defendants notice and an opportunity to cure until such time as the court determines the representative capacity of plaintiffs.

226. The CFA is a statute that is to be applied broadly given the statute's remedial purpose.[40]

227. Under the CFA, "(d) The term "person" as used in this act shall include any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof;" N.J.S.A. 56:8-1(d).

228. The parties meet the definition of "person" as set forth in N.J.S.A. 56:8-1(d).

229. Under the CFA, "[t]he term "advertisement" shall include the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof or to make any loan;...." N.J.S.A. 56:8-

---

[40] *Lemelledo v. Beneficial Management Corp. of Am.*, 150 N.J. 255, 264 (1997); *Blatterfein v. Larken Associates*, 323 N.J. Super. 167, 178 (App. Div. 1999).

1(a).

230. Under the CFA, "[t]he term "merchandise" shall include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale;…." N.J.S.A. 56:8-1(c).

231. The vehicle is merchandise subject to the CFA.

232. Under the CFA, the term "sale" shall include any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute. N.J.S.A. 56:8-1(e).

233. The sale of the vehicle constitutes a "sale" under the CFA.

234. Further, N.J.S.A. 56:8-2 states, in pertinent part: "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice…." N.J.S.A. 56:8-2.

235. The CFA is designed to protect the public even when a merchant acts in good faith.[41]

236. As to any individual defendants facing CFA violations pled in this pleading, under the CFA, there is no need to pierce any corporate or company veil; the Court instead focuses on individual defendants' misconduct supporting CFA violations.

237. Therefore, assuming for argument's sake that the individual defendants named to this case operated via one or more valid corporations or companies, the corporate veil does not insulate corporate officers or employees or company managing members or employees from CFA liability.[42]

238. Defendants' course of conduct in this dispute provides evidence of a section 2 knowing omission violation of N.J.S.A. 56:8-2 (section 2) via unlawful practices, both in the initial transaction and in subsequent performance.

239. Relative to the vehicle's problems, which were known to defendants before plaintiffs purchased the vehicle and which defendants failed to disclose to plaintiffs, defendants committed a knowing omission involving the following: (1) nondisclosure—"a fact existing at the time of the transaction was not disclosed"; (2) materiality of

---

[41] *Cox v. Sears*, 138 N.J. 2, 16 (1994).
[42] *Allen v. V & A Bros.*, 208 N.J. 114 (2011).

fact undisclosed—"the fact, if disclosed, would be important to the plaintiffs' decision to purchase or to the decision of any reasonable buyer"; (3) knowledge—defendants "knew the fact and its importance at the time of the transaction"; and (4) intentional concealment—defendants withheld the information intending for the buyer to make a decision without knowing the fact.

240. Defendants engaged in an "omission" - the act of neglecting to do what the law requires and liability is imposed for such inaction because of the existence of a duty to act under the circumstances.[43]

241. Before the sale and via the warranty reimbursement records at their disposal from warranty repairs paid for by defendants to their franchise dealerships, the employees of defendants' management department had the information necessary to conclude that the materials and workmanship defect was not a mere isolated occurrence but rather existed in all 450 GLEs and should be addressed via a voluntary recall.

242. However, the employees of defendants' management department refused to take action because defendants would benefit more from the continuing sale of 450 GLEs.

---

[43] New Jersey Model Civil Jury Charge 4:43.

243. Vehicle purchasers such as plaintiffs have viable knowing omission claims where, as here, a manufacturer distributes a vehicle with a problem not readily discoverable by customers but of which the manufacturer was aware yet failed to disclose to those customers.[44]

244. Unlike the usual vehicle put into the steam of commerce with a warranty, the manufacturer was not in good faith insuring against a risk but actually knew *with certainty* that the product at issue or one of its components was going to fail.[45]

245. Plaintiffs need not prove their case on the pleadings but rather, must merely allege details showing that it is

---

[44]. *Robinson v. Kia Motors Am., Inc.*, No. 13-006, 2015 U.S. Dist. LEXIS 121755 (D.N.J. Sept. 11, 2015). The court explained:  In addition to the allegations of knowledge described above, Plaintiffs further assert that Kia was aware of the defect based on (1) online customer complaints about the alleged problem, and (2) a technical service bulletin ("TSB") issued by Defendants . . . . Specifically, Plaintiffs direct the Court to specific websites that they allege contain complaints about the crankshaft pulley bolt problem. (*Id.*). They include detailed information regarding the names of the websites and the number and nature of the complaints. (*Id.*). In addition, Plaintiffs allege that a TSB issued in June 2007 that "identified the problem discussed in this complaint stating: '[t]he Crankshaft Pulley bolt may become loose, especially if improperly torqued during routine service . . . .'" At least one New Jersey Plaintiff, Robinson, purchased her vehicle after the June 2007 TSB was issued . . . . Its "publication adds further plausibility to [plaintiffs'] allegations that [d]efendants had knowledge of . . . the alleged defect."
[45]. *Coba v. Ford Motor Co.*, No. 12-1622 (KM) (MAH), 2017 U.S. Dist. LEXIS 123546 (D.N.J. Aug. 4, 2017).

*plausible* that defendants knew of the problems before the sale and yet failed to disclose same to plaintiffs.[46]

246. There is evidence of defendants' foreknowledge of failure because defendants knew the problems plagued successive model years of 450 GLEs (as evidenced by comments on the aforesaid vehicle owner forum indicating the repeated reporting of failures for identical or near identical or related reasons) and yet failed to correct the problems for subsequent model year lines.[47]

247. In addition to the aforesaid misconduct referenced above, during the course of the transaction or during subsequent performance of obligations, defendants may have committed

---

[46] *Leon v. Rite Aid Corp.*, 340 N.J. Super. 462, 472 (App. Div. 2001).  See also *Printing Mart v. Sharp Elecs.Corp.*, 116 N.J. 739, 746 (1989)("…in determining whether dismissal under Rule 4:6-2(e) is warranted, the court should not concern itself with the plaintiffs' ability to prove its allegations.").

[47]. *T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-04209 (WHW) (CLW), 2015 U.S. Dist. LEXIS 29678 (D.N.J. Mar. 11, 2015). The court explained: Plaintiff buttresses this allegation with a research report from CK Commercial Vehicles, published before Plaintiff purchased any of its tractors, which indicates that 37% of a group of users of tractors with Cummins engines experienced "a high rate of cracked DPF filters . . . ." [T]he amended complaint also alleges that Defendants learned about these defects through "[t]he on-board diagnostics systems . . . that store trouble or fault codes and provide data to Defendants' and/or their authorized service providers' diagnostic computers." On a motion for class certification of the CFA claims, the district court held that the plaintiffs' CFA claims sufficed. As to ascertainable loss, one plaintiff incurred over $80,000 in post-warranty repair costs. *T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-4209 (WHW) (CLW), 2015 U.S. Dist. LEXIS 29678 (D.N.J. June 7, 2016).

other types of CFA violations, such as failure to make

other mandatory disclosures or the like – misconduct which

may be uncovered during the course of discovery.

248. To the extent that substantial aggravating circumstances

are necessary for any of the aforesaid CFA violations, all

of the aforesaid misconduct amounted to substantial

aggravating circumstances over and above a mere breach of

contract and/or breach of warranty and therefore, said

misconduct was sufficient to trigger one or more CFA

violations.

249. Substantial aggravating circumstances may include,

'existence of bad faith or lack of fair dealing.'"[48]

250. Substantial aggravating circumstances are present in this

case because defendants, possessing knowledge of the

vehicle's predelivery problems, acted in bad faith and

failed to deal fairly with plaintiffs because defendants:

(1) put into the stream of commerce and continued to offer

the vehicle for sale to consumers such as plaintiffs while

failing to disclose the vehicle's problems; (2) were aware

that the problems would manifest themselves within the

---

[48.] *JWQ Cabinetry Inc. v. Granada Wood & Cabinets Inc.*, No. 13-4110 (FLW), 2015 U.S. Dist. LEXIS 31730 (D.N.J. Mar. 16, 2015) (citing *Petri Paint Co., Inc. v. OMG Ams., Inc.*, 595 F. Supp. 2d 416, 420 (D.N.J. 2008)) (citing, in turn, *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994)).

warranty period and that the vehicle would fail yet failed to disclose that information to plaintiffs; and (3) provided repeated repairs that defendants knew would not fix the vehicle or fix the vehicle in a reasonable period of time while failing to disclose such fact to plaintiffs and while failing to simply provide plaintiffs with a UCC revocation of acceptance remedy or NCLL statutory repurchase remedy.[49]

251. When purchasing the vehicle, plagued as it is by the problems of which the manufacturer was aware of presale, plaintiffs failed to receive the benefit of plaintiffs' bargain.  The vehicle's value is substantially impaired by the predelivery problems of which plaintiffs only became aware after taking delivery of the vehicle.

252. Plaintiffs had the vehicle examined by a mechanic expert and that expert determined that the vehicle suffered a

---

[49] See, e.g., *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 443 (D.N.J. 2012) (citing *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 111-12 (App. Div. 2006); *Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 501 (D.N.J. 2009); *Kuzian v. Electrolux Home Prods., Inc.*, No. 12-3341 (NLH/AMD), 2013 U.S. Dist. LEXIS 44050, at *29-30 (D.N.J. Mar. 27, 2013)(A putative class of plaintiffs alleged that defective ice makers failed to produce ice, leaked water into the refrigerators causing the electrical components to short out and malfunction, thereby caused the refrigerators to warm to unsafe temperatures and that the defective ice makers and resulting leaks caused food to spoil and caused damage to flooring, walls and other personal property beyond the refrigerator itself.).

diminution in value and that the defect affects the

vehicle's use, value and safety.  Exhibit H.

253. That diminution in the vehicle's value due to its repair

history establishes the basis for an ascertainable loss of

money or property proximately caused by the CFA violations

detailed above that is able to be ascertained within a

reasonable degree of certainty.[50]

254. The potential for future repair costs to attempt to fix

the problems once the warranty is over is evidence of an

out of pocket ascertainable loss of money that is able to

be ascertained within a reasonable degree of certainty.[51]

Where, as here, someone faces or expects to incur an out of

pocket loss, such a loss equates with an ascertainable loss

sufficient to support liability under the CFA.[52]

---

[50]. *Bang v. BMW of N. Am., LLC*, No. 15-6945, 2016 U.S. Dist.
LEXIS 166329 (D.N.J. Dec. 1, 2016). The court explained: Here,
Plaintiffs have alleged injuries that have already occurred, as
well as imminent future injury. Specifically, all Named
Plaintiffs have alleged economic injury in the form of
diminished resale value of their vehicles. In addition,
Plaintiffs spent time taking their vehicles to BMW repair
centers. Several Plaintiffs have also incurred out-of-pocket
costs to purchase extra oil and replacement batteries.
Accordingly, they have satisfied Article III's injury in fact
requirement. *Bang v. BMW of N. Am., LLC*, No. 15-6945, 2016 U.S.
Dist. LEXIS 166329 (D.N.J. Dec. 1, 2016).
[51] *T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-4209 (WHW)
(CLW), 2015 U.S. Dist. LEXIS 29678 (D.N.J. June 7, 2016).(one
plaintiff incurred over $80,000 in post-warranty repair costs.).
[52] See *Cox v. Sears Roebuck & Co.*, 138 N.J. 2 (1994); *Thiedemann
v. Mercedes-Benz USA*, 183 N.J. 234 (2005).  Under the CFA one
does not need to actually incur the loss to sufficiently allege

255. Making payments on a vehicle while it is being repaired for approximately 47 days is evidence of an out of pocket ascertainable loss – i.e., paying for a vehicle that is unable to be used.

256. Being deprived of the use of a vehicle while it is undergoing repairs is an ascertainable loss of property. See N.J.S.A. 56:8-2.

257. Plaintiffs are considering purchasing substitute transportation to replace the vehicle and if plaintiffs do so, the cost of that substitute transportation will be evidence of an out of pocket ascertainable loss.

258. If plaintiffs rent a vehicle or pay for public transportation or rideshares or taxi so that plaintiffs don't have to drive an unreliable vehicle, those costs will be evidence of an out of pocket ascertainable loss.

259. Had plaintiffs received disclosure of the problems before purchasing the vehicle, plaintiffs would have never paid out of pocket for the vehicle and that purchase price – paid for a vehicle with problems that can't be fixed in a reasonable time or perhaps ever under the warranty - establishes an out of pocket ascertainable loss of money that is able to be ascertained within a reasonable degree

---

same in a pleading.  See *Thiedemann v. Mercedes-Benz USA*, 183 N.J. 234 (2005).

of certainty.[53]

260. Because plaintiffs suffered an ascertainable loss as aforesaid, treble damages are available for the CFA aforesaid CFA violations.[54]

261. Equitable relief is available in the form of a full refund and a judgment or order declaring the aforesaid misconduct as illegal.[55]

262. In addition, a statutory refund is sought – that is, relief pursuant to the CFA's refund provision, which states: "Any person violating the provisions of the within act shall be liable for a refund of all moneys acquired by means of any practice declared herein to be unlawful.[56]  The refund of moneys herein provided for may be recovered in a private action or by such persons authorized to initiate actions pursuant to P.L.1975, c. 376 (C. 40:23-6.47 et

---

[53]· *BK Trucking Co. v. PACCAR, Inc.*, No. 15-2282 (JBS/AMD), 2016 U.S. Dist. LEXIS 85149 (D.N.J June 30, 2016)(Vehicle buyers claimed vehicles equipped with emission treatment system are defective and render plaintiffs' vehicles inoperable due to the engines' constant failure despite repeated warranty repair and the precise details of those systems are in the exclusive control of defendants. Plaintiffs have further alleged that, if defendants had disclosed to them the nature of the ATS and its impact on the engine, they would not have bought vehicles equipped with the engine or would not have paid over $100,000 for them).
[54] N.J.S.A. 56:8-19.
[55] N.J.S.A. 56:8-19.
[56] N.J.S.A. 56:8-2.11.

seq.).[57]"   The New Jersey Supreme Court explained the separate cause of action available for refunds as follows: "The CFA vests the Attorney General with jurisdiction to enforce its provisions through a variety of mechanisms, N.J.S.A. 56:8-3 to -8, -11, -15 to -18, & -20, but it also provides individual consumers with a cause of action to recover refunds, N.J.S.A. 56:8-2.11 to -2.12, and treble damages for violations, whether in good faith or otherwise, N.J.S.A. 56:8-19."[58]

263. Pursuant to the CFA, an award of counsel fees and litigation costs is also sought.[59]

264. One or more statutes pled herein provide for fee shifting for parties hiring counsel and prevailing under said statutes.

265. Accordingly, the counsel bringing this case serves as a private attorney general.[60]

266. Otherwise, consumers pursuing claims under fee shifting states might incur potentially considerable expense for a

---

[57] N.J.S.A. 56:8-2.12.  The last reference in this provision to "P.L.1975, c. 376 (C. 40:23-6.47 et seq.)" refers to actions by the offices of the Department of Consumer Affairs.
[58] *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255 (1997).
[59]. *Artistic Lawn & Landscape Co., Inc. v. Smith*, 381 N.J. Super. 75, 89 (Law Div. 2005) (citing *BJM Insulation & Constr., Inc. v. Evans*, 287 N.J. Super. 513 (App. Div. 1996)).
[60] See *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 268 (1997).

potentially small recovery.[61]

267. Plaintiffs bring this putative class action for damages, repurchases, refunds, equitable and injunctive relief on behalf of themselves and applicable New Jersey citizens.

268. More specifically and subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, plaintiffs propose the following class of persons who purchased or leased a 2021 or older 450 GLE vehicle (class vehicle) manufactured or assembled or distributed by defendants, with the vehicle being purchased, leased or registered in New Jersey.

269. Excluded from the class are: (a) defendants, any entity in which defendant has a controlling interest and its legal representatives, officers, directors, employees, assigns and successors; (b) the Judges to whom this case is assigned and any member of the Judges' staff or immediate family; and (c) class counsel.

270. Plaintiffs seek only damages and injunctive relief on behalf of themselves and the class members. Plaintiffs disclaim any intent or right to seek any recovery in this

---

[61] See, e.g., *Skeer v. EMK Motors, Inc.*, 187 N.J. Super. 465, 470 (App. Div. 1982)(discussing fee shifting under the CFA); *Chattin v. Cape May Greene, Inc.*, 243 N.J. Super. 590, 610 (App. Div. 1990), aff'd o.b., 124 N.J. 520 (1992) (citing *Coleman v. Fiore Bros.*, Inc., 113 N.J. 594, 598 (1989))(same); *Furst v. Einstein Moomjy*, 182 N.J. , 21 (2004)(same).

action for personal injuries, wrongful death, or emotional distress suffered by plaintiffs and/or the class members.

271. Defendants are in exclusive possession, custody and control of the list of persons who were class members in the prior case and any other cases.

272. While there may be other cases pending against defendants, upon information and belief, the proposed class members' claims in this matter don't overlap with those other pending cases.

273. It isn't the intent to have overlapping classes and any overlap will be ameliorated through amendment if facts show that they do overlap.

274. Defendants' actions are not isolated.

275. Defendants' actions have affected similarly situated individuals throughout the State of New Jersey.

276. Defendants acted on grounds generally applicable to the class members, thereby justifying relief against defendants for the class members as whole.

277. Plaintiffs are members of the class that they seek to represent.

278. The class is believed to number at least hundreds, if not thousands, of persons and their joinder is impracticable, except by via a class action.

279. The disposition of the claims of the class in a class

action will benefit both the parties and the Court.

280. There are questions of law and/or fact common to the class predominating over any question affecting only individual class members as to whether defendants are liable to plaintiffs for violation of applicable law. For instance, are defendants liable for the class action claims pled in the complaint?

281. Class certification is also appropriate because defendants acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to plaintiffs and the class members.

282. Specifically, plaintiffs seek injunctive relief via a court judgment or order requiring an end to the unlawful practices and/or the issuance of a corrective or explanatory notice to the class members.

283. Plaintiffs' claims are typical of the claims of the class insofar as named class representatives and the members of the class were similarly exposed to the statutory harms alleged herein and were similarly injured and/or face similar risks therefrom.

284. The proposed class representatives state a claim upon which relief can be granted that is typical of the claims of absent class members.  If brought and prosecuted individually, the claims of each class member would

necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

285. Plaintiffs will fairly and adequately represent the interests of the class insofar that the plaintiffs' claims are typical of those of the class members.

286. Plaintiffs are committed to the vigorous representation of the class members.

287. Plaintiffs retained counsel experienced and skilled in consumer law and class action litigation.

288. Plaintiffs have no conflict of interest in the maintenance of this class action.

289. If the matter is maintained as a class action, it shall provide for a fair and efficient adjudication of this dispute.

290. The claims and remedial theories pursued by the named class representative are sufficiently aligned with the interests of absent class members to ensure that the individual claims of the class will be prosecuted with diligence and care by the individual plaintiffs as class representatives.

291. Contrawise, especially in view of the small dollar amounts in controversy relative to the individual plaintiffs' claims, it would be impracticable and undesirable for each

member of the class who suffered harm to bring a separate action.

292. Further, the maintenance of separate actions in lieu of the instant proposed class action would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications.

293. Contrawise, a single class action such as the instant proposed class action can determine the rights of all class members while economizing judicial resources.

294. Moreover, as plaintiffs invoked consumer protection statutes and have pled a prima facie case for the violation of same, the policy goals behind those consumer protection statutes provide further reason for permitting class action certification of the instant action.

295. The benefits of adjudicating this case via a class action far outweigh any difficulties in management of the case as a class action.

296. Class action treatment of this case is a superior method for the fair and efficient adjudication of this dispute because:

- individual claims by the class members are impractical as the costs of pursuit far exceed what any one plaintiff or class member has at stake;

- as a result, there has been no other litigation over the controversies herein;

- individual members of the class have no interest in prosecuting and controlling separate actions; and

- the proposed class action is manageable.

- the proposed class is readily ascertainable.

297. Certification of the class under R. 4:32 or Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate because defendants acted on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

298. Certification of the class under R. 4:32 or Rule 23(b)(3) of the Federal Rules of Civil Procedure is appropriate in that: (a) the questions of law or fact common to the members of the class predominate over any questions affecting an individual member; and (b) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

299. Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual lawsuits would entail.

300. Absent a class action, many members of the class will

likely not even obtain relief, whether because they are unaware of their right to relief from the harm caused by defendants' illegal practices, due to the prohibitive time and monetary cost inherent in individual litigation, or otherwise.

301. While the exact number of class members is unknown to plaintiffs at this time and can only be determined by appropriate discovery, membership in the class is ascertainable based upon the records maintained by defendants and governmental officials.

302. Upon information and belief, during the relevant time periods, over one hundred of the class vehicles, if not thousands of class vehicles, were sold, leased or registered in New Jersey.

303. Therefore, the class members are so numerous that individual joinder of all class members is impracticable under R. 4:32 or Fed. R. Civ. P. 23(a)(1).

304. Plaintiffs' claims are typical of the claims of the class members whom they seek to represent under R. 4:32 or Fed. R. Civ. P. 23(a)(3) because plaintiffs and each class member have a vehicle with the same problems.

305. Plaintiffs will fairly and adequately represent and protect the interests of the class members as required by R. 4:32 or Fed. R. Civ. P. 23(a)(4).

306. Plaintiffs are adequate representatives because their interests do not conflict with the interests of the class members and intend to vigorously prosecute this case.

307. Further, plaintiffs retained counsel (i.e., Lewis Adler and Paul DePetris) competent and experienced in complex class action litigation, including putative automotive warranty class action litigation and New Jersey CFA litigation and who together certified at least eight (8) class actions and intend to vigorous prosecute this case.

308. Therefore, the interests of the class members will be fairly and adequately protected.

309. A class action is appropriate under R. 4:32 or Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to class members predominate over any questions affecting only individual members and a class action is superior to any other available means for fairly and efficiently adjudicating the controversy.

310. The class members' interests in individually controlling the prosecution of separate actions is low given the magnitude, burden, and expense of individual prosecutions against large merchants such as defendants.

311. Plaintiffs nor their counsel are aware of any pending litigation concerning this controversy already begun by any of the class members.

312. It is desirable to concentrate this litigation in this forum to avoid burdening the courts with individual lawsuits.

313. As interpreted by New Jersey courts, New Jersey consumer statutes lend themselves to class action treatment, lest viable individualized consumer claims go unprosecuted due to the dubious utility of prosecuting them on individual bases.

314. Further, individualized litigation presents a potential for inconsistent or contradictory results and increases delay and expense to all parties and the court system presented by the legal and factual issues of this case.

315. The proposed class action has no management difficulties.

316. Defendant's records and the records available publicly will easily identify the class members.

317. As the problems are common to all the class vehicles, the same documents and testimony shall prove plaintiffs' and the class members' claims.

318. If the case proceeds as a class action, the parties and the court system shall benefit via a single adjudication, economies of scale and comprehensive supervision by a single court.

319. A class action is appropriate under R. 4:32 or Fed. R. Civ. P. 23(b)(2) because, as detailed above, defendants

acted or refused to act on grounds applicable  generally to

the class members, so that final injunctive relief or

corresponding declaratory relief is appropriate as to all

class members.

**COUNT 1**

**VIOLATION OF THE NEW JERSEY NEW CAR LEMON LAW**

**PLED BY PLAINTIFFS AND THE CLASS AGAINST THE MANUFACTURER**

320. The allegations contained in the previous paragraphs are repeated as if fully set forth.

321. This count is pled by plaintiffs and the class against the manufacturer.

322. Pursuant to N.J.S.A. 56:12-31, et seq., plaintiffs reported the problems and/or nonconformities with the vehicle to the manufacturer via the dealer and/or the repairing dealers (the dealers repairing the vehicle) directly to the manufacturer and thereby gave the manufacturer a reasonable number of opportunities to repair the vehicle.

323. After said notification and/or a reasonable number of repair attempts to the vehicle as performed by the manufacturer (either itself or via the dealer and/or repairing dealers), the manufacturer was unable to repair the problems and/or nonconformities in a reasonable period of time.

324. In violation of N.J.S.A. 56:12-29, et seq., the problems and/or nonconformities substantially impair or impaired the vehicle's use, value and/or safety.

325. The NCLL states, in relevant part:[62]  "[i]f, during the period specified in section 3 of this act, the manufacturer, or, in the case of an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier, of that part of the motor vehicle containing the nonconformity, or its dealer or distributor, is unable to repair or correct the nonconformity within a reasonable time, the manufacturer, comanufacturer, or post-manufacturing modifier shall accept return of the motor vehicle from the consumer. (1) In the case of a motor vehicle, other than an authorized emergency vehicle as set forth in paragraph (2) of this subsection, the manufacturer shall provide the consumer with a full refund of the purchase price of the original motor vehicle including any stated credit or allowance for the consumer's used motor vehicle, the cost of any options or other modifications arranged, installed, or made by the manufacturer or its dealer within 30 days after the date of original delivery, and any other charges or fees including, but not limited to, sales tax, license and registration fees, finance charges, reimbursement for towing and reimbursement for actual expenses incurred by the consumer for the rental of

---

[62] N.J.S.A. 56:12-32.

a motor vehicle equivalent to the consumer's motor vehicle
and limited to the period during which the consumer's motor
vehicle was out of service due to the nonconformity, less a
reasonable allowance for vehicle use. (2) In the case of an
authorized emergency vehicle, the manufacturer, co-
manufacturer, or post-manufacturing modifier shall provide
the consumer with a full refund of the purchase price of
the original emergency vehicle, depending on the source of
the nonconformity, including any stated credit or allowance
for the consumer's used emergency vehicle, as well as any
other charges or fees, including, but not limited to, sales
tax, license and registration fees, reimbursement for
towing and reimbursement for actual expenses incurred by
the consumer for the rental of a substitute emergency
vehicle, if applicable, for the period during which the
consumer's emergency vehicle was out of service due to the
nonconformity. (3) Nothing in this subsection shall be
construed to preclude a manufacturer, co-manufacturer, or
post-manufacturing modifier from making an offer to replace
the vehicle in lieu of a refund; except that the consumer
may, in any case, reject an offer of replacement and demand
a refund. Refunds shall be made to the consumer and
lienholder, if any, as their interests appear on the
records of ownership maintained by the Chief Administrator

of the New Jersey Motor Vehicle Commission. In the event that the consumer accepts an offer to replace the motor vehicle in lieu of a refund, it shall be the manufacturer's, co-manufacturer's, or postmanufacturing modifier's responsibility to insure that any lien on the returned motor vehicle is transferred to the replacement vehicle. b. A consumer who leases a new motor vehicle shall have the same remedies against a manufacturer, co-manufacturer, or post-manufacturing modifier under this section as a consumer who purchases a new motor vehicle. If it is determined that the lessee is entitled to a refund pursuant to subsection a. of this section, the consumer shall return the leased vehicle to the lessor or manufacturer, co-manufacturer, or post-manufacturing modifier, and the consumer's lease agreement with the motor vehicle lessor shall be terminated and no penalty for early termination shall be assessed. The manufacturer, co-manufacturer, or post-manufacturing modifier shall provide the consumer with a full refund of the amount actually paid by the consumer under the lease agreement, including any additional charges as set forth in subsection a. of this section if actually paid by the consumer, less a reasonable allowance for vehicle use. The manufacturer, comanufacturer, or post-manufacturing modifier shall

provide the motor vehicle lessor with a full refund of the vehicle's original purchase price plus any unrecovered interest expense, less the amount actually paid by the consumer under the agreement. Refunds shall be made to the lessor and lienholder, if any, as their interests appear on the records of ownership maintained by the Chief Administrator of the Motor Vehicle Commission.

326. While plaintiffs, via plaintiffs' counsel, offered to return the vehicle to the manufacturer, to date and in violation of N.J.S.A. 56:12-32, the manufacturer never accepted return of the vehicle from plaintiffs and never provided plaintiffs with a full refund of the purchase price of the vehicle as required by N.J.S.A. 56:12-32.

327. Pursuant to N.J.S.A. 56:12-32 and N.J.S.A. 56:12-42, plaintiffs seek a refund and other actual expenses incurred (including any expert witness fees incurred) as well as attorney's fees and court costs.

328. As set forth on the certifications annexed to this pleading, plaintiffs complied with the provisions of N.J.S.A. 56:12-41.

**COUNT 2**

**SECTION 2 CFA VIOLATIONS**

**PLED BY PLAINTIFFS AND THE CLASS AGAINST THE MANUFACTURER**

329. The allegations contained in the previous paragraphs are repeated as if fully set forth herein.

330. This count is pled by plaintiffs and the class against the manufacturer.

331. Given defendants' omission about the problems and the predelivery repairs, defendants engaged in knowing omission affirmative act section 2 CFA violations via unlawful practices, both in the initial transaction and in subsequent performance thereof.

332. By failing to alert or disclose presale to plaintiffs the existence of the problems of which defendants had knowledge, defendants engaged in an "omission" - the act of neglecting to do what the law requires and liability is imposed for such inaction because of the existence of a duty to act under the circumstances.[63]

333. Therefore, the following occurred in this case: (1) nondisclosure by the manufacturer — "a fact existing at the time of the transaction was not disclosed"; (2) materiality of fact undisclosed by the manufacturer — "the fact, if

---

[63.] New Jersey Model Civil Jury Charge 4:43.

disclosed, would be important to the plaintiffs' decision to purchase or to the decision of any reasonable buyer"; (3) knowledge on the part of the manufacturer — the merchant "knew the fact and its importance at the time of the transaction"; and (4) intentional concealment by the manufacturer — the merchants withheld the information intending for the buyer to make a decision without knowing the fact.

334. In addition to the aforesaid misconduct referenced above, during the course of the transaction or during subsequent performance of obligations, defendants may have committed other types of CFA violations, such as failure to make other mandatory disclosures or the like – misconduct which may be uncovered during the course of discovery.

335. To the extent that substantial aggravating circumstances are necessary for any of the aforesaid CFA violations, all of the aforesaid misconduct amounted to substantial aggravating circumstances over and above a mere breach of contract and/or breach of warranty and therefore, said misconduct was sufficient to trigger one or more CFA violations. This is because defendants' entire course of conduct indicates a lack of good faith and fair dealing towards plaintiffs and a predatory approach instead of one that was honest and forthright.

336. As a proximate result of the section 2 CFA violations detailed above, plaintiffs incurred out of pocket ascertainable losses of money detailed above.

337. For example, a merchant's sticker price for a product or service can provide evidence of loss – even if that price is greater than fair market value.[64]

338. Therefore, the dealer's sales price for the vehicle provides a measure of loss.

339. Where, as here, someone faces or expects to incur or actually incurs an out of pocket loss, such a loss equates with an ascertainable loss sufficient to support liability under the CFA.[65]

340. In addition, plaintiffs failed to receive the benefit of the bargain – the vehicle at the promised price and free from the undisclosed problems. The vehicle's value is diminished as stated by the expert report submitted herewith.  Exhibit H.

341. Therefore, the vehicle is worth less than its purchase price and plaintiffs didn't get the vehicle in the

---

[64] *Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1 (2004).
[65] See *Cox v. Sears Roebuck & Co.*, 138 N.J. 2 (1994); *Thiedemann v. Mercedes-Benz USA*, 183 N.J. 234 (2005).  Under the CFA one does not need to actually incur the loss if they have an estimate thereof.  *Thiedemann v. Mercedes-Benz USA*, 183 N.J. 234 (2005).  Further, a merchant's sticker price can provide evidence of loss. *Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 12 (2004).

condition promised and therefore, has a claim of

ascertainable loss of money or property associated

therewith.

342. Treble damages are available for the aforesaid

misconduct.[66]

343. Equitable relief is available in the form of a full refund

and a judgment or order declaring the aforesaid misconduct

as illegal.[67]

344. In addition, a statutory refund is sought – that is,

relief pursuant to the CFA's refund provision, which

states: "Any person violating the provisions of the within

act shall be liable for a refund of all moneys acquired by

means of any practice declared herein to be unlawful.[68]  The

refund of moneys herein provided for may be recovered in a

private action or by such persons authorized to initiate

actions pursuant to P.L.1975, c. 376 (C. 40:23-6.47 et

seq.).[69]"   The New Jersey Supreme Court explained the

separate cause of action available for refunds as follows:

"The CFA vests the Attorney General with jurisdiction to

enforce its provisions through a variety of mechanisms,

---

[66] N.J.S.A. 56:8-19.
[67] N.J.S.A. 56:8-19.
[68] N.J.S.A. 56:8-2.11.
[69] N.J.S.A. 56:8-2.12.  The last reference in this provision to
"P.L.1975, c. 376 (C. 40:23-6.47 et seq.)" refers to actions by
the offices of the Department of Consumer Affairs.

N.J.S.A. 56:8-3 to -8, -11, -15 to -18, & -20, but it also provides individual consumers with a cause of action to recover refunds, N.J.S.A. 56:8-2.11 to -2.12, and treble damages for violations, whether in good faith or otherwise, N.J.S.A. 56:8-19."[70]

345. Pursuant to the CFA, an award of counsel fees and litigation costs is also sought.[71]

---

[70] *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255 (1997).

[71] . N.J.S.A. 56:8-19; *Artistic Lawn & Landscape Co., Inc. v. Smith*, 381 N.J. Super. 75, 89 (Law Div. 2005) (citing *BJM Insulation & Constr., Inc. v. Evans*, 287 N.J. Super. 513 (App. Div. 1996)).

**COUNT 3**

**BREACH OF EXPRESS WARRANTY AND VIOLATION OF THE MAGNUSON-MOSS WARRANTY—FEDERAL TRADE COMMISSION IMPROVEMENT ACT**

**PLED BY PLAINTIFFS AND THE CLASS AGAINST THE MANUFACTURER**

346. The allegations contained in the previous paragraphs are repeated as if fully set forth.

347. This count is pled by plaintiffs and the class against the manufacturer.

348. Since the vehicle are goods, the UCC applies to this dispute.[72]

349. At the time of sale and/or thereafter, defendants or their agents issued plaintiffs the warranty, which was an express warranty in accordance with the UCC and/or the MMWA.

350. Plaintiffs accepted the vehicle in the belief that the vehicle conformed to the aforesaid warranty.

351. Defendants expressly warranted the labor that defendants performed or caused to be performed to the vehicle and/or parts that defendants replaced or caused to be replaced on the vehicle.

---

[72] As explained by the Appellate Division: Article 2 of the UCC applies to transactions in goods. N.J.S.A. 12A:2-102. "`Goods' mean all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities and things in action." N.J.S.A. 12A:2-105(1). *DiIorio v. Structural Stone & Brick*, 845 A.2d 658, 368 N.J. Super. 134 (N.J. Super., 2004).

352. Plaintiffs relied on said warranty and/or representations and believed them to be true and would not have purchased the vehicle but for said warranty.

353. Following delivery of the vehicle to plaintiffs and problems arising therewith, plaintiffs learned that the vehicle wasn't as warranted.

354. For, the vehicle, as originally delivered and/or subsequent to repair, exhibited problems that substantially impair the vehicle's value to plaintiffs.

355. Plaintiffs performed plaintiffs' obligations under the aforesaid warranty, including but not limited to plaintiffs' obligation to notify defendants of problems that plaintiffs experienced with/exhibited by the vehicle and gave defendants a reasonable time to correct and/or repair and/or address said problems and defendants or their agents failed to correct and/or repair and/or address said problems in a reasonable time.

356. By failing to correct and/or repair and/or remedy the vehicle's problems within a reasonable time, defendants breached their obligations under the aforesaid warranty.

357. The limited repair remedies that defendants provided to plaintiffs failed of their essential purpose, as defendants were unable and/or unwilling to correct and/or repair and/or remedy the vehicle's problems within a reasonable

time.  Therefore, any disclaimers/limitations of liability contained in the warranty are null and void under the doctrine of failure of essential purpose.

358. Defendants' failure to correct and/or repair and/or remedy the vehicle's problems within a reasonable time or to replace it with conforming goods in a reasonable period of time or to provide the remedy of revocation of acceptance constitute a breach of express warranty.

359. Pursuant to the MMWA, via one or more repair attempts referenced in this pleading (exhibit A) and before filing suit, plaintiffs afforded defendants a reasonable opportunity to cure defendants' failure to comply with the warranty but defendants failed to render such compliance.

360. Further, plaintiffs demanded relief from the manufacturer presuit but never received that relief.  Exhibits A, G & H.

361. Thereafter, pursuant to the UCC (N.J.S.A. 12A:2-608), plaintiffs provided defendants with a letter notifying defendants that plaintiffs revoked acceptance of the vehicle and demanded a refund from defendants pursuant to the UCC and/or MMWA.  Exhibit A.  However, to date, defendants refused to comply with said demand.

362. Defendants committed a breach of express warranty under the UCC and/or under that of any other jurisdiction whose law the Court finds applies to the instant action.

363. Plaintiffs are entitled to relief pursuant to N.J.S.A. 12A:2-608 and therefore, seek the remedy of revocation of acceptance in accordance therewith.

364. Plaintiffs are consumers as defined by 15 U.S.C. § 2301, defendants are warrantors as defined by 15 U.S.C. § 2301 and the vehicle is a consumer product as defined by 15 U.S.C. § 2301.

365. The provisions of 15 U.S.C. § 2301, et seq. apply to this case, because, pursuant to 15 U.S.C. § 2301-2303, defendants are manufacturers and/or sellers and/or warrantors of a consumer product sold to plaintiffs with written and implied warranties and plaintiffs are entitled to enforce the provisions of same.

366. Pursuant to 15 U.S.C. § 2308, defendants provided a written warranty to plaintiffs in conjunction with the vehicle.

367. Defendants' breach of warranty caused plaintiffs to suffer a diminution of value in the vehicle.  Accordingly, plaintiffs suffered damages by defendants' failure to comply with defendants' obligations under the U.C.C. and/or MMWA and/or under the aforesaid warranty and thus bring this action against defendants for damages and pursuant to 15 U.S.C. § 2310, et seq., plaintiffs are entitled to recover attorney's fees and court costs.

368. More specifically, 15 U.S.C. § 2310 states in part:

"a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief—(A) in any court of competent jurisdiction in any State or the District of Columbia…(2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiffs for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

369. Accordingly, pursuant to the UCC and the MMWA, plaintiffs seek the remedies of revocation of acceptance, damages applicable under those statues and an award of fees and costs pursuant to the MMWA.

**COUNT 4**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND VIOLATION OF THE MAGNUSON-MOSS WARRANTY—FEDERAL TRADE COMMISSION IMPROVEMENT ACT**

**PLED BY PLAINTIFFS AND THE CLASS AGAINST THE MANUFACTURER**

370. The allegations contained in the previous paragraphs are repeated as if fully set forth.

371. This count is pled by plaintiffs and the class against the manufacturer.

372. At the time of sale and/or thereafter, defendants failed to properly disclaim implied warranties in accordance with the UCC and/or the MMWA and/or defendants impliedly warranted that the vehicle was of merchantable quality and/or was reasonably fit and/or suitable for the purpose for which it was purchased.

373. Plaintiffs accepted the vehicle in the belief that the vehicle conformed to the aforesaid warranty.

374. Plaintiffs relied on said warranty and/or representations and believed them to be true and would not have purchased the vehicle but for said warranty.

375. Following delivery of the vehicle to plaintiffs and problems arising therewith, plaintiffs learned that the vehicle was not as warranted.

376. For, the vehicle, as originally delivered and/or

subsequent to repair, exhibited problems that substantially impair the vehicle's value to plaintiffs.

377. Plaintiffs performed plaintiffs' obligations under the aforesaid warranty, including but not limited to plaintiffs' obligation to notify defendants of problems that plaintiffs experienced with/exhibited by the vehicle and gave defendants a reasonable time to correct and/or repair and/or address said problems and defendants or their agents failed to correct and/or repair and/or address said problems in a reasonable time.

378. By failing to correct and/or repair and/or remedy the vehicle's problems within a reasonable time, defendants breached their obligations under the aforesaid warranty.

379. Defendants' failure to correct and/or repair and/or remedy the vehicle's problems within a reasonable time or to replace it with conforming goods in a reasonable period of time constitute a breach of defendants' warranty obligations, including but not limited to a breach of the implied warranty of merchantability.

380. Pursuant to the MMWA, via one or more repair attempts referenced in this pleading (exhibit A) and before filing suit, plaintiffs afforded defendants a reasonable opportunity to cure defendants' failure to comply with the warranty but defendants failed to render such compliance.

381. Thereafter, pursuant to the UCC (N.J.S.A. 12A:2-608), plaintiffs provided defendants with a letter notifying defendants that plaintiffs revoked acceptance of the vehicle and demanded a refund from defendants pursuant to the UCC and/or MMWA.  Exhibit A.  However, to date, defendants refused to comply with said demand.

382. Defendants committed a breach of the implied warranty of merchantability under the UCC and/or under that of any other jurisdiction whose law the Court finds applies to the instant action.

383. Plaintiffs are entitled to relief pursuant to N.J.S.A. 12A:2-608 and therefore, seek the remedy of revocation of acceptance in accordance therewith.

384. Plaintiffs are consumers as defined by 15 U.S.C. § 2301, defendants are warrantors as defined by 15 U.S.C. § 2301 and the vehicle is a consumer product as defined by 15 U.S.C. § 2301.

385. The provisions of 15 U.S.C. § 2301, et seq. apply to this case, because, pursuant to 15 U.S.C. § 2301-2303, defendants are manufacturers and/or sellers and/or warrantors of a consumer product sold to plaintiffs with written and implied warranties and/or service contracts and plaintiffs are entitled to enforce the provisions of same.

386. Pursuant to 15 U.S.C. § 2308, as defendants have extended

written warranties and/or service contracts to plaintiffs,
except for the modifications permitted in said statute,
defendants are unable to disclaim or modify the implied
warranties issued in conjunction with the vehicle.

387. Defendants' breach of warranty caused plaintiffs to suffer
a diminution of value in the vehicle.  Accordingly,
plaintiffs suffered damages by defendants' failure to
comply with defendants' obligations under the U.C.C. and/or
MMWA and/or under the aforesaid warranty and thus bring
this action against defendants for damages and pursuant to
15 U.S.C. § 2310, et seq., plaintiffs are entitled to
recover attorney's fees and court costs.

388. More specifically, 15 U.S.C. § 2310 states in part:
"a consumer who is damaged by the failure of a supplier,
warrantor, or service contractor to comply with any
obligation under this chapter, or under a written
warranty, implied warranty, or service contract, may bring
suit for damages and other legal and equitable relief—(A)
in any court of competent jurisdiction in any State or the
District of Columbia…(2) If a consumer finally prevails in
any action brought under paragraph (1) of this subsection,
he may be allowed by the court to recover as part of the
judgment a sum equal to the aggregate amount of cost and
expenses (including attorneys' fees based on actual time

expended) determined by the court to have been reasonably incurred by the plaintiffs for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

389. Accordingly, pursuant to the UCC and the MMWA, plaintiffs seek the remedies of revocation of acceptance, damages applicable under those statues and an award of fees and costs pursuant to the MMWA.

## COUNT 5

### UNJUST ENRICHMENT

### PLED BY PLAINTIFFS AND THE CLASS AGAINST DEFENDANTS

390. The allegations contained in the previous paragraphs are repeated as if fully set forth.

391. This count is pled by plaintiffs and the class against defendants.

392. New Jersey recognizes the doctrine of unjust enrichment, which rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.[73]

393. The New Jersey Supreme Court rejects privity as a prerequisite to suits against manufacturers[74] and permits suits when products are purchased from third-party intermediaries.[75]

394. The parties have a link - the warranty that isn't gratuitously given[76] but is a marketing tool to attract sales benefitting the manufacturer when they sell to

---

[73] *Assocs. Commercial Corp. v. Wallia*, 211 N.J. Super. 231, 243 (App. Div. 1986) (quoting *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 108 (App. Div. 1966)).
[74] *Henningsen v. Bloomfield Motors*, 32 N.J. 358, 161 A.2d 69 (1960).
[75] *Defrank v. Samsung Elecs. Am.*, 19-21401 (D. N.J. October 26, 2020).
[76] *Thiedemann v. Mercedes-Benz USA, LLC,* 183 *N.J.* 234, 251, 872 *A.*2d 783 (2005).

distributors.

395. Nor does the warranty preclude alternate pleading of the unjust enrichment claim.[77]

396. Refusing to dismiss an unjust enrichment claim, a district court explained:[78] "it would be inequitable to suggest that the Beam Defendants can insulate themselves from liability on an unjust enrichment claim simply by asserting that retail sales by liquor stores cut off any relationship between the consumers and the manufacturer. This is particularly true in this case where Plaintiffs cannot seek a remedy directly from the liquor stores based on misrepresentations allegedly made by the Beam Defendants themselves…. [W]here a plaintiff alleges that a defendant manufacturer has made false claims or misrepresentations directed for the purpose of generating retail sales, and where those retails sales could have the effect of increasing the amount of wholesale sales to the manufacturer, it is plausible that a plaintiff can show evidence of a sufficiently direct relationship between the parties under New Jersey law."

---

[77] *Defrank v. Samsung Elecs. Am.*, 19-21401 (D. N.J. October 26, 2020).

[78] *Stewart v. Beam Global Spirits & Wine, Inc.*, 877 F.Supp.2d 192, 200 (D. N.J. 2012).

397. Another district court ruled likewise:[79] "such claims are permissible where the plaintiff also alleges that the manufacturer "engaged in fraudulent conduct." *Suriaga v. GE*, 2019 WL 6799613 at *7 (D.N.J. Dec. 12, 2019). The court in *Callano* recognized this possibility as well, concluding that unjust enrichment is justified where there has been "fraud perpetrated by defendants." 91 N.J. Super. at 110…. federal courts applying its holding have concluded that if a manufacturer is alleged to have engaged in a false marketing campaign or to have failed to disclosed a defect, plaintiffs have made out a claim for unjust enrichment. See *Morcom v. LG Elecs., USA, Inc.*, 2017 WL 8784836 at *10 (D.N.J. Nov. 30, 2017; Stewart, 877 F. Supp. 2d at 200. Plaintiffs have made such allegations and as such have stated a claim."

398. Therefore, the unjust enrichment claim is viable.

399. As a direct and proximate result of defendants' failure to disclose known defects, defendants profited through the sale and lease of the class vehicles.

400. Although these vehicles are purchased through defendants' agents – i.e., franchise dealerships - the money from the vehicle sales flows directly back to defendants, which

---

[79]*Defrank v. Samsung Elecs. Am.*, 19-21401 (D. N.J. October 26, 2020).

distributes the vehicles into the stream of commerce by selling same to defendant's agents.

401. Additionally, as a direct and proximate result of defendants' failure to disclose the defect in the class vehicles, plaintiffs and class members have vehicles that have or will in future require repeated, high-cost repairs that can confer or have conferred an unjust substantial benefit upon defendants.

402. Defendants have been unjustly enriched due to the known defect in the class vehicles through the use money paid that earned interest or otherwise added to defendants' profits when said money should have remained with plaintiffs and class members.

403. Defendants received a benefit from plaintiffs and the class members and the retention of that benefit by defendants without payment would be unjust.

404. A value may be ascribed to the amount of the benefit whereby there occurred such unjust enrichment.

405. Remuneration was and is reasonably expected by plaintiffs and the class but that remuneration was never given by defendants to plaintiffs and the class.

406. The failure to give remuneration resulted in defendants receiving an unjust enrichment.

407. It would be unjust for the benefits so conferred to be

retained by defendants without compensation being paid to plaintiffs and the class members.

408. As a result of defendants' unjust enrichment, plaintiffs and the class members have suffered damages.

## COUNT 6

### PROMISSORY ESTOPPEL

### PLED BY PLAINTIFFS AND NOT THE CLASS AGAINST DEFENDANTS

409. The allegations contained in the previous paragraphs are repeated as if fully set forth.

410. This count is pled by plaintiffs and not the class against defendants.

411. In response to the first amended complaint, plaintiffs filed a motion to dismiss for failure to state a claim for relief which alleged that the problems were never covered by the warranty.

412. Defendants took this position notwithstanding defendants' performance, before and after the filing of suit, of performing - via defendants' agent the dealer - at least 6 warranty repair attempts to the vehicle for the problems. Exhibit A.

413. Defendants claim that there exist no warranties between the parties that apply to the problems.

414. However, given defendants' course of conduct of luring plaintiffs into purchasing the vehicle and offering the warranty as an inducement and making repair attempts allegedly thereunder only to now belatedly attempt to deny warranty coverage, defendants should be estopped from denying obligations that arose either under the warranty or

during the parties' course of dealings with one another.

415. Warranties are not gratuitous promises but rather, highly publicized marketing tools designed to offer peace of mind to consumers.

416. The Third Circuit explained:[80]  "The Standard Warranty's cost is built into the price of each new vehicle sold by Ford to the dealer and by the dealer to the end consumer. Purchasers of Ford vehicles do not pay any additional consideration for the Standard Warranty nor can they purchase new vehicles without the Standard Warranty."

417. "A promise which is made without any consideration being given by the other party sometimes can be enforced.  Thus, even if nothing of value was promised or exchanged by the party who reasonably relied on a promise, sometimes the promise can be enforced."[81]

418. As detailed above, defendants against whom this count is pled made promises about the vehicle's coverage under the warranty and yet failed to keep those promises as aforesaid.

419. Moreover, plaintiffs relied on defendants against whom this count is pled promises to plaintiffs' detriment.

---

[80] *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818 (3rd Cir. 1999).
[81] Model Civil Jury Charge 4.10K.

420. If defendants against whom this count is pled were to escape liability for such harm, plaintiffs would be unfairly prejudiced.

421. Under the cause of action of promissory estoppel, plaintiffs may recover damages if they prove the following elements: (1) defendants against whom this count is pled made a clear and definite promise. (2) defendants against whom this count is pled should have reasonably expected that plaintiffs will rely on the promise will be bound by the promise and incur liability to the other for damages proximately caused thereby. (3) plaintiffs reasonably relied on defendants against whom this count is pled promise. (4) defendants against whom this count is pled thereby caused detriment of a definite and substantial nature.[82]

422. By offering and extending the warranty to plaintiffs and performing at least 6 repair attempts to the vehicle for over 70 days (exhibit A), defendants made a clear and definite promise to repair the vehicle at no charge to

---

[82] *Woolley v. Hoffman-La Roche, Inc. , 99 N.J. 284, 303 n.9 (1985)* , modified on other grounds, 101 N.J. 10, 499 A.2d 515 (1985); *Peck v. Imedia, Inc. , 293 N.J. Super. 151, 168 (App. Div. 1996)*; *Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank, 163 N.J. Super. 463, 479 (App. Div. 1978)*.

plaintiffs during the warranty period.[83]

423. Defendants clearly expected that the promise would be relied upon – defendants' marketing and management departments used the warranty to incentivize plaintiffs and the class to purchase the vehicle.

424. By purchasing the vehicle and repeatedly presenting the vehicle for warranty repairs, plaintiffs did reasonably rely on that promise.

425. Since defendants are now taking the position that the warranty fails to cover the problems after previously remaining silent on the issue and in fact taking the opposite position, plaintiffs' reliance on the promise is causing plaintiffs to suffer a definite and substantial

---

[83]Promissory Estoppel is well established in New Jersey. *E.g., Royal Assoc. v. Concannon,* 200 *N.J. Super.* 84 (App. Div. 1985). *See Spaulding v. Hussain,* 229 *N.J. Super.* 430, 438 (App. Div. 1988) where "the trial judge correctly charged the elements of promissory estoppel, namely, a clear and definite promise made with the expectation that the promisee will rely coupled with reasonable reliance therein by the promisee to his detriment." *See also Friedman v. Tappan Development Corp.,* 22 *N.J.* 523 (1956); *The Malaker Corp. v. First Jersey National Bank,* 163 *N.J. Super.* 463 (App. Div. 1978), *certif. den.* 79 *N.J.* 488 (1979). However, more recent decisions have tended to relax the strict requirement of a "clear and definite" promise, particularly where the plaintiff seeks damages resulting from detrimental reliance on promises made. *See, e.g., Pop's Cones v. Resorts Intern. Hotel,* 307 *N.J. Super.* 461, 469-70, 472 (App. Div. 1997); *Peck v. Imedia, Inc.,* 293 *N.J. Super.* 151, 168 (App. Div. 1996).

detriment.[84]

426. Accordingly, plaintiffs seek compensatory damages for defendants against whom this count is pled misconduct based on the doctrine of promissory estoppel.

---

[84] *Peck v. Imedia, Inc.,* 293 *N.J. Super.* 151 (App. Div. 1996) discusses the need for detrimental reliance without expressly stating that the reliance by "substantial and definite." 293 *N.J. Super.* at 165. The "definite and substantial" requirement can be traced to *Friedman v. Tappan Dev. Corp.* 22 *N.J.* 523, 538, (1956) and has been reiterated in more modern cases, like *Malaker,* 163 *N.J. Super.* at 479, and *Royal Assoc.,* 200 *N.J. Super.* at 92. However, the *Restatement (Second)* expressly questions the continued viability of the "substantial and definite" requirement. § 90, *Reporter's Note,* at 247-48.

## COUNT 7

### CLAIMS AGAINST THE DOES ONLY

427. The allegations contained in the previous paragraphs are repeated as if fully set forth.

428. This count is pled against the Does.

429. All allegations pled in the above counts are pled against the Does and all relief sought in said counts is sought against the Does.

## PRAYER FOR RELIEF COMMON TO ALL COUNTS

**WHEREFORE,** judgment is demanded for: (1) all applicable damages – including any specific types of damages specifically pled in any of the above listed counts; (2) the remedies provided for under the common law and/or any state and/or federal statutes pled herein or applicable to this case including any mandated counsel fees and/or costs/expenses and any applicable equitable relief; and (3) such other and further relief as the court shall deem equitable and just.

## CERTIFICATION OF VERACITY OF PLEADING

LEWIS G. ADLER hereby certifies to the Court as follows:

1. I am an attorney at law licensed to practice law in the State of New Jersey.

2. I am co-counsel for plaintiffs.

3. I make the statements contained in this certification from personal knowledge.

4. The basis of my personal knowledge is my personal work on this file.

5. I make this certification in support of this pleading.

6. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2)

is supported by existing law or by a nonfrivolous argument
for extending, modifying, or reversing existing law; (3)
the factual contentions have  evidentiary support or, if
specifically so identified, will likely have evidentiary
support after a reasonable   opportunity for further
investigation or discovery; and (4) the complaint otherwise
complies with the requirements of Rule 11.

CERTIFICATION MADE PURSUANT TO 28 U.S.C. §1746

I certify, under penalty of perjury that the foregoing is true
and correct.

EXECUTED ON:  January 14, 2022

Respectfully submitted,

/s/Lewis G. Adler
LEWIS G. ADLER
26 Newton Ave.
Woodbury, NJ 08096
Tel. #: (856) 845-1968
Fax #: (856) 848-9504
Co-counsel for plaintiff(s)
Email:  lewisadler@verizon.net

**JURY DEMAND**

Relative to all issues pled in the instant action that so
triable, a trial by jury is demanded.

**DESIGNATION OF TRIAL COUNSEL**

**LEWIS G. ADLER, ESQ.** is designated as trial counsel in this
matter for the parties submitting this pleading for filing.

**LOCAL RULE 11.2 CERTIFICATION**

LEWIS G. ADLER hereby certifies to the Court as follows:

1. I am an attorney at law licensed to practice law in the State of New Jersey.

2. I am counsel for the party/parties filing this document.

3. I make the statements contained in this certification from personal knowledge.

4. The basis of my personal knowledge is my personal work on this file.

5. I make this certification in support of this pleading.

6. The matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding, and, if so, the certification or other authorized document shall identify each such action, arbitration or administrative proceeding, and all parties thereto.

CERTIFICATION MADE PURSUANT TO 28 U.S.C. §1746

I certify, under penalty of perjury that the foregoing is true and correct.

EXECUTED ON: January 14, 2022

Respectfully submitted,

/s/Lewis G. Adler
LEWIS G. ADLER
26 Newton Ave.
Woodbury, NJ 08096
Tel. #: (856) 845-1968
Fax #: (856) 848-9504
Co-counsel for plaintiff(s)
Email: lewisadler@verizon.net

# COMPLAINT
# EXHIBIT A



*Ray Catena*
*Motor Car Corporation*

Mercedes-Benz

| 123 South Main Street | 2155 Route 22 West |
|---|---|
| **EDISON, N.J. 08837** | **UNION, N.J. 07083** |
| (732) 549-8020 | (908) 964-4000 |

www.raycatena.com

| CUSTOMER NO. 254013 | ADVISOR MICHAEL MIGLIORE    929 | TAG NO. 3535 | INVOICE DATE 04/15/21 | INVOICE NO. M8CS33101 |
|---|---|---|---|---|
| **JERRY SCATTAGLIA** | LABOR RATE 172.00 | LICENSE NO. | MILEAGE 2,194 | COLOR IRDIUM SLVR | STOCK NO. 217987 |

| YEAR / MAKE / MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | DELIVERY DATE 10/28/20 | DELIVERY MILES 21 |
|---|---|---|

| VEHICLE I.D. NO. 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | SELLING DEALER NO. 51146 | PRODUCTION DATE 09/23/20 |
|---|---|---|

| F.T.E. NO. | P.O. NO. | R.O. DATE 04/10/21 |
|---|---|---|

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS C# 1771451J269878    E# 26092030246374    MO: 2194 |
|---|---|---|

```
LABOR & PARTS-------------------------------------------------------------
J# 1 98MBZ          TOWING                TECH(S):099              INTERNAL
        VEHICLE TOWED IN

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-------------------UNIT PRICE-
                                        JOB #  1 TOTAL PARTS           0.00

                        JOB #  1 TOTAL LABOR & PARTS                   0.00
--------------------------------------------------------------------------
J# 2 98MBZLOANER    RCMC LOANER CAR       TECH(S):099              INTERNAL
        LOANER CAR #27
        SUPPLIED LOANER CAR

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-------------------UNIT PRICE-
                                        JOB #  2 TOTAL PARTS           0.00

                        JOB #  2 TOTAL LABOR & PARTS                   0.00
--------------------------------------------------------------------------
J# 3 54MBZ          MISC                  TECH(S):099              WARRANTY
        CLIENT STATES VEHICLE WILL NOT START - NO CRANK NO START
        CK. VEHICLE DOES NOT START, SDS AND CHARGER HOOK UP SDS TEST
        CK. DTC'S B183349 BATTERY FOR 48 VOLT ON BOARD ELECTRICAL
        SYSTEM HAS A MALFUNCTION...THERE'S AN INTERNAL ELECTRICAL
        FAULT. B183371 THE BATTERY FOR 48 VOLT ON BOARD ELECTRICAL
        SYSTEM HAS A MALFUNCTION..THE ACTUATOR IS BLOCKED. PROCESS
        DTC'S AS PER LI54.10-P-069698  AND PERFORM CK. LIST..FOR
        CAUSE 2 FOR THESE 2 FAULT CODES MENTIONED ABOVE...
        AS PER LI54.10-P-069698  REMOVE R/F SEAT AND R/F RUG AND R/R
        PORTION OF REAR RUG REMOVE FLOOR BOARD PANELING AND REPLACE
        48 VOLT BATTERY..WITH DC/DC CONVERTER AND INITIAL STARTUP OF
        DC/DC CONVERTER AND UPDATE 48V SYSTEM BATTERY...RECK.
        FUNCTIONS OK. ERASED CODES AND REASSEMBLE VEHICLE ..

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-------------------UNIT PRICE-
JOB # 3     1    000-982-67-14-MB    STARTER BATTER           WARRANTY
                                        JOB #  3 TOTAL PARTS           0.00

                        JOB #  3 TOTAL LABOR & PARTS                   0.00
--------------------------------------------------------------------------
J# 4 68MBZZTRIM2    INT. ELECT CONCERN    TECH(S):099              WARRANTY
        CLIENT STATES DASH WENT OUT FOR 1-2 MINUTES AND THEN CAME
        BACK ON (WHILE DRIVING)
        CK. VEHICLE CLUSTER WENT BLANK, SDS AND CHARGER HOOK UP SDS
        TEST CK. DTCS NONE CK. FOR RELATED LI'S NONE CK. FOR RELATED
        PROBLEMS WITH OTHER VEHICLES NONE SPECIFIC TO THIS COMPLIANT
        CK. FOR CLUSTER S/W UPDATES AND UP CLUSTER S/W

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-------------------UNIT PRICE-
                                        JOB #  4 TOTAL PARTS           0.00

                        JOB #  4 TOTAL LABOR & PARTS                   0.00
--------------------------------------------------------------------------
ESTIMATE------------------------------------------------------------------
CLIENT HEREBY ACKNOWLEDGES RECEIVING
        ORIGINAL ESTIMATE OF     $0.00 (+TAX)
```

The Reynolds and Reynolds Company  ERAINTINVE
SF710054 Q  (07/20)



*Ray Catena*
*Motor Car Corporation*

| 123 South Main Street | 2155 Route 22 West |
|---|---|
| **EDISON, N.J. 08837** | **UNION, N.J. 07083** |
| (732) 549-8020 | (908) 964-4000 |

www.raycatena.com

| CUSTOMER NO. 254013 | ADVISOR MICHAEL MIGLIORE 929 | TAG NO. 3535 | INVOICE DATE 04/15/21 | INVOICE NO. M8CS33101 |
|---|---|---|---|---|

| JERRY SCATTAGLIA | LABOR RATE 172.00 | LICENSE NO. | MILEAGE 2,194 | COLOR IRDIUM SLVR | STOCK NO. 217987 |
|---|---|---|---|---|---|

| YEAR / MAKE / MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | DELIVERY DATE 10/28/20 | DELIVERY MILES 21 |
|---|---|---|

| VEHICLE I.D. NO. 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | SELLING DEALER NO. 51146 | PRODUCTION DATE 09/23/20 |
|---|---|---|

| F.T.E. NO. | P.O. NO. | R. O. DATE 04/10/21 |
|---|---|---|

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS C# 1771451J269878   E# 26092030246374                MO: 2194 |
|---|---|---|

```
COMMENTS------------------------------------------------------------
MB LOANER 27
FINISH DATE 4/15/2021

TOTALS--------------------------------------------------------------

**********************
* METHOD OF PAYMENT                    TOTAL LABOR....      0.00
* [ ] CASH  [ ] CHECK *               TOTAL PARTS....      0.00
* [ ] A/X   [ ] VISA                  TOTAL SUBLET...      0.00
* [ ] MASTER                          TOTAL G.O.G....      0.00
* [ ] RCMC CHARGE                     TOTAL MISC CHG.      0.00
**********************                 TOTAL MISC DISC      0.00
          THANK YOU FOR YOUR BUSINESS!  TOTAL TAX......      0.00
          ****************************           --------
```

**TOTAL INVOICE $    0.00**

_____
    CLIENT SIGNATURE

The Reynolds and Reynolds Company  ERAINTINVE
SF710054 Q  (07/20)

# Ray Catena
## Motor Car Corporation

Mercedes-Benz

123 South Main Street
**EDISON, N.J. 08837**
(732) 549-6606

2155 Route 22 West
**UNION, N.J. 07083**
(908) 964-4000

www.raycatena.com

0101IM8CS35778

| CUSTOMER NO. | | ADVISOR | | TAG NO. | | INVOICE DATE | | M8CS35778 |
|---|---|---|---|---|---|---|---|---|
| 254013 | | MICHAEL MIGLIORE | | 929 | 8700 | 05/20/21 | | STOCK NO. |
| | | LABOR RATE | LICENSE NO. | MILEAGE | | COLOR | | 217987 |
| JERRY SCATTAGLIA | | 172.00 | | | 2,670 | IRDIUM SLVR | | DELIVERY MILES |
| 135 OAK AVE | | YEAR / MAKE / MODEL | | | | DELIVERY DATE | | 21 |
| STATEN ISLAND, NY 10306-4002 | | 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | | | | 10/28/20 | | |
| | | VEHICLE I.D. NO. | | | | SELLING DEALER NO. | | PRODUCTION DATE |
| | | 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | | | | 51146 | | 09/23/20 |
| | | F.T.E. NO. | | P.O. NO. | | R.O. DATE | | |
| RESIDENCE PHONE | BUSINESS PHONE | | | | | 05/17/21 | | |
| | | COMMENTS | | | | | | |
| | | C# 1671591A327336    E# 25693030228215 | | | | | | MO: 2670 |

LABOR & PARTS --------------------------------------

J# 1 98MBZLOANER   RCMC LOANER CAR                TECH(S):099                        0.00
        LOANER CAR #89
        COURTESY LOANER CARS SUPPLIED BY RAY CATENA MOTORS MUST BE
        RETURNED WITHIN 24 HOURS OF VEHICLE COMPLETION.
        BEYOND 24 HOURS THE CUSTOMER WILL INCUR A
        RENTAL CHARGE OF $155.00 PER DAY.
        CUSTOMER INITIALS :
        SUPPLIED LOANER CAR

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-----------------UNIT PRICE-
                                                JOB # 1 TOTAL PARTS          0.00

                                        JOB # 1 TOTAL LABOR & PARTS          0.00
--------------------------------------------------------------------------
J# 2 00MBZ0000      CHECK FLUIDS/TIREPSI     TECH(S):099                        0.00
        CHECK ALL FLUIDS AND TIRE PSI
        TOP OFF ALL FLUIDS/CHECKED AND ADJUSTED ALL TIRE PRESSURE
        COMPLETED

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-----------------UNIT PRICE-
                                                JOB # 2 TOTAL PARTS          0.00

                                        JOB # 2 TOTAL LABOR & PARTS          0.00
--------------------------------------------------------------------------
J# 3 07MBZ-ENGLAMP-B CHECK ENG LAMP          TECH(S):099             WARRANTY
        CLIENT STATES THE CHECK ENGINE LIGHT IS ON
        CK. VEHICLE CK ENGINE LAMP ON SDS AND CHARGER HOOK-UP SDS
        TEST CK. DTC U04160B IMPLAUSABLE DATA RECEIVED FROM TRACTION
        SYSTEM...PROCESS DTC PERFORM GUIDED TEST....CK. FOR RELATED
        LI'S FAULT IS NOT PRESENT CK. FOR MODULE UPDATES
        FOUND NEW S/W FOR ESP MODULE AND UP ESP MODULE S/W

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-----------------UNIT PRICE-
JOB # 3      0    177-900-09-09    CONTROL UNIT,                      WARRANTY
        PART ON SPECIAL ORDER
                ** QUANTITY 1 IS SPECIAL ORDERED **
                                                JOB # 3 TOTAL PARTS          0.00

                                        JOB # 3 TOTAL LABOR & PARTS          0.00
--------------------------------------------------------------------------
J# 4 54MBZ          MISC                     TECH(S):099             WARRANTY
        CLIENT STATES THE DASH BEGAN MAKING A BUZZING NOISE THAT
        STILL HAPPENED EVEN AFTER CLIENT SHUT VEHICLE OFF - SEE MIKE
        M
        CK. FOR BUZZING NOISE COMING FROM DASH, VERIFIED CUSTOMER
        CONCERN. FOUND FAN FOR CHARGING PAD NOISEY.  ORDERED PAD -
        ON BACK ORDER, CLIENT WILL BE NOTIFIED WHEN PART ARRIVES.

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-----------------UNIT PRICE-
                                                JOB # 4 TOTAL PARTS          0.00

                                        JOB # 4 TOTAL LABOR & PARTS          0.00
--------------------------------------------------------------------------

*Ray Catena*
## Motor Car Corporation

Mercedes-Benz

123 South Main Street
**EDISON, N.J. 08837**
(732) 549-6606

2155 Route 22 West
**UNION, N.J. 07083**
(908) 964-4000

www.raycatena.com

0101IM8CS35778

| CUSTOMER NO. 254013 | | ADVISOR MICHAEL MIGLIORE | | TAG NO. 929 | 8700 | INVOICE DATE 05/20/21 | INVOICE NO. M8CS35 |
|---|---|---|---|---|---|---|---|
| JERRY SCATTAGLIA | | LABOR RATE 172.00 | LICENSE NO. | MILEAGE | 2,670 | COLOR IRIDIUM SLVR | STOCK NO. 217987 |
| 135 OAK AVE | | YEAR / MAKE / MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | | | | DELIVERY DATE 10/28/20 | DELIVERY MIL |
| STATEN ISLAND, NY 10306-4002 | | VEHICLE I.D. NO. 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | | | | SELLING DEALER NO. 51146 | PRODUCTIO 09/ |
| | | F.T.E. NO. | | P.O. NO. | | R.O. DATE 05/17/21 | |
| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS C# 1671591A327336     E# 25693030228215 | | | | | |

```
LABOR & PARTS--------
J# 5+54MBZ-TEST-D   ELECTRICAL TEST          TECH(S):099              WARRANTY
          CLIENT STATES THE VOLUME BUTTON ON STEERING WHEEL IS LOOSE -
          SOP
          CK. VEHICLE STEERING WHEEL BUTTONS MALFUNCTION..
          REMOVE AIR BAG, AND STEERING WHEEL TRIM AND REPLACE STEERING
          WHEEL BUTTONS...REASSEMBLE AND CK. FUNCTIONS OF BUTTONS
          OK...

PARTS------QTY---FP-NUMBER--------------DESCRIPTION------------------UNIT PRICE-
JOB # 5    1    099-905-62-06-9332   SWITCH PANEL W                  WARRANTY
                                         JOB #  5 TOTAL PARTS         0.00

                              JOB #  5 TOTAL LABOR & PARTS           0.00
--------------------------------------------------------------------------------
ESTIMATE----------------------------------------------------------------
CLIENT HEREBY ACKNOWLEDGES RECEIVING
          ORIGINAL ESTIMATE OF    $0.00 (+TAX)
COMMENTS----------------------------------------------------------------
PICK UP / DELIVERY - MB LOANER 89
FINISH DATE 5/20/2021

TOTALS------------------------------------------------------------------
**********************               TOTAL LABOR....       0.00
* METHOD OF PAYMENT   *               TOTAL PARTS....       0.00
* [ ] CASH  [ ] CHECK *               TOTAL SUBLET...       0.00
* [ ] A/X   [ ] VISA  *               TOTAL G.O.G....       0.00
* [ ] MASTER          *               TOTAL MISC CHG.       0.00
* [ ] RCMC CHARGE     *               TOTAL MISC DISC       0.00
**********************               TOTAL TAX......       0.00
          THANK YOU FOR YOUR BUSINESS!                    --------
          *****************************   TOTAL INVOICE $   0.00
```

_____

CLIENT SIGNATURE

The Reynolds and Reynolds Company  ERARETIVAE  COBZAN2 Q  (07/03)



*Ray Catena*
*Motor Car Corporation*

Mercedes-Benz

| 123 South Main Street | 2155 Route 22 West |
|---|---|
| **EDISON, N.J. 08837** | **UNION, N.J. 07083** |
| (732) 549-8020 | (908) 964-4000 |

www.raycatena.com

| CUSTOMER NO. 246957 | ADVISOR MICHAEL MIGLIORE 929 | TAG NO. 8705 | INVOICE DATE 11/11/20 | INVOICE NO. M8CS22526 |
|---|---|---|---|---|
| ANDREW SCATTAGLIA | LABOR RATE 172.00 | LICENSE NO. | MILEAGE 242 | COLOR IRDIUM SLVR | STOCK NO. 217987 |

| | YEAR / MAKE / MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | DELIVERY DATE 10/28/20 | DELIVERY MILES 21 |
|---|---|---|---|
| | VEHICLE I.D. NO. 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | SELLING DEALER NO. 51146 | PRODUCTION DATE 09/23/20 |
| | F. T. E. NO. | P.O. NO. | R. O. DATE 11/10/20 |

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS C# 1771451J269878    E# 26092030246374 | MO: 242 |
|---|---|---|---|

```
LABOR & PARTS------------------------------------------------
J# 1 98MBZ       TOWING                    TECH(S):1418              0.00
          TOW IN

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-------------------UNIT PRICE-
                                        JOB #  1 TOTAL PARTS           0.00

                            JOB # 1 TOTAL LABOR & PARTS               0.00
------------------------------------------------------------------------
J# 2 54MBZ-TEST-D    ELECTRICAL TEST       TECH(S):1418         WARRANTY
          CLIENT STATES THE R/SIDE OF THE VEHICLE IS DEAD - DOOR LOCK
          INOP - MIRROR DOESN'T FOLD - CHECK/REPORT
          Verify complaint, drive vehicle into shop. Hook up sds and
          charger. Found fault codes
          in many modules for communication to RF door control module
          N69/2. Opening RF door appears to have rectified fault. RNR
          RF door sill trim, check fuse 302. Find 13.2 volts. RNR RF
          door panel. Check connectors on door control module and pins
          for tightness. Found connector 6 to not be plugged in
          completely. Connector 6 does not appear to be root of cause
          being that connector 6 primarily controls lighting and seat
          position. Concerned about connector 3 because of circuit 30
          voltage and can communication. Find 13.2 volts at connector
          3 pins 4 and 5. OK. Check CAN communication find 2.2V CAN
          low pin 1 to chassis ground. Find 2.6V from CAN high pin 2
          to chassis ground. RNR RF seat RNR RF carpeting. Due to
          vehicle age finding loose ground is not uncommon. Perform
          Voltage drop test from Connector 3 pin 4 to W15/1 find 0.0V
          ok. Check for continuity between those two points, find .1
          ohms of resistance. Check pins for tightness at X35/2x1 find
          all associated pins to have good drag and contact pattern.
          No fault found there. Perform hard reset of N69/2 by
          tension at F150/1 tension ok. Upon reinstalling fuse found
          everything to functioning. Suspect faulty module due to hard
          reset having to be performed. Install new door control
          module RF. Perform initial start up of RF door. All ok at
          current time. Clear codes.

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-------------------UNIT PRICE-
JOB # 2      1    167-900-40-13      CONTROL UNIT,               WARRANTY
                                        JOB #  2 TOTAL PARTS           0.00

                            JOB # 2 TOTAL LABOR & PARTS               0.00
------------------------------------------------------------------------
J# 3 98MBZLOANER    RCMC LOANER CAR       TECH(S):1418              0.00
          MB LOANER 119
          SUPPLIED LOANER CAR

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-------------------UNIT PRICE-
                                        JOB #  3 TOTAL PARTS           0.00

                            JOB # 3 TOTAL LABOR & PARTS               0.00
------------------------------------------------------------------------
```

The Reynolds and Reynolds Company  ERAINTIVE
SF710054 Q (07/20)



### Ray Catena
### Motor Car Corporation

Mercedes-Benz

123 South Main Street
**EDISON, N.J. 08837**
(732) 549-8020

2155 Route 22 West
**UNION, N.J. 07083**
(908) 964-4000

www.raycatena.com

| CUSTOMER NO. 246957 | ADVISOR MICHAEL MIGLIORE 929 | TAG NO. 8705 | INVOICE DATE 11/11/20 | INVOICE NO. M8CS22526 |
|---|---|---|---|---|

| ANDREW SCATTAGLIA | LABOR RATE 172.00 | LICENSE NO. | MILEAGE 242 | COLOR IRDIUM SLVR | STOCK NO. 217987 |
|---|---|---|---|---|---|

YEAR / MAKE / MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D   DELIVERY DATE 10/28/20   DELIVERY MILES 21

VEHICLE I.D. NO. 4 J G F B 5 K B 6 M A 3 2 7 3 3 6   SELLING DEALER NO. 51146   PRODUCTION DATE 09/23/20

F.T.E. NO.   P.O. NO.   R.O. DATE 11/10/20

RESIDENCE PHONE   BUSINESS PHONE   COMMENTS C# 1771451J269878   E# 26092030246374   MO: 242

```
ESTIMATE-----------------------------------------------------------------
    CLIENT HEREBY ACKNOWLEDGES RECEIVING
        ORIGINAL ESTIMATE OF    $0.00 (+TAX)
COMMENTS-----------------------------------------------------------------
    TOW IN
    FINISH DATE 11/11/2020
    MB LOANER
    SALES IS DELIVERING CAR

TOTALS------------------------------------------------------------------

***********************        TOTAL LABOR....     0.00
* METHOD OF PAYMENT            TOTAL PARTS....     0.00
* [ ] CASH  [ ] CHECK *        TOTAL SUBLET...     0.00
* [ ] A/X   [ ] VISA           TOTAL G.O.G....     0.00
* [ ] MASTER                   TOTAL MISC CHG.     0.00
* [ ] RCMC CHARGE              TOTAL MISC DISC     0.00
***********************        TOTAL TAX......     0.00
                                                 --------
        THANK YOU FOR YOUR BUSINESS!      TOTAL INVOICE $     0.00
        *****************************
```

_____
    CLIENT SIGNATURE

The Reynolds and Reynolds Company  ERAINTIVE
SF710054 Q  (07/20)



*Ray Catena*

*Motor Car Corporation*

**Mercedes-Benz**

123 South Main Street
**EDISON, N.J. 08837**
(732) 549-8020

2155 Route 22 West
**UNION, N.J. 07083**
(908) 964-4000

www.raycatena.com

| CUSTOMER NO. 246957 | ADVISOR MICHAEL MIGLIORE    929 | TAG NO. 8844 | INVOICE DATE 01/08/21 | INVOICE NO. M8CS23982 |
|---|---|---|---|---|
| ANDREW SCATTAGLIA | LABOR RATE 172.00 | LICENSE NO. | MILEAGE 554 | COLOR IRDIUM SLVR | STOCK NO. 217987 |

| YEAR / MAKE / MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | DELIVERY DATE 10/28/20 | DELIVERY MILES 21 |
|---|---|---|

| VEHICLE I.D. NO. 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | SELLING DEALER NO. 51146 | PRODUCTION DATE 09/23/20 |
|---|---|---|

| F. T. E. NO. | P. O. NO. | R. O. DATE 12/01/20 |
|---|---|---|

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS C# 1771451J269878    E# 26092030246374 | MO: 554 |
|---|---|---|---|

```
LABOR & PARTS------------------------------------------------------------
J# 1 98MBZ          TOWING                    TECH(S):099              0.00
          TOW IN

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-------------------UNIT PRICE-
                                        JOB #  1 TOTAL PARTS          0.00

                              JOB #  1 TOTAL LABOR & PARTS            0.00
--------------------------------------------------------------------------
J# 2 54MBZ-BATTERY-D REPLACE BATTERY     TECH(S):099 55           WARRANTY
          CLIENT STATES RED BATTERY LIGHT IS ON - VEHICLE WILL NOT
          CRANK/START
          VERIFIED COMPLAINT , NO START AND WARNING IN CLUSTER 48
          VOLTS BATTERY WARNING ON., PERFORMED QUICK TEST PRINT CODE#
          B183387 DC/DC CONVERTER BATTERY FOR THE 48V SYSTEM HAS A
          MALFUNCTION, THE MESSAGE IS MISSING. LIN G1/3 - 48V ON VOLT.
          B183349 THE BATTERY FOR THE 48VOLT ON BOARD SYSTEM HAS A
          MALFUNCTION. FOLLOWING LI54. 10-P-069698 FUNCTIONAL
          IMPAIRMENT OF 48V ON-BOARD ELECTRICAL OPEN PTSS CASE# 154425
           SYSTEM,VEHICLE FALLS
          INTO CAUSE/REMEDY 1 AND 2 CAUSE#1 NO START WITH B183387 IN
          DC/DC CONVERTER N83/1, CAUSE 2 B183349 IN 48 VOLT BATTERY.
          PERFORMED rEMEDY1 CAUSED NO START WITH B183387 IN DC/DC
          CONVERTER N83-1 A. IF FIRST VISIT PULL QUICK CHEST IF FAULT
          CODE IS B183387 IN N83-1 (REGARDLESS OF OTHERFAULTS) REPLACE
          ONLY 48V BATTERY. REMEDY 2 B183349 IN 48V BATTERY. A. IF
          FAULT B 183349 IN 48V I. REPLACE ONLY 48 V BATTERY
          (REGARDLELSS OF OTHER FAULTS). I UPDADED DC /DC CONVERTER IF
          LATEST S/W IS AVAILABLE 9 IS THE RESOLUTION RPLACE 48V
          BATTERY AND UPDATED DC/DC CONVERTER.
          PULLED INITIAL QUICK  TEST AND DC/DC CONTROL UNIT LOG.
          PULLED ISA PERFORMANCE DATA BEFORE CLEARING FAULTS. COULD
          NOT ROAD TEST VEHICLE WOULD NOT START. COULD NOT CONFIRM ALL
          48V COMPONENTS COULD BE ACTUATED. NO 48V OUTPUT OF BATTERY.
          VIA XENTRY GUIDE TEST
          A1=M75 ELECTRICAL COOLANT PUMP
          A2=M60 ELECTRICAL TURBO
          A3=A95 ELECTRICAL AC COMPRESSOR
          PRINTED OUT FROM 12V TEST WITH XENTRY BATTERY TESTER IN
          FRONT SAM. DETACHED LINES BETWEEN DC/DC CONVERTER N83-1
          AN48V ON BOARD ELECTRICAL SYSTEM BATTERY, NO DAMAGE ,
          SOILING , CORROSION AND RESISTANCE OF ALL CABLE PINS .1
          OHMS. REMOVED IND INSPECT ALL CABLE INTO/ OUT OF DC/DC
          CONVERTER ALL CLEAN AND TIGHT. AS A RESULT ME MUST REPLACE
          48V ON BOARD ELECTRICAL SYSTEM BATTERY, R&R PASS FRONT SEAT
          ASSEMBLY, R&R REAR SEAT BOTTOM , R&R FRONT AND REAR CARPET,
          R&R FLOOR PANELS , ACCESS  48V BATTERY , R&R BATTERY COOLANT
          LINES , R&R ELECTRICAL LINES , REMOVE FOAM AND REPLACED 48V
          BATTERY , SWAP CONTROL MODULE TO NEW BATTERY , INSTALLED NEW
          BATTERY ,ASSEMBLE VEHICLE IN REVERSE ORDER, PROGRAM NEW

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-------------------UNIT PRICE-
JOB # 2   1    222-989-00-00        TS THERMAL COM                   WARRANTY
JOB # 2   1    000-982-67-14        STARTER BATTER                   WARRANTY
```

The Reynolds and Reynolds Company  ERAINTIINVE
SF710054 Q  (07/20)



*Ray Catena*
*Motor Car Corporation*

| 123 South Main Street | 2155 Route 22 West |
|---|---|
| **EDISON, N.J. 08837** | **UNION, N.J. 07083** |
| (732) 549-8020 | (908) 964-4000 |

www.raycatena.com

| CUSTOMER NO. 246957 | ADVISOR MICHAEL MIGLIORE 929 | TAG NO. 8844 | INVOICE DATE 01/08/21 | INVOICE NO. M8CS23982 |
|---|---|---|---|---|
| ANDREW SCATTAGLIA | LABOR RATE 172.00 | LICENSE NO. | MILEAGE 554 | COLOR IRDIUM SLVR | STOCK NO. 217987 |
| | YEAR / MAKE / MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | | DELIVERY DATE 10/28/20 | DELIVERY MILES 21 |
| | VEHICLE I.D. NO. 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | | SELLING DEALER NO. 51146 | PRODUCTION DATE 09/23/20 |
| | F. T. E. NO. | P. O. NO. | R. O. DATE 12/01/20 | |
| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS C# 1771451J269878      E# 26092030246374 | | MO: 554 |

```
LABOR & PARTS-----------------------------------------------------------
J# 1 98MBZ          TOWING                  TECH(S):099              0.00
              TOW IN

PARTS------QTY---FP-NUMBER-------------DESCRIPTION-----------------UNIT PRICE-
                                        JOB #  1 TOTAL PARTS        0.00

                                        JOB #  1 TOTAL LABOR & PARTS  0.00
-----------------------------------------------------------------------
J# 2 54MBZ-BATTERY-D REPLACE BATTERY         TECH(S):099 55        WARRANTY
              CLIENT STATES RED BATTERY LIGHT IS ON - VEHICLE WILL NOT
              CRANK/START
              VERIFIED COMPLAINT , NO START AND WARNING IN CLUSTER 48
              VOLTS BATTERY WARNING ON., PERFORMED QUICK TEST PRINT CODE#
              B183387 DC/DC CONVERTER BATTERY FOR THE 48V SYSTEM HAS A
              MALFUNCTION, THE MESSAGE IS MISSING. LIN G1/3 - 48V ON VOLT.
              B183349 THE BATTERY FOR THE 48VOLT ON BOARD SYSTEM HAS A
              MALFUNCTION. FOLLOWING LI54. 10-P-069698 FUNCTIONAL
              IMPAIRMENT OF 48V ON-BOARD ELECTRICAL OPEN PTSS CASE# 154425
               SYSTEM,VEHICLE FALLS
              INTO CAUSE/REMEDY 1 AND 2 CAUSE#1 NO START WITH B183387 IN
              DC/DC CONVERTER N83/1, CAUSE 2 B183349 IN 48 VOLT BATTERY.
              PERFORMED rEMEDY1 CAUSED NO START WITH B183387 IN DC/DC
              CONVERTER N83-1 A. IF FIRST VISIT PULL QUICK CHEST IF FAULT
              CODE IS B183387 IN N83-1 (REGARDLESS OF OTHERFAULTS) REPLACE
              ONLY 48V BATTERY. REMEDY 2 B183349 IN 48V BATTERY. A. IF
              FAULT B 183349 IN 48V I. REPLACE ONLY 48 V BATTERY
              (REGARDLELSS OF OTHER FAULTS). I UPDADED DC /DC CONVERTER IF
              LATEST S/W IS AVAILABLE 9 IS THE RESOLUTION RPLACE 48V
              BATTERY AND UPDATED DC/DC CONVERTER.
              PULLED INITIAL QUICK  TEST AND DC/DC CONTROL UNIT LOG.
              PULLED ISA PERFORMANCE DATA BEFORE CLEARING FAULTS. COULD
              NOT ROAD TEST VEHICLE WOULD NOT START. COULD NOT CONFIRM ALL
              48V COMPONENTS COULD BE ACTUATED. NO 48V OUTPUT OF BATTERY.
              VIA XENTRY GUIDE TEST
              A1=M75 ELECTRICAL COOLANT PUMP
              A2=M60 ELECTRICAL TURBO
              A3=A95 ELECTRICAL AC COMPRESSOR
              PRINTED OUT FROM 12V TEST WITH XENTRY BATTERY TESTER IN
              FRONT SAM. DETACHED LINES BETWEEN DC/DC CONVERTER N83-1
              AN48V ON BOARD ELECTRICAL SYSTEM BATTERY, NO DAMAGE ,
              SOILING , CORROSION AND RESISTANCE OF ALL CABLE PINS .1
              OHMS. REMOVED IND INSPECT ALL CABLE INTO/ OUT OF DC/DC
              CONVERTER ALL CLEAN AND TIGHT. AS A RESULT ME MUST REPLACE
              48V ON BOARD ELECTRICAL SYSTEM BATTERY, R&R PASS FRONT SEAT
              ASSEMBLY, R&R REAR SEAT BOTTOM , R&R FRONT AND REAR CARPET,
              R&R FLOOR PANELS , ACCESS  48V BATTERY , R&R BATTERY COOLANT
              LINES , R&R ELECTRICAL LINES , REMOVE FOAM AND REPLACED 48V
              BATTERY , SWAP CONTROL MODULE TO NEW BATTERY , INSTALLED NEW
              BATTERY ,ASSEMBLE VEHICLE IN REVERSE ORDER, PROGRAM NEW

PARTS------QTY---FP-NUMBER-------------DESCRIPTION-----------------UNIT PRICE-
JOB # 2    1    222-989-00-00       TS THERMAL COM              WARRANTY
JOB # 2    1    000-982-67-14       STARTER BATTER              WARRANTY
```

The Reynolds and Reynolds Company  ERAINTINVE
SF710054 Q  (07/20)



*Ray Catena*
*Motor Car Corporation*

Mercedes-Benz

| 123 South Main Street | 2155 Route 22 West |
|---|---|
| **EDISON, N.J. 08837** | **UNION, N.J. 07083** |
| (732) 549-8020 | (908) 964-4000 |

www.raycatena.com

| CUSTOMER NO. 246957 | ADVISOR MICHAEL MIGLIORE 929 | TAG NO. 8844 | INVOICE DATE 01/08/21 | INVOICE NO. M8CS23982 |
|---|---|---|---|---|

| ANDREW SCATTAGLIA | LABOR RATE 172.00 | LICENSE NO. | MILEAGE 554 | COLOR IRDIUM SLVR | STOCK NO. 217987 |
|---|---|---|---|---|---|

| | YEAR / MAKE / MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | DELIVERY DATE 10/28/20 | DELIVERY MILES 21 |
|---|---|---|---|

| VEHICLE I.D. NO. 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | SELLING DEALER NO. 51146 | PRODUCTION DATE 09/23/20 |
|---|---|---|

| F.T.E. NO. | P.O. NO. | R.O. DATE 12/01/20 |
|---|---|---|

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS C# 1771451J269878    E# 26092030246374 | MO: 554 |
|---|---|---|---|

```
                                    JOB #  2 TOTAL PARTS        0.00

                                    JOB #  2 TOTAL LABOR & PARTS 0.00
-------------------------------------------------------------------------
ESTIMATE-----------------------------------------------------------------
CLIENT HEREBY ACKNOWLEDGES RECEIVING
        ORIGINAL ESTIMATE OF      $0.00 (+TAX)
COMMENTS-----------------------------------------------------------------
TOW IN
THIS CAR IS GONE DO NOT CALL CLIENT

TOTALS-------------------------------------------------------------------

***********************          TOTAL LABOR....    0.00
* METHOD OF PAYMENT              TOTAL PARTS....    0.00
* [ ] CASH   [ ] CHECK *         TOTAL SUBLET...    0.00
* [ ] A/X    [ ] VISA            TOTAL G.O.G....    0.00
* [ ] MASTER                     TOTAL MISC CHG.    0.00
* [ ] RCMC CHARGE                TOTAL MISC DISC    0.00
***********************          TOTAL TAX......    0.00
            THANK YOU FOR YOUR BUSINESS!            --------
            ******************************** TOTAL INVOICE $  0.00
```

_____
     CLIENT SIGNATURE

The Reynolds and Reynolds Company  ERAINTINVE
SF710054 Q  (07/20)



*Ray Catena*
## Motor Car Corporation

Mercedes-Benz

| 123 South Main Street | 2155 Route 22 West |
|---|---|
| **EDISON, N.J. 08837** | **UNION, N.J. 07083** |
| (732) 549-8020 | (908) 964-4000 |

www.raycatena.com

| CUSTOMER NO. 254013 | ADVISOR MICHAEL MIGLIORE 929 | TAG NO. 3535 | INVOICE DATE 04/15/21 | INVOICE NO. M8CS33101 |
|---|---|---|---|---|

| JERRY SCATTAGLIA | LABOR RATE 172.00 | LICENSE NO. | MILEAGE 2,194 | COLOR IRDIUM SLVR | STOCK NO. 217987 |
|---|---|---|---|---|---|

| | YEAR / MAKE / MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | DELIVERY DATE 10/28/20 | DELIVERY MILES 21 |
|---|---|---|---|

| | VEHICLE I.D. NO. 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | SELLING DEALER NO. 51146 | PRODUCTION DATE 09/23/20 |
|---|---|---|---|

| | F. T. E. NO. | P.O. NO. | R. O. DATE 04/10/21 |
|---|---|---|---|

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS C# 1771451J269878    E# 26092030246374 | MO: 2194 |
|---|---|---|---|

```
LABOR & PARTS------------------------------------------------------
J# 1 98MBZ          TOWING              TECH(S):099              INTERNAL
        VEHICLE TOWED IN

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-------------------UNIT PRICE-
                                        JOB #  1 TOTAL PARTS          0.00

                        JOB #  1 TOTAL LABOR & PARTS                  0.00
-------------------------------------------------------------------
J# 2 98MBZLOANER    RCMC LOANER CAR     TECH(S):099              INTERNAL
        LOANER CAR #27
        SUPPLIED LOANER CAR

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-------------------UNIT PRICE-
                                        JOB #  2 TOTAL PARTS          0.00

                        JOB #  2 TOTAL LABOR & PARTS                  0.00
-------------------------------------------------------------------
J# 3 54MBZ          MISC                TECH(S):099              WARRANTY
        CLIENT STATES VEHICLE WILL NOT START - NO CRANK NO START
        CK. VEHICLE DOES NOT START, SDS AND CHARGER HOOK UP SDS TEST
        CK. DTC'S B183349 BATTERY FOR 48 VOLT ON BOARD ELECTRICAL
        SYSTEM HAS A MALFUNCTION...THERE'S AN INTERNAL ELECTRICAL
        FAULT. B183371 THE BATTERY FOR 48 VOLT ON BOARD ELECTRICAL
        SYSTEM HAS A MALFUNCTION..THE ACTUATOR IS BLOCKED. PROCESS
        DTC'S AS PER LI54.10-P-069698  AND PERFORM CK. LIST..FOR
        CAUSE 2 FOR THESE 2 FAULT CODES MENTIONED ABOVE...
        AS PER LI54.10-P-069698  REMOVE R/F SEAT AND R/F RUG AND R/R
        PORTION OF REAR RUG REMOVE FLOOR BOARD PANELING AND REPLACE
        48 VOLT BATTERY..WITH DC/DC CONVERTER AND INITIAL STARTUP OF
        DC/DC CONVERTER AND UPDATE 48V SYSTEM CK...RECK.
        FUNCTIONS OK. ERASED CODES AND REASSEMBLE VEHICLE ..

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-------------------UNIT PRICE-
JOB # 3      1    000-982-67-14-MB    STARTER BATTER           WARRANTY
                                        JOB #  3 TOTAL PARTS          0.00

                        JOB #  3 TOTAL LABOR & PARTS                  0.00
-------------------------------------------------------------------
J# 4 68MBZZTRIM2    INT. ELECT CONCERN  TECH(S):099              WARRANTY
        CLIENT STATES DASH WENT OUT FOR 1-2 MINUTES AND THEN CAME
        BACK ON (WHILE DRIVING)
        CK. VEHICLE CLUSTER WENT BLANK, SDS AND CHARGER HOOK UP SDS
        TEST CK. DTCS NONE CK. FOR RELATED LI'S NONE CK. FOR RELATED
        PROBLEMS WITH OTHER VEHICLES NONE SPECIFIC TO THIS COMPLIANT
        CK. FOR CLUSTER S/W UPDATES AND UP CLUSTER S/W

PARTS------QTY---FP-NUMBER--------------DESCRIPTION-------------------UNIT PRICE-
                                        JOB #  4 TOTAL PARTS          0.00

                        JOB #  4 TOTAL LABOR & PARTS                  0.00
-------------------------------------------------------------------
ESTIMATE-----------------------------------------------------------
CLIENT HEREBY ACKNOWLEDGES RECEIVING
        ORIGINAL ESTIMATE OF     $0.00 (+TAX)
```

The Reynolds and Reynolds Company  ERAINTINVE
SF710054 Q  (07/20)



*Ray Catena*
*Motor Car Corporation*

| 123 South Main Street | 2155 Route 22 West |
|---|---|
| **EDISON, N.J. 08837** | **UNION, N.J. 07083** |
| (732) 549-8020 | (908) 964-4000 |

www.raycatena.com

| CUSTOMER NO. 254013 | ADVISOR MICHAEL MIGLIORE    929 | TAG NO. 3535 | INVOICE DATE 04/15/21 | INVOICE NO. M8CS33101 |
|---|---|---|---|---|

| JERRY SCATTAGLIA | LABOR RATE 172.00 | LICENSE NO. | MILEAGE 2,194 | COLOR IRDIUM SLVR | STOCK NO. 217987 |
|---|---|---|---|---|---|

| | YEAR / MAKE / MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | DELIVERY DATE 10/28/20 | DELIVERY MILES 21 |
|---|---|---|---|

| | VEHICLE I.D. NO. 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | SELLING DEALER NO. 51146 | PRODUCTION DATE 09/23/20 |
|---|---|---|---|

| | F. T. E. NO. | P.O. NO. | R. O. DATE 04/10/21 |
|---|---|---|---|

| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS C# 1771451J269878      E# 26092030246374 | MO: 2194 |
|---|---|---|---|

```
COMMENTS-----------------------------------------------------------------
MB LOANER 27
FINISH DATE 4/15/2021

TOTALS-------------------------------------------------------------------

***********************
* METHOD OF PAYMENT
* [ ] CASH  [ ] CHECK *
* [ ] A/X  [ ] VISA
* [ ] MASTER
* [ ] RCMC CHARGE
***********************
          THANK YOU FOR YOUR BUSINESS!
          *****************************
```

| | |
|---|---|
| TOTAL LABOR.... | 0.00 |
| TOTAL PARTS.... | 0.00 |
| TOTAL SUBLET... | 0.00 |
| TOTAL G.O.G.... | 0.00 |
| TOTAL MISC CHG. | 0.00 |
| TOTAL MISC DISC | 0.00 |
| TOTAL TAX...... | 0.00 |

**TOTAL INVOICE $      0.00**

_____
    CLIENT SIGNATURE

The Reynolds and Reynolds Company  ERAINTIVE
SF710054 Q  (07/20)



*Ray Catena*
*Motor Car Corporation*

Mercedes-Benz

123 South Main Street
**EDISON, N.J. 08837**
(732) 549-6606

2155 Route 22 West
**UNION, N.J. 07083**
(908) 964-4000

www.raycatena.com

0101IM8CS39921

| CUSTOMER NO. 254013 | ADVISOR MICHAEL MIGLIORE | TAG NO. 3074 | INVOICE DATE 07/19/21 | INVOICE NO. M8CS39921 |
|---|---|---|---|---|
| JERRY SCATTAGLIA | 929 | | | |
| 135 OAK AVE | LABOR RATE 172.00 | LICENSE NO. | MILEAGE 3,506 | COLOR IRDIUM SLVR | STOCK NO. 217987 |
| STATEN ISLAND, NY 10306-4002 | YEAR/MAKE/MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | DELIVERY DATE 10/28/20 | DELIVERY MILES 21 |
| | VEHICLE I.D. NO. 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | P.O. NO. | SELLING DEALER NO. 51146 | PRODUCTION DATE 09/23/20 |
| | P.T.E. NO. | | R.O. DATE 07/16/21 | |
| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS C# 167/1591A327336   E# 25693030228215 | | MO: 3507 |

```
LABOR & PARTS
J# 1 98MBZ-PICKUP    PICK UP/DELIVERY              TECH(S):099                    0.00
             VEHICLE PICK UP AND OR DELIVERY
             SEE JOB LINE FOR REPAIR

PARTS-----QTY---FP-NUMBER-------------DESCRIPTION--------------UNIT PRICE-
                                           JOB # 1 TOTAL PARTS                  0.00

                                   JOB # 1 TOTAL LABOR & PARTS                  0.00

J# 2 98MBZLOANER    RCMC LOANER CAR              TECH(S):099                    0.00
             MB LOANER 20
             SUPPLIED LOANER CAR

PARTS-----QTY---FP-NUMBER-------------DESCRIPTION--------------UNIT PRICE-
                                           JOB # 2 TOTAL PARTS                  0.00

                                   JOB # 2 TOTAL LABOR & PARTS                  0.00

J# 3 68MBZ-INTERIOR- MISC INTERIOR REPAIR        TECH(S):099          WARRANTY
             CLIENT STATES THE DASH BEGAN MAKING A BUZZING NOISE THAT
             STILL HAPPENED EVEN AFTER CLIENT SHUT VEHICLE OFF - SEE MIKE
             M - 3OP CHARGING PAD
             R&R CENTER CONSOLE AND REPLACE CHARGE PAD, INITIALIZED AND
             CK. FUNCTIONS OK

PARTS-----QTY---FP-NUMBER-------------DESCRIPTION--------------UNIT PRICE-     WARRANTY
JOB # 3      1    177-900-17-10       CONTROL UNIT,                              0.00
                                           JOB # 3 TOTAL PARTS                  0.00

                                   JOB # 3 TOTAL LABOR & PARTS                  0.00

ESTIMATE
CLIENT HEREBY ACKNOWLEDGES RECEIVING
             ORIGINAL ESTIMATE OF    $0.00 (+TAX)
COMMENTS
MB LOANER 20
FINISH DATE 7/19/2021

TOTALS

****************
* METHOD OF PAYMENT *                      TOTAL LABOR....      0.00
* [ ] CASH  [ ] CHECK *                    TOTAL PARTS....      0.00
* [ ] A/X   [ ] VISA  *                    TOTAL SUBLET...      0.00
* [ ] MASTER          *                    TOTAL G.O.G....      0.00
* [ ] RCMC CHARGE     *                    TOTAL MISC CHG.      0.00
****************                           TOTAL MISC DISC      0.00
        THANK YOU FOR YOUR BUSINESS!       TOTAL TAX......      0.00
        *********************************
                                           TOTAL INVOICE $      0.00


    CLIENT SIGNATURE

PAGE 1 OF 1
             CUSTOMER COPY            | END OF INVOICE |  03:32pm
```



*Ray Watena*

## Motor Car Corporation



Mercedes-Benz

123 South Main Street
**EDISON, N.J. 08837**
(732) 549-6606

2155 Route 22 West
**UNION, N.J. 07083**
(908) 964-4000

www.raycatena.com

01011M8CS44095

| CUSTOMER NO. 254013 | ADVISOR MICHAEL MIGLIORE | | TAG NO. 929 3539 | INVOICE DATE 10/20/21 | INVOICE NO. M8CS44095 |
|---|---|---|---|---|---|
| JERRY SCATTAGLIA | LABOR RATE 178.00 | LICENSE NO. | MILEAGE 4,537 | COLOR IRDIUM SLVR | STOCK NO. 217987 |
| 135 OAK AVE | YEAR / MAKE / MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | | | DELIVERY DATE 10/28/20 | DELIVERY MILES 21 |
| STATEN ISLAND, NY 10306-4002 | VEHICLE I.D. NO. 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | | | SELLING DEALER NO. 51146 | PRODUCTION DATE 09/23/20 |
| | F.T. NO. | | P.O. NO. | R.O. DATE 09/16/21 | REPRINT# 1 |
| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS C# 1671591A327336    E# 25693030228215 | | | MO: 4537 |

```
LABOR & PARTS---------------------------------------------------------------
J# 1 98MBZLOANER    RCMC LOANER CAR              TECH(S):0133              0.00
         MB LOANER 26
         SUPPLIED LOANER CAR

PARTS------QTY---FP-NUMBER-------------DESCRIPTION------------------UNIT PRICE-
                                              JOB #  1 TOTAL PARTS          0.00

                                      JOB #  1 TOTAL LABOR & PARTS          0.00
------------------------------------------------------------------------------
J# 2 00MBZ0000      CHECK FLUIDS/TIREPSI         TECH(S):0133              0.00
         CHECK ALL FLUIDS AND TIRE PSI
         TOP OFF ALL FLUIDS/CHECKED AND ADJUSTED ALL TIRE PRESSURE
         COMPLETED

PARTS------QTY---FP-NUMBER-------------DESCRIPTION------------------UNIT PRICE-
                                              JOB #  2 TOTAL PARTS          0.00

                                      JOB #  2 TOTAL LABOR & PARTS          0.00
------------------------------------------------------------------------------
J# 3 00MBZ10K       10,000 MILE SERVICE          TECH(S):0133          INTERNAL
         CLIENT REQUESTS THE 10,000 MILE SERVICE WITH TIRE ROTATION
         As per cust.
         COMPLETED SERVICE

PARTS------QTY---FP-NUMBER-------------DESCRIPTION------------------UNIT PRICE-
JOB # 3      1    256-184-00-00     TS OIL FILTER                    INTERNAL
JOB # 3      1    002-990-20-17     SCREW PLUG                       INTERNAL
JOB # 3      1    000-986-20-00-13  FLUID                            INTERNAL
JOB # 3      9    000-989-80-02-11BMEU MB 229.52 SAE                 INTERNAL
                                              JOB #  3 TOTAL PARTS          0.00

                                      JOB #  3 TOTAL LABOR & PARTS          0.00
------------------------------------------------------------------------------
J# 4 27MBZ-ELC-TST-B ELEC TEST TRANS            TECH(S):0133          INTERNAL
         CLIENT STATES ON A FLAT SURFACE IN DRIVE WITHOUT FOOT ON
         BRAKE VEHICLE WILL ROLL BACKWARD.  CLIENT HAS ALMOST HIT CAR
         BEHIND THEM, PARKTRONIC ALERTS SOUND TOO
         Function test and unable to verify complaint. Hook up
         charger and SDS. Performed quick test and found no codes
         present
         NPF at this time, see line 5

PARTS------QTY---FP-NUMBER-------------DESCRIPTION------------------UNIT PRICE-
                                              JOB #  4 TOTAL PARTS          0.00

                                      JOB #  4 TOTAL LABOR & PARTS          0.00
------------------------------------------------------------------------------
J# 5 27MBZZTRANSS    TRANS CONCERN               TECH(S):0133          INTERNAL
         CLIENT STATES TRANSMISSION FEELS LIKE IT IS SLIPPING, CLIENT
         HAS TO FLOOR THE GAS IN ORDER TO ACCELERATE. GEAR CHANGING
         ALSO SEEMS VERY ROUGH AT TIMES - CHECK/REPORT
```

## LIMITED LABOR WARRANTY

The Repair Center guarantees the labor used in performing the repairs listed on the front of the Repair Order for a period of 90 days or 4,000 miles (whichever comes first) from the date such repairs were completed. This Limited Warranty specifically excludes; front end alignments, electrical wiring and shorts, and fuel system—when due to contamination. This Limited Warranty is extended to the vehicle client and is not transferable to, nor enforceable by, any other person.

During the duration period of this Limited Warranty, the Repair Center will provide additional labor, at no expense to client, for any additional repairs that are necessitated as a result of any defect in labor performed while completing the repairs listed on the front of the Repair Order.

To obtain repairs under this Limited Warranty, client must: (a) notify the Repair Center at the address shown on the front of the Repair Order of any defect in labor within a reasonable time after client discovers or should have discovered any such defect. Such notice, however, must be given to the Repair Center before the end of the duration period of this Limited Warranty, as specified above; (b) deliver the vehicle to the Repair Center at the address shown on the front of the Repair Order within five (5) days of notice of such defect in labor; (c) authorize the Repair Center to make the repairs required; and (d) pay the charges for any additional parts required together with applicable sales tax upon completion of such repair.

All implied warranties, including the implied warranties of merchantability and fitness for a particular purpose, are limited to the duration period of this limited warranty. Under no circumstances will the Repair Center be liable to client for any incidental or consequential damages including, but not limited to, damages for loss of property, loss of vehicle use, loss of time, loss of income and profits, inconvenience or commercial loss.

This part(s) is sold "as is". The only warranties applying to this part(s) are those which may be offered by the manufacturer(s). The selling center hereby expressly disclaims all warranties, either express or implied, including any implied  warranties of merchantability or fitness for a particular purpose, and neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of this part(s) and/or service. Client shall not be entitled to recover from the selling center any consequential damages, damages to property, damages for loss of use, loss of time, loss of profits, or income, or any other incidental damages. In addition, expressly excluded is any retailer liability for defects pertaining to safety or performance, by way of "strict liability", negligence or otherwise.



*Ray Catena*

*Motor Car Corporation*

Mercedes-Benz

123 South Main Street
**EDISON, N.J. 08837**
(732) 549-6606

2155 Route 22 West
**UNION, N.J. 07063**
(908) 964-4000

www.raycatena.com



0101IM8CS44095

| CUSTOMER NO. 254013 | ADVISOR MICHAEL MIGLIORE | TAG NO 929 | 3539 | INVOICE DATE 10/20/21 | INVOICE NO. M8CS44095 |
|---|---|---|---|---|---|
| JERRY SCATTAGLIA | LABOR RATE 178.00 | LICENSE NO. | MILEAGE 4,537 | COLOR IRIDIUM SLVR | STOCK NO. 217987 |
| 135 OAK AVE | YEAR / MAKE / MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | | | DELIVERY DATE 10/28/20 | DELIVERY MILES 21 |
| STATEN ISLAND, NY 10306-4002 | VEHICLE I.D. NO. 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | | | SELLING DEALER NO. 51146 | PRODUCTION DATE 09/23/20 |
| | F.T.L. NO. | | P.O. NO. | R.O. DATE 09/16/21 | REPRINT# 1 |
| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS C# 1671591A327336 | E# 25693030228215 | | MO: 4537 |

non time to test drive veh (4537-4541mi) and unable to
duplicate. Hook up charger and SDS. Performed testing as per
Xentry ITT. As per Xentry check and found no software update
avail
As per Xentry performed torque converter and standstill
adaptations. Cleared all codes and test, all OK

PARTS------QTY---FP-NUMBER--------------DESCRIPTION--------------------UNIT PRICE-
                                                JOB #  5 TOTAL PARTS              0.00

                                        JOB #  5 TOTAL LABOR & PARTS              0.00

J# 6 07MBZ-ENGLAMP-B CHECK ENG LAMP                    TECH(S):0133             INTERNAL
        CLIENT STATES INTERM. CHECK ENGINE LIGHT COMES ON WHILE
        DRIVING
        Function test and found no CEL is on, hook up charger and
        SDS. Performed quick test and found no codes present. Test
        drove veh and re check, all OK
        NPF at this time

PARTS------QTY---FP-NUMBER--------------DESCRIPTION--------------------UNIT PRICE-
                                                JOB #  6 TOTAL PARTS              0.00

                                        JOB #  6 TOTAL LABOR & PARTS              0.00

J# 7 88MBZ-ADJUST-D  ADJ. BODY                        TECH(S):0133              0.00
        CLIENT STATES THERE IS A DENT ON HOOD - AUTOXCEL WARRANTY
        y

PARTS------QTY---FP-NUMBER--------------DESCRIPTION--------------------UNIT PRICE-
                                                JOB #  7 TOTAL PARTS              0.00

                                        JOB #  7 TOTAL LABOR & PARTS              0.00

J# 8+40MBZWHEEL      WHEEL REFINISH                    TECH(S):0133              0.00
        CLIENT STATES THE R/REAR WHEEL HAS CURB DAMAGE
        REPAIR DAMAGED WHEEL
        COMPLETED

PARTS------QTY---FP-NUMBER--------------DESCRIPTION--------------------UNIT PRICE-
                                                JOB #  8 TOTAL PARTS              0.00

                                        JOB #  8 TOTAL LABOR & PARTS              0.00

SUBLET-----PO#-------VEND INV#-INV.DATE-DESCRIPTION------------------------
JOB # 7    310094           10/08/21 DENT/SCATTAGLIA 58203862         INTERNAL
JOB # 8    310067    2423   10/05/21 WHEEL REPR/SCATTAGLIA 2423       138.00
                                                TOTAL - SUBLET        138.00

ESTIMATE-------------------------------------------------------------
CLIENT HEREBY ACKNOWLEDGES RECEIVING
        ORIGINAL ESTIMATE OF   $250.00 (+TAX)
COMMENTS-------------------------------------------------------------
PICK UP / DELIVERY - MB LOANER 26

PAGE 2 OF 3            CUSTOMER COPY            [CONTINUED ON NEXT PAGE]   08:20am

The Reynolds and Reynolds Company  PRINTWISE  CC623452 Q (02/03)

## LIMITED LABOR WARRANTY

The Repair Center guarantees the labor used in performing the repairs listed on the front of the Repair Order for a period of 90 days or 4,000 miles (whichever comes first) from the date such repairs were completed. This Limited Warranty specifically excludes: front end alignments, electrical wiring and shorts, and fuel system--when due to contamination. This Limited Warranty is extended to the vehicle client and is not transferable to, nor enforceable by, any other person.

During the duration period of this Limited Warranty, the Repair Center will provide additional labor, at no expense to client, for any additional repairs that are necessitated as a result of any defect in labor performed while completing the repairs listed on the front of the Repair Order.

To obtain repairs under this Limited Warranty, client must: (a) notify the Repair Center at the address shown on the front of the Repair Order of any defect in labor within a reasonable time after client discovers or should have discovered any such defect. Such notice, however, must be given to the Repair Center before the end of the duration period of this Limited Warranty, as specified above; (b) deliver the vehicle to the Repair Center at the address shown on the front of the Repair Order within five (5) days of notice of such defect in labor; (c) authorize the Repair Center to make the repairs required; and (d) pay the charges for any additional parts required together with applicable sales tax upon completion of such repair.

All implied warranties, including the implied warranties of merchantability and fitness for a particular purpose, are limited to the duration period of this limited warranty. Under no circumstances will the Repair Center be liable to client for any incidental or consequential damages including, but not limited to, damages for loss of property, loss of vehicle use, loss of time, loss of income and profits, inconvenience or commercial loss.

This part(s) is sold "as is". The only warranties applying to this part(s) are those which may be offered by the manufacturer(s). The selling center hereby expressly disclaims all warranties, either express or implied, including any implied warranties of merchantability or fitness for a particular purpose, and neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of this part(s) and/or service. Client shall not be entitled to recover from the selling center any consequential damages, damages to property, damages for loss of use, loss of time, loss of profits, or income, or any other incidental damages. In addition, expressly excluded is any retailer liability for defects pertaining to safety or performance, by way of "strict liability", negligence or otherwise.



*Ray Catena*
*Motor Car Corporation*

Mercedes-Benz

123 South Main Street
**EDISON, N.J. 08837**
(732) 549-6606

2155 Route 22 West
**UNION, N.J. 07083**
(908) 964-4000

www.raycatena.com



0101IM8CS44095

| CUSTOMER NO. 254013 | ADVISOR MICHAEL MIGLIORE | TAG NO 929 | 3539 | INVOICE DATE 10/20/21 | INVOICE NO. M8CS44095 |
|---|---|---|---|---|---|
| JERRY SCATTAGLIA | LABOR RATE 178.00 | LICENSE NO | MILEAGE 4,537 | COLOR IRDIUM SLVR | STOCK NO. 217987 |
| 135 OAK AVE | YEAR / MAKE / MODEL 21/MERCEDES LIGHT TRUCK/GLE450W4/4 D | | | DELIVERY DATE 10/28/20 | DELIVERY MILES 21 |
| STATEN ISLAND, NY 10306-4002 | VEHICLE I.D. NO 4 J G F B 5 K B 6 M A 3 2 7 3 3 6 | | | SELLING DEALER NO 51146 | PRODUCTION DATE 09/23/20 |
| | F.T.E NO | | P.O. NO. | 9. O. DATE 09/16/21 | REPRINT# 1 |
| RESIDENCE PHONE | BUSINESS PHONE | COMMENTS C# 1671591A327336    E# 25693030228215 | | | MO: 4537 |

TOTALS- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

```
***********************
* METHOD OF PAYMENT
* [ ] CASH   [ ] CHECK *
* [ ] A/X   [ ] VISA
* [ ] MASTER
* [ ] RCMC CHARGE
***********************
```

THANK YOU FOR YOUR BUSINESS!
*****************************

CLIENT SIGNATURE

| | |
|---|---|
| TOTAL LABOR.... | 0.00 |
| TOTAL PARTS.... | 0.00 |
| TOTAL SUBLET... | 138.00 |
| TOTAL G.O.G.... | 0.00 |
| TOTAL MISC CHG. | 0.00 |
| TOTAL MISC DISC | 0.00 |
| TOTAL TAX...... | 0.00 |
| **TOTAL INVOICE $** | **138.00** |

The Reynolds and Reynolds Company  PRINTING  CO8254832 O  (07/00)

SF6170096 Q  (01/06)

## LIMITED LABOR WARRANTY

The Repair Center guarantees the labor used in performing the repairs listed on the front of the Repair Order for a period of 90 days or 4,000 miles (whichever comes first) from the date such repairs were completed. This Limited Warranty specifically excludes: front end alignments, electrical wiring and shorts, and fuel system--when due to contamination. This Limited Warranty is extended to the vehicle client and is not transferable to, nor enforceable by, any other person.

During the duration period of this Limited Warranty, the Repair Center will provide additional labor, at no expense to client, for any additional repairs that are necessitated as a result of any defect in labor performed while completing the repairs listed on the front of the Repair Order.

To obtain repairs under this Limited Warranty, client must: (a) notify the Repair Center at the address shown on the front of the Repair Order of any defect in labor within a reasonable time after client discovers or should have discovered any such defect. Such notice, however, must be given to the Repair Center before the end of the duration period of this Limited Warranty, as specified above; (b) deliver the vehicle to the Repair Center at the address shown on the front of the Repair Order within five (5) days of notice of such defect in labor; (c) authorize the Repair Center to make the repairs required; and (d) pay the charges for any additional parts required together with applicable sales tax upon completion of such repair.

All implied warranties, including the implied warranties of merchantability and fitness for a particular purpose, are limited to the duration period of this limited warranty. Under no circumstances will the Repair Center be liable to client for any incidental or consequential damages including, but not limited to, damages for loss of property, loss of vehicle use, loss of time, loss of income and profits, inconvenience or commercial loss.

This part(s) is sold "as is". The only warranties applying to this part(s) are those which may be offered by the manufacturer(s). The selling center hereby expressly disclaims all warranties, either express or implied, including any implied warranties of merchantability or fitness for a particular purpose, and neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of this part(s) and/or service. Client shall not be entitled to recover from the selling center any consequential damages, damages to property, damages for loss of use, loss of time, loss of profits, or income, or any other incidental damages. In addition, expressly excluded is any retailer liability for defects pertaining to safety or performance, by way of "strict liability", negligence or otherwise.

# COMPLAINT
# EXHIBIT B

The Warranty Process Flow Within the
Automotive Industry:
An Investigation of
Automotive Warranty Processes and Issues

Prepared for the

Program on Automotive Practices

Sponsored by

Microsoft Corporation



August 2005

The statements, findings, and conclusions herein are those of the authors and do not
necessarily reflect the views of the project sponsor.

# Acknowledgements

The CAR-Microsoft Program on Automotive Industry Practices is a four-year research effort consisting of in-depth, focused interviews with industry participants on subjects of importance to all industry stakeholders.  The Automotive Industry Program, funded by Microsoft, will investigate two topics per year, with results publicly disseminated.   The first topic of investigation for 2005, presented in this report, is the flow of warranty data within the automotive industry.

The Center for Automotive Research would like to thank Microsoft Corporation for its support and proactive interest in topics of critical importance to all automotive industry stakeholders.  We believe the CAR-Microsoft Program on Automotive Industry Practices is representative of Microsoft's desire to further public discussion on important automotive issues.

We would like to thank those in the automotive industry who took time to guide our work.  CAR greatly appreciates the willingness of those interviewed to share their insights and ideas.  Without their support such a project would not be possible.  These individuals showed a strong passion for creating better warranty processes both within their companies, and throughout the industry.  We hope this report reflects, in some way, the commitment these industry participants have toward their work.

Finally, this report is the result of several people contributing in many ways. The authors of this report would like to thank Karen Esper, who contributed by formatting and managing the document.  Jillian Lindsay Gauthier assisted in the interview process and document review.


Brett C. Smith
Assistant Director, Manufacturing, Engineering and Technology

Raymond T. Miller
Research Assistant

The Center for Automotive Research
1000 Victors Way, Suite 200
Ann Arbor, MI 48108
Telephone:  (734) 662-1287
Fax:  (734) 662-5736
www.cargroup.org

## TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ................................................................I

Introduction ...............................................................................1

The Path from Repair Bay to the Supplier ...............................2

From the Dealer to the Vehicle manufacturer .........................3

The Pathway Within the Vehicle manufacturers ......................5

Data Overload...........................................................................10

Strategic Warranty Considerations .........................................13

Conclusions ..............................................................................16

# Executive Summary

The Center for Automotive Research (CAR) has undertaken the CAR-Microsoft Program on Automotive Industry Practices.  The program is a four-year research effort consisting of in-depth, focused interviews with industry participants on subjects of importance to all industry stakeholders.  The Automotive Industry Program will investigate two topics per year, with results publicly disseminated.  [The first topic of investigation is warranty process flow in the automotive industry.]  Importantly, this topic is not intended to gather confidential data such as warranty cost estimates.  Instead, this report will describe the flow of warranty data gathering, including processing and application activities, and where possible, highlight selected practices and critical future operating issues.

As with many CAR projects, the identity of companies interviewed will not be made available—nor will information be presented in a way that may directly identify any participating companies.  CAR researchers interviewed representatives from three automakers, four suppliers, and one dealership as part of this project.  Given the relative small number of interviews, this report is not intended to be a complete description of the topic.  Instead it is hoped that by selecting companies that have been identified as thought leaders in a specific topic, these reports will be then be viewed as contributing to the greater understanding of the issues and challenges.

Given the high volume of manufacture, the complexity of the product, and the often harsh operating environment in which the automobile is used, it is inevitable that there will be component failures.  While there are certainly lessons to be learned from these failures, such incidents can in some ways be viewed as normal operating noise from non-assignable causes.  However, the manufacturers and suppliers must be able to differentiate the expected component failure rate—the 'noise'—from those incidents that may be an indication of a systemic failure of the component.  This report will focus on how the industry is addressing those warranty issues that appear to be serial in nature, and would thus present significant potential cost exposure.

Guided by the responses of those interviewed, CAR has identified two areas of the warranty process of focus for this report, and four issues that are likely to be critical challenges for the industry in the coming years.  The first area of focus is the flow of data from the dealership to the manufacturer, and then from the manufacturer to the supplier.  The second area of focus is the challenges brought about by the large volume of warranty data that is available.

Lastly, CAR will address four issues that were described by interviewees as pending warranty challenges within the industry: (1) the challenge of increased warranty issues surrounding greater application of on-vehicle electronics; (2) the lack of skilled mechanics; (3) the action of vehicle manufacturers moving toward warranty cost-sharing as a method to increase revenue; and finally (4) the difficulty presented when applying current warranty strategies in developing markets.

The flow of warranty data, in its most simple form, is a reporting and transfer of information regarding an in-service product failure.  A failure is reported by the service representative (the dealer) to the vehicle manufacturer, and then, if deemed necessary by the vehicle manufacturer, to the component supplier.  In reality, this seemingly simple path is exceptionally complex, and at times even serendipitous.  The warranty data

process is highly quantitative and qualitative, sometimes scientific, and often creative. The process as identified by the participants includes:

1. Part identification/defect analysis and codification.
2. Reporting of warranty claim to the vehicle manufacturer—claim processing.
3. Investigation of claim by vehicle manufacturer warranty analysis center—claim review.
4. Notification of incident—or more accurately, increase in reported incidents—to component supplier.
5. Incident remediation (i.e. manufacturing, engineering, materials etc.) as required.
6. And, possible further action taken to assure the correction is implemented throughout the product line, including future components.

This report describes the communication formats, and touch-points for the six data flow processes.

As noted, on the surface the warranty process would appear to be rather straight forward. However, the variance with which the data is collected, communicated and analyzed creates opportunity for complexity nearly unimaginable by an outsider. Warranty data coding of failures varies from dealer to dealer—even from technician to technician—within a vehicle manufacturer dealer network, as well as between the vehicle manufacturer dealer networks. Nearly all interviewed suggested that if they were to take the same part to five different dealers, the failure would likely be identified and coded differently by each dealer. In their view, this was not an indictment of the repair shops ability to analyze the problem. Instead it was a reflection of the extent of the challenge. Often times the reason for a part failure is obvious, but just as often, the root cause of a failure is not readily apparent. The dealer repair shop must make a rapid decision regarding the failed part. Included in the decision process is allowable repair time, workload of staff, the experience of the technician, and even the history of reimbursement by the vehicle manufacturer.

From this rather inauspicious start, the data is then sent to the vehicle manufacturer where, although it is usually centrally housed, it often follows several separate paths. While each manufacturer has developed its own internal process for warranty data, the flow generally starts with a review of the dealership claim. In most aspects, this step serves as a method to monitor dealer repair work and focus on the process of repairing the vehicle. Although the claim process has become electronic in recent years, there is still a considerable amount of staff effort required to analyze and follow-up via telephone for clarification. While this review process is intended to monitor the dealership repair work, it is also considered a line of first defense in identifying potential warranty problems.

Once the warranty data is in an acceptable form, the vehicle manufacturer enters it into a database. From this point, each manufacturer has developed very established and confidential internal systems, often using both internally developed and third party software. The warranty data is controlled by either a quality or warranty function, but can be accessed by product engineering, manufacturing, materials, legal, finance, and other functions within the company.

Selected data is then made available to the suppliers.  The type of data transferred from vehicle manufacturer to supplier differs greatly among the vehicle manufacturers.  One respondent described three general types of data they receive: incident-based data (limited to claims and count); rate-based data (based on production/sales); and warranty data with month of production/months in service (MOP/MIS) data included.  Obviously the ability to tie a defect to a date of manufacture, months in service, or some similar measure is of great value when assessing the problem and developing a response.  It was widely agreed that to have an effective warranty process, the 'born on date' for a component is critical.  The traceability of subsystems may become a competitive advantage for manufacturers and suppliers.

While the warranty data is vital to identifying systemic failures, an analysis of the component is often required to establish root cause of the failure.  Due largely to logistics and transportation, it is also a costly proposition.  Thus it is important to better understand the fate of the failed component.  Often the component is disposed of at the dealership, thus ending any opportunity to establish root cause of the failure.  Manufacturers also may randomly select dealers to send a limited number of components for inspection, allowing a sample for study.  These are then sent to the supplier for review.  Finally, if the supplier has an indication there may be issues related to a component, the supplier may request the vehicle manufacturer obtain a small number of components for analysis from the dealers.  Importantly, the vehicle manufacturers differ greatly in how they deliver the parts.  Some send them through a vehicle manufacturer parts center, while others have a more formal warranty processing location, and still others send the parts directly to the supplier.  The inherent conflict of the warranty system is that it was originally developed to monitor and pay claims, not necessarily to capture the data.

The vehicle manufacturers (and some of the suppliers) interviewed indicated that one of the most pressing challenges of warranty investigation is the vast amounts of data processed, and the wide range of groups within the company that have use for the data.  During the creation and implementation of the TREAD (Transportation Recall Enhancement, Accountability and Documentation) act, much was made of the enormous amount of data already collected by the industry.  Based on numerous published reports, CAR estimates the automotive industry handles well over 100 million warranty claims per year.  Each claim includes numerous fields, and often several lines of text.  Realistically, the industry handles billions of warranty data fields annually.

Not only are companies challenged to develop methods of effectively capturing and storing warranty data, but they also must have the ability to access the information in a timely—and perhaps most importantly—cost effective way.   As noted, each manufacturer has developed such information technology systems, but there continues to be concern that these systems are not yet fully capable of delivering consistent data to the suppliers. One supplier suggested they don't need more data, instead they need increased responsiveness (of the manufacturers to data requests); while another suggested that there was not consistent data available.  A strong theme from all discussions was that a successful warranty program relied on a strong relationship between the interested parties.

Several companies were either currently investigating or had recently investigated text data mining as a method of increasing their ability to better analyze warranty data.  From a vehicle manufacturer's viewpoint, text data mining presents opportunity to further

investigate and understand the vast text reports received from dealer repair shops. The ability to accurately analyze text entered by technicians may offer insight into, and potential early warning of, likely in-service product failures. One supplier indicated that it had spent several months investigating text data mining, but concluded that the cost of off-the-shelf systems could not be justified by the expected savings.

During the interviews, respondents identified several issues that will likely challenge the automotive industry in the near future. While CAR does not attempt to offer solutions to these issues, each of them is worthy of discussion and provides fertile ground for further research. Those areas are:

1. Warranty cost sharing
2. The lack of skilled mechanics
3. Electronics as a warranty burden
4. Adapting warranty systems to developing markets

This report presents a description of the flow of warranty data within the automotive industry, and highlights pending challenges faced by dealers, vehicle manufacturers and suppliers. CAR's investigation has highlighted several areas that offer opportunity for improvement. It is apparent that the industry continues to struggle with the warranty data flow, particularly in the areas of data management and process interfaces. In conclusion, CAR believes the warranty process will continue to be an area of great challenge, interest and opportunity for the industry.

## Introduction

The Center for Automotive Research (CAR) has undertaken the CAR-Microsoft Program on Automotive Industry Practices.  This program is a four-year research effort consisting of in-depth, focused interviews with industry participants on subjects of importance to all industry stakeholders.  The Automotive Industry Program will investigate two topics per year; the results will be publicly disseminated.   Warranty in the automotive industry is the first topic for consideration.  It is important to note that it is not the study's purpose to gather confidential data, such as warranty cost estimates.  Instead, this report will describe the flow of warranty data gathering and, where possible, highlight selected practices and critical future operating challenges.  The identity of companies interviewed will not be made available—nor will information be presented in a way that could directly identify any participating company.

As a part of this project, CAR researchers interviewed representatives from three vehicle manufacturers (VM), four automotive suppliers, and one automobile dealer.  By design, this program's studies are not intended to be a complete description of the topic.  Instead it is hoped that by focusing on companies identified as leaders in a specific topic, these reports will then be viewed as contributing to the greater understanding of the issues and challenges.

Given the high volume of manufacture, the complexity of the product, and the often harsh environment in which the automobile operates, it is inevitable that there will be component failures.  While there are certainly lessons to be learned from these failures, such incidents can in some ways be viewed as normal operating noise.  However, the vehicle manufacturers and suppliers must be able to differentiate the expected component failure rate—the 'noise'—from those incidents that may indicate a systemic failure of the component.  This report will focus on how the industry is addressing those warranty issues that appear to be systemic in nature, and would thus present significant potential cost exposure.

Theoretically, vehicle manufacturers can address warranty costs via two approaches.  First, they can proactively attempt, through engineering, to reduce expected warranty costs toward zero.  While this approach will likely lead to robustly engineered products, and concomitantly higher usage of engineering resources, it also often requires a willingness to accept a higher initial price for a component.  Alternatively, the manufacturers can attempt to monitor the warranty data and react to in–service incidents.  This approach is closely associated with those companies that have a strong cost-focused purchasing bias in their sourcing decision process.  Realistically, each vehicle manufacturer uses a combination of the strategies, with some companies biased more toward the proactive engineering approach, while others tend to place more emphasis on reacting to reported data.

The automotive industry tends to focus on warranty in terms of direct costs— manufacturing, logistics and labor for replacement.  Granted, these are significant costs; however, it is also important to understand other 'soft' costs associated with warranty.  While any in-service product failure is likely to dissatisfy a customer to some extent, the quick, accurate repair of a warranty issue is likely to lessen the customer's overall dissatisfaction.  Any discussion of warranty processes should not overlook the

importance of developing warranty strategies that deliver the greatest customer satisfaction—or more appropriately—least dissatisfaction in the most cost effective manner.

## The Path from Repair Bay to the Supplier

The flow of warranty data, in its most simple form, is a reporting and transferring of information regarding an in-service product failure.  A failure is reported by the service representative (the dealer) to the vehicle manufacturer, and then, if deemed necessary by the vehicle manufacturer, to the component supplier[1].  In reality, this seemingly simple path is exceptionally complex, and at times even serendipitous.  The warranty data process is highly quantitative and qualitative, sometimes scientific, and often creative.

The process, as identified by the participants, includes:

1. Part identification/defect analysis and codification.  This may be the most critical element of the process, and yet it is certainly the most variable.  The process of capturing the customer's description of an in-service product failure, diagnosing the problem and correcting it remains a difficult and unscientific process.

2. Reporting of warranty claims to the vehicle manufacturer. The movement of data from the dealer repair shop to the vehicle manufacturer has become electronic in recent years, which has allowed for a much faster reporting system.

3. Investigation of claim by vehicle manufacturer warranty analysis center.  Even though warranty claim filing has become increasingly electronic, it still requires effort to verify and clarify the data.  Each manufacturer has a group review the data and enter it into some form of warranty database.  This database is then accessed by product engineering, product development, manufacturing engineering, and the manufacturing plant, among others.

4. Notification of incident—or more frequently, increase in reported incidents—to component supplier.  The type and amount of data transferred to supplier differs among the vehicle manufacturers.

5. Incident remediation (i.e. manufacturing, engineering, materials etc.) as required.  If the in-service product failure is found to be caused by a supplier component, the supplier will then use the available data and parts to identify the problem, and determine actions to elicit a remedy.

---

[1] CAR acknowledges the failure of a product may enter through other sources (e.g. police reports, fleet reports, insurance claims and customer service calls).  For this study, the focus is on the warranty process though the most common entry-point, from the dealer's repair shop.

2

6. Proactive suppliers and the vehicle manufacturers will take action to assure the correction is implemented throughout the product line, including incorporating the knowledge into future component development.

## From the Dealer to the Vehicle Manufacturer

On the surface the warranty process appears to be rather straightforward. However, the variance with which the data is collected, communicated, and analyzed results in complexity nearly unimaginable by someone unfamiliar with the process. Warranty data reporting varies from dealer to dealer within vehicle manufacturer dealer networks, and even mechanic to mechanic within dealerships. Vehicle manufacturers also differ in the reporting methods they require of their dealers. Such a varied starting point for warranty data creates potential for great difficulty downstream.

Nearly all study participants suggested that if they were to take the same part to five different dealers, the failure would likely be identified and coded differently by each dealer. In their views, this was not an indictment of the repair shops' ability to analyze the problem. Instead, it was a reflection of the extent of the challenge. Often times, the reason for a part failure is obvious, but just as often, the root cause of a failure is not readily apparent. The dealer repair shop must make a rapid decision regarding the failed part. Included in the decision process is allowable repair time, workload of staff, the experience of the technician or mechanic, and even the history of reimbursement by the vehicle manufacturer.

Because the point of entry for an in-service product failure is so critical, it is valuable to investigate this stage of the process more closely (Diagram 1). The first step in the process is to record the customer's complaint. Again, while this is a seemingly simple task, there is great opportunity for miscommunication as the customer tries to explain the problem to the service manager. Importantly, this input—often a short written documentation of the issue—can be a vital part of the warranty tracking process. Key words or phrases entered at this point can potentially offer insights as vehicle manufacturers and suppliers undertake root cause analysis weeks, months or even years later. An investigation of the warranty process in the automotive industry quickly highlights the fact that the dealer repair shop service manager is, in many ways, the cornerstone of a successful process. Once the shop manager identifies a likely cause of the problem, the vehicle is assigned to the appropriate mechanic.[2]

Each vehicle manufacturer continues to develop strategies that remove the responsibility from the repair shop floor. One vehicle manufacturer respondent suggested the biggest improvement of the information received from the repair shop to the vehicle manufacturer would be the implementation of a new, more structured warranty reporting software; however, the respondent also suggested that the replacement cost was currently prohibitive. While it is important to develop systems that make the identification of an in-service failure more efficient and effective, it is also important to realize that the ability of the mechanic or technician will be a key part of any diagnosis strategy for the

---

[2] Repair shops may use a technician to identify the problem, then, in turn assign a mechanic who will do the actual repair work.

foreseeable future.  As such, it behooves the industry to work to develop a skilled technical base at the dealership level.

**Diagram 1: In-Service Problem Identification**



The mechanic, using visual inspection, technical manuals, service bulletins, and technical support from the vehicle manufacturer, must then begin the process of identifying the part that has failed.  Upon determining the failure, the mechanic must then match it to a warranty repair code.  The coding process illustrates two important variables.  First, there are often ulterior motives for the mechanic to select a code for the in-service failure.  For example, some codes may tend to offer more repair time, or may be less likely to be questioned by the manufacturer[3].  Second, the true cause of the failure may not be completely understood, thus the mechanic may make an educated guess as to why the failure occurred, and code it accordingly.  Given the time constraints, working environment and differing experience level among mechanics, it is understandable that the mechanics often aren't able to fully identify the product failure. However, once the repair is performed, a warranty claim is then sent to the manufacturers.

Most respondents expressed concern that there is potential for dealers to consider the repair shop as a profit center by affecting *unnecessary* repair work.  Although there was no data presented to support this concern, those that mentioned the problem indicated that if new vehicle sales were down, some dealers were more likely to push warranty

---

[3] CAR does not wish to suggest that these are necessarily fraudulent acts, instead they may be honest attempts by the mechanic to better capture the time needed to complete an adequate repair, and better satisfy the customer, while remaining within the standards set forth.

claims to fill the profit 'valleys.'  While such actions have wide ranging implications, of interest to this report is the potential for a decrease in the accuracy of the reported warranty data.  A warranty claim that is not accurate—whether intentionally or unintentionally entered as such—will have consequences throughout the entire warranty process.

Finally, it is at the dealer repair shop where warranty data and the part are separated.  Most parts are scrapped, while others are shipped to the manufacturer—or directly to the supplier for review.  In order to understand and analyze the warranty process more completely, it is important to note the data and the component take markedly different paths.

## The Pathway Within the Vehicle Manufacturer

From this rather inauspicious start, the data is then sent to the vehicle manufacturer where it often follows several separate paths, although it is usually centrally housed.  While each manufacturer has developed its own internal process for warranty data, the flow generally starts with a review of the dealership claim.  Such a review is intended to monitor the work done at the dealership.  In most aspects, this step serves as a method to monitor dealer repair work and focus on the process of repairing the vehicle.  Special attention is given at this step to assuring the warranty claim meets the standards set by the manufacturer.  Commonly, the review includes an evaluation of the claim to assure completeness and correctness, an analysis of the type of repair, the time taken to make the repair (especially if different from the standard), the frequency of repair at that dealership vis-à-vis other dealerships and other such concerns.  Although the entry of the claim process has become electronic in recent years (most are now on-line, and completed overnight), there is still a considerable amount of staff effort required to analyze and follow-up via telephone for clarification.  While this review process is intended to monitor the dealership repair work, it is also considered a line of first defense in identifying potential warranty problems as trends become evident.

The reduction in time for the claim filing process has important implications for root cause analysis.  Critical to understanding any in-service part failure is the interaction with the mechanic.  The ability for the vehicle manufacturer—or even the supplier—to contact the mechanic within a few days of when the repair is affected increases the chance the mechanic will be able to more clearly remember the repair in question, and thus more accurately describe the problem identified, and the process of repair.

Once the warranty data is in an acceptable form, the vehicle manufacture enters it into a database.   From this point, each manufacturer has developed comprehensive and confidential internal systems, often using both internally developed and third party software.  The warranty data is controlled by either a quality or warranty function, but is available to be accessed by product engineering (product and manufacturing), manufacturing (assembly plant), legal and other functions within the company.  Diagram 2 illustrates the complex flow of warranty data within the vehicle manufacturer.  It is important to note warranty data is only one form of information used to identify in-service product issues.  Other forms (technical call centers, insurance claims, police reports, etc.) are often captured by other internal functions, and are likely to be stored in entirely different data warehouses.

Warranty data is accessed by many different functions within a vehicle manufacturer. The manufacturers interviewed indicated that because the warranty data was accessed by so many functions internally, some uncertainty exists among the different functions as to who else in the organization might be accessing the same data and what their needs might be.  There was also uncertainty expressed as to how the data might be of value to others in the company.  It is a valuable area of further study to more closely examine the pathways within the vehicle manufacturers.  However, two caveats are offered.  First, the flow of data, or more appropriately the description of users, within these large companies is complex.  Second, each manufacturer views the warranty process as a competitive advantage, and is not necessarily interested in discussing detailed descriptions of the process.

**Diagram 2: Flow of Data within the Vehicle Manufacturer (VM)**



The type and amount of data that flows to suppliers from a vehicle manufacturer differs greatly among vehicle manufacturers.  Generally, the supplier must query the vehicle manufacturer database (increasingly via web-based applications) to access warranty information.  One respondent described three general types of data his company receives (Diagram 3): incident-based data (limited to claims and count); rate-based data (based on production/sales); and data that included months in service, and month of production.  While the suppliers interviewed had developed strong internal warranty tracking processes, the respondents made it clear the quality of data passed along by

the vehicle manufacturers affected the speed and accuracy of any early warning system. The ability to tie a defect to a date of manufacture, months in service, or other similar measures is of great value when assessing the problem and developing a response. Certainly there has been much discussion surrounding the traceability of parts in the manufacturing process. However, the traceability of some key components in service presents an opportunity for those wishing to gain a competitive advantage in the automotive warranty business. Vehicle manufacturers that develop effective reporting systems—a means of getting concise, accurate warranty data to their suppliers in a timely fashion—will take a large step toward developing a proactive early warning system.

**Diagram 3: The Reporting of Data from Vehicle Manufacturer to Supplier**



Because of the variance in the warranty reporting processes among vehicle manufacturers, each supplier interviewed had set up its warranty efforts by customer. Such redundancy was difficult for the suppliers to justify financially. Although several people interviewed indicated it would be valuable for the vehicle manufacturers to work to make their systems more common, there was little hope that it would occur. It is worth noting the Automotive Industry Acton Group (AIAG) has begun to investigate warranty process flow, with the intention of developing a set of industry best practices for use as a guideline. As such, this guideline could potentially serve to offer a first step toward industry standardization within some elements of the automotive warranty reporting system.

While the warranty data is important for identifying systemic failures, an analysis of the component is often required to establish the root cause of the failure. It is a costly proposition, due largely to logistics and transportation. Thus, it is important to better understand the fate of the failed component. Diagram 4 shows the possible outcomes for an in-service failure under warranty. The vast majority of components are disposed of at the dealership, thus eliminating any opportunity to establish the root cause of the

failure.[4]  Manufacturers may randomly select dealers and require that the dealers send a limited number of components for inspection, creating a sample for study.  Depending on the vehicle manufacturer, these components are then sent either to their component assessment center, or directly to the supplier for review.

**Diagram 4: The Returning of Parts from Vehicle Manufacturer Repair Shop to Supplier**



If the supplier has an indication there may be issues related to a component, the supplier may request the vehicle manufacturer obtain a small number of components for analysis from the dealers.  As was illustrated during the course of the interviews for this project, the automotive warranty process is often driven by relationships.  Each of the suppliers interviewed had established relationships that enabled them to side-step the bureaucratic red tape, and resolve issues rapidly.  This was especially evident in the area of component procurement.  Such relationships are difficult to represent in a flow chart, but are vital to successfully solving warranty issues.  One final method of parts dispersal, according to one supplier: one vehicle manufacturer sends the supplier a 'box of parts' with no information nor explanation of failure.

Each supplier interviewed had developed similar, albeit slightly different processes, for analyzing the warranty data.  Diagram 5 shows the general flow of warranty data and parts as described by a smaller supplier.  The data (and component) is directed from the vehicle manufacturer to the supplier's manufacturing plant, where it is received by the plant's quality department.  After review of the data, a cross-functional team is assembled to begin the process of identifying the problem.  It is important to note that the smaller supplier felt warranty issues were in essence a 'plant issue,' thus they used

---

[4] Vehicle manufacturers have often struggled with quality on newly launched vehicles, and therefore have become much more aggressive in addressing launch quality.  Several companies have leveraged the existing warranty system to assure that launch products have a 100 percent part return program.  By capturing all parts that fail during the launch phase and using the warranty infrastructure to analyze the data, companies hope to quickly respond to potential product issues.

the manufacturing plant as the central processing point for the in-service product failures.

**Diagram 5: Stylized Flow of Warranty Data and Parts—Tier 2 (Small Supplier)**



CAR researchers also had discussions with a larger supplier who admitted that ownership of the problem—and thus solution—was often found at the manufacturing plant.  However, this supplier had a more comprehensive program than the others (Diagram 6).  This maybe due, in part, to a progressive warranty strategy as well as availability of greater resources.  According to this supplier, the warranty data was received from the vehicle manufacturer by a central quality contact for this supplier. This supplier requested a structured monthly data report from its customer. The data was then reviewed by the customer-focused quality team.  Any issues were discussed at a cross-functional meeting. The warranty data was tracked using structured problem solving strategies. If it was determined that more information was needed, they would make a special request to the vehicle manufacturer for more specific data or components.  The supplier also worked with the vehicle manufacturers' assembly facility, engineers and others as needed.

The supplier requested that generic parts (i.e. those components that were used for several different vehicle lines and customers) be sent to a central location.  This was done because these products tended to be manufactured using similar processes in multiple plants.   Components that were product specific (i.e. those components that were unique to a vehicle) were passed on to their specific manufacturing plant.

9

**Diagram 6: Stylized Flow of Warranty Data and Parts—Tier 1 (Large Supplier)**



The availability of resources was an important determinant of the supplier's warranty process. The larger companies are more likely to have dedicated quality departments, focusing on ongoing warranty tracking. Conversely, smaller companies are more likely to have a small quality staff, with much of the product failure analysis done by an ad hoc cross-functional team at the manufacturing facility. In such cases, the tracking of warranty information is then done by a small staff at the product engineering center.

Several respondents interviewed used basic spreadsheet software found on most computers to handle all data. A few respondents indicated they needed more complex information technologies to be used for specific and more technical actions—or as one respondent suggested the "backroom work." However, most of the respondents interviewed strongly indicated their current spreadsheet software was more than adequate for many of their manipulation and data management needs. The challenge was making the "back room" operations available in a format conducive to corporate wide use through common user-friendly interfaces.

## Data Overload

The manufacturers (and some of the suppliers) interviewed indicated one of the most pressing challenges of warranty investigation is the vast amount of data processed. Further, they indicated the wide range of groups within the company that have use for

the data adds even greater complexity. During the creation and implementation of the TREAD (Transportation Recall Enhancement, Accountability and Documentation) Act (2000), much was made of the enormous amount of data already collected by the industry. Based on numerous published estimates, and discussions with industry sources, CAR researchers estimate the automotive industry handles well over 100 million warranty claims per year. Each claim includes numerous fields, and often several lines of text. Realistically, the industry handles billions of warranty data fields annually. The challenge for vehicle manufacturers is not to get enough data, but instead to better understand which of the data is important.

While the TREAD act is not of central concern to this report, it is important to briefly address some key points of the regulation. Probably the most visible element of TREAD is the development of an early warning database to help identify critical safety defects. Like many aspects of the warranty/defect discussion, this database (containing information on 24 vehicle systems) presents a challenge far greater than merely reporting those key systems. Although the act requires vehicle manufacturers to report quarterly on 24 different systems, in reality each of those systems is made up of numerous components, which are manufactured by a wide range of suppliers. Interestingly, the interviewees had varying levels of familiarity with TREAD. The vehicle manufacturers have proactively approached the act by developing internal systems. Each manufacturer has developed a TREAD response system that it believes offers a significant advantage over its competitors. However, the vehicle manufacturer representatives were not willing to discuss the specifics of those programs. This highlights an interesting challenge with regard to investigating warranty processes. Each manufacturer believes warranty to present opportunity for strong competitive advantage. Thus, there is little willingness to share strategies, and even less understanding of the opportunities presented by collaborative efforts. The suppliers interviewed seemed to better grasp the opportunity—and even need—to develop collaborative solutions. This is likely due to the fact the suppliers have to deal with numerous warranty systems. The suppliers may be better able to identify which vehicle manufacturer systems truly provide a competitive advantage.

Although the usefulness of the TREAD act was initially questioned by many within the automotive industry, several respondents did credit the act for leading manufacturers to be more proactive in establishing early warning reporting systems. It has encouraged—even required—the companies to re-examine their existing systems, to better understand the data, and to assess how the warranty process might be improved.

Diagram 7 shows the various inputs that comprise a vehicle manufacturer warranty data warehouse. It is important to note although the diagram suggests a single data storage warehouse, there are often numerous data warehouses within each manufacturer. While this report has focused on the dealer warranty repair shop as the entry point, it is valuable to briefly consider the other input sources. National Highway Transportation Safety Administration (NHTSA) reports, police reports and insurance claims are usually presented in some form of coded response and unstructured text. Customer feedback (via call centers and other forums) is often the first line of notification for a developing problem. Critical data can also be gathered from mechanic councils and tracking repair part sales. There is also valuable information available from monitoring both internal and supplier engineering documents. Many of these inputs present rich information. However, they are often in the form of unstructured text.

**Diagram 7: In-Service Product Failure Reporting Channels**



Not only are companies challenged to develop methods of effectively capturing and storing warranty data, but they also have the ability to access the information in a timely—and perhaps most importantly—cost-effective way.  As noted, each manufacturer has developed numerous internal information technology storage and retrieval systems.  These legacy systems are occasionally redundant, and often narrowly focused. One individual stated that data overload was an important challenge. According to this respondent, it was critical for each function within a vehicle manufacturer to learn what data were the best indicators for their needs.  They should then use that type of data as the guidepost.  The other types of data should then be used to confirm trends identified by the lead data.

A supplier indicated that it doesn't need more data. Instead, it needed increased responsiveness from the manufacturers to data requests. Another supplier also

suggested that consistent data was not available. All discussions asserted a successful warranty program relied on a strong relationship between the interested parties, in part to make up for the lack of robust data (and component retrieval) processes.

Both manufacturers and suppliers highlighted the richness and importance of warranty claim text. Each of the respondents described the complexity and repetitiveness of reviewing the unstructured text. Each of the suppliers was either currently investigating, or had recently considered unstructured text data mining as a method of increasing their ability to better analyze warranty data. From a vehicle manufacturer perspective, text data mining presents an opportunity to further investigate and understand the vast text reports received from dealer repair shops. The text entries may offer insight into, and potentially an early warning of, in-service product failures. Such analysis also adds depth to the often vague or inconclusive repair codes entered at the repair shop.

One supplier indicated that his company had spent several months investigating text mining, but concluded that the cost of off-the-shelf systems could not be justified by the expected savings. The respondent believed the vast coding differences and terminology between vehicle manufacturers presented complexity issues that made text mining strategies difficult (and cost prohibitive) at the supplier level. This respondent believed the standard reports were sufficient in tracking potential problems. However, another supplier had worked with a software provider to develop a text mining application that effectively searched data text from several manufacturers. This supplier believed that its ability to mine text was a significant advantage. Further, they indicated several other suppliers had contacted him to inquire about their application of the software.

## Strategic Warranty Considerations

During the interviews, respondents identified several issues that will likely challenge the automotive industry in the near future. This section will address those concerns. While solutions to these issues are not presented here, each of the issues is worth discussing and provides fertile ground for further research.

A.  Warranty Cost Recovery

The issue of most concern to supplier respondents was that of vehicle manufacturers moving toward a cost recovery warranty strategy as a revenue stream. As an increasing amount of the vehicle is built by suppliers, it is logical to believe components produced by suppliers are a major portion of the total warranty cost. One vehicle manufacturer estimated that 80 to 85 percent of all recalls were traceable to supplier components. Therefore, according to the vehicle manufacturers, it is logical that the suppliers take a larger portion of the financial responsibility for the failures. The vehicle manufacturer representatives indicated it was a logical step to pursue some form of cost sharing. They also expected it would happen.

Currently, it is common practice for the component supplier to be responsible for the manufacturing cost of the failed part covered under warranty plus some portion of the logistics and labor cost. However, the vehicle manufacturer must cover the remaining costs, including transportation, part replacement labor, and

information processing.  Warranty cost recovery has shifted an increased portion of those non-manufacturing costs to the supplier.

Suppliers felt that if the vehicle manufacturers continue to pursue cost recovery, it will have a negative impact on product quality.  It was suggested that suppliers will be forced to put increased resources into defending against accusations, and less time resolving issues, resulting in more cost for all.  Another aspect is the lack of ability to build some cost for warranty into the piece price of the component. Suppliers suggested that the car companies 'bake-in' warranty cost into the price of a vehicle.  (Assuming they are able to get the 'price.')  Suppliers have no leverage/leeway to include a 'warranty cost' into the price of the component.  A part is sold at production cost, with no allowance for future warranty costs.  Thus, if the suppliers are increasingly charged for total warranty costs, the respondents believe it could have serious implications.

Importantly, the suppliers interviewed indicated they had made recommendations—even warnings—to vehicle manufacturers regarding product decisions.  According to these suppliers, the warnings usually went unheeded and occasionally predicted warranty actions accurately during production.  There was great concern among the suppliers that with warranty cost recovery, the suppliers would likely be paying for future product failures that could have been prevented with better upfront engineering.

Suppliers (and the dealership manager) also expressed concern regarding vehicle manufacturers including a strong purchasing bias in their component sourcing decision process.  One supplier recounted an example where it had clearly demonstrated that its component, although a few pennies more expensive than that of its competitor's, had a significantly lower expected warranty cost—and a thus a lower overall cost.  According to the supplier, the vehicle manufacturer, driven by its purchasing bias, chose the component with the lower upfront cost.  According to this supplier, within several months of launch the cheaper component was already causing significant warranty expense and likely customer dissatisfaction.   Suppliers indicated such a strategy creates a very difficult operating environment.

Suppliers also expressed concern regarding initial analysis of the component at the dealership, and the integration of that component into the vehicle.  Because of the vagaries of component identification, defect analysis and codification processes (at the dealership repair shop) suppliers suggested there is opportunity, even likelihood, that their part may be improperly identified as at fault.  Further, if the in-service failure is the fault of their part, they may be held liable for the costs of disassembling the vehicle to conduct a repair.  Such cost (as measured in mechanic labor hours) could be substantial, and is driven, not by the component, but instead by vehicle design decisions made by the vehicle manufacturer.

B.  Lack of Skilled Mechanics

As described in this report, the first step in the warranty process is the identification of the in-service product failure by the mechanic at the dealer repair shop.  If a problem is not properly identified, or it takes several attempts to

correctly pinpoint the problem, the process is less efficient.  The service manager interviewed indicated his concern regarding the availability of highly competent mechanics.  According to the service manager, a strong understanding of how a vehicle works is essential to quickly and accurately assessing in-service product failures.  Based on his experience, he believes there are too few mechanics who truly understand the automobile.  He left little doubt that a good mechanic can be one of the most effective early warning points in the process.

While mechanics are critical to the warranty process, they can also be viewed as the touch point for the customer.  An accurate, fair and fast assessment of a warranty issue by the mechanic can greatly enhance customer satisfaction.  Thus, a first step for vehicle manufacturers looking to more effectively address warranty costs while increasing customer satisfaction is to address the shortage of highly trained mechanics with a strong diagnostic skill.

C.  Electronics as a Warranty Burden

Numerous articles in the popular press have illustrated the growing dissatisfaction (as measured in quality ratings) among consumers—and concern among vehicle manufacturers—regarding the reliability of in-vehicle electronics.  Warranty repair for electrical systems has always presented unique challenges.  Traditionally a wire that was 'pinched' during installation in the vehicle could cause a short in the electrical system.  This type of electrical open circuit has been a part of the failure identification challenge since the alternator became a standard option on the vehicle.  However, it is no longer as simple as finding a bare wire or a poorly performing electrical motor.  Now many of the product failures are caused by software or other electronic glitches.  The non-technical term for such challenges offered by one respondent was 'chasing electronic gremlins.'

These electronic gremlins present significant challenges for the repair shop attempting to properly identify and correct the problem.  A dealer repair shop manager interviewed for this project estimated that 90 percent of the electronic problems reported by consumers were intermittent, and were not able to be validated by the dealership on the first attempt.  Since the warranty process cannot start without a validated problem, they will return the vehicle to the consumer and expect it back within a short period.  After two failed attempts to verify using vehicle manufacturer guidelines, the manager then advises the mechanic to attempt to identify the problem by using a process of elimination.  Often times such a strategy proves to be very time-consuming and difficult to code into warranty claim forms.  However, the manager felt it was his responsibility to his customers to go beyond what the system allowed, and do anything in his power to resolve their problems.  Once the electronic gremlin was identified, the dealership was able to correct about 90 percent of the problems.  The area of in-service electronic product failure resolution—and prevention of such incidences—presents a strong opportunity for further investigation.

D.  The International Challenge

The final area of concern addressed in this report is the international challenge—or more accurately the *two* international challenges.  The first challenge is that of

vehicle manufacturers operating different warranty strategies and processes in the United States, Japan and Europe.  Suppliers indicated some manufacturers have different warranty processes and targets for each of these regions.  The elimination of such differences could bring significant efficiency gains.  The second challenge is that of bringing the current warranty methodology to developing markets.

The warranty process is, in many ways, driven by the dealer repair service shops.  As noted earlier, the dealer repair service is the point of entry for any in-service product failure.  The United States, Japanese and European dealer systems are characterized by strong technical expertise, significant experience, and ample resources.  As such, they have demonstrated an ability to analyze and identify in-service product failures.  They also benefit from strong logistical networks within the borders of their country of operation.  Although the dealerships in these different regions are similar in some ways, they have developed within the constraints of the local customs, laws and consumer requirements.  Suppliers indicated their customers had different systems in place in the each of the developed markets.  From their point of view, there is significant opportunity to standardize international warranty operations.

As manufacturers move into developing markets, they often ask their suppliers to apply their warranty data control systems to operations in these new markets.  This request presents challenges on many levels.  It was strongly suggested that operations in markets with relatively undeveloped dealer networks—and no local suppliers—cannot meet the same warranty standards as those in more experienced markets.  It is important for vehicle manufacturers to work with suppliers and dealers in these developing markets to leverage the systems already in place elsewhere, but also to be prepared for lapses in the system.

## Conclusions

This study, the first in the CAR-Microsoft Program on Automotive Industry Practices, is intended to identify the flow of warranty data through the automotive value chain.  As such, CAR researchers have captured the drivers and pertinent issues regarding this important automotive data process flow.  However, to view the path warranty data travels as merely a data flow process would be a mistake.   As this project progressed, it became apparent that although the flow of warranty data was increasingly becoming more formalized, successful actions were still often behavioral and relationship driven.  From the dealership through to the supplier, each of the interviewees had examples of how they went beyond the process 'structure' to obtain a better result.

It is valuable to present a few examples of this creative behavior for illustrative purposes.  One supplier, with a critical new engine component, developed an early warning system by enlisting the help of local dealerships.  This supplier contacted several local dealers and asked them to inform the supplier if the dealer were to perform repairs on engines that used this particular technology.  The supplier had an engineer assigned to the dealerships to observe the repair, and analyze specifics of the failure.  While such an action is not statistically reliable, it gives the supplier immediate feedback on early problem detection.

16

Another supplier spoke of how his personal relationship with his vehicle manufacturer warranty contact allowed him to 'go around' the process to get a more immediate response to questions and concerns.  If this supplier needed better access to a part, or wanted further data, he would contact the vehicle manufacturer representative.  And certainly, the service manager interviewed had developed numerous action plans that better enabled him to reach a satisfactory—and equitable—resolution for the vehicle owner.  CAR researchers believe any analysis of the warranty process must consider these behavioral characteristics as an important and effective part of the system.

Similarly, there were individuals within the vehicle manufacturers that had clearly driven a process or project to resolve challenges.  These individuals had to use creativity to overcome the challenge of the legacy systems, scope, and cost to develop solutions that achieved the desired results while still staying within the bounds of their corporate culture.

These relationships, while successful, are indicative of the complexity of an effective warranty process.  As vehicle manufacturers and IT providers attempt to formalize the warranty process, it is likely that behavioral aspects will continue to be a vital part of rapid warranty resolution.

# COMPLAINT
# EXHIBIT C

(https://mbworld.org)

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)
> New GLE Keeps Draining Battery - won't start

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)    Log In |

Register (https://mbworld.org/forums/register.php)

 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#) MBWorld.org Forums (https://mbworld.org/forums/) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/mercedes-benz-suvs-trucks-vans-diesels-other-9/) > GLE Class (V167) (https://mbworld.org/forums/gle-class-v167/250/)
(https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html) > New GLE Keeps Draining Battery - won't start

Username [Username]    [Log In]
Password [          ]
By logging into your account, you agree to our Terms of Use (https://www.internetbrands.com/iterms/) and Privacy Policy (https://www.internetbrands.com/privacy-main.html), and to the use of cookies as described therein.
Register (https://mbworld.org/forums/register.php)    Forgot Password? (https://mbworld.org/forums/login.php?do=lostpw)

| Register (https://mbworld.org/forums/register.php) | FAQ (https://mbworld.org/forums/faq.php) | Community ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#community) | Calendar (https://mbworld.org/forums/calendar.php) | (ht |

**GLE Class (V167)** Produced 2020 to present

# New GLE Keeps Draining Battery - won't start

↩ Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&p=8079971)

Subscribe 🔔 (https://mbworld.org/forums/subscription.php?do=addsubscription&t=785752)

Thread Tools (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)

Rate Thread (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadrating)

🗓 06-12-2020, 08:46 AM    #1 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8079971)

**Willfulone (https://mbworld.org/forums/members/461941-willfulone.html)**

Newbie

Join Date: Jun 2020
Location: Virginia
Posts: 4
Likes: 0
Received 3 Likes on 2 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=461941)
2020 GLE350

**New GLE Keeps Draining Battery - won't start**

Hello Everyone

Sorry this is my first post.

Got a new 2020 GLE350 about 3 months ago

About a week ago, it would not start, bunch of lights on the dash, would not turn over

MB sent out a service and they jumped the car

It ran for another week, and then just died again. We had it towed to MB this time

Already checked the Battery and the Alternator, all are fine

Any idea what is causing the battery drain

Tks

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8079971)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8079971&securitytoken=guest)

Contact Us (https://mbworld.org/forums/sendmessage.php) - About Us (https://mbworld.org/forums/about-us/) - Archive (https://mbworld.org/forums/archive/) - Advertising (https://www.internetbrandsauto.com/contact/) - Cookie Policy (https://www.internetbrands.com/privacy/cookie-policy.html) - Privacy Statement (https://www.internetbrands.com/privacy/privacy-main.html) - Terms of Service (https://www.internetbrands.com/iterms/) - Do Not Sell My Personal Information (https://www.internetbrands.com/privacy/privacy-contact-form.php)

© 2021 MH Sub I, LLC dba Internet Brands



↩ Reply (ht...

Share ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)



« First  ‹ Prev   1 / 1   Next ›  Last »   Go to Page... [Go]

# //////MBWorld (https://mbworld.org)

MBWorld.org Forums (https://mbworld.org/forums/node?nojs=a22746f0c4b521018f30ef3008b2c79d) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79d&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79d&f=)
> New GLE Keeps Draining Battery - won't start

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)

NOW PLAYING


The Easiest Way to Find Your
HG_ChevroletTrail...

The Easiest Way to Find Your
HG_LincolnNaviga...


Toyota Supra

**Register** (https://mbworld.org/forums/register.php)

---

☐ 06-12-2020, 10:17 AM

**#2 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8080042)**

### Ron.s (https://mbworld.org/forums/members/410733-ron-s.html)

MBWorld Fanatic!



(https://mbworld.org/forums/members/410733-ron-s.html)

Join Date: May 2018
Location: Boise
Posts: 2,023
Likes: 240 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=410733)
Received 352 Likes on 270 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=410733)
2021 GLE AMG 53 SUV.....
2018 Audi SQ5

🟢

Don't rule out the battery. I had a similar situation except that with the 450 the 48 volt starts the car. I kept getting "critical battery" message and the dealer couldn't find anything wrong. Then when it was in for 3 days to replace the MBUX controller it ran down after a charge and they replaced it (the 12 volt battery). I think it had an internal short but got that 3td hand from SA & probably a guess.

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8080042)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8080042&securitytoken=guest)

---

☐ 06-17-2020, 07:03 AM

**#3 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8084079)**

### me2mb (https://mbworld.org/forums/members/461563-me2mb.html)

Newbie

Join Date: Jun 2020
Posts: 4
Likes: 3 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=461563)
Received 0 Likes on 0 Posts
2020 GLE 350 4matic

Quote:

Originally Posted by **Willfulone** 🔗 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8079971)
Hello Everyone

Sorry this is my first post.

Got a new 2020 GLE350 about 3 months ago

About a week ago, it would not start, bunch of lights on the dash, would not turn over

MB sent out a service and they jumped the car

It ran for another week, and then just died again. We had it towed to MB this time

Already checked the Battery and the Alternator, all are fine

Any idea what is causing the battery drain

Tks

I was detailing/ceramic coating mine last week and received a notification that my starter battery is in critical condition. I realized that by having my key in my pocket and moving around the vehicle, accidentally locking and unlocking the car multiple times, that this car was 16x78172 the entire time I was detailing, it was draining the battery.

💬 Reply (https://mbworld.org/forums/newreply.php?...)

The process took me a total of 10 hours and the alert occurred around hour 8. When I

---

Share ▾ (https://mbworld.org/forums/...)

« First (https://mbworld.org/...) ‹ Prev    1 / 1    Next › (https://mbworld.org/...)    Last » (https://mbworld.org/...)    Go to Page...    Go

noticed, I turned the engine on for 20 minutes to recharge the battery then I removed the key from my ... the battery then I removed the key from my haven't gotten....

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)
> New GLE Keeps Draining Battery - won't start

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)

---

📅 06-18-2020, 06:17 PM | #4 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085537)

**Willfulone** (https://mbworld.org/forums/members/461941-willfulone.html)
Newbie

Join Date: Jun 2020
Location: Virginia
Posts: 4
Likes: 0
Received 3 Likes on 2 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=461941)
2020 GLE350

Back from the shop

ESP was a constant drain on battery

Supposedly a known issue

Fixed with a software update

Will let you know if it fixes the problem permanently, tks for the responses

🗨 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8085537)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8085537&securitytoken=guest)

---

📅 06-18-2020, 10:55 PM | #5 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085738)

**Ron.s** (https://mbworld.org/forums/members/410733-ron-s.html)
MBWorld Fanatic!



(https://mbworld.org/forums/members/410733-ron-s.html)

Join Date: May 2018
Location: Boise
Posts: 2,023
Likes: 240 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=410733)
Received 352 Likes on 270 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=410733)
2021 GLE AMG 53 SUV.....
2018 Audi SQ5

Quote:

Originally Posted by **Willfulone** 🔗 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085537)
*Back from the shop*

*ESP was a constant drain on battery*

*Supposedly a known issue*

*Fixed with a software update*

*Will let you know if it fixes the problem permanently, tks for the responses*

Even with the ignition off? Do you have the TSB or Software detail so some of us can check to see if ours needs it? Or post a copy of work order?

🗨 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8085738)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8085738&securitytoken=guest)

---

📅 06-19-2020, 06:39 AM | #6 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085868)

**Willfulone** (https://mbworld.org/forums/members/461941-willfulone.html)
Newbie

Join Date: Jun 2020
Location: Virginia
Posts: 4
Likes: 0
Received 3 Likes on 2 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=461941)
Share 📅 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)

Quote:

Originally Posted by **Ron.s** 🔗 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085738)
*Even with the ignition off? Do you have the TSB or Software detail so some of us can check to see if ours needs it? Or post a copy of work order?*

I do, I will dig it out and post it up

🗨 (post_thanks.php?do=findthanks&u=461941) 🗨 (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

---

MBWorld (https://mbworld.org)

Contact Us (https://mbworld.org)

Log In |

Register (https://mbworld.org/forums/register.php)

⟪ First | ◀ Prev | 1 / 1 | Next ▸ | Last ⟫ | Go to Page... | Go

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9)

> New GLE keeps Draining Battery...won't start. (https://mbworld.org/forums/members/432673-bad-habit.html) (06-19-2020), mikapen (https://mbworld.org/forums/members/125919-mikapen.html) (12-20-2020)

The following 2 users liked this post by Willfulone:

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)     Log In |

Register (https://mbworld.org/forums/register.php)

---

**06-20-2020, 08:23 PM**

**#7 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8087087)**

robert c (https://mbworld.org/forums/members/398518-robert-c.html)
Member

Join Date: Nov 2017
Location: Eastern Maryland
Posts: 125
Likes: 11 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=398518)
Received 14 Likes on 12 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=398518)
ES350 E300 GLE350 GMC3500 Duramax



It seems battery issues are a thing to deal with as our lives and driving patterns have changed due to the virus shutdowns. I am only driving to the post office and grocery store and barely keeping the battery up on the GLE. My Denali Duramax lost both batteries during the cold weather as they weren't being fully charged and the extra drain on the batteries for the glow plugs. Those new AGM batteries just gave up. I am using a Granite battery tender on the new ones for sure. I am also using a Granite tender on the E300 as it hasn't been started since March. The GLE is keeping it's battery ok for some reason but if it acts funny I'll put a tender on it also.

Robert

🔁 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8087087)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8087087&securitytoken=guest)

---

**06-22-2020, 01:53 AM**

**#8 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8087859)**

maalox (https://mbworld.org/forums/members/427860-maalox.html)
Member

Join Date: Feb 2019
Location: Boston
Posts: 137
Likes: 3 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=427860)
Received 30 Likes on 24 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=427860)
.

> Quote:
> Originally Posted by **Willfulone** 🔗 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085868)
> *I do, I will dig it out and post it up*

Just wondering if you were able to find the TSB #? I might have to get my car serviced this week and would like to get outstanding software updates done at the same time. Dealer always claims there are no updates to any of the components, though I did see in another thread GregW mentioned he got updates a while back to the EIS (Electronic Ignition Switch), ESP (Electronic Stability Program), ME & fuel pump software at some point.

Thanks!

🔁 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8087859)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8087859&securitytoken=guest)

---

**08-03-2020, 11:34 AM**

**#9 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8123608)**

Vernedia (https://mbworld.org/forums/me...org/forums/me

**2020 Just at dealer 3 weeks** (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html)

I just wanted o follow up with you to see if you were still having problems. I was driving my 2020 GLE on the expressway and as soon as I got off stopped at a light my car

🔁 Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

‹ Prev | 1 / 1 | Next › | Last »   Go to Page...   Go

≡
MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)
> New GLE Keeps draining battery - won't start

turned off. All light on dash were lit up but the car didn't restart. It was towed to dealer and has been (https://mbworld.org).

battery is critical and needs to be recharged"). Very hard to believe reading all of the bad reviews on this car. Did the software fix work?

Originally Posted by **Willfulone** ➡ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8085537)

*Back from the shop*

*ESP was a constant drain on battery*

*Supposedly a known issue*

*Fixed with a software update*

*Will let you know if it fixes the problem permanently, tks for the responses*

Last edited by Vernedia; 08-03-2020 at 11:36 AM. Reason: Misspelling

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8123608)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8123608&securitytoken=guest)

---

08-03-2020, 01:08 PM    **#10 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8123701)**

**robert c (https://mbworld.org/forums/members/398518-robert-c.html)**
Member

Join Date: Nov 2017
Location: Eastern Maryland
Posts: 125
Likes: 11 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=398518)
Received 14 Likes on 12 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=398518)
ES350 E300 GLE350
GMC3500 Duramax

Is this car equipped with the electronics assistance package if so......
did the car start by disconnecting the battery and hooking back up as it appears most do
Robert

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8123701)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8123701&securitytoken=guest)

---

08-03-2020, 08:08 PM    **#11 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124137)**

**Vernedia (https://mbworld.org/forums/members/465290-vernedia.html)**
Newbie

Join Date: Aug 2020
Posts: 3
Likes: 0
Received 1 Like on 1 Post (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=465290)
2020 GLE

Pinched wire for starter solenoid

Quote:

Originally Posted by **robert c** ➡ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8123701)
*Is this car equipped with the electronics assistance package if so......*
*did the car start by disconnecting the battery and hooking back up as it appears most do*
*Robert*

So this is what they claim was wrong with my GLE only took 3 weeks to figure out. I'm not buying it. Just picked it up so we will see . Now I feel like I don't have a reliable vehicle especially with all the bad reviews I have read. Pinched wiring starter circuit BUT it stopped while at a stop light and then didn't start after it cut off. I'm no mechanic but it doesn't add up to me.

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8124137)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8124137&securitytoken=guest)

---

08-04-2020, 10:32 AM    **#12 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124441)**

**cosmobenz (https://mbworld.org/forums/members/375033-cosmobenz.html)**

I've had the same issue with my four month old 2020GLE! Keep getting "Critical" messages via email. Dealer has had the vehicle three or four times and continues with software updates apparently dictated by Mercedes. "Starter Battery Partly Charged" shows on the dashboard despite the car being driven daily. Really frustrating and I'm quickly losing confidence in both the vehicle and dealership!

◀ First   ◁ Prev   1 / 1   Next ▷   Last ▶▶    Go to Page...    Go

MBWorld.org Forums (https://mbworld.org)

Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org)

GLE Class (V167) (https://mbworld.org)

New GLE Keeps draining battery - won't start (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)   Log In |

Register (https://mbworld.org/forums/register.php)

///MBWorld (https://mbworld.org)

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

> New GLE keeps Draining Battery - won't start

Junior Member
Location: Central Virginia
Join Date: Dec 2016
Likes: 0
2017 MB GLC300 & 2020
GLE350

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)

Log In |

🔒 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8124441)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8124441&securitytoken=guest)

Register (https://mbworld.org/forums/register.php)

---

📄 08-04-2020, 11:21 AM

#13 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124483)

**Ron.s (https://mbworld.org/forums/members/410733-ron-s.html)**



(https://mbworld.org/forums/members/410733-ron-s.html)

MBWorld Fanatic!

Join Date: May 2018
Location: Boise
Posts: 2,023
Likes: 240 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=410733)
Received 352 Likes on 270 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=410733)
2021 GLE AMG 53 SUV.....
2018 Audi SQ5

🟢

Quote:

> Originally Posted by **cosmobenz** ▣ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124441)
> I've had the same issue with my four month old 2020GLE! Keep getting "Critical" messages via email. Dealer has had the vehicle three or four times and continues with software updates apparently dictated by Mercedes. "Starter Battery Partly Charged" shows on the Mercedesme app for almost a week now despite the car being driven daily. Really frustrating and I'm quickly losing confidence in bothe the vehicle and dealership!

As I posted earlier....mine turned out to be a bad battery and it has been good since it was replaced. Common sense is it's either 1. Battery issue 2. Short draining battery 3. Not charging properly. This isn't Rocket Science so I'd go with the theory of the Dealer Tech being the problem. Since it's a fairly uncommon problem you have to wonder why they would be looking at software anyway? If it was software wouldn't it be widespread?

💬 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8124483)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8124483&securitytoken=guest)

---

#14 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124533)

📄 08-04-2020, 12:19 PM

Vernedia (https://w

**Pinched wire for starter solenoid**

Quote:

> Originally Posted by **Ron.s** ▣ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124483)
> As I posted earlier....mine turned out to be a bad battery and it has been good since it was replaced. Common sense is it's either 1. Battery issue 2. Short draining battery 3. Not charging properly. This isn't Rocket Science so I'd go with the theory of the Dealer Tech being the problem. Since it's a fairly uncommon problem you have to wonder why they would be looking at software anyway? If it was software wouldn't it be widespread?

I totally agree. I picked up the car yesterday and looked at app 2 hours later "battery partially charged " drove it for15 minutes changed to charged . Checked it all night and drove 40 minutes to work. Still says charged, had to pray all the way to work that this expensive car didn't stop on me again!! I will attach work order. Sorry could not straighten it upward. And yes I do have EAP.

🔁 Reply (https://... Share (https://...

◁ First  ‹ Prev  1 / 1  Next ›  Last ››   Go to Page...   Go



orld.org/forums/members/465290-vernedia.html)
Newbie
Join Date: Aug 2020
Posts: 3
Likes: 0
Received 1 Like on 1 Post (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=465290)
2020 GLE

DESCRIPTION OF SERVICE AND PARTS

mail: no@no.com

2 - 51MBZ: BODY ELECTRICAL
TOK IN - CUSTOMER STATED THE VEHICLE STOPPED
RUNNING WHILE SITTING AT A STOP LIGHT. INTERIOR
ITEMS HAVE POWER, VEHICLE WOULD NOT START. NO
NOISE FROM THE ENGINE WHEN PRESSING THE STARTING
BUTTON
Caused by
PINCHED WIRING STARTER CIRCUIT
Tech: DANIEL ZGOBICA (001)
Tech: DANIEL ZGOBICA (001)
CONNECT SDS. CONNECT BATTERY CHARGER. PERFORMED
DIAGNOSTICS. FOUND PINCHED WIRING FOR STARTER
SOLENOID. REPAIRED HARNESS. VEHICLE NOW WORKING
TO MB SPECS AT THIS TIME. RELEASE TO CLIENT.

*Work order attached.*

Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8124533)

Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8124533&securitytoken=guest)

| **The following users liked this post:** | Lanzz (https://mbworld.org/forums/members/374132-lanzz.html) (08-04-2020) |
|---|---|

08-04-2020, 03:39 PM

**#15 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124779)**

Will

MBWorld

MBWorld.org Forums (https://mbworld.org/forums/index.php) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0ce4b52108b20bf29b2c78c0b&f=300) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0ce4b52108b20bf29b2c78c0b&f=855)
> New GLE-Keeps Draining Battery, won't start

Originally Posted by **maalox** (https://mbworld.org/forums/members/maalox.html) (Post 1234567) (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html)

*Just wondering if you were able to find the TSB # ? I might have to get my car serviced this week and would like to mention this. No issues as of late (knock on wood) but the car did not like the cold from last week (Keyless Go, Electronic Ignition Switch), ESP (Electronic Stability Program), ME & ...*

*Thanks!*

**New GLE-Keeps Draining Battery, won't start**

Thread Tools ▼ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Here you go    Search this Thread ▼ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)    Log In |

Sorry for the delay - had a little stay in the Hospital    Register (https://mbworld.org/forums/register.php)



*Invoice from Mercedes-Benz of Alexandria (Customer Copy)*

Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

Share ▼ (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

Join Date: Jun 20
Location:
Newbie

Posts: 4

MBWorld (https://mbworld.org)

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

> New GLE Keeps Draining Battery - won't start

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)    Log In |

Register (https://mbworld.org/forums/register.php)

Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8124779)

Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8124779&securitytoken=guest)

| The following users liked this post: | maalox (https://mbworld.org/forums/members/427860-maalox.html) (08-04-2020) |
| --- | --- |

#16 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8125399)

08-05-2020, 11:57 AM

quattrogombh (https://mbworld.org/forums/members/...)

"Working to MB Specs". — back in the day, that meant something. Now it just means a reset to the counter to when it's back in the shop.

Quote:

> Originally Posted by **Vernedia** ⏩ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8124533)
> *I totally agree. I picked up the car yesterday and looked at app 3 hours later" battery partially charged " drove it for15 minutes changed to charged . Checked it all night and drove 40 minutes to work. Still says charged, had to pray all the way to work that this expensive car didn't stop on me again. I will attach work order. Sorry could not straighten it upward. And yes I do have EAP.*

Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

Share ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)

///////MBWorld (https://mbworld.org)

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=91) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

> New GLE Keeps Draining Battery - won't start

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)    Log In |

Register (https://mbworld.org/forums/register.php)



Work order attached.

↩ Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

Share ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)

« First    ‹ Prev    1 / 1    Next ›    Last »    Go to Page…    Go

////MBWorld (https://mbworld.org)

**New GLE Keeps Draining Battery - won't start**

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)    Log In |

**Register** (https://mbworld.org/forums/register.php)

Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

Share ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)

//////MBWorld (https://mbworld.org)

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

New GLE Keeps Draining Battery - won't start

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)    Log In |

Register (https://mbworld.org/forums/register.php)

Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8125394)

Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8125394&securitytoken=guest)

---

📓 **12-20-2020, 12:32 PM**      **#17 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8229025)**

**nwehler (https://mbworld.org/forums/members/474063-nwehler.html)**

Newbie

Join Date: Dec 2020
Location: Delray Beach FLORIDA
Posts: 3
Likes: 4 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=474063)
Received 0 Likes on 0 Posts
GLE 450

**GLE battery drain**

I had a similar experience my new '21 GLE450: battery went dead after 230 miles. Had to be towed - could not be jumped. I am waiting more than 30 days fir a new battery coming from Germany. None in the US. So frustrating. Mercedes has a serious problem here with this 48v battery system.

> Quote:
>
> Originally Posted by **Ron.s** 🔜 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8080042)
> *Don't rule out the battery. I had a similar situation except that with the 450 the 48 volt starts the car. I kept getting "critical battery" message and the dealer couldn't find anything wrong. Then when it was in for 3 days to replace the MBUX controller it ran down after a charge and they replaced it (the 12 volt battery). I think it had an internal short but got 3td hand from SA & probably a guess.*

Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8229025)

Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8229025&securitytoken=guest)

---

📓 **12-20-2020, 07:03 PM**      **#18 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8229274)**

**MikeFLA (https://mbworld.org/forums/members/...html)**

> Quote:
>
> Originally Posted by **nwehler** 🔜 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8229025)
> *I had a similar experience my new '21 GLE450: battery went dead after 230 miles. Had to be towed - could not be jumped. I am waiting more than 30 days*



MBWorld.org Forums (https://mbworld.org) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?f=227) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?f=322)

**New GLE Keeps Draining Battery won't start**

mbers/474087-mikefla.html)
Junior Member
Likes: 12 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=474087)
Received 6 Likes on 5 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=474087)
2020 GLE450

Same world problems on our battery is cancelled, then a real service system. Several times I had that problem as well as my GLE update. The car with roadside assistance which is a joke for another post. After repeating to the dealership that it wouldn't start. Anyway, he called me and he's seen this before, and for me to try to start the car. Did that as well but that didn't work. Finally had to do a reset on the car. Drove me to a shop in Pompano Beach, FL. the next morning. Drove perfectly fine to the shop. They informed me later in the day that the 48 volt battery needs to be replaced, there are none in the US, and 47 on back order in Germany with no idea when I would get one. The car is still with them since December 1. This is my first MB, and I'm NOT impressed at all. The biggest question I have is...this a battery problem, or software issue...or both? Batteries don't usually come back to life after a failure, and a 10 minute shutdown?? Seems that resetting the software by restarting the car made the issue go away...for now at least.

🗨 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8229274)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8229274&securitytoken=guest)

---

📑 04-06-2021, 10:44 AM

#19 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post8309265)

**Bill Baird (https://mbworld.org/forums/members/269175-bill-baird.html)**
Member

Join Date: Mar 2013
Location: Chicago suburbs
Posts: 109
Likes: 51 (https://mbworld.org/forums/post_thanks.php?do=findthanks_user_gave&u=269175)
Received 26 Likes on 19 Posts (https://mbworld.org/forums/post_thanks.php?do=findthanks&u=269175)
2018 C43 Coupe, 2018 GL350, 2007 CL600

My '18 GLE sat from May to August with no problem. My '07 GL600 sat from November to February with no problem. Neither had a battery tender. It makes me think there is some kind of draw. There was a really good explanation on how to find the problem on the "Car Wizards" youtube channel.

What's draining the battery on this '01 Mercedes SLK320? CAR …

▶

🗨 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=8309265)

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8309265&securitytoken=guest)

---

#20 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#post830

04-06-2021, 02:25 PM

Challe (

Quote:

Originally Posted by **Willfulone** 🔁 (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-html#post8124779)
*Here you go*

*Sorry for the delay - had a little stay in the Hospital*

🗨 Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

⏬ Share (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)

≡

**MBWorld** (https://mbworld.org)

🔍

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c) > GLE-Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

> New GLE Keeps Draining Battery - won't start

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)    Log In   |

Register (https://mbworld.org/forums/register.php)



H'mm how is MB Alexandria doing these days. Had one car there, now moved them all to Arlington, far better service in my experience

↩ Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

Share ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)

« First   ‹ Prev   1 / 1   Next ›   Last »   Go to Page…   Go

■■■MBWorld (https://mbworld.org)

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

**New GLE Keeps Draining Battery - won't start**

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)    Log In |

**Register** (https://mbworld.org/forums/register.php)

Location : Alexandria , VA USA
Posts : 48
Likes : 0
Received 0 Likes on 0 Posts
2013 ML350 BlueTEC

⚙

🔊 Reply (https://mbworld.org/forums/newreply.php?do=newreply&p=830

👍 Like (https://mbworld.org/forums/post_thanks.php?do=post_thanks_add&p=8309419&securitytoken=

🔄 Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&p=8079971)

Subscribe 🔔 (https://mbworld.org/forums/subscription.php?do=addsubscription&t=785752)

⬅ Back to Subforum
Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)
(https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)

View Next Unread

MBWorld.org Forums (https://mbworld.org/forums/index.php?s=a22746f0c4b521018f30ef3008b2c79c) > Mercedes-Benz SUVs, Trucks, Vans, Diesels, Other (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=9) > GLE Class (V167) (https://mbworld.org/forums/forumdisplay.php?s=a22746f0c4b521018f30ef3008b2c79c&f=250)

> **New GLE Keeps Draining Battery - won't start**

2021 GLE 450 Battery Charging

Currently Active Users Viewing This Thread: 1 (0 members and 1 guests)

Thread Tools ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadtools)

Search this Thread ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html?nojs=1#goto_threadsearch)    Log In    |

Register (https://mbworld.org/forums/register.php)

↩ Reply (https://mbworld.org/forums/newreply.php?do=newreply&noquote=1&t=785752)

Share ▾ (https://mbworld.org/forums/gle-class-v167/785752-new-gle-keeps-draining-battery-won-t-start.html#)

# COMPLAINT
# EXHIBIT D



# MERCEDES GLE FORUM

Search Community

Home  ›  Forums  ›  Mercedes-Benz GLE (W166 & …  ›  **Mercedes GLE General Discu…**  ›

# Electrical Problems with 2020 GLE450

➔  Jump to Latest

Follow

1 - 4 of 4 Posts

J  **johnh55@att.net** · Registered
Joined 6 mo ago · 1 Posts

✔ Discussion Starter  •  #1  •  6 mo ago

I have had 4 occasions in last 3 months where 450 is dead after only sitting for an hour. Its now at Dealer for second time for this problem with total of 15 days of trying to fix it. In 3 of those occasions, jumping finally started it. Dealer replaced starter battery. THen it happened again last week and thus up at the dealer.

A GLE 450 they gave me as a loaner last time also ended up not starting while I had it and had to be towed - not even a jump started it.

ANy one know if other GLEs are having this problem? I know hundreds of GLEs were stored at the factory when they were originally built.

My GLE was built in November of 2018. I bought it new in January of 2020.

ANy help would be greatly appreciated. Love the car but don't trust it at all.

Reply

  **Jeorge** · Registered
Joined 6 mo ago · 4 Posts

#2  •  6 mo ago

#2 · 5 mo ago

Do you still have warranty ?

Reply

---

 **WG36** · Registered
Joined 5 mo ago · 1 Posts

#3 · 5 mo ago

Hi,

I had the same problem with 2016 GLE 450 AMG, (bought new from the dealer) The first week I received it the car would completely shutdown I would have to open the door in order to restart it, for 4 years I had nothing but problem after problem, mostly electrical. They never found the issue with the engine and entire ignition and computer system shutting down and having to be restarted. This had nothing to do with the eco engine start and stop.
The transmission from day one was beyond jolty. Eventually the car completely shutting down stopped after the dealer had done updates to the cars computer system etc.., but they could never diagnose many recurring and new issues. I sold the car as I deemed it a complete lemon from day one.

All that being said I fell in love with the all new GLE 53 AMG when I first heard of its announcement and even considered many full M competition BMW vehicles and Range Rovers etc...,

The New GLE53 AMG, is beyond impressive and works wonderfully, the car is mind blowing and drives 1000 times better then the older GLE's (2019 and older).

Everything is new on the car from what I understand and it is an amazing vehicle.

Reply

---

 **NicholasAnderson** · Registered
Joined 1 mo ago · 1 Posts

#4 · 1 mo ago

Yes, I'm very familiar with your problem, it usually happens with this type of model. Usually it has to be solved in the production service centers, but it is also possible to have the repair done by a handyman who works for himself. I am now convinced that it is worth it to check your car several times before buying it and make sure there are no factory problems with it. I was trained to do this when I took a course How to

[Become an Electrician: Career Guide [2021 Update]](#) and I don't think you should neglect the training because it explains many things and solves problems.

Reply

---

1 - 4 of 4 Posts

## Join the discussion

Continue with Facebook

 Continue with Google or [sign up with email](#)

# Recommended Reading

Did you find the recommended reading relevant to this discussion?    😊 Yes    ☹ No

### [9G-Tronic Transmission - Almost Everything You Need To Know](#)

Transmission and Drivetrain Discussion

💬 7    👁 8K

H   HDGFND · updated 8 mo ago

---

### [2016 gle 350d](#)

Engines and Technical Discussion

💬 9    👁 4K

S   serta · updated Jan 17, 2017

---

### [2020 gle 450 air conditioner problems](#)

Introductions

💬 3    👁 1K

R   Ross Novelli Jr · updated 29 d ago

---

## Check Engine Light on Brand New GLE 350d

Mercedes GLE General Discussion

💬 20    👁 15K

B   bwdownie · updated Jun 16, 2017

---

## 2016 GLE350 broke after 50 miles

Mercedes GLE General Discussion

💬 1    👁 2K

H   helodrive · updated Jun 25, 2016

---

Home    About Us    Terms of Use    Privacy Policy    Help    Contact us

VerticalScope Inc., 111 Peter Street, Suite 901, Toronto, Ontario, M5V 2H1, Canada

Forum software by XenForo 🔊

# COMPLAINT
# EXHIBIT E

Case 2:21-cv-12750-BRM-JRA Document 20 Filed 01/14/22 Page 187 of 229 PageID: 1031

**2020 Mercedes-Benz GLE 450**
★★★★☆ **4.0** 26 Reviews

**Learn About This Car**

Write Your Review

Research / Mercedes-Benz / GLE 450 / 2020 GLE 450

# Consumer Reviews

Share

## 2020 Mercedes-Benz GLE 450

**$55,791 - $104,948** MSRP Range



## Review Score

★★★★☆ **4.0** 26 Reviews

👍 **54%** of drivers recommend this car

### Score Breakdown

▰▰▰▰▱ Comfort

▰▰▰▰▱ Value for the Money

▰▰▰▰▱ Interior Design

▰▰▰▰▱ Reliability

▰▰▰▰▱ Performance

▰▰▰▰▱ Exterior Styling

Learn about the 2020 Mercedes-Benz GLE 450

**2020 Mercedes-Benz GLE 450**

**4.0** 26 Reviews

**Learn About This Car**

Write Your Review

# Have You Driven the 2020 Mercedes-Benz GLE 450?

Write Your Review

### What Drivers Are Saying

Read reviews that mention:

| All Reviews | Engine | Easy Entry | New Car | Mechanical Problem | Beautiful Car |

| Comfortable Ride | Comfortable Seat | Great Job | Great Creature | Safe Car | Brake |

Feedback

**1** - **26** of **26** reviews        Most Helpful

★★★★★

**Most innovative vehicle I've owned.**

*by Penny J from WICHITA, KS on Sun Feb 02 2020*

I'm completely blown away with all the features in this GLE 450. I wanted a 6 cylinder and it's an SUV

Show Full Review ⌄

★★★★★

**My Favorite Mercedes SUV yet!**

*by Lone Star Lady from Dallas, TX on Fri Feb 07 2020*

This is my third Mercedes SUV that I have owned over the past 15 years. The GLE 450 is amazing! The

Show Full Review ⌄

★★★★★

**Super solid and comfortable cruiser**



2020 Mercedes-Benz GLE 450 Consumer Reviews | Cars.com

**2020 Mercedes-Benz GLE 450**

**4.0**   26 Reviews

**Learn About This Car**

Write Your Review

---

★★★★★

This the 5th MBZ I have owned and it is the best .

*by MBZ fan from Ocean City,NJ on Thu Apr 09 2020*

Excellent design, both ext and int. Comfortable ride, comfortable seats. MPG far better than stated by

---

Show Full Review ⌄

---

★★★★★

Soft handling

*by Watchman from Alaska on Mon Jun 22 2020*

This is one of the most beautiful car I've driven, it's so beautiful and amazing, good sounding system.

---

Show Full Review ⌄

---

★☆☆☆☆

Most unreliable car I have ever owned.

*by CEO from Lexington NC on Fri Nov 08 2019*

I currently own 3,Mercedes - I will never own another one. This 2020?450!GLE has refused to start, left me stranded 10 times in 8 weeks- only to find out from a tow truck driver there is a problem with the software . Which Mercedes has now confessed is true. I will turn this new car back to dealer. NC lemon law.



| | |
|---|---|
| Comfort ▮▮▮▯▯ | Value for the Money ▮▮▮▯▯ |
| Interior Design ▮▮▮▯▯ | Reliability ▮▮▯▯▯ |
| Performance ▮▮▮▯▯ | Exterior Styling ▮▮▮▯▯ |

Purchased a **New** car

Uses car for **Commuting**

**Does not** recommend this car!!

39 out of 41 people found this review helpful. Did you?

**2020 Mercedes-Benz GLE 450**
**4.0** 26 Reviews

Learn About This Car

Write Your Review

★★★☆☆
I spoke too soon
*by Christopher Holloway from Suffolk, Virginia on Wed Jul 24 2019*

At 580 miles the temperature warning light came on. I took it to the dealer. They were very nice and

Show Full Review

Feedback

★★☆☆☆
Been in the shop more days than I've owned it😩
*by Dschu from Mcallen Texas on Mon Nov 18 2019*

I ordered my 450 GLE in June. I finally received it on October the 6th. After one week the engine light

Show Full Review

★★☆☆☆
Not worth the frustration
*by Rosa Disappointed Customer from Atlanta, GA on Wed Feb 05 2020*

I ordered the car in August 2019 and 2 weeks later I got a red flag stating it was overheating, went to

Show Full Review

★★★☆☆
I spoke too soon
*by LA Guy from LA, CA on Wed Nov 20 2019*

Responding to "I spoke too Soon" I had the same problem. First warning sign of overheating. Then

Show Full Review

**2020 Mercedes-Benz GLE 450**
**4.0** 26 Reviews

Learn About This Car

Write Your Review

I have had it for seven months. It has been out of service and in the shop over forty days. Mercedes will

Show Full Review

★★★☆☆
Not a reliable and a safe car to drive
*by Tom from Bay Area , Fremont on Sun Dec 29 2019*

The GLE 450 car is good with exterior and interior. But when it comes to long ride it's not the safest car

Show Full Review

Feedback

★★★☆☆
Disappointment
*by Disappointment from New York, NY on Sat Sep 21 2019*

Do you know that dream of having a mercy? Believe it became a nightmare. In my mind, it's

Show Full Review

★★★★☆
Good outweighs Bad (Maybe)
*by Cliff M, retiree cruising Canada and U.S.A. from Lashburn, SK., Canada on Wed Mar 25 2020*

...ught it because of all its features. I am still discovering some of them! We have put on 36k

Show Full Review

★★★★★
Impressed and Satisifed

**2020 Mercedes-Benz GLE 450**

**4.0**   26 Reviews

**Learn About This Car**

Write Your Review

---

★★★★★

Good car, no issues, a small reliability problem.
by Jenny Liverhead from San Antonio, TX on Thu Jan 30 2020

This car is a great car, spacious, intelligent, and overall good interior and exterior. But the

---

Show Full Review ⌄

---

★★★★☆

So happy with my new GLE 450
by Amanda from Cincinnati, OH on Mon Nov 04 2019

Hands down the best in the segment. The one and only complaint is that I can't channel surf the radio

---

Show Full Review ⌄

---

★★★★★

Absolutely Beauty
by Happy from Saskatoon Sk. on Wed Oct 09 2019

Excellent, an absolute pleasure to drive, and mileage for a vehicle of this size is outstanding. I have

---

Show Full Review ⌄

---

★★★★★

Luxurious and Roomie
by Lionsfan from Los Ángeles,CA on Tue Jan 21 2020

I am 6'2 and was looking for a roomie, luxury ride with all the bells and whistles. This ride does not

---

Show Full Review ⌄

**2020 Mercedes-Benz GLE 450**

**4.0**  26 Reviews

Learn About This Car

Write Your Review

Perfect for me room wise. I'm disabled it is roomy enough for my equipment. Decent gas mileage

Show Full Review ⌄

⭐⭐⭐⭐⭐

**New 2020 GLE is worth the wait**
*by Pkmakai from Newport Beach CA on Mon Aug 05 2019*

Fabulous, new design exterior and interior much improved. Much friendlier, easier to use electronics

Show Full Review ⌄

⭐⭐⭐⭐⭐

**Awesome Vehicle**
*by lenko from Orleans Ma on Mon May 13 2019*

This vehicle is exactly what I was shopping for, and I am loving it. Car is in immaculate condition and

Show Full Review ⌄

TEST DRIVE REVIEW

⭐⭐⭐⭐☆

**Thinking of buying**
*by Jeff Long Island from New york on Sun Feb 16 2020*

Show Full Review ⌄

⭐⭐⭐☆☆

**Never had a car so bad**

**2020 Mercedes-Benz GLE 450**

**4.0** 26 Reviews

**Learn About This Car**

Write Your Review

⭐⭐⭐⭐⭐

**Very comfortable and reliable.**

*by Sara Brown from Liberty, Tx on Sun Feb 14 2021*

I love the look of this car. I love the convenience of this car. I am looking forward to learning about all

**Show Full Review** ⌄

⭐⭐⭐☆☆

**Great vehicle but......**

*by KLYPH EM from Lashburn, SK Canada on Fri Feb 12 2021*

This is my 4th MB SUV. On the plus side I like the smooth quiet ride and the great creature comforts of

**Show Full Review** ⌄

| Prev | | Next |

**1**

250 Per Page

**Our Company**

About Cars.com

Investor Relations

Contact Cars.com

Mobile Apps

**Buying & Selling**

Find a Car

Certified Pre-Owned

Sell Your Car

Car Book Values

**Our Partners**

Auto.com

NewCars.com

**2020 Mercedes-Benz GLE 450**

**4.0**  26 Reviews

Learn About This Car

Write Your Review

Terms of Service

Privacy Statement

Do Not Sell My Personal Information

Accessibility Statement

Ad Choices

[+] Feedback

© 2021 Cars.com. All rights reserved.

Feedback

# COMPLAINT
# EXHIBIT F

Richard Roth
RSJ AUTO LLC

May 5, 2021

Perlman-DePetris Consumer Law
1926 Greentree Rd. Suite 100
Cherry Hill, NJ 08003

RE:
Jerry Scattaglia
135 Oak Ave.
Staten Island, NY 10306

Mr. DePetris,

I have reviewed this vehicle's repair invoices, Mr. Scattaglia's documentation of his repeated attempted repair experiences, technical service bulletins and other relevant information regarding this case. Subsequent to reviewing the supplied documentation, I examined Mr. Scattaglia's 2021 Mercedes Benz GLE 450 VIN# 5FNRL6H75JB096844 on 4/28/21. I performed a multipoint inspection which includes road testing the vehicle, a visual inspection, and a diagnostic scan of the vehicle's electronic systems. The vehicle had 2,384 miles at the time of my inspection. During this review, I have formed opinions about the vehicle's repair history, defects, and value. My evaluation takes into account the disclosure of its repair history.



---
**Page 1**
---

<u>SUMMARY</u>

- Three (3) repair visits and forty-nine (49) days out of service for abnormal no crank, no start conditions and electrical system anomalies in 6 months of ownership.
- This vehicle is clearly defective from the factory.  There were latent defects that existed at the time of sale that have caused the repeated no crank, no start abnormal condition and electrical system anomalies that are extant to this day.
- These anomalies are known issues as there are numerous Mercedes Benz TSBs regarding the 48V on-board electrical system.
- The right front door module was replaced, and the 48V battery was replaced twice in 6 months of ownership.  This repeated repair is significant as a majority of the interior of the vehicle has to be removed during this repair attempt.  The passenger front seat, seat bottom, front and rear carpet and the floor panels all were removed twice.  All this to attempt to repair the repeated and continued no crank, no start anomalies that Mr. Scattaglia complained about no less than 3 times since delivery of the Mercedes Benz GLE 450.
- I found the use, value and safety of this vehicle have been impaired by the recurring defects and malfunctions of the engine and electrical system.
- I found the diminished value of this vehicle to be $10,483.97.


<u>I. RECORDS REVIEWED</u>

1. Retainer agreement signed by counsel.
2. RO 4-10-21
3. RO 12-1-20
4. RO 11-11-20
5. Cars.com forum posts
6. MBworld.com forum posts
7. Mercedes GLE forum posts.
8. Client contact info for use in scheduling inspection
9. Client factual summary
10. Window sticker
11. Pages from warranty book (summaries of coverage)
12. Service contract page
13. Certificate of title for vehicle
14. Redacted retail order
15. Mercedes Benz TSBs
16. Current NADA Value Report

II.  BACKGROUND

Mr. Scattaglia purchased the vehicle new on 10/29/20.  The purchase price is $76,918.36.  The vehicle was delivered defective as manifested during his ownership.  **This Mercedes Benz GLE 450 has had repeated abnormal conditions including: right side of the vehicle is dead, no crank, no start (2 times), battery light illuminated, and dash goes blank while driving.**  It has required no less than three (3) additional repairs and forty-nine (49) days out of service to attempt to correct these abnormal conditions.  Mr. Scattaglia reports that the electrical system problems still occur to this day.

III. REPAIR HISTORY

Mr. Scattaglia reports that the vehicle was serviced by an authorized Mercedes Benz repair facility at least three (3) times between the purchase date of 10/29/20 and 4/10/21.

The specific repair visits based on the records supplied by Mr. Scattaglia are as follows:

- 11/10/20 @ 242 miles.  13 days after purchase.  2 days out of service.

  - CLIENT STATES THE R/SIDE OF THE VEHICLE IS DEAD - DOOR LOCK INOP - MIRROR DOESN'T FOLD.
    - Verify complaint, drive vehicle into shop. Hook up sds and charger.
    - Found fault codes in many modules for communication to RF door control module N69/2. Opening RF door appears to have rectified fault.
    - RNR RF door sill trim, check fuse 302. Find 13.2 volts.
    - RNR RF door panel. Check connectors on door control module and pins for tightness.
    - Found connector 6 to not be plugged in completely. Connector 6 does not appear to be root of cause being that connector 6 primarily controls lighting and seat position. Concerned about connector 3 because of circuit 30 voltage and can communication. Find 13.2 volts at connector 3 pins 4 and 5. OK. Check CAN communication find 2.2V CAN low pin 1 to chassis ground. Find 2.6V from CAN high pin 2 to chassis ground.
    - RNR RF seat RNR RF carpeting. Due to vehicle age finding loose ground is not uncommon. Perform Voltage drop test from Connector 3 pin 4 to W15/1 find 0.0V ok. Check for continuity between those two points, find .1ohms of resistance. Check pins for tightness at X35/2x1 find all associated pins to have good drag and contact pattern. No fault found there.
    - Perform hard reset of N69/2 by tension at F150/1 tension ok. Upon reinstalling fuse found everything to functioning. Suspect faulty module due to hard reset having to be performed.
    - Install new door control module RF. Perform initial start up of RF door. All ok at current time. Clear codes.

---

**Page 3**

- 12/1/20 @ 554 miles. 41 days out of service. *NOTE: Mr. Scattaglia reports the vehicle failed on 11/30/20 and was towed to the dealer that day.*

  - CLIENT STATES RED BATTERY LIGHT IS ON - VEHICLE WILL NOT CRANK/START

    - VERIFIED COMPLAINT , NO START AND WARNING IN CLUSTER 48 VOLTS BATTERY WARNING ON.
    - PERFORMED QUICK TEST PRINT CODE#B183387 DC/DC CONVERTER BATTERY FOR THE 48V SYSTEM HAS A MALFUNCTION, THE MESSAGE IS MISSING. LIN G1/3 - 48V ON VOLT.B183349 THE BATTERY FOR THE 48VOLT ON BOARD SYSTEM HAS A MALFUNCTION.
    - FOLLOWING LI54. 10-P-069698 FUNCTIONAL IMPAIRMENT OF 48V ON-BOARD ELECTRICAL OPEN PTSS CASE# 154425 SYSTEM, VEHICLE FALLS INTO CAUSE/REMEDY 1 AND 2 CAUSE#1 NO START WITH B183387 IN DC/DC CONVERTER N83/1, CAUSE 2 B183349 IN 48 VOLT BATTERY.
    - PERFORMED rEMEDY1 CAUSED NO START WITH B183387 IN DC/DC CONVERTER N83-1 A. IF FIRST VISIT PULL QUICK CHEST IF FAULT CODE IS B183387 IN N83-1 (REGARDLESS OF OTHERFAULTS) REPLACE ONLY 48V BATTERY.
    - REMEDY 2 B183349 IN 48V BATTERY. A. IF FAULT B 183349 IN 48V I. REPLACE ONLY 48 V BATTERY (REGARDLELSS OF OTHER FAULTS). I UPDADED DC /DC CONVERTER IF LATEST S/W IS AVAILABLE 9 IS THE RESOLUTION RPLACE 48V BATTERY AND UPDATED DC/DC CONVERTER.
    - PULLED INITIAL QUICK TEST AND DC/DC CONTROL UNIT LOG.
    - PULLED ISA PERFORMANCE DATA BEFORE CLEARING FAULTS. COULD NOT ROAD TEST VEHICLE WOULD NOT START. COULD NOT CONFIRM ALL 48V COMPONENTS COULD BE ACTUATED. NO 48V OUTPUT OF BATTERY.
    - VIA XENTRY GUIDE TEST
      - A1=M75 ELECTRICAL COOLANT PUMP
      - A2=M60 ELECTRICAL TURBO
      - A3=A95 ELECTRICAL AC COMPRESSOR
    - PRINTED OUT FROM 12V TEST WITH XENTRY BATTERY TESTER IN FRONT SAM. DETACHED LINES BETWEEN DC/DC CONVERTER N83-1 AN48V ON BOARD ELECTRICAL SYSTEM BATTERY, NO DAMAGE , SOILING , CORROSION AND RESISTANCE OF ALL CABLE PINS .1 OHMS.
    - REMOVED IND INSPECT ALL CABLE INTO/ OUT OF DC/DC CONVERTER ALL CLEAN AND TIGHT. AS A RESULT WE MUST REPLACE 48V ON BOARD ELECTRICAL SYSTEM BATTERY
    - R&R PASS FRONT SEAT ASSEMBLY, R&R REAR SEAT BOTTOM , R&R FRONT AND REAR CARPET, R&R FLOOR PANELS , ACCESS 48V BATTERY , R&R BATTERY COOLANT LINES , R&R ELECTRICAL LINES , REMOVE FOAM AND REPLACED 48V BATTERY , SWAP CONTROL MODULE TO NEW BATTERY , INSTALLED NEW BATTERY , ASSEMBLE VEHICLE IN REVERSE ORDER, PROGRAM NEW BATTERY.

- 4/10/21 @ 2,194 miles. 6 days out of service.

  o CLIENT STATES VEHICLE WILL NOT START - NO CRANK NO START

    ▪ VEHICLE DOES NOT START, SDS AND CHARGER HOOK UP SDS TEST CK.
    ▪ DTC'S B183349 BATTERY FOR 48 VOLT ON BOARD ELECTRICAL SYSTEM HAS A MALFUNCTION...THERE'S AN INTERNAL ELECTRICAL FAULT. B183371 THE BATTERY FOR 48 VOLT ON BOARD ELECTRICAL SYSTEM HAS A MALFUNCTION..THE ACTUATOR IS BLOCKED.
    ▪ PROCESS DTC'S AS PER LI54.10-P-069698 AND PERFORM CK. LIST..FOR CAUSE 2 FOR THESE 2 FAULT CODES MENTIONED ABOVE...
    ▪ AS PER LI54.10-P-069698 REMOVE R/F SEAT AND R/F RUG AND R/R PORTION OF REAR RUG REMOVE FLOORBOARD PANELING AND REPLACE 48 VOLT BATTERY..WITH DC/DC CONVERTER AND INITIAL STARTUP OF DC/DC CONVERTER AND UPDATE 48V SYSTEM BATTERY...CHECK.
    ▪ FUNCTIONS OK. ERASED CODES AND REASSEMBLE VEHICLE.

  o CLIENT STATES DASH WENT OUT FOR 1-2 MINUTES AND THEN CAME BACK ON (WHILE DRIVING)
    ▪ CK. VEHICLE CLUSTER WENT BLANK, SDS AND CHARGER HOOK UP SDS TEST CK.
    ▪ DTCS NONE CK. FOR RELATED LI'S NONE CK. FOR RELATED PROBLEMS WITH OTHER VEHICLES NONE SPECIFIC TO THIS COMPLIANT
    ▪ CK. FOR CLUSTER S/W UPDATES AND UP CLUSTER S/W

Mr. Scattaglia reports that the electrical system anomalies still occur to this day.

IV. INSPECTION

I inspected Mr. Scattaglia's vehicle on 4/28/21 @ 2,384 miles.

- I checked the vehicle's fluids; they were of normal level and condition.

- I scanned the vehicle's computer systems.  Numerous abnormal trouble codes were found.

   o   48 computer systems were analyzed on this vehicle.

   o   I found 28 abnormal trouble codes, 18 of which were in the instrument cluster module which directly corresponds to Mr. Scattaglia's most recent complaint, the instrument cluster display blacking out while driving.

   o   ***NOTE:  It is logical to conclude that during the last repair attempt at the authorized Mercedes Benz repair facility that these codes were not retrieved nor diagnosed, OR, the abnormal were retrieved, not diagnosed then cleared, (but not documented on the repair order) and they have all set/reset in the last 13 days between when the defective unrepaired vehicle was delivered back to Mr. Scattaglia and my inspection. Either way, the vehicle is not repaired and has extant abnormal conditions as illustrated by the numerous trouble codes.  From these codes it is reasonable to conclude that Mr. Scattaglia will continue to experience the instrument cluster anomalies while driving which is a serious safety concern.*** See the following abnormal trouble codes.

   o   Engine
       ▪   U0416-08 | Implausible Data Were Received From Control Unit 'Traction System'. There is a signal fault or the message is faulty. - Pending.

   o   Antilock Brakes
       ▪   U1155-FF | Communication With The Lower Control Panel Has A Malfunction. - Stored.
       ▪   U1427-94 | Implausible Data Were Received From Control Unit 'Audio Or Comand'. There Is An Unexpected Instruction. - Stored.

   o   Instrument Panel
       ▪   U0100-87 | Communication With The Control Unit 'Combustion Engine' Has A Malfunction. The message is missing.- Stored.
       ▪   U0101-87 | Communication With Control Unit Transmission Has A Malfunction. The message is missing. - Stored.
       ▪   U0109-87 | Communication With Control Unit Fuel Pump Has A Malfunction. The message is missing. - Stored.
       ▪   U0115-87 | Communication With Control Unit 'drivetrain' Has A Malfunction. The message is missing. - Stored.
       ▪   U0122-87 | Communication With Control Unit 'Traction System' Has A Malfunction. The message is missing. -Stored.

- U0127-87 | Communication with the tire pressure monitor has a malfunction. The message is missing. - Stored.
- U0141-87 | Communication with the front signal acquisition and actuation module has a malfunction. The message is missing. - Stored.
- U0142-87 | Communication with the rear signal acquisition and actuation module has a malfunction. The message is missing. - Stored.
- U0147-87 | Communication With Control Unit 'audio Or Comand' Has A Malfunction. The message is missing. -Stored.
- U0151-87 | Communication with the supplemental restraint system (SRS) has a malfunction. The message is missing. - Stored.
- U0159-87 | Communication with PARKTRONIC has a malfunction. The message is missing. - Stored.
- U0212-87 | Communication with the steering column module has a malfunction. The message is missing. - Stored.
- U111B-87 | Communication With The Control Unit 'Mercedes Benz Intelligent Drive' Has A Malfunction. The message is missing. - Stored.
- U1167-87 | Communication with the left front reversible emergency tensioning retractor has a malfunction. The message is missing. - Stored.
- U1168-87 | Communication with the right front reversible emergency tensioning retractor has a malfunction. The message is missing. - Stored.
- U118F-87 | Communication With The Control Unit For Telematics Services Has A Malfunction. The message is missing. - Stored.
- U11AD-87 | Communication With Control Unit Display Cluster Has A Malfunction. The message is missing. - Stored.
- U120E-87 | Communication With The Blind Spot Assist Has A Malfunction. The message is missing. - Stored.

- Parktronic
  - U0147-86 | Communication With Control Unit 'audio Or Comand' Has A Malfunction. There Is An Incorrect Signal. -Stored.

- Electronic Ignition Switch
  - U1160-00 | A Bus Keep Awake Unit Was Detected. There Is A General Failure. - Stored.

- Ambiance Light
  - U1127-87 | Communication With One Or More Color Generation And Coupling Modules On LIN Bus 6 Has A Malfunction. The message is missing. - Stored.

- Audio/COMAND Display
  - U014787 | Communication With Control Unit 'Audio Or Comand' Has A Malfunction. The Message Is Missing.

- Audio or COMAND
  - B227B-00 | The Specified And Actual Configurations Of The MOST Components Are Different. There Is A General Failure. - Stored.

- o Panoramic Sliding Roof
  - ▪ U0147-87 | Communication With Control Unit 'audio Or Comand' Has A Malfunction. The message is missing. -Stored.
  - ▪ U0169-87 | Communication With The Overhead Control Panel Has A Malfunction. The message is missing. -Stored.

- o Touchpad
  - ▪ U0147-87 | Communication With Control Unit 'audio Or Comand' Has A Malfunction. The message is missing. -Stored.

- o Rear Switching Module
  - ▪ U1160-00 | A Bus Keep Awake Unit Was Detected. There Is A General Failure. -Stored.

- I road tested the vehicle.  No anomalies were experienced.

<u>V. OPINION</u>

Mr. Scattaglia has a vehicle that has had numerous abnormal conditions including: the right side of the vehicle is dead, no crank, no start (2 times), battery light illuminated, and dash goes blank while driving, during 6 months of ownership.  These type of warranty issues are not acceptable under any industry standard I am aware of and I find them unreasonable from my standpoint as a 29-year veteran of the industry.

I have many years' experience as an automotive shop owner/operator, responsible for generating, authorizing and auditing records exactly like these.  Relying on this experience, my inspection of the vehicle, the accounts of Mr. Scattaglia, and the documentation from the authorized factory agencies, I am able to make this evaluation.

The above repair history is significant since:

- There are repeated abnormal complaints about the engine not starting and electrical system anomalies.  It is impossible to ignore the abnormal and poor performance of the vehicle given Mr. Scattaglia's repeated complaints.  This vehicle has not been repaired after three (3) visits and forty-nine (49) days out of service for the same and various abnormal conditions.

- Mercedes Benz knew as early as 1/28/20 the problems with this vehicle existed. They still knowingly delivered the vehicle to Mr. Scattaglia on 10/29/20 with the known problems as is illustrated in official Mercedes Benz service bulletins regarding the 48V on-board electrical system.  These bulletins are:

  - LI54.10-P069698 "Functional impairment of 48 V on-board electrical system"
    - 1/28/2020
    - Complaints:
      - Instrument cluster message 48 V on-board electrical system battery (G1/3) in yellow or red.
      - Vehicle does not start.
      - Limp home mode due to high engine operating temperatures.

  - LI54.10-P-071596 "Vehicle does not start / Vehicle cannot be unlocked - starter battery may be discharged"
    - 8/7/2020
    - Complaints:
      - Vehicle does not start / Vehicle cannot be unlocked
      - Display message in instrument cluster "Battery - Start Engine - see Operator's Manual"

  - LI54.10-P-071499 "Xentry Battery Tester results disagree with workshop assessment"
    - 8/10/2020
    - Complaint:
      - The result from the XENTRY battery test does not match the current state of the battery.

- The repair invoices prove the malfunctions have occurred repeatedly and the authorized Mercedes Benz repair facility has not performed any meaningful diagnosis or repairs to correct these problems.

- The right front door module was replaced, and the 48V battery was replaced twice in 6 months of ownership.  This repeated repair is significant as a majority of the interior of the vehicle has to be removed during this repair attempt.  The passenger front seat, seat bottom, front and rear carpet and the floor panels all were removed twice.  All this to attempt to repair the repeated and continued no crank, no start anomalies.

- Mr. Scattaglia reports the electrical system issues continue to this day.

The above repair history and vehicle inspection results are significant as the repeated complaints include no start, no crank and electrical system anomalies.

Overall, the condition and performance of this vehicle is fair at best and dangerous at worst in certain situations.  I have been in the automotive repair industry for 29+ years and have owned a transmission and total car care repair facility for 10+ years.  I consider the poor performance of this vehicle to be a serious safety concern and understand Mr. Scattaglia's reluctance to drive this vehicle as he is concerned that the vehicle will not start, or the instrument cluster will black out while driving like he has experienced numerous times.  Mr. Scattaglia does not feel safe operating this vehicle and is concerned for his and his family's safety.  I would not feel safe or confident driving Mr. Scattaglia's vehicle due to the above concerns experienced.

**Repair History Effect on Use, Value, and Safety**

The use of this vehicle has been substantially compromised since it repeatedly failed to operate as intended, the unreasonable number of times it has had to go back to the dealer for repair attempts to have essentially the same abnormal condition fixed, the number of days it has been out of service, and through the difficulty of procuring proper repairs from the authorized Mercedes Benz repair facility.

The value of this vehicle has been substantially compromised.  The significant repair history with right side of the vehicle is dead, no crank, no start (2 times), battery light illuminated, and dash goes blank while driving, the numerous abnormal trouble codes found during my inspection, along with three (3) repair visits and forty-nine (49) days out of service in 6 months of ownership, compromises the vehicle's value.

This is because one of the greatest areas of diminished value is private party sale.  Since Mr. Scattaglia would achieve the greatest value for his Mercedes Benz GLE 450 when listing himself for sale rather than trading it in to a dealer and that disclosure of the vehicle's repair history would be a prerequisite to the private sale and thus cause the sale price to be lowered significantly.  Dealers do not consider warranty repairs when accepting vehicle trades or purchasing vehicles from consumers.  Automotive dealers instead focus mainly on physical exterior and interior visible condition and miles registered on the vehicle's odometer.

Mr. Scattaglia's repair history coupled together is unreasonable; the problems Mr. Scattaglia experienced are unexpected and abnormal.  I would consider this GLE 450 unreliable given Mr. Scattaglia's repair history.

The safety of this vehicle has been compromised by the engine and electrical system malfunctions chronicled in its repair history.  The engine should start as expected without failing to crank or start, and the instrument cluster should not black out while driving.  If the engine fails to start or the instrument cluster blacks out while driving, serious safety concerns occur.

Finally, there is no indication that this Mercedes Benz GLE 450's engine and electrical system nonconformities, defects and abnormal conditions are the result of abuse, neglect, or unauthorized modifications or alterations of this Mercedes Benz GLE 450 by anyone other than the manufacturer. This is based on my vehicle inspection and the review of the records provided which include the authorized Mercedes Benz repair facility repair orders and records, Mercedes Benz recalls and service bulletins, along with the accounts of Mr. Scattaglia.  It is also my understanding Mr. Scattaglia will testify under oath that the vehicle has not been in any accidents, damaged, modified or undergone any body or collision repairs or refinishing since he purchased it.

VI. Damages

Diminished Value is the difference in value at the time and place of acceptance between the value of the goods as accepted and the value they would have had if they had been delivered as warranted. This 2021 Mercedes Benz GLE 450 was unfit, unmerchantable and unsafe at the time of sale. There is a significant difference or diminished value from as the vehicle was represented and as it truly existed. The diminished value of this vehicle as delivered and warranted equals 13.63% of the purchase price.

Valuation is a part of what I have done on a daily basis at my shop. We performed major repairs like transmissions, engine, AC and everything in between. It is important to value the vehicle to determine if the repairs are the right thing to do. Valuing and appraising is a process that any mechanic or used car dealer would do. Starting with a thorough examination of the vehicle, sometimes disassembling components to determine the extent of the repair or damage. Next, I calculate the cost of the repairs. Using the same court accepted methodology mechanics and used car dealers employ, I determine the value of the vehicle with the industry accepted reference guides like Kelly Blue Book and NADA guides. I gather the elements and facts including what was paid for the vehicle, what was its price when new, mileage and condition. I then apply an objective, court and industry accepted standard to determine the value of the vehicle. I have applied the same method to the facts of this case.

I based this diminution on the vehicle's value today per NADA Guides.com. In "Clean Retail" condition the vehicle is worth $74,625 based on its age and mileage. "Rough" condition is defined by NADA as "A vehicle with significant mechanical defects requiring repairs in order to restore reasonable running condition." I define the condition of this vehicle as "Rough" since its purchase given the significant repair history with right side of the vehicle is dead, no crank, no start (2 times), battery light illuminated, and dash goes blank while driving, the numerous abnormal trouble codes found during my inspection, along with three (3) repair visits and forty-nine (49) days out of service in 6 months of ownership. As the vehicle was delivered in "Rough" condition, its value today is $64,450. The difference between these figures is 13.63%. Therefore, the diminution in the value of this vehicle, as warranted and delivered at the time and place of delivery is equal to 13.63% of the purchase price. Taking the 13.63% and multiplying it by the purchase price of $76,918.36 equals $10,483.97 as the diminished value at the time of purchase.

These opinions have been made to a reasonable degree of automotive mechanical certainty based on my years of experience in the automotive repair industry. I reserve the right to supplement and amend this report with additional inspection reports, pictures, videos or other information in the future.

Respectfully submitted,

Richard Roth

- For Reference, the following is the CV for Richard Roth.

# EXPERIENCE

**Owner, RSJ AUTO LLC**                                              **December 2012-Present**

- Provide Expert Witness services including vehicle inspections, report generation with photos and videos, attendance and testimony at trials/arbitrations, attendance at service advisor, and mechanic depositions.
- Court Admissions as a Mechanical and Valuation Expert:
    - Philadelphia County, PA
    - Allegheny County, PA
    - Lehigh County, PA
    - Camden County, NJ
    - Cumberland County, NJ
    - Sussex County, NJ
    - Burlington County, NJ
- Provide service to automotive repair shops including diagnostic, mechanical, and management assistance on an as needed basis.
- Provide mechanical and physical damage appraisals. (PAMVPDA License #788577)
- Provide mechanical breakdown and physical inspections for insurance, warranty, and fleet companies. (Allstate, Safe-Guard VSC, Auto Retention Services, Aegis/APCO, Preferred Warranties Inc., ARI, General Motors-Chrysler-Mopar Vehicle Protection, Subaru Factory Warranty and others).
- Provide pre-purchase vehicle inspections for warranty companies.

**Owner, AAMCO Transmissions and Total Car Care, Turnersville, NJ  July 2007-September 2017**

- Involved daily in the diagnosis and repair of customer vehicles.
- Manage all operations, sales, marketing and technical proficiencies.  This includes customer interfacing, management of customer service manager and technicians.
- Practical hands-on knowledge and performance of all repair services, supplies and equipment including: automatic transmission, manual transmission, clutch, brakes, exhaust, air conditioning, cooling system, air bag, automotive parts, automotive lubricants, friction materials, part suppliers, differential, emissions, alignment, steering, suspension, tires, EGR, EVAP, check engine light diagnosis, engine, tools, scan tools, scanner, smoke machine, alignment, and tires.
- Regularly worked with insurance, warranty and fleet company adjusters providing service on current model year vehicles.
- Over 15,000 vehicles serviced.

**Director of Transmission Operations, Henley Transmissions,**
**Newton, MA/Moveras, Salem, NH**                              **May 2006-June 2007**

- General management of 6 AAMCO centers' operations, sales, marketing and technical proficiencies.  This includes human resources management of customer service managers and technicians, 67 employees.
- Worked daily in the diagnosis and service recommendations of vehicles in all 6 centers.
- Shared in the management of a centralized transmission remanufacturing facility (Moveras) that supplied transmissions to the company owned stores and other local repair shops.  Assisted in the design and management of transmission teardown, parts supply, rebuilding and dyno testing procedures

**Director of Technical Services, AAMCO Transmissions Inc.**          **July 1991-April 2006**

- Management of AAMCO's Technical Support Department, providing technical support for transmission repair and total car care repair to over 800 AAMCO centers.
  - Support services provided to the chain include management of:
    - Technical Hotline (phone technical support for all AAMCO Centers).
    - Regional Technical Support Managers (8 in-field trainers/center analysts).
    - Technical Information, Certification and Testing.
- Technical Training Materials Production – Manage the planning, developing and leadership of Technical projects to meet corporate goals.  Personally involved at every level of production of books, technical bulletins, certification tests, and videos including writing, layout, editing, photography, print production, slide production, video production (taping, editing, on-screen talent, duplication, collateral materials, etc.).
  - Some of the training titles produced include but are not limited to:  transmission specific programs (E4OD, VW 01M, CD4E, JF506E, SATURN, 4L80-E, 4T65E, 45RFE, etc.), Valve Body Repair, ACCESS (Automotive Computer Controls & Electrical System Servicing), 1-5 Series, Differential Repair, R&R (transmission removal and reinstallation), Fundamental Rebuilding, Standard Transmission, *Do These or CBs*, *Rebuilder's Kwik Reference Guide, Kwik Pressure Specifications Guide*, Brake System Servicing, Air Conditioning System Servicing, Air Bag System servicing, and the Benchnote Series.
- Equipment and Tools
  - Performed evaluation, in-field testing, and recommendation of tools and equipment from numerous vendors.
  - Maintained AAMCO's required tool and equipment list for AAMCO Dealers.
  - Negotiated national pricing programs with RTI (now MAHLE), Snap-on, Hot Flush, and Rotary.
  - Worked closely with AAMCO's Parts warehouse on procurement and distribution.

- Part, Lubricant and Service vendors
  - o Negotiated national programs with Autozone, Transtar and Lubeguard.
  - o Met with vendors executives regularly to design special programs and promotions for AAMCO Dealers.
- Technical Seminars
  - o Developed, created, and presented technical training seminars.
  - o Presented seminars to groups of dealers and technicians with audiences ranging from 10 to over 300 attendees.
- Center Visits
  - o Personally performed over 500 AAMCO center visits nationwide, in Canada, and Puerto Rico.

**AFFILIATIONS AND CERTIFICATIONS**

**Pennsylvania Insurance Department**

- **Licensed Motor Vehicle Physical Damage Appraiser, License #788577**

**ASE Certification**

- **A1 through A7 certified through 2021**

**GLG (Gerson Lehrman Group) Research Consulting Management Council Member**

- Council Member since 2010
- Paid consultant on various automotive projects including part suppliers, tools, lubricants, repair and industry trends

**MOBILE AIR CONDITIONING SOCIETY (MACS)**
- Certified MACS Air Conditioning Repair, Training and Testing Proctor

**SMART AIR**
- Certified Vehicle Mold Screening Technician

**EDUCATION**

- **B.A. Cabrini College in Communications and Business**                    **May 1988**

# XENTRY TIPS

## Functional impairment of 48 V on-board electrical system

| | |
|---|---|
| Topic number | LI54.10-P-069698 |
| Version | 3 |
| Function group | 54.10 Battery, power supply, voltage converter |
| Date | 01-28-2020 |
| Validity | Model series 257, 213, 238, 167, 290 with code B01 |
| Reason for change | Refining Remedies |
| Reason for block | |

**Complaint:**

1. Instrument cluster message 48 V on-board electrical system battery (G1/3) in yellow or red

2. Vehicle does not start

3. Limp home mode due to high engine operating temperatures

**Cause:**

Cause 1/5: Communication error between 48 V on-board battery G1/3 and DC/DC converter: B183387 in DC/DC converter N83/1

Cause 2/5: Limp home mode with additional symptoms: overheating, A/C blowing hot, and loss of acceleration with fault code: B1873371 The battery for 48V on-board electrical system has a malfunction. The actuator is blocked.

Note: this fault code may include additional 48V system consequential faults although B1873371 is the primary root cause.

Cause 3/5: Red battery light or check engine light without fault B1873371

Cause 4/5: Battery Not found in Quick Test.

Cause 5/5: Fault B183301 in DC/DC or B183349 in 48V battery.

**Remedy:**

Preliminary measures NOTE: It is imperative to document each one of these steps in detail. Some of the remedies will require opening a PTSS case. This information is vital in helping to expedite the diagnostic process.

• Make sure Add-ons are are up to date in Xentry Machine

• Disconnect and inspect all chassis grounds such as W15/5, W15/7, W16/3, W16/4, and W16/5. If painted over, remove all paint such that ring terminal can press flush against bare surface.

• Complete guided test(s) and subsequent physical layer inspection.

• Confirm all 48v components can be actuated via Xentry guided tests: A1 = M75 electrical coolant pump, A2 = M60 Electrical turbo, A3 = A9/5 electric refrigerant (A/C)

# XENTRY TIPS

• Test 12v battery with Midtronics. Document results in case.

• Detach line between DC/DC converter N83/1 and 48 V on-board electrical system battery. Check for: damage, soiling, corrosion,and check resistance of all cable pins (should nearly 0.2 ohms).

• Road test to attempt to duplicate fault. Test drive under as many various driving styles as possible: manual, automatic, slow, aggressive, Comfort, Sport+, etc. SAFETY is more important than testing. Please proceed with caution.

• Make sure to indicate in file names or descriptions the order the uploaded documents occurred.

• If complaint cannot be replicated and this is vehicles first visit clear all fault codes, save new quick test, field test for 20 miles with varying driving styles, and then open PTSS case.

• Upload all relevant documentation from above including:

  1. Screenshots showing completed guided test(s) for Every fault code

  2. Initial quick test

  3. Upload any control unit logs only from relevant control units that have faults


Remedy 1/5 -- if (No start)

  a. If first visit pull Quick Test

    i. If fault code is B183387 in DC/DC converter N83/1

      1. Update Xentry with newest Add-Ons

      2. Inspect Physical layers (grounds, DC/DC to 48v battery connector, etc)

      3. Confirm all 48v components can be actuated via Xentry guided tests

      4. Complete guided test(s) for every fault code--not just 48v

      5. Clear all faults and test drive for 30 miles

        a. If fault B183387 returns = replace battery only

        b. If fault B183387 does not return = release vehicle

        c. If additional faults = open PTSS case.

  b. If second visit open PTSS case


Remedy 2/5 -- if limp home: CEL, overheating, loss of power/acceleration, etc.

  i. If First visit pull Quick Test AND if fault code B183371 The actuator is blocked is present in battery (regardless of other faults)

    1. Update Xentry with newest Add-Ons

    2. Inspect Physical layers (grounds, DC/DC to 48v battery connector, etc)

    3. Confirm all 48v components can be actuated via Xentry guided tests

    4. Confirm completed guided test(s) for every fault code--not just 48v

    5. Disconnect 12V battery more than 10 minutes for hard reset 48V system

6. Clear all faults and test drive for 30 miles

a. If fault B183371 returns = replace battery and DC/DC

b. If fault B183371 does not return = release vehicle

c. If additional faults = open PTSS case

ii. If second or greater visit open TIPS case.

Remedy for 3/5 Battery light or CEL (without limp home mode)

a. If faults any of these faults exist (WITHOUT B183371): B183214, B183216, or B183217

b. Check ground point W106/x or W30/11 exactly (correct torque, damage, soiling)

c. Test drive.

i. If reproducible:

1. unplug all 48 V components individually (on F153/2 disconnect the individual components of circuits 40) and perform a test drive each time.

2. After each test drive, run a quick test to check if any of the 48 V components - except the unplugged ones - are detected as faulty.

a. Try to actuate all components that are still connected.

3. If unable to actuate or detected faulty = replace component.

4. Retest.

ii. If cannot reproduce = release

Remedy for 4/5 and 5/5

a. if 48v battery not found in quick test even though wiring harness G1/3 to N83/1 has no faults

b. OR if fault B183301 in DC/DC

c. OR if fault B183349 in 48v

i. Replace battery only

ii. Update DC/DC converter N83/1 if later software is available.

| Symptoms |
|---|
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery function / Battery discharges |
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery/on-board electrical system display message / Battery/Alternator - Serviced Required |

| Control unit/fault code | | |
|---|---|---|
| Control unit | Fault code | Fault text |

© Copyright Mercedes-Benz AG

# XENTRY TIPS

| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183301 | The battery for the 48V on-board electrical system has a malfunction. There is a general electrical fault. (LIB48_222) |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183217 | The 48V on-board electrical system has a malfunction. The limit value for electrical voltage has been exceeded. |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183216 | The 48V on-board electrical system has a malfunction. The limit value for electrical voltage has not been attained. |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183214 | The 48V on-board electrical system has a malfunction. There is a short circuit to ground or an open circuit. |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183214 | The 48V on-board electrical system has a malfunction. There is a short circuit to ground or an open circuit. (LIB48_222) |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183216 | The 48V on-board electrical system has a malfunction. The limit value for electrical voltage has not been attained. (LIB48_222) |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183217 | The 48V on-board electrical system has a malfunction. The limit value for electrical voltage has been exceeded. (LIB48_222) |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183319 | The battery for the 48V on-board electrical system has a malfunction. The limit value for current has been exceeded. (LIB48_222) |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183371 | The battery for the 48V on-board electrical system has a malfunction. The actuator is blocked. (LIB48_222) |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183371 | The battery for the 48V on-board electrical system has a malfunction. The actuator is blocked. |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183319 | The battery for the 48V on-board electrical system has a malfunction. The limit value for current has been exceeded. |
| N83/1 - DC/DC converter (DDW) (DCDC48_222) | B183301 | The battery for the 48V on-board electrical system has a malfunction. There is a general electrical fault. |

| Parts | | | | | | |
|---|---|---|---|---|---|---|
| Part number | ES1 | ES2 | Designation | Quantity | Note | EPC |
| A 000 901 45 09 | | | 48 V on-board electrical system battery (48 V LIB) G1/3 | 1 | | X |
| A 000 902 49 48 | | | DC/DC converter (DDW) N83/1 | 1 | | X |

| Operation numbers/damage codes | | | | | |
|---|---|---|---|---|---|
| Op. no. | Operation text | Time | Damage code | Note | |
| | | | 540HY 73 | Battery 48 V on-board electrical system - electrical fault | |
| | | | 09803 ** | Electric additional compressor - not determinable | |
| | | | 1500X 92 | Integrated starter alternator short circuit | |
| | | | 5416D 73 | DC/DC converter 48 V on-board electrical system | |

© Copyright Mercedes-Benz AG

# XENTRY TIPS

## Implausible "service due" instrument cluster message, head unit pop-up, or MMC message

| | |
|---|---|
| Topic number | LI00.20-P-070791 |
| Version | 4 |
| Function group | 00.20 Maintenance, service system (FSS, ASSYST) |
| Date | 05-28-2020 |
| Validity | Model series 118, 167, 177, and 247 |
| Reason for change | Remedy updated |
| Reason for block | |

Complaint:

The following customer complaints may be noted:

- "Service A/B Due" message is displayed in the instrument cluster before the appropriate mileage or date is reached
- "Service A/B Due: Do you want to make an appointment?" pop-up message in the head unit display (see attachment) before the appropriate mileage or date is reached
- "Your Mercedes-Benz _ is due for service." MMC service lead email or App message (see attachment) is sent to the customer before the appropriate mileage or date is reached

| Attachments | |
|---|---|
| File | Description |
| MMC service lead email example.jpg | MMC service lead email |
| service lead popup example.jpg | Service Lead head unit popup message |

Cause:

Improper mileage synchronization between the electronic ignition lock (N73), instrument cluster (N133/1), and the central powertrain controller (N127)

Note: The vehicle's odometer as displayed in the instrument cluster is not affected and continues to operate as designed.

Remedy:

At present time updated Central Powertrain Controller (N127) software is available for the following vehicles:

- Model series 118, 177 and 247 equipped with the M260 engine variant
- Model series 167 equipped with the M264 engine variant

Software is still under development for other affected engine variants and models.

| Symptoms |
|---|
| Overall vehicle / Maintenance / Active Service System Plus ASSYST PLUS / Premature indication |

| Attachments |
|---|
| |

© Copyright Mercedes-Benz AG

# XENTRY TIPS

MMC service lead email example.jpg:

**Your Mercedes-Benz A 220 4MATIC Sedan is due for service.**

Dear ▊▊▊

Your Mercedes-Benz A 220 4MATIC Sedan, ▊▊▊▊▊▊▊▊▊, is due for service. Commit to excellence with genuine Mercedes-Benz parts and expert technicians to keep your vehicle running at its very best.

**Service includes:**
• Synthetic motor oil replacement
• Oil filter replacement
• Fluid level checks and corrections based on factory recommended service intervals for your vehicle
• Tire inflation check and correction
• Brake component inspection
• Reset maintenance counter
• Other vehicle and mileage dependent services

To schedule an appointment, please contact Mercedes-Benz of ▊▊▊▊▊▊ or book an appointment online today.

Sincerely,

Mercedes-Benz of ▊▊▊▊

*This message was triggered by sensors within your vehicle.*

Book an Appointment

© Copyright Mercedes-Benz AG

CTENORE

# XENTRY TIPS

service lead popup example.jpg:



# XENTRY TIPS

## Xentry Battery Tester results disagree with workshop assessment

| | |
|---|---|
| Topic number | LI54.10-P-071499 |
| Version | 1 |
| Function group | 54.10 Battery, power supply, voltage converter |
| Date | 08-10-2020 |
| Validity | 118, 177, 247, 167, 205, 213, 217, 222, 238, 253, 257, except code U98 (LITHIUM-IONEN-STARTERBATTERIE (LISB)) |
| Reason for change | |
| Reason for block | |

**Complaint:**

The result from the XENTRY battery test does not match the current state of the battery.

**Cause:**

The XENTRY battery tester uses the stored on-board electrical system data in the SAM module to access the health of the 12 volt battery. The XENTRY battery test may not take into account a single discharge event because the SAM cannot record the data if the battery is discharged.

Note: A discharged battery is not necessarily defective. A discharged battery may be recovered with no permanent damage.

**Remedy:**

1) If the battery is discharged, charge battery. Review WS54.00-P-0037B for minimum charger specifications.

Note the amperage difference between trickle (maintainer) chargers of at least 16A and quick chargers of at least 30A.

Review AP54.10-P-5449U. Note when battery is sufficiently charged the charger current is less 5A.

2) While charging the battery analyze the vehicle data to determine root cause of discharge using the following data points:

A) Review FSAM on-board electrical data conspicuous records

NOTE: For guidance on use of the on-board electrical data please review the AKUBIS video titled "New on-board electrical system diagnosis shown on BR 166". The video can be accessed through WIS by following the path WSM--> content by model series --> passenger cars --> ML-Class --> Model 166 --> group 54 --> New on-board electrical system diagnosis.

B) Customer description

C) Midtronics test

Determine if root cause is due:

• vehicle technical issue?

# XENTRY TIPS

• customer behavior?

• defective battery?


3) If battery still does not accept charge, or if battery is determined to be defective, create a PTSS case.

Must include with case:

A) Amperage setting of charger and time battery was on charger

B) Xentry Battery Tester results

C) Voltage of battery taken with multimeter: Do not connect charger while taking measurements

D) SAM control unit log

E) Midtronics tester results

F) Workshop analysis of conspicuous SAM data

G) Root cause analysis for battery discharge based on the above documents (technical, customer, or defective battery)

NOTE: For expedited results when creating a case write customer complaint as "Xentry Battery Tester implausible".

| Symptoms |
|---|
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery function / Battery discharges |

XENTRY TIPS

# Vehicle does not start / Vehicle cannot be unlocked - starter battery may be discharged

| | |
|---|---|
| Topic number | LI54.10-P-071596 |
| Version | 1 |
| Function group | 54.10 Battery, power supply, voltage converter |
| Date | 08-07-2020 |
| Validity | BR167 |
| Reason for change | |
| Reason for block | |

## Complaint:

- Vehicle does not start / Vehicle cannot be unlocked

- Display message in instrument cluster "Battery - Start Engine - see Operator's Manual"

| Attachments | |
|---|---|
| File | Description |
| Beispiel_Buswachhalter.pdf | Example for reading bus keepawake event from electrical system data |
| Beispiel Kl. 15 EIN_de.pdf | Example for terminal 15 ON |
| example terminal 15 active.pdf | Example for terminal 15 ON |
| example_BUS_keep_awake.pdf | Example for bus keepawake event |

## Cause:

Bus keepawake control units are flagged up by event code U116000 "A bus keepawake control unit has been detected" in the electronic ignition switch (EZS) control unit.

If prolonged CAN activity (40 mins or longer) is evident in the on-board electrical system data, but this is Not flagged by the EZS, go directly to cause 3.

Cause 1. The ESP control unit is keeping the CAN bus awake.

Affected software: A1679020202, A1679025704, A1679026603, A1679021403, A1679028301

Cause 2. Concerns All vehicles with code 631/632/640/641/642

LED Head Light Module control unit is keeping the bus awake.

Affected software: A2479026401

© Copyright Mercedes-Benz AG

XENTRY TIPS

---

Cause 3. Only concerns vehicles with CAN activity lasting 40 minutes or longer, and without DTC U116000 in the EZS

The EZS control unit itself is keeping the bus awake

## Remedy:
Remedy 1. Flash the ESP with the latest software release

Invoice under damage code 43181-72

Remedy 2. Concerns only vehicles with code 631/632/640/641/642

Flash LED Head Light Module control unit with the latest software release.

Invoice under damage code 82B01- 73

Remedy 3. Replace the EZS.

Invoice under damage code 8000N-54

Remedy 4.  Continue with the analysis (create a PTSS case)

The following information is required for the analysis:

- Control unit event log of electronic ignition lock, EZS (N73)

- Control unit event log of SAM-F (N10/6)

- Up-to-date no-load current measurement

For all causes, discuss the following questions with the customer:

- Were there any messages in the instrument cluster?

- Did this behavior occur once only, or has it occurred before?

If so, when (approximately)?

- Was the vehicle parked in a particular location or with high traffic levels?

- Has the vehicle been modified or are there any installations in the vehicle?

| Symptoms |
| --- |
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery function / Battery discharges |
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery function / Battery cannot be charged |
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery/on-board electrical system display message / Low voltage Charge battery |
| Overall vehicle / Power supply / Battery/On-board electrical system / Battery/on-board electrical system display message / Charging |

| Parts | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Part number | ES1 | ES2 | Designation | Quantity | Note | EPC |

---

© Copyright Mercedes-Benz AG

# XENTRY TIPS

| A 001 982 81 08 | | 80 Ah starter battery | 1 | | X |
|---|---|---|---|---|---|
| A 001 982 82 08 | | 92 Ah starter battery | 1 | | X |

| Operation numbers/damage codes | | | | |
|---|---|---|---|---|
| Op. no. | Operation text | Time | Damage code | Note |
| 54-1011 | PERFORM QUICK TEST | | | Use the damage code for the component causing the damage! |
| 54-0640 | CHECK BATTERY SYSTEM (AFTER QUICK TEST) | | | Use the damage code for the component causing the damage! |
| 54-1109 | CHECK CONDITION OF BATTERY | | | Use the damage code for the component causing the damage! |
| 54-1126 | REPLACE BATTERY (AFTER CHECK) | | | Use the damage code for the component causing the damage! |
| 54-0650 | MAINTAIN ON-BOARD ELECTRICAL SYSTEM VOLTAGE (FOR TESTING AND DIAGNOSIS WORK) | | | Use the damage code for the component causing the damage! |
| 54-0991 | PROGRAM CONTROL UNIT ............... (AFTER QUICK TEST) | | | Use the damage code for the component causing the damage! |
| 54-0992 | CODE CONTROL UNIT............. (AFTER QUICK TEST) | | | Use the damage code for the component causing the damage! |
| 54-0645 | CHECK NO-LOAD CURRENT CONSUMPTION | | | Use the damage code for the component causing the damage! |
| 54-2536 | REPLACE ELECTRONIC IGNITION LOCK CONTROL UNIT (AFTER QUICK TEST) | | | Use the damage code for the component causing the damage! |

| WIS-References | | | |
|---|---|---|---|
| Document number | Title | Note | Allocation |
| AR54.10-P-1129LW | Battery - Check condition | | Cause |
| AR54.10-P-1130LW | Charge battery | | Remedy |
| AR54.21-P-0038ME | Remove/install electronic ignition lock control unit | | Remedy |

# COMPLAINT
# EXHIBIT G



4:33

17

+1 (908) 616-5755 ›

No problem!

Today 3:01 PM

They hear the dash noise! Just gotta find it now..

Also, got you a GLE for tomorrow morning.. Are you available to have it swapped out in the morning?

Yeah what time ?

Awesome. I told ya I wasn't nuts !

It sounds like a vibrator

Lololol

Never thought for a sec you were nuts

I know you are up early.. I can probably send it at 8am?

Hahaha. 8 should be good. I'm usually back from dropping kids at schoool by 745

Text Message

10:30 ⏺

< 21

+1 (908) 616-5755 ›

It's not a charger that thing

So far no noise.. Check engine was just software update..

Keep you posted

Got nothing on the buzzing noise.. Shop foreman can't find anything that would have caused it.. Do you want me to hold it and keep trying or prep to have it delivered back?

Kee trying.  I guarantee it's not a software issue.   The noise has been occurring more regularly

Text Message

Q W E R T Y U I O P
A S D F G H J K L
Z X C V B N M

123    space    return

# COMPLAINT
# EXHIBIT H

**From:** Jerry Scattaglia <█████████████>
**Date:** December 30, 2020 at 7:56:46 AM EST
**To:** customer-advocacy.usa@cac.mercedes-benz.com
**Subject: Re: Mercedes-Benz USA Follow-up To Your Contact**

Naportia.  My battery still
Is not in and was delayed again until January.    Action needs to be taken in behalf of MB


Sent from my iPhone


On Dec 14, 2020, at 12:21 PM, Jerry Scattaglia <███████████> wrote:

Portia.  Yet again another issue with MB
That's not my phone number.  My phone number is████████.  Please call me ASAP

Jerry scattaglia

Sent from my iPhone


On Dec 14, 2020, at 12:01 PM, customer-advocacy.usa@cac.mercedes-benz.com wrote:


Dear Gerald Scattaglia,

We appreciate your contact with Mercedes-Benz USA, LLC. I attempted to contact you at ████████
without success. If you still require assistance, please contact me at the telephone number below. If you
reach my voicemail, please leave a message and I will return your call as quickly as possible. Or, if you
prefer, simply reply to this email with your best contact number and availability.

I am typically in the office Monday through Friday from 9:00 AM until 5:00 PM Eastern time. The
Mercedes-Benz Customer Assistance Center is closed on weekends and most major holidays.

I welcome your contact and look forward to speaking with you.


Best Regards,


Naportia
Executive Referral Manager
Mercedes-Benz USA, LLC
(800) 367-6372 (ext. 4613)

When responding, please "reply with history" as this email includes a special thread ID that ensures faster notification and processing of your response. Please be sure to not delete the THREAD ID associated with this e-mail when responding.

[ACTIVITY ID:2-4O0C5WK][CASE ID:2-4MEIT6Q